```
 1

 2

 3

 4

 5

 6              IN THE UNITED STATES DISTRICT COURT FOR THE

 7                    EASTERN DISTRICT OF CALIFORNIA

 8

 9  MANUAL LOPES, et al.,          )        No. CV-F-06-1243 OWW/SMS
                                   )
10                                 )        ORDER GRANTING IN PART WITH
                                   )        LEAVE TO AMEND AND DENYING
11                    Plaintiff,   )        IN PART DEFENDANT GENSKE,
                                   )        MULDER & COMPANY'S MOTION TO
12              vs.                )        DISMISS (Doc. 9) AND
                                   )        DEFENDANT DOWNEY BRAND LLP'S
13                                 )        MOTION TO DISMISS (Doc. 11)
    GEORGE VIEIRA, et al.,         )
14                                 )
                                   )
15                    Defendant.   )
                                   )
16                                 )
```

17       Plaintiffs Manual and Mariana Lopes dba Lopes Dairy; Raymond

18  Lopes, Joseph Lopes and Michael Lopes, individually and dba

19  Westside Holstein; Alvarado Machado and Tony Estevan filed a

20  Complaint on September 11, 2006.  Defendants are George and Mary

21  Vieira; California Milk Market, a California Corporation; Valley

22  Gold, LLC, a California limited liability company; Genske, Mulder

23  LLP, a California limited liability partnership; Anthony Cary;

24  Downey Brand LLP, a California limited liability partnership;

25  Central Valley Dairymen, Inc., a California Food and Agriculture

26

                                   1

1  Nonprofit Cooperative Association (CVD); and Does 1-100.[1]

2       Defendants Genske, Mulder & Company (hereinafter referred to

3  as Genske) and Downey Brand LLP (hereinafter referred to as

4  Downey) have each filed motions to dismiss the Second Cause of

5  Action (securities fraud), the Third Cause of Action (violation

6  of California securities law), the Fifth Cause of

7  Action(negligence) and the Sixth Cause of Action

8  (misrepresentation) for failure to state a claim upon which

9  relief can be granted pursuant to Rule 12(b)(6), Federal Rules of

10  Civil Procedure.[2]

11       A.  <u>BACKGROUND</u>.

12       The Complaint alleges the following summary as an

13  introduction to more specific allegations:

14           1. Plaintiffs are all owners and operators of
             dairy farms located in Merced County,
15           California. Through the machinations of
             George Vieira and his wife, Mary Vieira,
16           facilitated by the gross negligence and/or
             participation of accounting, managerial and
17           legal professionals, more than $20 million
             worth of milk produced by Plaintiffs' farms
18           was diverted from the proper supply channels
             into a criminal enterprise headquartered in
19           New Jersey. As a result, Plaintiffs have
             unnecessarily incurred expenses and other

20

21       [1]The caption to the Complaint lists only Does 1-25.  However,
    Paragraph 41 lists Does 1-100.
22       [2]The First Cause of Action for violation of RICO is alleged
    against Defendants George and Mary Vieira, CMM and Does 1-20.  The
23  Fourth Cause of Action is for rescission of the "milk for equity"
    contracts and is alleged against Defendant Valley Gold and its
24  agents, Defendants George Vieira and Cary.  The Seventh Cause of
    Action is for breach of contract by Plaintiffs individually against
25  CVD, Valley Gold, and Does 61-65, and on behalf of CVD or as
    intended third party beneficiaries of CVD's contracts with CMM and
26  Valley Gold and Does 66-70.

damages, and Plaintiffs not been paid for the milk that they supplied; rather, the proceeds from the sale of their milk has been diverted to the criminal enterprise and to George Vieira and his wife, Mary Vieira, and their company California Milk Market, a California Corporation. George Vieira, Mary Vieira and California Milk Market, in turn, used the diverted proceeds to purchase real estate in at least Stanislaus County, San Joaquin County and Tuolumne County. They have more recently attempted to shelter and hide their ill-gotten proceeds by transferring parcels of real estate to third parties, either acting as nominees or without payment of fair value.

2. The criminal enterprise that George Vieira, Mary Vieira and California Milk Market conspired with and used to divert milk payments from plaintiffs to themselves consisted of an affiliation of cheese manufacturers, bulk buyers of cheese products, and milk product brokers, together with the officers and owners who ran these businesses.

3. The criminal enterprise centered upon a publicly traded company called Suprema Specialties, Inc., and a concerted scheme to inflate the size, profitability, growth and inventory value of Suprema Specialties, Inc. Indeed, from 1996 to 2002, Suprema Specialties, Inc. reported annual double-digit growth in sales and revenues, and it used that reported growth to raise more than $150 million from two public stock offerings and from bank loans. These funds were then largely diverted to individual members of the criminal enterprise.

4. Suprema Specialties, Inc. created the appearance of rapid and steady growth by using fictitious invoices and fictitious purchase orders, in a scheme that the Securities and Exchange Commission dubbed "Round-Tripping." Under the Round-Tripping arrangements, Suprema Specialties, Inc. would pretend to purchase milk and milk products from milk product brokers, ostensibly to manufacture into cheese. Suprema Specialties,

3

Inc. would then issue checks to pay for these orders, but no product was physically shipped. Instead, the milk product brokers and bulk cheese buyers who participated in the criminal enterprise would turn around and pretend to order manufactured cheese products from Suprema Specialties, Inc., which Suprema Specialties, Inc. would report on its books to inflate its sales and accounts receivable. The milk product brokers and bulk cheese consumers would then use the payments that were sent to them from Suprema Specialties, Inc., after deducting commission payments for themselves, to make payments on the fictitious orders, so that Suprema Specialties, Inc. could show regular payments on its fictitious accounts receivable and keep the receivables current – a condition required for Suprema Specialties, Inc.'s large bank loans.

5. In 2001, Suprema Specialties, Inc. reported $420 million in revenues; a substantial portion of those revenues was fictitious. The Securities and Exchange Commission's investigation found that from 1998 to February of 2002, at least $135 million of Suprema Specialties, Inc.'s reported revenue was fictitious.

6. In order to maintain the pretense of growth and profitability, Suprema Specialties, Inc. manufactured cheese and cheese products and it maintained warehouses of inventory. But the actual inventory based upon the actual volume of cheese that Suprema Specialties, Inc. manufactured was too small in relation to its reported volume of sales, and Suprema Specialties, Inc. accordingly cut the cheese with starch fillers and affixed false labels to the inventory, thus fraudulently inflating both the size and the value of the inventory.

7. Additionally, to mask its fraudulent activities, Suprema Specialties, Inc. used the same milk product brokers for its legitimate purchases of milk as it used for its fictitious purchases. This practice, and other steps taken by the criminal enterprise, directly led to plaintiffs' catastrophic

4

loss. The loss primarily falls into four categories.

**SUPREMA'S BANKRUPTCY**

8. Defendant George Vieira was retained by and controlled the day-to-day operations of and business planning for Central Valley Dairymen, an agricultural cooperative through which plaintiffs sold the milk produced by their dairy farms. From November 2001 through March 2002, Mr. Vieira was also the Chief Operating Officer of Suprema Specialties West, Inc., a wholly owned subsidiary of Suprema Specialties, Inc. In addition, Mr. Vieira and his wife Mary Vieira owned and controlled defendant California Milk Market, LLC, one of the milk product brokers that was a member of the criminal enterprise centered around Suprema Specialties, Inc.

9. As part of the criminal enterprise, Mr. Vieira regularly caused Central Valley Dairymen to sell its inventory of milk to Suprema Specialties, Inc., as well as to the related subsidiaries of Suprema Specialties, Inc., all routed through California Milk Market, LLC. Indeed, even when Suprema Specialties, Inc.'s stock was delisted, and after Suprema Specialties, Inc. filed for bankruptcy, Mr. Vieira *still* caused Central Valley Dairymen to sell its inventory of milk to Suprema Specialties West, Inc.

10. For several years, Mr. Vieira actively concealed the implosion of Suprema Specialties, Inc. from plaintiffs, hid from plaintiffs his involvement in the criminal enterprise, and concocted false excuses to explain why plaintiffs had not received payment for the milk that they supplied to Central Valley Dairymen. Within the last year, plaintiffs have discovered the truth – that the milk was diverted without payment to a criminal enterprise, and that on January 7 of 2004, Mr. Vieira and other leaders of the criminal enterprise pled guilty to securities fraud and conspiracy to engage in mail fraud and bank fraud.

11. Because of the bankruptcy of Suprema

Specialties, Inc. and Suprema Specialties West, Inc., caused by the criminal enterprise guided by Mr. Vieira, Plaintiffs have been denied payment for millions of dollars in milk supplied through Central Valley Dairymen to California Milk Market, Suprema Specialties, Inc. and Suprema Specialties West, Inc.

**LOSS OF FUND PROTECTION**

12. In 1987, the State of California established the Milk Producers Trust Fund to provide protection to dairy farmers like Plaintiffs. The fund guarantees that California milk producers will be paid for their milk as long as the milk is sold to a bonded California processor. However, the Fund does not cover milk sales that are handled by a broker; and the Fund does not cover milk that is sold to a processor in which the producer holds a beneficial interest.

13. Mr. Vieira, while purporting to act as a fiduciary agent for Central Valley Dairymen and its dairy farm members (including Plaintiffs), routed a substantial portion of the agricultural cooperative's supply of milk through California Milk Market, a milk brokerage owned and controlled by Mr. Vieira and his wife. By routing milk through California Milk Market, these defendants caused Plaintiffs to lose the protection of the Milk Producers Trust Fund. This loss of Trust Fund protection only added to Plaintiffs' staggering losses.

**CHURNING**

14. Additionally, as part of the Round-Tripping scheme centered around Suprema Specialties, Inc., California Milk Market engaged in the fictitious sale of milk on behalf of Central Valley Dairymen to Suprema Specialties, Inc. or its subsidiary, Suprema Specialties West, Inc. Because these fictitious sales did not actually occur, California Milk Market and Central Valley Dairymen maintained excess milk inventory that needed to be shipped to other

6

processors.

15. To mask the fraudulent Round-Tripping scheme, California Milk Market and the criminal enterprise prepared false paperwork stating that the milk comprising the excess inventory had been shipped to Suprema Specialties, Inc. and its subsidiary, but that the milk failed to meet quality requirements, resulting in the milk being rejected by the processor and returned to Central Valley Dairymen. With the fictitious transaction masked in this fashion, California Milk Market and its owners and operators would then broker the milk to another legitimate processor.

16. With each transaction, however, California Milk Market collected a brokerage fee, and Plaintiffs are informed and believe, and thereon allege, that California Milk Market, George Vieira and Mary Vieira also created fictitious shipping invoices diverting to themselves payment for transport costs that in reality were never incurred. With the slew of fictitious transactions, California Milk Market accordingly collected fees that it had not earned, and diverted further sums that rightfully belonged to Plaintiffs into the hands of George Vieira and Mary Vieira.

CREATION OF VALLEY GOLD, LLC

17. In addition, the criminal enterprise centered around Suprema Specialties, Inc. was so lucrative and successful that Mr. Vieira decided in the summer of 2003, after the collapse of Suprema Specialties, Inc., to recreate the scheme. To do so, however, he needed to find or create a cheese manufacturer to replace Suprema Specialties' role in the fraudulent scheme.

18. By mid 2003, it was clear that the artificially inflated sales of Suprema Specialties, Inc. and its subsidiaries could no longer be maintained. Indeed, in early 2003, George Vieira was already engaged in negotiations with the U.S. Attorney's offices about pleading guilty to securities fraud for

7

his participation in the criminal enterprise's scheme to inflate the stock price of Suprema Specialties, Inc. through the use of fictitious Round-Tripping transactions. On March 28, 2003, the U.S. Attorneys Office sent a seven page letter to Mr. Vieira's attorney stating the materials [sic] terms of the plea deal. Mr. Vieira signed the letter indicating his consent to the plea terms on August 26, 2003.

19. Seeing the inevitable end to the lucrative enterprise with Suprema Specialties, Inc., Mr. Vieira conceived of a new plan to repeat the scheme with a new captive cheese manufacturer.

20. In the summer of 2003, Mr. Vieira thus proposed to Plaintiffs and other members of Central Valley Dairymen that they form a new entity, defendant Valley Gold, LLC, and through that entity purchase the moth-balled Land-O-Lakes processing facility located in Gustine, California.

21. Mr. Vieira personally spearheaded this proposal, but he also enlisted the assistance of Genske-Mulder LLP and Downey Brand LLP. Genske-Mulder was and remains a professional partnership that specializes in providing complete accounting, tax and consulting services for he [sic] dairy industry. Their roster of clients included Central Valley Dairymen and many of its individual diary [sic] farm members, including Plaintiffs. They purportedly reviewed and helped prepare the business plan for Valley Gold, LLC, and recommended that Plaintiffs both invest in Valley Gold, LLC and supply Valley Gold, LLC with milk. Defendant Downey Brand LLP is a California law partnership, and it was retained by Mr. Vieira to assist in the formation of Valley Gold, LLC. Genske-Mulder and Downey Brand also prepared a prospectus and offering memorandum to market and sell shares of Valley Gold, LLC, including detailed financial forecasts, a detailed business plan, and disclosures required by Federal Securities law. A true and correct copy of one of the prospectuses is attached hereto as Exhibit A. A true and correct copy

8

of the offering memorandum is attached hereto as Exhibit B.

22. Plaintiffs, individually and through Central Valley Dairymen, were induced to invest more than $1 million for the formation of Valley Gold, LLC; and Plaintiffs were also induced to supply milk to Valley Gold, LLC and to personally guarantee Valley Gold, LLC's bank loans. The numerous representations made to Plaintiffs to induce this action, including those in the prospectus and offering memorandum, were materially false and misleading.  Defendants did not even notify the Plaintiffs that Valley Gold, LLC was not bonded, or that by becoming investors in Valley Gold, LLC, any sale of Plaintiffs' milk to Valley Gold, LLC would *not* be covered by the Milk Producers Trust Fund.

23. On January 7, 2004, George Vieira concluded his negotiations with the U.S. Attorney's office and pled guilty for his criminal involvement in the scheme to inflate the apparent profitability of Suprema Specialties, Inc., and he was shortly afterward barred from working in the dairy and cheese business, including being barred from his role as the chief operating officer of Valley Gold, LLC. Mr. Vieira did not disclose this information but instead allowed Valley Gold, LLC to default on its bank loans and on its purchase obligations for the Land-O-Lakes facility. The facility was foreclosed, and the bank loans were placed in default.

24. As a result, Plaintiffs again were left without payment for millions of dollars worth of milk; they lost their cash investment in Valley Gold, LLC; and they were sued by the banks on their personal guarantees.

25. Plaintiffs are unsophisticated dairy farmers, and they relied upon the professional advice and supposed expertise not only of Mr. Vieira, but also of Downey Brand, Genske-Mulder and Anthony Cary. The professionals, however, all chose to parrot Mr. Vieira's assurances that he was acting to

protect Plaintiffs' interests and maximize
the value of their milk; and not a single
professional had the courage to stand up and
report the irregularities of Mr. Vieira's
proposals, the colossal and unnecessary risks
involved in the proposed business venture, or
even the fact that Mr. Vieira was actively
negotiating with the U.S. Attorney's office
to plead guilty to securities and bank fraud.

26. Those who were charged with protecting
Plaintiffs' interests instead actively
allowed Plaintiffs to be bilked out of more
than $20 million.

Genske is alleged to specialize in providing complete
accounting, tax and consulting services for the dairy industry
and to have provided the following services to its clients,
including CVD, Valley Gold and many of the Plaintiffs: (1) annual
and long-term tax planning; (2) cash flow management; (3)
breakeven analysis; (4) industry standards; (5) financial goal
setting; (6) financial forecasts and projections; (7) management
advisory services; (8) investment review; and (9) cash flow
analysis for expansion or restructuring.  ¶ 36.  Genske is
alleged to have received direct financial benefit from
Plaintiffs, CVD and Valley Gold and, with the assistance of
Defendant Anthony Cary, an attorney practicing in Sacramento, and
Defendant George Vieira, "prepared financial projections for the
purpose of attracting investors to VALLEY GOLD, and ... actively
participated in the preparation of a prospectus to attract
investors for VALLEY GOLD, including the preparation of grossly
negligent financial forecasts for the operation of VALLEY GOLD."
¶ 37.  The Complaint alleges that Genske, with Vieira and Cary,

"acted in an advisory capacity with regard to CVD's investment in VALLEY GOLD, and the individual investments made in VALLEY GOLD" by Plaintiffs.   ¶ 38.

Downey is alleged to have been "retained by CVD and/or VALLEY GOLD, particularly to take the lead in preparing a prospectus for the offering of securities for VALLEY GOLD and thereafter in creating a (blatantly illegal) proposal for Plaintiffs to forego payment for milk supplied to VALLEY GOLD in exchange for worthless additional ownership interests in VALLEY GOLD - at a time when it should have been clear to defendants that GEORGE VIEIRA's plans for VALLEY GOLD were destined to fail."  ¶ 40.

B.  <u>GOVERNING STANDARDS</u>.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001).  Dismissal of a claim under Rule 12(b)(6) is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from

11

them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003). Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980). When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir.1988).

   C. **DERIVATIVE ACTIONS**.

   Genske moves to dismiss the Complaint to the extent that Plaintiffs purport to bring derivative actions on behalf of CVD and Valley Gold.[3]

_____

[3]Although not raised by the moving defendants, a threshold issue is whether the individual Plaintiffs may bring a derivative action on behalf of CVD as well as suing CVD as a defendant in this action. As explained in Witkin, 9 *Summary of California Law*, Corporations, § 173 (10th Ed.):

> The normal joinder rules for multiple plaintiffs apply in actions brought by shareholders ... Thus, a shareholder bringing a derivative action may not join an individual cause of action unless the shareholder's injury arises out of the same transaction or

The Complaint alleges that Defendant CVD "is a non-profit cooperative association ... formed ... pursuant to the provisions of Chapter 1, Division 20 of the California Food and Agricultural Code, the Capper-Volstead Act (7 U.S.C.A. §§ 291-292), and the Cooperative Marketing Act (7 U.S.C.A. § 451, et seq.)." ¶ 31.   It is further alleged that "Defendant CVD, at all times material herein, marketed and brokered Plaintiffs' product (milk), on Plaintiffs' behalf, pursuant to CVD's Bylaws, and statute" and that "[t]his agreement was created pursuant to the terms, conditions, and prevailing rates established by the California Department of Food and Agriculture."   ¶ 32.   The Complaint further alleges in pertinent part:

### DERIVATIVE RIGHTS

43. As a non-profit cooperative association

---

occurrence and has its origin in circumstances independent of the plaintiff's status as a shareholder, i.e., a breach of a director's duty owed to the shareholder personally ....

When managing officers are charged with malfeasance or negligence that results in a loss of assets, this is an injury to the corporation that may be redressed in a derivative action.   However, despite loss in share value, a shareholder has no personal action for indirect injuries in this type of case ....

However, the facts may justify a personal action by a shareholder even though the corporation may also have a cause of action for the same wrong.   Witkin, *id.*, § 174; *see, e.g., Jones v. H.F. Ahmanson & Co.*, 1 Cal.3d 93, 106-107 (1969); *Denevi v. LGCC, LLC,* 121 Cal.App.4th 1211, 1221-1222 (2004).   Because the moving defendants did not raise this ground in their respective motions and because resolution of the issue may depend upon the facts, this issue is not addressed further in this Order.

formed pursuant to the provisions of Chapter 1 of Division 20 of the California Food and Agricultural Code, the Capper-Volstead Act (7 U.S.C.A. §§291-292), and the Cooperative Marketing Act (7 U.S.C.A. §451, et seq.), CVD operates on behalf of and for the benefit of its member dairies, collecting proceeds from the sale of milk for the member dairies, and holding those proceeds in trust and for the benefit of the member dairies. CVD and its managers, consultants and employees thus are fiduciary trustees owing duties of care and loyalty directly to the members of CVD, including Plaintiffs.

44. Moreover, as a non-profit agricultural cooperative association, and pursuant to section 54173 of the California Food and Agricultural Code, CVD acted as the agent for its member dairies in marketing, selling, storing and handling the milk produced by the member dairies; and the directors, officers, consultants and professionals retained by CVD were accordingly subagents, owing direct duties of care and trust to the member dairies, including Plaintiffs.

45. In providing services to CVD, defendants GENSKE-MULDER, CARY, GEORGE VIEIRA and DOWNEY BRAND therefore assumed duties of care and loyalty directly to Plaintiffs, and each of them.

46. In an abundance of caution, however, and to the extent that the claims asserted by Plaintiffs are derivative of the rights of CVD, then Plaintiffs pursue those rights on behalf of CVD and accordingly add CVD as an involuntary party to this lawsuit so that the full rights of CVD can be adjudicated and any recovery distributed, as the Court ultimately deems appropriate, to the members of CVD.

47. CVD continues to be controlled by GEORGE VIEIRA and/or his affiliates and those beholden to his desires, and it would thus be futile for Plaintiffs to make a demand upon CVD or its directors to pursue the relief sought in this lawsuit. Indeed, another group of former CVD member dairies has previously instituted legal proceedings based upon the

14

general criminal scheme described above, and CVD has demonstrated its hostility to its own member dairies and its refusal to hold its managers, consultants, professionals and accountants responsible for their misdeeds and omissions by actively opposing the claims instead of cooperating in securing redress for its members.

48. VALLEY GOLD also continues to be controlled by GEORGE VIEIRA, and it would likewise be futile for Plaintiffs to make a demand upon VALLEY GOLD to pursue the relief sought in this lawsuit. Apart from GEORGE VIEIRA, Plaintiffs know of no person or entity has any present control over the operations of VALLEY GOLD.

49. To the extent that the claims asserted by Plaintiffs are derivative of the rights of VALLEY GOLD, then Plaintiffs pursue those rights on behalf of VALLEY GOLD and accordingly add VALLEY GOLD as an involuntary party to this lawsuit so that the full rights of VALLEY GOLD can be adjudicated and any recovery distributed, as the Court ultimately deems appropriate, to the members of VALLEY GOLD.

Plaintiffs point to the allegations in Paragraph 43 of the Complaint:

CVD operates on behalf of and for the benefit of its member dairies, collecting proceeds from the sale of milk for the member dairies, and holding those proceeds in trust and for the benefit of the member dairies.  CVD and its managers, consultants and employees thus are fiduciary trustees owing duties of care and loyalty directly to the members of CVD, including Plaintiffs.

Plaintiffs assert that they have alleged derivative claims on behalf of CVD out of an abundance of caution "in the event that we were wrong, and that contrary to our belief, Central Valley Dairymen is treated as a normal corporation for purposes of

15

pursuing derivative claims."  Plaintiffs further contend:

> The problem with defendants' [sic] motion is
> that it seeks to have it both ways.  On the
> one hand, defendants [sic] agree that Central
> Valley Dairymen cannot sue them (and thus
> plaintiffs' cannot sue derivatively on
> Central Valley Dairymen's behalf).  But on
> the other hand, they argue that their duties
> only were to Central Valley Dairymen, and not
> to the individual plaintiffs.

> The law cannot be so fickle that it would
> wholly deny recourse for a fraud perpetrated
> on an agricultural cooperative.  Of course,
> if defendants are willing to concede that
> their duties flowed to the individual
> plaintiffs, then there is no need for use to
> present derivative claims on behalf of
> Central Valley Dairymen.  But otherwise, we
> stand by the pleading that we presented 'in
> an abundance of caution.'

Chapter 1, Division 20 of the California Food and
Agricultural Code, Sections 54001-54291, pertains to nonprofit
cooperative associations.  Section 54002 defines the term
"association" to mean "any corporation which is organized
pursuant to this chapter."  The term "member" "includes members
of associations without capital stock and holders of common stock
in associations which are organized with shares of stock."
Section 54003.  Section 54040 provides:

> The General Corporation Law (Division 1
> (commencing with Section 100) of Title 1 of
> the Corporations Code) as added by Chapter
> 682 of the Statutes of 1975 and as heretofore
> or hereinafter amended and all powers and
> rights under such law applies to each
> association which is organized pursuant to
> this chapter; except where such provisions
> are in conflict with or inconsistent with the
> express provisions of this chapter.  For the
> purposes of associations organized without
> shares of stock, the members shall be deemed

16

to be 'shareholders' as the term is used in
the General Corporation Law.

Sections 54081-54083 pertain to Articles of Incorporation;
Sections 54111-54122 pertain to Bylaws; Sections 54141-54150
pertain to Directors and Management; Sections 54141-54182 pertain
to the powers of the nonprofit cooperative association; and
Sections 54231-54239 pertain to members or stockholders.
"Nonprofit cooperative associations are similar to private
corporations, in that they are distinct and separate entities,
and except where specific provisions apply, they are governed by
the general corporation law.  44 Cal.Jur.3d, Marketing
Associations, § 5.

These statutory provisions establish that under California
law, CVD is treated as a corporation and that Plaintiffs'
contention that CVD is treated as a trust owing fiduciary duties
as a trustee to its members is legally unsustainable.

California Corporations Code § 800 pertains to shareholder
derivative actions.  Section 800(a) defines the term
"corporation" to include "an unincorporated association"; the
term "board" to include "the managing body of an unincorporated
association"; the term "shareholder" to include "a member of an
unincorporated association"; and the term "shares" to include
"memberships in an unincorporated association".  "The statute
dealing with derivative actions by corporate shareholders, by
defining 'corporation' to include an unincorporated association
and 'shareholder' to include a member of an unincorporated

17

association, is applicable to actions brought by members of unincorporated associations."  7 Cal.Jur.3d, Associations and Clubs, § 56; *see also* Harl, 14 *Agricultural Law*, § 131.06[3].

Although no California case involving a derivative action on behalf of a member or shareholder of a nonprofit cooperative association within the meaning of the relevant provisions of the Food and Agricultural Code was discovered through independent research, by express statutory provision, CVD is treated as a corporation under California law and its members may bring a derivative action on its behalf of the cooperative if they allege compliance with the requirements of the California Corporations Code.

Corporations Code § 800(b) provides:

> No action may be instituted or maintained in right of any domestic ... corporation by any holder of shares or of voting trust certificates of the corporation unless both of the following conditions exist:
>
> (1) The plaintiff alleges in the complaint that plaintiff was a shareholder, of record or beneficially, or the holder of voting trust certificates at the time of the transaction or any part thereof of which plaintiff complains or that plaintiff's shares or voting trust certificates thereafter devolved upon plaintiff by operation of law from a holder who was a holder at the time of the transaction or any part thereof complained of; provided, that any shareholder who does not meet these requirements may nevertheless be allowed in the discretion of the court to maintain the action on a preliminary showing to and determination by the court, by motion and after a hearing, at which the court shall consider such evidence, by affidavit or testimony, as it deems material, that (i)

18

there is a strong prima facie case in favor
of the claim asserted on behalf of the
corporation, (ii) no other similar action has
been or is likely to be instituted, (iii) the
plaintiff acquired the shares before there
was disclosure to the public or to the
plaintiff of the wrongdoing of which
plaintiff complains, (iv) unless the action
can be maintained the defendant may retain a
gain derived from defendant's willful breach
of a fiduciary duty, and (v) the requested
relief will not result in unjust enrichment
of the corporation or any shareholder of the
corporation; and

(2) The plaintiff alleges in the complaint
with particularity plaintiff's efforts to
secure from the board such action as
plaintiff desires, or the reasons for not
making such effort, and further alleges that
plaintiff has either informed the corporation
or the board in writing of the ultimate facts
of each cause of action against each
defendant or delivered to the corporation or
the board a true copy of the complaint which
plaintiff proposes to file.

Rule 23.1, Federal Rules of Civil Procedure, provides:

In a derivative action brought by one or more
shareholders or members to enforce a right of
a corporation or of an unincorporated
association, the corporation or association
having failed to enforce a right which may
properly be asserted by it, the complaint
shall be verified and shall allege (1) that
the plaintiff was a shareholder or member at
the time of the transaction of which the
plaintiff complains or that the plaintiff's
share or membership thereafter devolved on
plaintiff by operation of law, and (2) that
the action is not a collusive one to confer
jurisdiction on a court of the United States
which it would not otherwise have.  The
complaint shall also allege with
particularity the efforts, if any, made by
the plaintiff to obtain the action the
plaintiff desires from the directors or
comparable authority and, if necessary, from
the shareholders or members, and the reasons
for the plaintiff's failure to obtain the

19

> action or for not making the effort.  The
> derivative action may not be maintained if it
> appears that the plaintiff does not fairly
> and adequately represent the interests of the
> shareholders or members similarly situated in
> enforcing the right of the corporation or
> association.  The action shall not be
> dismissed or compromised without the approval
> of the court, and notice of the proposed
> dismissal or compromise shall be given to
> shareholders or members in such manner as the
> court directs.

A shareholder seeking to vindicate the interests of a corporation

through a derivative suit must first demand action from the

corporation's directors or plead with particularity the reasons

why such demand would have been futile.  *In re Silicon Graphics*

*Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir.1999).  Rule 23.1,

however, does not establish the circumstances under which demand

would be futile.  *See Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S.

90, 96 (1991).  The law of the state of incorporation determines

these standards.  *In re Silicon Graphics, id.* at 990.

Genske argues that the Complaint fails to allege that

Plaintiffs made a demand on CVD or Valley Gold to assert the

claims alleged and that the Complaint at Paragraphs 47-48 makes

only the most cursory allegations that CVD and Valley Gold

continue to be controlled by Vieira and, thus, a demand is

excused by Section 800(b)(2).

As explained in *Country National Bank v. Mayer*, 788 F.Supp.

1136, 1144 (E.D.Cal.1992):

> A derivative action is a suit brought on
> behalf of a corporation in order to redress a
> grievance suffered by the corporation ...
> Under California law, such an action

20

> ordinarily must be instituted by the
> directors of the corporation ... The so-
> called 'business judgment rule' provides that
> the judgment of shareholders and courts
> cannot supplant the decisions of the
> directors of a corporation relative to the
> day-to-day management of the corporation ...
> 'Under this rule, a director is not liable
> for a mistake in business judgment which is
> made in good faith and in what he or she
> believes to be the best interests of the
> corporation, where no conflict of interest
> exists.' ....

> 'The business judgment rule applies to all
> discretionary decisions by the board,
> including the decision not to pursue a cause
> of action.' ... Because of the rule, a
> shareholder must plead and prove that he has
> made a demand upon the directors to act and
> that they refused or failed to act ... If the
> board refuses in good faith and in the
> reasonable exercise of its business judgment
> to commence the action, the shareholder may
> not institute the action.

Plaintiffs argue that the Complaint adequately alleges that compliance with the demand requirement of Section 800 would have been futile with regard to CVD and Valley Gold.  Plaintiffs cite *Reed v. Norman*, 152 Cal.App.2d 892, 898 (1957):

> While it is the general rule that in a
> derivative action the plaintiff must plead a
> demand upon and refusal by the directors to
> act, it is equally well settled that such
> demand and refusal need not be alleged if the
> facts pleaded demonstrate such a demand would
> have been futile.

**Judge Karlton in** *Country National Bank* **explains:**

> The precomplaint demand requirement may be
> excused when the plaintiff demonstrates that
> demand would be 'futile' ... Many decisions
> by the California courts interpreting the
> futility exception to the demand requirement
> are of little assistance in disposing of the
> matter at bar since they discuss the

21

> substantive requirements in light of
> California's pleading standard.  Nonetheless,
> upon close examination of California
> decisions, certain standards emerge.  Without
> question, futility is demonstrated under
> California's substantive law where the
> directors are involved or not disinterested
> in the actions for which plaintiff seeks
> relief ... Moreover, a case which preceded
> California's current pleading requirement
> reveals that allegations of domination of the
> board by a president of a corporation who is
> adverse to plaintiff's position suffice to
> demonstrate futility.  *See Wickersham v.*
> *Crittenden*, 106 Cal. 329 ... (1895)(it was
> 'averred in the complaint, as a reason for
> not making a request of the directors of the
> bank to bring this action that the directors
> were all under the control of Crittenden and
> acting in conjunction with him'); *see also*
> *Miles v. McFarland*, 104 Cal.App. 513, 519 ...
> (1930)(demand futile where plaintiff alleges
> corporation is in hands of hostile
> representative).  When demand is excused, the
> court suspends deference to the directors'
> business judgment because the board as a unit
> is unable to fulfill its role as the
> corporation's decisionmaker.

788 F.Supp. at 1144-1145.

In *Shields v. Singleton*, 15 Cal.App.4th 1611, 1622 (1993), the Court of Appeals explained:

> [T]he general allegations which plaintiff
> here indiscriminately levels against all the
> directors of the Company are insufficient to
> establish that demand on the board would have
> been futile.  As the court below noted, in
> order to evaluate the demand futility claim,
> the court must be apprised of facts specific
> to each director from which it can conclude
> that that particular director could or could
> not be expected to fairly evaluate the claims
> of the shareholder plaintiff.  'The task of
> demanding action ... is not onerous.  No
> policy recommends eviscerating the demand
> requirement as plaintiff would have us do.'
> (*Greenspun v. Del E. Webb Corp.* (9th
> Cir.1980) 634 F.2d 1204, 1210).

22

The allegations in Paragraph 48 concerning the futility of a demand on Valley Gold satisfy the requirements of California law and Rule 23.1.  It is alleged that Valley Gold is controlled by Defendant Vieira and that "Plaintiffs know of no other person or entity that presently has any control over the operations of VALLEY GOLD."

However, the allegations in Paragraph 47 do not satisfy the requirements of California law and Rule 23.1 concerning futility. The allegations are conclusory.  Plaintiffs must allege with specificity facts with regard to each director of CVD from which it may be inferred that the particular director could or could not be expected to fairly evaluate the claims that Plaintiffs seek to prosecute in a derivative action on behalf of CVD, and Plaintiffs must describe with more particularity the lawsuit allegedly brought by other members of CVD which CVD allegedly actively opposed.

The motion to dismiss the Complaint to the extent that Plaintiffs purport to bring derivative actions on behalf of CVD is GRANTED WITH LEAVE TO AMEND.

D.   <u>SECOND CAUSE OF ACTION FOR SECURITIES FRAUD</u>.

The Second Cause of Action is alleged by Plaintiffs individually and on behalf of CVD against Genske, Downey, Cary, Valley Gold, Vieira and Does 21 through 40.  After incorporating all preceding allegations, the Second Cause of Action alleges that these Defendants prepared a prospectus in late April 2003 that was used to market and sell security interests in Valley

Gold, including to Plaintiffs.   ¶ 63.  The "prospectus", which is captioned "Valley Gold, LLC Business Plan", is attached to the Complaint as Exhibit A.  Defendants are alleged to have also prepared an Offering Memorandum that was provided to potential investors.  The Offering Memorandum, captioned "Confidential Private Offering Memorandum" is attached to the Complaint as Exhibit B.  *Id.*  The interests procured from Plaintiffs in the form of membership interests in Valley Gold are alleged to constitute securities within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934 "because Plaintiffs were induced to invest their money (and later their rights to payment for milk) into a common enterprise from which they expected to earn profits through the efforts and acumen of others, namely GEORGE VIEIRA and the other officers and employees of VALLEY GOLD."  ¶ 64.  Defendants are alleged to have been "sellers" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934,

> 65.   ... because the injury suffered by Plaintiffs by purchasing security interests in VALLEY GOLD flowed directly and proximately from the actions and representations of these defendants. These defendants also actively participated in the sale of ownership interests in VALLEY GOLD to Plaintiffs and were motivated by a desire to serve their own financial interests. GEORGE VIEIRA was motivated to secure the income from being an employee and the managing member of VALLEY GOLD as well as from his plan to use VALLEY GOLD as a vehicle to continue the fraudulent Round-Tripping transactions that he had so lucratively engaged in with the criminal RICO enterprise discussed above.  GENSKE-MULDER was motivated

by its anticipation of securing income as a paid consultant and as the primary accounting firm for VALLEY GOLD — an anticipation that was cemented by the close relationship between GEORGE VIEIRA and equity partners of GENSKE-MULDER. Defendant DOWNEY BRAND was motivated by the anticipation and promise that it would be attorneys for and be paid for the rendition of legal services to VALLEY GOLD and because GEORGE VIEIRA was using the funds of CVD to pay for the services in forming and soliciting investors for VALLEY GOLD, a payment source that could only be justified as a legitimate business expense for CVD if VALLEY GOLD was successfully formed, launched and sufficiently funded to begin operations.

66. In addition to the purchases of VALLEY GOLD as part of its initial formation, in or about late September of 2003, defendants GEORGE VIEIRA, GENSKE-MULDER, CARY and DOES 41 through 50 also induced Plaintiffs and CVD to enter into illegal and unlawful agreements to exchange milk (or accounts receivable owed to them for milk) for additional equity ownership interests in VALLEY GOLD.

67. The reason the "milk for equity" contracts were illegal and unlawful is because California Food and Agricultural Code sections 62191, 62196 and 62200 require (a) that milk producers be paid for milk solely in cash or with checks that are reduceable to cash in no more than one business day; (b) that payment be made in very short time periods (roughly 15 days); and (c) that failing to abide by these requirements and endeavoring to use *any* other payment arrangement is an unlawful business practice.

68. In inducing Plaintiffs to enter into contracts to exchange milk for equity (in the general form of the contribution agreement attached hereto as Exhibit C and the assignment agreement attached hereto as Exhibit D), defendants GEORGE VIEIRA, GENSKEMULDER [sic], CARY and DOES 41 through 50 falsely represented to Plaintiffs:

        (a) that the contracts were proper

25

and lawful;

(b) that CVD was contractually required to supply milk to VALLEY GOLD and if Plaintiffs stopped supplying their milk to CVD and switched to another agricultural cooperative, they would be violating the law and subject to substantial fines and penalties;

(c) that VALLEY GOLD was doing well and had sizeable orders that ensured that Plaintiffs would earn significantly more from their increased ownership in VALLEY GOLD than they were owed for their milk.

69. These representations were false, and were made be [sic] defendants in order to induce Plaintiffs and CVD to purchase additional equity ownership interests in VALLEY GOLD in exchange for milk.

70. Defendants GEORGE VIEIRA, CARY, GENSKE-MULDER, DOWNEY BRAND and DOES 21 through 40 were also "sellers" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934 because they actively solicited Plaintiffs to purchase interests in VALLEY GOLD.

71. In violation of the Securities Act of 1933, the Securities Exchange Act of 1934, Exchange Act Rule 10b-5 enacted under the regulatory authority of the Securities and Exchange Commission and the Sarbanes-Oxley Act of 2002, the prospectus and the Offering Memorandum and the related materials and communications supplied by these defendants to Plaintiffs, including the materials used to induce plaintiffs to enter into the "milk for equity" contracts, contained material misrepresentations and omissions of material facts that caused the communications to Plaintiffs to be materially misleading, and constituted a fraudulent and deceitful manipulation and contrivance of the regulatory requirements enacted under the Federal Securities laws for the protection of parties like Plaintiffs.

26

72. The prospectus and the Offering Memorandum and the related materials and communications supplied by these defendants to Plaintiffs, including the materials used to induce plaintiffs to enter into the "milk for equity" contracts contained, [sic] served as manipulative and deceptive devices and contrivances intended to contravene the rules and regulations of the Securities and Exchange Commission as necessary and appropriate for the protection of investors, and thus violated section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §78j(b).)

73. Plaintiffs purchased securities in VALLEY GOLD, both individually and through CVD, in direct reliance upon the misleading, false, incomplete and deceptive prospectus and Offering Memorandum and related communications supplied by these defendants, including the materials used to induce plaintiffs to enter into the "milk for equity" contracts, aquicint [sic] securities in VALLEY GOLD directly from VALLEY GOLD as the issuer of the securities.

74. Among other material misrepresentations and material omissions of material facts, these materials:

a. Stressed that VALLEY GOLD's success was dependent upon the unique "experience and abilities of Mr. [George] Vieira [and two associates]" without disclosing that Mr. Vieira's unique experience was not formed in the successful production of cheese products, but rather in the concoction of fictitious cheese products and cheese diluted with starch fillers manufactured not for commercial success with consumers, but rather to inflate the apparent inventory value and sales volume of a by then bankrupt cheese manufacturer, for the sole purpose of perpetuating a hundreds of million dollar securities fraud on securities investors situated similarly to

27

Plaintiffs;

b. Disclosed that Mr. Vieira had been contacted by the U.S. Attorney's Office as part of its investigation into the bankruptcy of Suprema Specialties, Inc., without disclosing that GEORGE VIEIRA was already actively involved in negotiations with the United States Attorney's Office to plead guilty to securities and bank fraud;

c. Failed to disclose that VALLEY GOLD was unbonded and not qualified to participate in the Milk Producers Trust Fund, which was a standard requirement for securing reliable supplies of milk product – necessary for legitimate cheese production facilities (but less important for sham facilities organized to fleece investors and banks without ever achieving commercial success);

d. Failed to disclose that if Plaintiffs became investors in VALLEY GOLD, their supplies of milk to VALLEY GOLD would in any event fail to qualify for the protections of the Milk Producers Trust Fund;

e. Included financial projections supplied by GENSKE-MULDER that vastly exceeded the performance of any startup cheese manufacturer, with the possible exception of Suprema Specialties, Inc., whose dramatic reported growth was by then known in the financial community (but not to Plaintiffs) to have been the result of smoke, mirrors and a fraudulent Round-Tripping scheme orchestrated by a criminal enterprise headquartered in New Jersey.

75. Plaintiffs are informed and believe, and thereon allege, that GENSKE-MULDER, GEORGE

28

VIEIRA and DOWNEY BRAND and DOES 21 through 40 all actively collaborated on preparing the prospectus and the Offering Memorandum that was supplied to Plaintiffs and that were instrumental in inducing Plaintiffs and CVD to purchase initial equity interests in VALLEY GOLD. Indeed, Plaintiffs have very recently discovered that some or all of these defendants participated in meetings and electronic communications to discuss the best way to conceal from Plaintiffs and CVD that GEORGE VIEIRA had, one month earlier, reached an agreement with the office of the United States Attorney to plead guilty to securities fraud and to a conspiracy to commit bank and mail fraud — the active criminal conspiracy centered on the Round-Tripping scheme that led to the collapse of Suprema Specialties, Inc. and its subsidiaries.

76. The terms of the negotiated plea bargain were spelled out in a seven-page letter dated March 28, 2003 from the U.S. Attorney's Office to GEORGE VIEIRA's attorney. And the plea deal (that was formally entered on January 4, 2004), barred GEORGE VIEIRA from acting as an officer or director of any company issuing registered securities under the Securities Exchange Act of 1934.

77. In the prospectus, however, defendants disclosed none of this vital information. Indeed, in the prospectus, defendants pretended that the implosion of Suprema Specialties, Inc. and its subsidiaries provided an *advantage* for the proposed business of VALLEY GOLD because as "one of the larger producers of ricotta in the state" a market void and thus a market opportunity was created when "Suprema Specialties, Inc. ceased operations in 2002." The prospectus failed to mention that Suprema Specialties ceased business because its fraudulent practices, inflated sales and falsified inventory forced it into bankruptcy; and the prospectus failed to mention that as much as 87% of the purported cheese production by Suprema Specialties that led defendants to characterize it as a large producer was fictitious, as reported by the Securities and Exchange Commission's investigation.

78. The Offering Memorandum provided a brief disclosure concerning Suprema Specialties' bankruptcy, but did so in a way to minimize the importance of the information and in a manner that created the impression that GEORGE VIEIRA's sole involvement with Suprema Specialties occurred because he "was, for a short period of time, an officer of Suprema West, Inc. . . . a subsidiary of Suprema Specialties, Inc." The Offering Memorandum did *not* disclose that GEORGE VIEIRA was not just any officer, but was the Chief Operating Officer and was thus directly responsible for fraudulent financial transactions that government officials were investigating. The Offering Memorandum also did *not* disclose that GEORGE VIEIRA had reached an agreement with the United States Attorney's Office to plead guilty to securities fraud and conspiracy to commit bank and mail fraud. And the Offering Memorandum did *not* disclose that in addition to being an officer of Suprema Specialties West, Inc., GEORGE VIEIRA and his wife MARY VIEIRA were also officers and owners of CMM, which was also a subject of the criminal investigation as well as a probable broker for any cheese produced by VALLEY GOLD.

79. The Offering Memorandum stated at page 7 that VALLEY GOLD was negotiating with a "cheese distributor in New Jersey" to produce substantially all of VALLEY GOLD's production for its first two years. The Offering Memorandum then stated that the negotiations had resulted in a contract, and that "the total amount of cheese to be purchased under this contract [is estimated] to be between 14 and 25.5 million pounds." The Offering Memorandum further disclosed that if the New Jersey distributor "for any reason [could] not fulfill its commitment to purchase the Company's product, there is no assurance that the Company would be able to find an immediate customer . . . and such a disruption could have a material adverse effect on the Company's business, operations and finances."

80. Plaintiffs are informed and believe, and thereon allege, that the New Jersey Cheese

30

Distributor referred to in the Offering
Memorandum was either Battaglia & Company,
Inc. or Packing Products, Inc., companies
owned and operated by Robert Quattrone, all
being members of the criminal RICO
enterprise, and all being under active
investigation by the United States Attorney's
Office and the Securities and Exchange
Commission. Indeed, Robert Quattrone pled
guilty to securities fraud and conspiracy to
commit bank and mail fraud at the same time
in the same court and on the same day as
GEORGE VIEIRA, and Plaintiffs are informed
and believe, and thereon allege, that the
plea terms had, as with GEORGE VIEIRA, been
finalized in March of 2004, before the
Offering Memorandum was prepared.

81. Despite mentioning that a "contract" and
"commitment" had been reached with the New
Jersey distributor, the Offering Memorandum
failed to disclose the identity of that
distributor. Plaintiffs are informed and
believe that this omission was the result of
a deliberate choice by defendants GENSKE-
MULDER, GEORGE VIEIRA, DOWNEY BRAND and DOES
21 through 40 to conceal the true nature of
the government's investigation, the plea
deals that had been negotiated, and the near
certainty that the result of Mr. Quattrone's
plea deal would bar him from distributing any
cheese produced by VALLEY GOLD, all of which
were material and adverse facts that, if
disclosed, would have caused Plaintiffs and
CVD to elect not to invest in VALLEY GOLD.

82. In addition, and beginning in or about
March of 2003, Defendants GEORGE VIEIRA with
the assistance of GENSKE-MULDER and DOES 21
through 40, and knowing these representations
to be false and with the intent to deceive
the Plaintiffs, and to induce them into
investing in VALLEY GOLD, further falsely and
fraudulently represented to the Plaintiffs
that:

(a) CVD had suffered financial
difficulty and had defaulted on
obligations to pay Plaintiffs for
milk because there were limited
markets for CVD's milk (when in

31

reality, the reason CVD had suffered financially was because of the Round-Tripping scheme and the churning of commissions by CMM);

(b) By investing in the formation of VALLEY GOLD, Plaintiffs and CVD would solve the problem of limited demand for CVD's milk because VALLEY GOLD would purchase the bulk of CVD's milk and process it into cheese, for which there was purportedly a strong market demand (when in reality, the apparent market demand for cheese was materially distorted by the Round-Tripping scheme and the fictitious cheese sales publicly reported by Suprema Specialties, Inc. and its subsidiaries, and the purported demand for cheese from the unnamed New Jersey distributor was illusory);

(c) GEORGE VIEIRA was a "hands-on" owner of VALLEY GOLD;

(d) GEORGE VIEIRA was "Chief Operating Officer" and was going to be responsible for the day-to-day management of VALLEY GOLD;

(e) VALLEY GOLD committed itself to selling only to reputable buyers with solid financial standing;

(f) GEORGE VIEIRA could use his contacts to "sell more cheese than VALLEY GOLD could ever produce";

(g) With the ownership of VALLEY GOLD, Plaintiffs MANUEL LOPES, MARIANA LOPES, JOSEPH LOPES and RAYMOND LOPES would "hold all the keys to financial success";

(h) VALLEY GOLD would not need to invest excessive resources to make the plant operable;

(i) VALLEY GOLD would make payments

32

for milk received (from Plaintiffs
MANUEL LOPES, MARIANA LOPES, JOSEPH
LOPES and RAYMOND LOPES):

 1. In accordance with the
announced in-plant usage
and pricing at the time
of delivery

 2. Producer payments
would be made on or
before the 28th day of the
month for milk received
during the first 15 days
of the month, and on the
13th day of the month for
milk received during the
remainder of the month;

(j) Milk payments were dictated by
the State of California and, as
such, not negotiable;

(k) "By having owners that live in
short proximity to the plant and
with one of the owners (GEORGE
VIEIRA) being the Chief Operating
Officer, the personnel at VALLEY
GOLD will see first hand the
company's commitment to quality"

(l) MANUEL LOPES, MARIANA LOPES,
JOSEPH LOPES and RAYMOND LOPES'
individual ownership would not be
diluted by allowing fellow members
or others to contribute capital
monies at any time; and

(m) In the event that VALLEY GOLD
needed additional capital, it would
offer additional ownership interest
to existing members, first, and all
other (outside) parties, second.

83. Defendants also actively encouraged
Plaintiffs to invest individually in VALLEY
GOLD and to agree to CVD's investment in
VALLEY GOLD, while the Defendants knew of
GEORGE VIEIRA's criminal activities outlined
above. In addition, VALLEY GOLD never
intended to and never committed itself to

selling only to reputable buyers with solid
financial standing. Instead, VALLEY GOLD
dealt with members of the criminal RICO
enterprise manipulated by GEORGE VIEIRA and
with which he was affiliated, and whom
Defendants knew were incapable of paying for
millions of dollars worth of VALLEY GOLD
cheese.

84. Further, GEORGE VIEIRA's negative and
toxic reputation in the cheese industry,
which should have been disclosed to the
investors, made it difficult for VALLEY GOLD
to market and sell its cheese, and it made it
difficult to obtain financing and quickly led
to VALLEY GOLD's collapse.

85. Plaintiffs were never aware of any facts
that made them suspicious of the veracity of
Defendants' representations, and did not
begin to discover the fraud, deceit and
misrepresentations of Defendants as herein
alleged until less than one year ago.

86. Plaintiffs only purchased equity
interests in VALLEY GOLD because of the false
and misleading representations contained in
the prospectus and the Offering Memorandum
and the accompany [sic] false and misleading
statements and omissions of defendants GEORGE
VIERRA [sic] and GENSKE-MULDER and DOES 21
through 40. Further, Plaintiffs only
consented to allow CVD to purchase equity
interests, and CVD only purchased equity
interests in VALLEY GOLD because of the false
and misleading representations contained in
the prospectus, the Offering Memorandum and
the accompany [sic] false and misleading
statements and omissions of defendants GEORGE
VIERRA [sic] and GENSKE-MULDER and DOES 21
through 40. Those equity interests are now
worthless.

87. As a result of defendants' violations of
the Federal Securities Laws, including the
Securities Act of 1933, the Securities
Exchange Act of 1934, Exchange Act Rule 10b-5
enacted under the regulatory authority of the
Securities and Exchange Commission and the
Oxley Sarbanes-Oxley Act of 2002, Plaintiffs
have incurred damages by investing millions

of dollars into a doomed enterprise and supplied millions more in milk to that enterprise — milk for which plaintiffs have not been paid, resulting in damages to Plaintiffs in a sum exceeding several million dollars.

1.   __SECTION 12 OF THE SECURITIES ACT OF 1933, 15 U.S.C. § 77*l*(a)(2)__.[4]

Defendants argue that the Second Cause of Action does not state a claim upon which relief can be granted under Section 12 of the Securities Act of 1933 because the Complaint does not allege that the securities were sold to Plaintiffs in a public offering.

Section 12(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), provides in pertinent part:

Any person who ... offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements in light of the circumstances under which they are made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable ... to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with

_____

[4]The parties do not always use the appropriate United States Code cite.  This lapse delays review of the applicable law.  In future briefs, the parties are directed to also cite the appropriate United States Code section(s) as well as any Act sections.

35

> interest thereon, upon the tender of such
> security, or for damages if he no longer owns
> the security.

In *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), the Supreme Court considered specifically the question of whether Section 12(2)'s right of rescission "extends to a private, secondary transaction, on the theory that recitations in the purchase agreement are part of a 'prospectus.'" *Id.* at 564.  In interpreting the term "prospectus" as used in Section 12, the Supreme Court looked to Section 2(10) of the Securities Act, 15 U.S.C. § 77b(10), which defines a "prospectus," and Section 10 of the 1933 Act, 15 U.S.C. § 77c, which sets forth the information which must be contained in a prospectus.  The Supreme Court ruled that a "prospectus" must have the same meaning in both Sections 10 and 12 and that "the term 'prospectus' refers to a document soliciting the public to acquire securities." *Id.* at 574.  The Supreme Court ruled:

> [T]he word 'prospectus' is a term of art
> referring to a document that describes a
> public offering of securities by an issuer or
> controlling shareholder.

*Id.* at 584.

Since *Gustafson*, many courts have held that Section 12(2) applies only to a prospectus issued in connection with a public offering.  *See, e.g., Whirlpool Financial Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 n.2 (7th Cir.1995)(in *Gustafson*, "Supreme Court held that a 'prospectus' for § 12(2) purposes includes only public offerings by issuers or their controlling shareholders");

*Maldonado v. Dominguez*, 137 F.3d 1, 8 (1st Cir.1998) (*Gustafson* conclusively decided that section 12(2) applies exclusively to "initial public offerings"); *Stack v. Lobo*, 903 F.Supp. 1361, 1375 (N.D.Cal.1995)("Section 12(2) applies only to initial public offerings, not secondary transactions").   Many courts have applied the *Gustafson* analysis to the sales of securities made through private placement memoranda and found that such sales are not public offerings.  *See Vannest v. Sage, Rutty & Co., Inc.*, 960 F.Supp. 651, 655 (W.D.N.Y.1997); *In re JWP, Inc. Securities Litigation*, 928 F.Supp. 1239, 1259 (S.D.N.Y.1996); *ESI Montgomery County, Inc. v. Montenay International Corp.*, 899 F.Supp. 1061, 1064 (S.D.N.Y.1995).

Defendants contend that the Complaint fails to allege that the securities were sold to Plaintiffs in a public offering, despite the use of the term "prospectus" and "offering memorandum" in Paragraph 21 of the Complaint.  As noted *supra*, the alleged "prospectus" is actually captioned "Valley Gold Business Plan" and the alleged "offering memorandum" is actually captioned "Confidential *Private* Offering Memorandum." [Emphasis added].  Referring to Paragraph 20 of the Complaint that Plaintiffs and other members of CVD were solicited to form Valley Gold to purchase the Land-O-Lakes cheese processing facility, Defendants argue that such a limited number of offerees is antithetical to a public offering.  Further, Defendants assert, the offering of interests is not alleged to be part of an offering registered with the SEC.

Plaintiffs respond that Defendants misstate the law. Plaintiffs contend that "[t]he rule is not that the Securities Act of 1933 only applies to public offerings; the rule is that the Securities Act of 1933 only governs misstatements or omissions in a 'prospectus.'"  Plaintiffs assert that a prospectus is "usually the document disclosing to investors the information contained in the registration statement."  However, Plaintiffs contend, if an offering is exempt from registration, then the "prospectus" is the document that is used instead to inform investors of the key terms of the investment.

Plaintiffs assert that the Supreme Court in *Gustafson* twice stressed that liability under Section 12 of the Securities Act of 1933 could apply to misstatements contained in disclosures made under exempt offerings, by citing the following statement in *Gustafson*:

> The conclusion that prospectus has the same meaning, and refers to the same types of communications (public offers by an issuer or its controlling shareholders), in both §§ 10 and 12 is reinforced by an examination of the structure of the 1933 Act.  Sections 4 and 5 of the Act together require a seller to file a registration statement and to issue a prospectus for certain defined types of sales (public offerings by an issuer, through an underwriter).  See 15 USC §§ 77d, 77e ... Sections 7 and 10 of the Act set forth the information required in the registration statement and the prospectus.  See §§ 77g, 77j.  Section 11 provides for liability on account of false registration statements; § 12(2) for liability based on misstatements in prospectuses.  See 15 USC §§ 77k, 77*l* ... Following the most natural and symmetrical reading, just as liability flows from the requirements imposed by §§ 5 and 7 providing

> for the filing and content of registration
> statements, *the liability imposed by § 12(2)
> cannot attach unless there is an obligation
> to distribute the prospectus in the first
> place (or unless there is an exemption)*.

513 U.S. at 570 (emphasis added).

Plaintiffs contend that "[t]he private placement that defendants crafted for Valley Gold ... was expressly crafted to fall into the private placement exemption from the registration requirements for securities offerings" set forth in Section 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d.[5]  Plaintiffs argue that the holding in *Gustafson* does not insulate Defendants from liability for the misstatements and omissions in the materials they have crafted.

Plaintiffs further argue that, at a minimum, "the courts that have addressed the issue have held that private placement memoranda *are* governed by the Securities Act of 1933 *unless* the offering was a *bona fide* private placement meeting all of the requirements of section 4(2) and the enforcing regulations and case law."

In *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119 (1953), the Supreme Court held:

> Since exempt transactions are those to which
> 'there is no practical need for [the bill's]
> application,' the applicability of § 4(1)

---

[5]15 U.S.C. § 77d(2) provides that the provisions of 15 U.S.C. § 77e do not apply to "transactions by an issuer not involving any public offering".  Section 77e sets forth prohibitions relating to interstate commerce and the mails; Section 77e(b) provides for the necessity of a prospectus meeting the requirements of 15 U.S.C. § 77j.

> should turn on whether the particular class
> of persons affected needs the protection of
> the Act.  An offering to those who are shown
> to be able to fend for themselves is a
> transaction 'not involving any public
> offering.'

*Id.* at 125.  "Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable."  *Id.* at 126.  The Ninth Circuit has endorsed a flexible test for determining if the private offering exemption under Section 4(2) is available.  *Western Federal Corp. v. Erickson*, 737 F.2d 1439, 1442 (9th Cir.1984), citing *S.E.C. v. Murphy*, 626 F.2d 633, 644-645 (9th Cir.1980).  The Ninth Circuit's test considers: "(1) the number of offerees, (2) the sophistication of the offerees, (3) the size and manner of the offering, and (4) the relationship of the offerees to the issuer."  739 F.2d at 1442.  "The party claiming the exemption must show that it is met not only with respect to each purchaser, but also with respect to each offeree."  *Id.*

Citing *Fisk v. Superannuities, Inc.*, 927 F.Supp. 718 (S.D.N.Y, 1996), Plaintiffs contend that it is error to dismiss a securities claim at the pleading stage solely on the ground that the offering was not a public offering.  In *Fisk*, the District Court rejected the argument at the pleading stage that *Gustafson* negated a Section 12(2) claim because the plaintiff's purchase was made pursuant to a private placement, holding in pertinent part:

40

Despite some broad language, the Supreme Court in *Gustafson* held only that the stock purchase contract at issue was not a prospectus because it 'was not required to contain the information contained in a registration statement and ... no statutory exemption was required to take the document out of § 10's coverage.' ... The Court thus implied that a material misstatement or omission in a document that, but for a statutory exemption, would be required to contain the information maintained in a registration statement would be a Section 10 prospectus and therefore would be subject to Section 12(2).  Weiss, *Securities Act Section 12(2) After* Gustafson v. Alloyd Co.: *What Questions Remain?*  50 Bus.Law. 1209, 1219-20 (1995).

...

There remains plaintiff's contention that the limited information thus far available to him casts doubt on 'whether the offering was a *bona fide* private placement.' ... He notes that a shareholder list made available to him shows over one hundred holders, some with holdings as small as 2,500 shares, circumstances suggesting to him that the offering was not limited to the sort of investors to which the Supreme Court referred in *Ralston Purina* in defining 4(2)'s private placement exemption.  Defendants respond by noting that there is no necessary inconsistency between the existence of a Section 4(2) exemption and either of the facts relied upon by plaintiffs.   They also point to the subscription agreement, with its requirement that would-be purchasers represent that they were accredited investors who had received all of the information they desired.

While there no doubt will be circumstances in which an issuer believes in good faith, albeit mistakenly, that its sales efforts have kept it within the limits of Section 4(2), it is well established that the burden of proving the existence of an exemption from registration under the Securities Act is on the person claiming it ... Moreover, any

41

> unfairness that might be occasioned would be
> mitigated by the issuer's ability to defeat a
> purchaser's claim or interpose a counterclaim
> for fraud where the purchaser has misled the
> issuer to its detriment ... In consequence,
> bearing in mind the remedial purpose of
> Section 12(2), this Court holds that the
> burden rests with defendants in this case to
> establish that this offering was covered by a
> statutory exemption.  The fact that the PPM
> indicates that the offering was so structured
> does not mean that plaintiff cannot prevail
> on the Section 12(2) claim under any facts
> that might be proved within the confines of
> the existing pleadings.

927 F.Supp. at 730-731.  Plaintiffs argue:

> Under the applicable law, the defendants are
> liable under the Securities Act of 1993
> unless they fully followed the requirements
> for an exemption from the Act's registration
> requirement.  And we are deeply skeptical
> that the defendants can make that showing.
> For among other requirements, a securities
> issuance is exempt only if the purchasers are
> sophisticated investors who are able to
> comprehend and evaluate the information
> contained in a private placement memorandum.
> That description hardly fits the plaintiffs
> in this case, many of whom can barely even
> read and write in English.

Defendants respond that *Fisk* is distinguishable.  In *Fisk*, the plaintiff pleaded a lengthy shareholder's list that cast doubt on whether the offering qualified as a private offering. Defendants cite *Lewis v. Fresne*, 252 F.3d 352, 357-358 (5th Cir.2001):

> The evidence shows that this was a private
> transaction.  Lewis only agreed to make the
> loan after receiving and rejecting a *private*
> placement memorandum.  He entered the deal
> through his own *private* broker.  The $650,000
> was designed to keep Mad Martha's running
> until a *private* placement sale of stock could
> be completed ....

42

Lewis contends that the district court ignored the 'public' aspects of his transaction. He cites to ... *Fisk v. SuperAnnuities, Inc.* ... The plaintiff in *Fisk*, however, alleged in his complaint that he had purchased 50,000 shares out of an offering of up to 4 million shares of common stock ... In contrast, Lewis's complaint contends that his 615,676 shares were represented to be 29% of the outstanding shares of stock. Thus, Lewis's purchase involved a major stake in Mad Martha's while the plaintiff in *Fisk* only bought himself a relatively small stake in the company. Two of the criteria for determining if a transaction is public is the size of the offering and the number of offerees ... Accordingly, Lewis fails to state a claim under the 1933 Act because the transaction at issue was a private one that is not governed by § 12. We affirm the district court's decision to deny Lewis's motion to remand and to dismiss his 1933 Act claims.

Defendants argue that Plaintiffs must plead either that the offering was made to the public or plead facts demonstrating it does not qualify as a private offering to state a claim for relief under Section 12(2). *Lewis v. Fresne*, *id.; In re Hayes Lemmerz Intern., Inc.*, 271 F.Supp.2d 1007, 1028 (E.D.Mich.2003)("[U]nlike the plaintiffs in *AAL High Yield* or *Fisk*, Plaintiffs have failed to demonstrate a factual question regarding whether the Offering Memorandum was a *bona fide* private offering"); *Vannest v. Sage, Rutty & Co., Inc.*, *supra*, 960 F.Supp. at 655 ("The plaintiffs have never asserted a Section 12(1) claim - for registration violations -, and they do not dispute that the offering was made pursuant to a private placement memorandum").

To the extent the Second Cause of Action purports to state a

claim for violation of Section 12(2) of the Securities Act of 1933, Defendants' motions to dismiss are GRANTED WITH LEAVE TO AMEND.   Plaintiffs shall amend to allege either that the offering of securities was a public offering or that the offering of securities was subject to registration and that the offering was not registered as required by applicable law.[6]

> 2.   **SECTION 17 OF THE SECURITIES ACT OF 1933, 15 U.S.C. § 77q, AND SARBANES OXLEY ACT**.

To the extent that the Second Cause of Action purports to state a claim under Section 17 of the 1933 Act, Defendants move for dismissal because Section 17 does not give rise to a private right of action.  *Hollinger v. Titan Capital Group*, 914 F.2d 1554, 1578 (9th Cir.1990), *cert. denied*, 499 U.S. 976 (1991).  In addition, to the extent that the Second Cause of Action purports to state a claim for relief under the Sarbanes Oxley Act, Defendants move to dismiss such claim because § 801 of the Act provides that "[n]othing in this section shall create a new, private right of action."

Because Plaintiffs do not respond to these grounds for dismissal of the Second Cause of Action, Plaintiffs have conceded dismissal on these grounds.   These claims are DISMISSED WITHOUT

---

[6]**Plaintiffs further contend that Defendants' motion to dismiss the claim under Section 12(2) on this ground is "largely moot", citing *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 944-945 (9th Cir.2005), and argue the Securities Exchange Act of 1934 applies to both public offerings and private placements. However, if Plaintiffs intend to allege a claim against Defendants under Section 12(2) of the Securities Act of 1933, Plaintiffs must amend the Complaint as set forth above.**

LEAVE TO AMEND.

          3.  **SECTION 10b OF THE SECURITIES EXCHANGE ACT OF 1934, 15 U.S.C. § 78j, AND RULE 10b-5.**

    Defendants move to dismiss claims in the Second Cause of Action for violation of Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5.

    15 U.S.C. § 78j(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange -
>
> ...
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5, promulgated under Section 10b, provides:

> It shall be unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

17 C.F.R. § 240.10b-5.

        a.  **FAILURE TO ALLEGE JURISDICTIONAL ELEMENT.**

    Downey moves for dismissal on the ground that the Complaint fails to allege any use of the mails or other instrumentality of interstate commerce to make the offering.  Plaintiffs acknowledge

the jurisdictional requirement but argue that the "bar is not high".  Plaintiff notes that "the intrastate use of the telephone confers federal jurisdiction under § 10 of the Securities Exchange Act of 1934, and S.E.C. Rule 10b-5 where the telephone calls in question are connected to the transaction of which there is a complaint."  *Spilker v. Shayne Laboratories, Inc.*, 520 F.2d 523, 526 (9th Cir.1975).  Plaintiffs assert that Downey "knows full well that phones, mails and e-mails were used to prepare the Offering Memorandum and the prospectus, to secure investors and to receive funds for Valley Gold."  Plaintiffs further assert that, at the pleading stage, jurisdiction need only be pled by reference to the statutory basis for jurisdiction.  Plaintiffs note that Paragraph 27 of the Complaint alleges, *inter alia*, that the Court has jurisdiction under the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(47).  If no instrumentality of interstate commerce was used to secure Plaintiffs' investment in Valley Gold, Plaintiffs contend that Downey may move for summary judgment.  Plaintiffs acknowledge that they can make further allegations concerning this element but argue:

> [D]efendants['] motivation is not to secure more information so that they can file an answer; for the defendants undoubtedly know in much more detail than the plaintiffs the numerous occasions where they made use of the phones, mails, faxes, internet and the like in preparing the offering materials, getting them to investors, and securing funds from plaintiffs and others.  Rather, the defendants' motivation is to cause delay and expense.

However, as Plaintiffs conceded at the hearing, Rule 8(a),

46

Federal Rules of Civil Procedure, requires that "[a] pleading ... shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ...."  The general rule governing pleading Federal jurisdiction requires more that a simple allegation that jurisdiction exists or citation of a Federal statue.  Rather, it is required that the Complaint clearly set out the basic facts necessary to support the conclusion that there is Federal jurisdiction. *Beeler v. United States*, 338 F.2d 687, 689 (3rd Cir.1964); *Fountain v. New Orleans Public Service, Inc.,* 265 F.Supp. 630, 632 (E.D.La.1967).  The Complaint must allege that the mail or an instrumentality of interstate commerce was used as the jurisdictional element of this claim in the Second Cause of Action.

Therefore, dismissal of the Second Cause of Action for failure to allege the jurisdictional element of Section 10b of the Securities Exchange Act of 1934 is GRANTED WITH LEAVE TO AMEND.

b.   <u>INTEREST IN VALLEY GOLD NOT A SECURITY</u>.

Genske moves for dismissal on the ground that the "milk for equity" interest in Valley Gold is not a security within the meaning of the law.  Genske refers to the allegations in Paragraph 20 of the Complaint that "Vieira ... proposed to Plaintiffs and other members of Central Valley Dairymen that they form a new entity ... Valley Gold, LLC, and through that entity purchase the moth-balled Land-O-Lakes processing facility ...."  Genske refers to the following statement in the Valley Gold, LLC

Business Plan attached to the Complaint as Exhibit A as

describing what Genske refers to as the "investment":

>    BUSINESS AND INDUSTRY OVERVIEW
>
>    *Industry Trends*
>
>    ...
>
>    **Since the deregulation of milk pricing, the
>    price of milk has fluctuated from as low as
>    $9.23 per cwt to as high as $16.94 per cwt in
>    the last five years.  *Valley Gold was formed
>    by investors who are all affiliated with the
>    dairy industry.  The majority of these
>    investors are milk producers who are looking
>    for a means to capitalize on the processing
>    end of the milk industry.  These investors
>    formed Valley Gold as a way to hedge their
>    risks relating to milk market fluctuations*.
>    The reason for this is that there is a direct
>    correlation between the price of milk and the
>    price of cheese.  As the price of milk
>    increases or decreases, the price of cheese
>    moves in the same direction.**

[Emphasis added].  Genske also refers to the allegations in

Paragraph 64 of the Complaint that "[t]he interests procured from

Plaintiffs in the form of membership interests in VALLEY GOLD ...

constituted securities within the meaning of the Securities Act

of 1933 and the Securities Exchange Act of 1934 because

Plaintiffs were induced to invest their money (and later their

rights to payment for milk) into a common enterprise from which

they expected to earn profits through the efforts and acumen of

others, namely GEORGE VIEIRA and the other officers and employees

of VALLEY GOLD"; to Paragraph 67 of the Complaint that the "'milk

for equity' contracts were illegal and unlawful"; and to

Paragraph 74(d) that milk supplied by Plaintiffs to Valley Gold

48

as investors would "fail to qualify for the protections of the Milk Producers Trust Fund".  Genske also refers to the Agreement to Contribute Additional Capital by Owner attached to the Complaint as Exhibit C, which provides in pertinent part:

> Whereas, VG had an undertaking by a major lender prior to its startup that that lender would extend to VG several million dollars of operating financing essential for that startup, but that lender later withdrew that undertaking, and VG has been unable to obtain the financing needed for its operations from other conventional financing sources;
>
> Whereas, Owner [a dairy cooperative member of CVD, a California Dairy Cooperative] has, in unanimous agreement with all other owners of VG (almost all of whom are also members of CVD), agreed to forego receiving payments from CVD for the purpose of allowing CVD to forego, on Owner's behalf, payments which will otherwise be due to CVD from VG, in order to provide, thereby, the financing essential to VG for its operating and other expenses during its startup, for a sufficient period of time to allow VG to remain financially solvent and/or find alternative financing (that agreement between Owner and CVD being stated in a separate written agreement);
>
> Now therefore, it is agreed that:
>
> 1.   AGREEMENT TO CONTRIBUTE PAYMENTS TO BE FOREGONE.  For valuable consideration, receipt of which is hereby acknowledged, Owner agrees that it will contribute to VG, as additional capital, Owner's milk payments from CVD to be foregone beginning October 1, 2003, as dealt with in the separate agreement between Owner and CVD previously referred to.
>
> 2.   OWNER'S ADDITIONAL EQUITY IN VG.  In consideration for Owner's undertaking to make the additional capital contributions referred to in the preceding paragraph, Owner shall receive (in compliance with all applicable security laws), an additional ownership

49

> equity interest in VG.  Owner's existing
> equity interest in VG shall be increased
> directly in proportion to Owner's foregone
> payments which have, as stated above, been
> credited to VG by CVD.  For example, if Owner
> has previously contributed $100,000 in equity
> capital to VG, and has, pursuant to this
> Agreement, committed to contribute an
> additional $200,000 in payments to be
> foregone by CVD to Owner, then Owner's equity
> interest in VG shall, upon compliance with
> all applicable securities laws, be $300,000.
> Further, an Owner's overall proportional
> interest in VG shall then be determined by
> dividing Owner's $300,000 interest into the
> total equity interests of all VG's owners,
> and VG shall adjust its records accordingly
> and so notify Owner.

Genske, citing *Reves v. Ernst & Young*, 494 U.S. 56 (1990),
argues:

> The inescapable conclusion to be drawn from
> the business plan and offering memorandum is
> that the purpose of the investment in Valley
> Gold was to provide a captive customer for
> Plaintiffs' milk rather than a passive
> investment in an investment security.
> Therefore, the Complaint fails to state a
> claim upon which relief can be granted
> because the interest in Valley Gold is really
> a commercial transaction whose purpose is to
> provide a captive purchaser for Plaintiffs'
> milk, not a passive investment which needs
> the protection of 10b-5 of the Federal
> securities laws.

In its reply brief, Genske emphasizes that it is referring to the
"milk for equity" transactions in September 2003:

> [T]hese transactions have all the appearances
> of a commercial transaction (creditors who
> could not otherwise receive any payment for
> their milk obtained 'equity' in Valley Gold
> in lieu of receiving nothing.)  Furthermore,
> this transaction appears to have been for the
> purpose of keeping Valley Gold in operation
> and a prospective purchaser for the
> Individual Plaintiffs' milk.  This

> **transaction has all the indicia of a**
> **commercial transaction in contrast to an**
> **investment transaction.**
>
> **For purposes of pleading, Plaintiffs should**
> **be required to state specifically the facts**
> **surrounding the 'milk for equity'**
> **transactions which will enable this Court to**
> **determine whether these transactions were**
> **commercial transactions or the sale of**
> **investment securities.**

In *Reves*, a 23,000-member agricultural cooperative sold promissory notes payable on demand by the holder in order to raise money to support the cooperative's general business operations.  Although the notes were uncollateralized and uninsured, they paid a variable rate of interest that was adjusted monthly to keep it higher than the rate paid by local financial institutions.  The notes were not traded on an exchange, but they were offered over an extended period to both members and nonmembers of the cooperative.  Advertisements for the notes characterized them as investments.  After the cooperative filed for bankruptcy, a class of noteholders filed suit under Section 10(b) of the Securities Exchange Act of 1934 against the accounting firm that had audited the cooperative's financial statements.  The District Court in *Reves* ruled for plaintiffs, but the Eighth Circuit reversed, holding that the demand notes were not securities within the meaning of the 1934 Act because the demand notes did not satisfy the elements of the test developed in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

The Supreme Court in *Reves* reversed the Eighth Circuit, holding in pertinent part that, under the circumstances, the

51

demand notes fell under the "note" category of instruments that are securities within the meaning of Section 3(a)(10) because the notes did not closely resemble any categories of instruments that are not properly viewed as securities, the transaction was most naturally conceived by both the sellers and the purchasers as an investment in a business enterprise rather than as a purely commercial or consumer transaction, there was common trading of the notes, it would have been reasonable for a prospective purchaser to perceive the notes as investments, and there was no risk-reducing factor to suggest that the notes were not securities, since the notes were uncollateralized and unsecured and would escape federal regulation entirely if federal securities laws did not apply to them.

In contending that the "milk for equity" interests in Valley Gold are not securities, Genske relies solely on the following statement in *Reves*:

> ... If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a 'security.'

494 U.S. at 66.

Genske's position is without merit for purposes of Rule 12(b)(6). Genske relies solely on the Supreme Court's discussion of when a note may or may not be characterized as a security under federal law. 15 U.S.C. § 78c(10) defines the term "security" to mean, *inter alia*, "any certificate of interest or

participation in any profit-sharing agreement ...."  Paragraph 64 of the Complaint alleges such an interest and the Confidential Private Offering Memorandum attached to the Complaint as Exhibit B refers to the membership interests in Valley Gold as "securities" and further provides in pertinent part:

> THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ... AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

Plaintiffs in substance allege that Valley Gold was undercapitalized or cash flow poor and that, in return for equity interests in the enterprise, investors would provide additional capital funding for Valley Gold.  Return of and on this capital was dependent on Valley Gold's success.  Whether the "milk for equity" interests described in the Complaint are or are not "securities" within the meaning of Section 78c(10) is a question to be determined at summary judgment or trial.

Dismissal of the Second Cause of Action on this ground is DENIED.

### c.  STATUTE OF LIMITATIONS.

Downey moves to dismiss the Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 claims as barred by the statute of limitations set forth in 28 U.S.C. § 1658(b):[7]

---

[7] In 2002, Congress passed the Sarbanes-Oxley Act extending the statute of limitations for Rule 10b-5 actions.  Pub.L.No. 107-204, 116 Stat. 745 (2002), codified in part at 28 U.S.C. § 1658(b).

... [A] private right of action that involves
a claim of fraud, deceit, manipulation, or
contrivance in contravention of a regulatory
requirement concerning the securities laws,
as defined in section 3(a)(47) of the
Securities Exchange Act of 1934 (15 U.S.C.
78c(a)(47)), may be brought not later than
the earlier of –

(1) 2 years after the discovery of the facts
constituting the violation; or

(2) 5 years after such violation.

Downey notes that one of the alleged misrepresentations is

that Defendants "[i]ncluded financial projections supplied by

GENSKE-MULDER that vastly exceeded the performance of any startup

cheese manufacturer, with the possible exception of Suprema

Specialties, Inc., whose dramatic reported growth was by then

known in the financial community (but not to Plaintiffs) to have

been the result of smoke, mirrors and a fraudulent Round-Tripping

scheme orchestrated by a criminal enterprise headquartered in New

Jersey."  Complaint at ¶ 74(e).  The Complaint alleges that

Plaintiffs invested in Valley Gold, were not paid for their milk,

and were asked to forego payment for their milk to maintain

Valley Gold's solvency by September 22, 2003.  Downey contends

that Plaintiffs were therefore "on inquiry" of claims against it

almost three years prior to the filing of the Complaint on

September 11, 2006, and argues:

In light of the rosy financial forecasts
Plaintiffs allege they received, Valley
Gold's utter collapse into insolvency between
the April 2003 Offering and September of that
year would place reasonable persons on
inquiry into the possibility that they had
been mislead, triggering the statute of

54

limitations.

Downey further contends that the Complaint alleges that Vieira plead guilty in January, 2004, nearly two and a half years before the Complaint was filed.  Downey attaches to its motion to dismiss a copy of a March 28, 2003 letter from the United State Attorney for the District of New Jersey to John Azzarello and James Cecchi, counsel for George Vieira, setting forth the plea agreement with Vieira.

The Ninth Circuit has considered, but not made a final determination on whether actual or inquiry notice of the alleged fraud triggers the running of Rule 10b-5's statute of limitations.  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, *supra*, 416 F.3d at 951; *Berry v. Valance Technology, Inc.*, 175 F.3d 699, 704 (9th Cir.1999).  In *Berry*, the Ninth Circuit declined to adopt either an inquiry or actual notice standard, but noted:

> If we were to adopt inquiry notice, we would agree with the Tenth Circuit's formulation of that standard.  In *Sterlin* [*v. Biomune Sys.*, 154 F.3d 1191 (10th Cir.1998], the Tenth Circuit surveyed case law from other circuits and found that most circuits 'generally apply an inquiry notice standard coupled with some form of reasonable diligence requirement.' *Id.* at 1199-1200.  In *Sterlin's* formulation, 'inquiry notice ... triggers an investor's duty to exercise reasonable diligence and ... the ... statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud.'  154 F.3d at 1201.  Were we to apply the *Sterlin* test to this case, we would face two questions.  First, did the *Forbes* article raise sufficient suspicion of fraud to cause

> a reasonable investor to investigate the
> matter further?  Second, when should a
> reasonably diligent investor have discovered
> the facts underlying the alleged fraudulent
> activity?  If the answer to the first
> question were yes, the answer to the second
> question would determine when the statute of
> limitations began to run.

175 F.3d at 704.

Plaintiffs point out that Paragraph 85 of the Complaint alleges:

> Plaintiffs were never aware of any facts that
> made them suspicious of the veracity of
> Defendants' representations, and did not
> begin to discover the fraud, deceit and
> misrepresentations of Defendants as alleged
> herein until less than a year ago.

Furthermore, Plaintiffs assert that the March 28, 2003 letter concerning Vieira's plea agreement does not demonstrate it was communicated to others or that *Plaintiffs* knew about the criminal matter because there is no evidence that Plaintiffs ever saw the letter.

The motion to dismiss on the statute of limitations ground is DENIED.  Even if an inquiry notice standard is employed, it cannot be determined from the face of the Complaint that these claims are time-barred as a matter of law.  *See Morley v. Walker*, *supra*, 175 F.3d at 759; *Jablon v. Dean Witter & Co.*, *supra*, 614 F.2d at 682.  This issue is more appropriately addressed by dispositive motion.

d.   <u>FAILURE TO PLEAD ELEMENTS OF SECURITIES FRAUD</u>.

The elements of a Rule 10b-5 claim are: (1) a misrepresentation or omission of a material fact; (2) scienter;

56

(3) causation; (4) reliance; and (5) damages. *Livid Holdings Ltd., supra*, 416 F.3d at 946. Claims brought under Rule 10b-5 must meet the particularity requirement of Rule 9(b), Federal Rules of Civil Procedure, which requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The enactment of the Private Securities Litigation Reform Act (PSLRA) in 1995 significantly altered pleading requirements in private securities fraud litigation by amending the 1934 Act to require that a complaint "'plead with particularity both falsity and scienter.'" *In re Daou Systems, Inc.*, 411 F.3d 1006, 1014 (9th Cir.2005), *cert. denied*, ___ U.S. ___, 126 S.Ct. 1325 (2006).

                    i.  <u>ADEQUACY OF PLEADING FRAUD AND SCIENTER</u>.[8]

Both Defendants move for dismissal on the ground that the allegations of fraud and scienter are not pleaded with the requisite particularity.

As explained in *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994), *cert. denied*, 516 U.S. 810 (1995):

---

[8]Genske has filed a Notice of Recent Case Law, advising that the United States Supreme Court heard oral argument on March 28, 2007 in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* No. 06-484, addressing the question:

> Whether, and to what extent, a court must consider or weigh competing inferences in determining whether a complaint asserting a claim of securities fraud has alleged facts sufficient to establish a 'strong inference' that the defendant acted with scienter, as required under the Private Securities Litigation Reform Act of 1995.

> In a securities fraud action, a pleading is
> sufficient under Rule 9(b) if it identifies
> the circumstances of the alleged fraud so
> that the defendant can prepare an adequate
> answer ... The pleading must state precisely
> the time, place, and nature of the misleading
> statements, misrepresentations, and specific
> acts of fraud.

In *In re Glenfed, Inc. Securities Litigation*, 42 F.3d 1541, 1547-1548 (9th Cir.1994)(*Glenfed* I), the Ninth Circuit further explained:

> ... Rule 9(b) requires particularized
> allegations of the circumstances *constituting*
> fraud.  The time, place, and content of an
> alleged misrepresentation may identify the
> statement or the omission complained of, but
> these circumstances do not 'constitute'
> fraud.  The statement in question must be
> false to be fraudulent ... To allege fraud
> with particularity, a plaintiff must set
> forth *more* than the neutral facts necessary
> to identify the transaction.  The plaintiff
> must set forth what is false or misleading
> about a statement and why it is false.  In
> other words, the plaintiff must set forth an
> explanation as to why the statement or
> omission complained of was false or
> misleading.  A plaintiff might do less and
> still identify the statement complained of;
> indeed, the plaintiff might do less and still
> set forth some of the circumstances of the
> fraud.  But the plaintiff cannot do anything
> less and still comply with Rule 9(b)'s
> mandate to set forth with particularity those
> circumstances which *constitute* the fraud.

The Ninth Circuit holds that "the general rule that allegations of fraud based on information and belief do not satisfy Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge [because] plaintiffs cannot be expected to have personal knowledge of the relevant facts." *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir.1993).  "However, this exception does

58

not nullify Rule 9(b); a plaintiff who makes allegations on information and belief must state the factual basis for the belief." *Id.* In *In re Daou Systems, Inc.*, *supra*, the Ninth Circuit holds:

> A securities fraud complaint must now 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' ...
>
> The complaint must also 'state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.' ... *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.1999) ... (facts must come closer to demonstrating intent as opposed to mere motive and opportunity).  The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because '"falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA.' ... Thus, the complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness.

411 F.3d at 1014-1015.

Downey and Genske argue that the Complaint does not specify when the alleged misrepresentations were made, who made them, does not allege Plaintiffs' individual reliance on them, does not allege why the statements were false or misleading, and fails to allege any particularized facts to substantiate Downey or Genske's state of mind or facts which otherwise give rise to a

strong inference that Downey acted with intent to defraud or with a reckless state of mind.

Plaintiffs argue that the allegations in the Complaint alleging fraud satisfy Rule 9(b).  Plaintiffs assert that where "as here, a securities fraud claim is based upon the distribution of written materials that are jointly authored, the plaintiffs satisfy the pleading requirements of ... Rule ... 9(b) by simply attaching the misleading written materials, identifying the co-authors 'and *where possible* the roles of the individual defendants in the misrepresentations."  Plaintiffs assert that this information is alleged at Paragraphs 63 and 75 of the Complaint:

> 63.  In or about late April of 2003, these defendants prepared a prospectus that was thereafter used to market and sell security interests in VALLEY GOLD, including to Plaintiffs ... These defendants also prepared an Offering Memorandum that was likewise provided to potential investors ....
>
> ...
>
> 75.  Plaintiffs are informed and believe, and thereon allege, that GENSKE-MULDER, GEORGE VIEIRA, and DOWNEY BRAND AND DOES 21 through 40 all actively collaborated on preparing the prospectus and the Offering Memorandum that was supplied to Plaintiffs and that were instrumental in inducing Plaintiffs and CVD to purchase initial equity interests in VALLEY GOLD.  Indeed, Plaintiffs have very recently discovered that some or all of these defendants participated in meetings and electronic communications to discuss the best way to conceal from Plaintiffs and CVD that GEORGE VIEIRA had, one month earlier, reached an agreement with the office of the United States Attorney to plead guilty to securities fraud and to a conspiracy to commit bank and

> mail fraud - the active criminal conspiracy
> centered on the Round-Tripping scheme that
> led to the collapse of Supreme Specialties,
> Inc. and its subsidiaries.

Plaintiffs rely on *In re Glenfed, Inc*. 60 F.3d 591 (9th Cir.1995)(*Glenfed* II), wherein the Ninth Circuit held:

> A plaintiff may satisfy Fed.R.Civ.P. 9(b)
> through reliance upon a presumption that the
> allegedly false and misleading 'group
> published information' complained of is the
> collective action of officers and directors.
> *See Blake v. Dierdorff*, 856 F.2d 1365, 1369
> (9th Cir.1988); *Wool v. Tandem Computers,*
> *Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987)

> > In cases of corporate fraud where
> > the false and misleading
> > information is conveyed in
> > prospectuses, registration
> > statements, annual reports, press
> > releases, or other 'group-published
> > information,' it is reasonable to
> > presume that these are the
> > collective actions of the officers.
> > Under such circumstances, a
> > plaintiff fulfills his
> > particularity requirement of Rule
> > 9(b) by pleading the
> > misrepresentations with
> > particularity and where possible
> > the roles of the individual
> > defendants in the
> > misrepresentations.

> *Wool*, 818 F.2d at 1440 ....

*Id.* at 593.  After noting that the "group publishing information" presumption was initially applied to a narrowly defined group of officers who had direct involvement in the day-to-day affairs of the company in general and in the company's financial statements in particular and, subsequently, to a small board of directors, *id.*, the Ninth Circuit addressed the application of the

presumption to outside directors who are not alleged to be
involved in the day-to-day operations:

> Plaintiffs contend that 'the *Wool* "group
> published information" presumption is
> applicable to outside directors where the
> plaintiffs plead that the outside directors
> hold positions on audit, executive and other
> committees that are responsible for
> overseeing the corporation's financial and
> disclosure activities.' We disagree. Merely
> because the complaint identifies a
> corporation's outside directors, various
> committee assignments, and generic
> responsibilities for every committee does not
> mean that the presumption of 'group published
> information' is applicable. To hold
> otherwise would be to ignore Rule 9(b)'s
> directive that 'the circumstances
> constituting the fraud or mistake shall be
> stated with particularity.' ... The 'group
> published information' presumption is
> grounded in reasonableness - and it is not
> reasonable to presume in every case, given
> the requirement of notice, that a 'corporate
> scheme to defraud was collectively devised by
> the [outside] director defendants.' ... To
> rely upon the 'group published information'
> presumption, Plaintiffs' complaint must
> contain allegations that an outside director
> either participated in the day-to-day
> corporate activities, or had a special
> relationship with the corporation, such as
> participation in preparing or communicating
> group information at particular times.

*Id.* Plaintiffs also cite *Howard v. Everex Systems, Inc.*, 228
F.3d 1057, 1065-1066 (9th Cir.2000):

> [T]he evidence shows that Hui [the CEO] had
> authority over the process of preparing and
> releasing the financial statements. The
> facts of the instant case fall between
> several cases discussing the authority prong
> of control person liability. In *Wool v.
> Tandem Computers, Inc.*, 818 F.2d 1433, 1441
> (9th Cir.1987), we found that a group of
> directors had 'the power to control or
> influence' their corporation. We noted that

> although the directors' status as such was
> insufficient for a finding of control, their
> day-to-day oversight of company operations
> and involvement in the financial statements
> at issue were sufficient to presume control
> over the 'transaction giving rise to the
> alleged security violation.' ... Hui was in a
> similar position through his participation in
> the day-to-day management of Everex and his
> review and signature of the financial
> statements.

Plaintiffs further rely on *United States ex rel. Lee v.*
*SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir.2001):

> Rule 9(b) may be relaxed to permit discovery
> in a limited class of corporate fraud cases
> where the evidence of the fraud is within a
> defendant's exclusive possession.

Plaintiffs argue that, in order to answer the Complaint,
Downey and Genske do not need to be told which attorneys worked
on the Valley Gold file, or which accountants participated in
putting together the fraudulent financial projections and
unlawful business plan; this information is peculiarly known to
the defendants, who can simply look at their billing files and
retrieve this information.

Downey and Genske respond that that the allegation in
Paragraph 75 that, based on "information and belief" that they
"collaborated" in preparing the Valley Gold Business Plan and the
Confidential Private Offering Memorandum do not suffice to meet
Rule 9(b)'s requirements.

They further note that *In re Glenfed* only approved the use
of the presumption against a corporation's control group that
actually issued the fraudulent statements.  They contend that the

reason Plaintiffs do not allege that either Downey or Genske made statements in these documents is that the statements were those of Valley Gold, the company making the offering.  Defendants assert that Plaintiffs' claims are, at best, that they aided and abetted Valley Gold's misstatements and omissions, a theory of liability rejected by the Supreme Court in *Central Bank of Denver, N.A. v. First Intestate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994)("[W]e hold that a private plaintiff may not maintain an aiding and abetting suit under §10(b).").  Genske cites *In re Rent-Way Securities Litigation,* 209 F.Supp.2d 493, 502-504 (W.D.Pa.2002) as authority that the "standards for liability as a participant in drafting documents for a company are not free from doubt."

However, *In re Rent-Way* specifically notes that, although numerous courts have held that varying levels of participation in another's misstatements do not give rise to primary liability after *Central Bank*,

> The contrary view is represented in *In re Software Toolworks, Inc.*, 50 F.3d 615 (9th Cir. 1994), *cert.denied*, 516 U.S. 907 ... (1995) which reversed a district court opinion granting summary judgment for an accounting firm that had participated in the drafting of two letters sent by Software Toolworks to the SEC.  *Id.* at 628-629.  The court found that a reasonable factfinder could have concluded based upon this participation that the accountants 'had access to all information that was available and deliberately chose to conceal the truth.' *Id.* at 629; *see also In re ZZZZ Best Sec. Litig.*, 864 F.Supp. 960, 970 (C.D.Cal.1994)(evidence of auditor's involvement in creation of allegedly

> misleading statements released to the public
> by Z Best created a question of fact
> regarding primary liability); *Adam v. Silicon
> Valley Banshares*, 884 F.Supp. 1398, 1401
> (N.D.Cal.1995)(plaintiffs could allege
> primary liability against accountant based
> upon various statements and reports issued by
> company); ... *Employers Ins. of Wausau v.
> Musick, Peeler & Garrett*, 871 F.Supp. 381,
> 389 (S.D.Cal.1994)(sufficient that plaintiffs
> pled that accountants were architects of
> prospectus and that the prospectus contained
> misrepresentations attributable to the
> accountants).

209 F.Supp.2d at 503.

With regard to pleading scienter, both Defendants argue that the Complaint does not plead scienter with the specificity required by the Ninth Circuit.

As explained in *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, *supra*, 416 F.3d at 948:

> *This circuit has interpreted the PSLRA's
> heightened* [sic] pleading standard as
> requiring plaintiff to 'plead, in great
> detail, facts that constitute strong
> circumstantial evidence of deliberately
> reckless or conscious misconduct.' *In re
> Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d
> 970, 974 (9th Cir.1999).  '[T]o show a strong
> inference of deliberate recklessness,
> plaintiffs must state facts that come closer
> to demonstrating intent, as opposed to mere
> motive and opportunity [to commit fraud]'.
> *Id.*  When determining whether plaintiffs have
> sufficiently plead scienter, we must consider
> 'whether the total of plaintiffs'
> allegations, even though individually
> lacking, are sufficient to create a strong
> inference that defendants acted with
> deliberate or conscious recklessness.' *No.
> 84 Employer-Teamster Joint Council*, 320 F.3d
> at 938 ... In making this assessment, we
> consider all reasonable inferences, whether
> or not favorable to the plaintiff. *Gompper
> v. VISX, Inc.*, 298 F.3d 893, 897 (9th

Cir.2002).

Plaintiffs argue that scienter has been adequately plead, contending that this requirement is satisfied with an allegation that the defendants "*knew* that the most obvious interpretation of a written disclosure was false (even if the disclosure could also be interpreted in a manner that was accurate." Plaintiffs rely on *Livid Holdings Ltd., supra,* 416 F.3d at 948-949:

> Livid alleges that the Defendants who purchased PCI stock on the same terms as UAE, were fully aware that the initial stock sale had not been completed. Nonetheless, Defendants wrote and attached the notice statement, which at best omitted crucial information about the prior sale's terms and status, and at worst was an intentional attempt to trick potential investors into believing that the sale had been completed and the cash had been received by PCI but was simply not incorporated into the previously written Memorandum. The district court, however, believed that the Defendants lacked the requisite mental state because 'if [they] had intended to mislead investors, [they] would have made the misrepresentation more explicit.' We disagree. There are few ways to make the misrepresentation more explicit at it states as 'fact' that the initial stock offering 'has been completed,' but that the attached Memorandum had not been updated to reflect this alleged fact. If Defendants' intention was to warn potential investors that the Memorandum was not current and to make no statement on whether or not the sale was successfully concluded, the Defendants could have conveyed this warning in a much clearer way. For example, had the sentence read: 'The document does not reflect any capital that may have been generated by the private equity fund-raising,' it would not imply that the $25 million fund-raising effort had been successfully completed and that PCI had received these funds, but the Memorandum did not yet reflect this fact.

Because Livid alleges that Defendants knew the contested statement's most obvious interpretation was false when made, Livid has met the heightened pleading standard for scienter by raising a strong inference of defendants' deliberate recklessness. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir.2004).  In combination with Livid's allegation that Defendants had a motive to misrepresent the status of the stock sale, Livid has pled facts constituting a strong inference of scienter.  Although this court has found that allegations of a motive to mislead, standing alone, cannot satisfy the heightened scienter standard, we are not precluded from considering allegations of motive in combination with other allegations of Defendants' intent to mislead or deliberate recklessness. *In re Silicon Graphics,* 183 F.3d at 974.  Therefore, we hold that the totality of the allegations creates a strong inference that the Defendants acted with the requisite scienter and reverse the district court's conclusion to the contrary.

Relying on this holding, Plaintiffs contend that the Complaint clearly demonstrates Defendants' intentional complicity:

As the complaint explains, in March of 2003, George Vieira concluded negotiations on a plea bargain with the United States Attorney's Office for his participation in the securities fraud, bank fraud and mail fraud that led to the collapse of Supreme Specialties, Inc. ....

Genske-Mulder and Downey Brand learned about the plea deal while they were still drafting the Offering Memorandum that was used to secure plaintiffs' investment in Valley Gold. And they realized that the information was highly material and also highly volatile, and would likely derail the planned formation of Valley Gold if it came to light. Accordingly, these defendants *expressly met to discuss how to disguise and hide the*

67

*information*.  (Complaint at ¶75).  And they then proceeded to draft the Offering Memorandum to hide the truth, distort the facts and mislead the plaintiffs.  (Complaint at ¶¶ 76-81).  Among other things, the defendants drafted the language in the Offering Memorandum:

> to minimize the importance of the information and in a manner that created the impression that GEORGE VIEIRA's sole involvement with Suprema Specialties occurred because he "was, for a short period of time, an officer of Suprema West, Inc. . . . a subsidiary of Suprema Specialties, Inc." The Offering Memorandum did *not* disclose that GEORGE VIEIRA was not just any officer, but was the Chief Operating Officer and was thus directly responsible for fraudulent financial transactions that government officials were investigating. The Offering Memorandum also did *not* disclose that GEORGE VIEIRA had reached an agreement with the United States Attorney's Office to plead guilty to securities fraud and conspiracy to commit bank and mail fraud. And the Offering Memorandum did *not* disclose that in addition to being an officer of Suprema Specialties West, Inc., GEORGE VIEIRA and his wife MARY VIEIRA were also officers and owners of CMM, which was also a subject of the criminal investigation as well as a probable broker for any cheese produced by VALLEY GOLD.

(Complaint at ¶78).

There is thus no reason for the defendants to wonder why they have been sued; and they need not guess or speculate in preparing an answer to the claims against them.  They were sued because they intentionally concealed George Vieira's agreement to plead guilty to a massive fraud - a fraud directly related to

68

> the Valley Gold investment that the
> plaintiffs were being asked to fund with
> millions of dollars.

In addition, Plaintiffs contend, the combination of these allegations with the allegations in Paragraph 65 that "GENSKE-MULDER was motivated by its anticipation of securing income as a paid consultant and as the primary accounting firm for VALLEY GOLD" and that "DOWNEY BRAND was motivated by the anticipation and promise that it would be attorneys for and be paid for the rendition of legal services to VALLEY GOLD" suffice under *Livid Holdings, Ltd.* to allege scienter under the Ninth Circuit's heightened pleading standard.

Defendants respond that a desire to be paid for services is insufficient to create an inference of scienter, citing *Acito v. Imcera Group, Inc.*, 47 F.3d 47, 54 (2nd Cir.1995):

> Plaintiffs' allegation that defendants were
> motivated to defraud the public because an
> inflated stock price would increase their
> compensation is without merit.  If scienter
> could be pleaded on that basis alone,
> virtually every company in the United States
> that experiences a downturn in stock price
> could be forced to defend securities fraud
> actions.  '[I]ncentive compensation can
> hardly be the basis on which an allegation of
> fraud is predicated.' ... Therefore, we hold
> that the existence, without more, of
> executive compensation dependent upon stock
> value does not give rise to a strong
> inference of scienter.

Therefore, they contend, the motive alleged in Paragraph 65 does not combine with the allegations in the Complaint to create a strong inference of scienter.

A fair reading of the Complaint supports the inference that

the Complaint alleges each professional services firm had actual knowledge of Vieira's prior fraudulent conduct, criminal wrongdoing, and plea bargain; knew that the new venture involved the same business practices and would be managed by Vieira in a comparable manner, and they intended to deceive the investing dairy participants.  What has not been alleged is who the firms' individual participants were, what they contributed, and how and when they accomplished it.  This is insufficient as to the two firms.  The allegations are otherwise sufficiently pleaded. The motions to dismiss on this ground are GRANTED WITH LEAVE TO AMEND.

ii. <u>RELIANCE, CAUSATION AND DAMAGES</u>.

Defendants further argue that the elements of reliance, causation and damages are not adequately pleaded.  These grounds were briefly stated in Genske's opening brief and amplified in the reply brief.  Defendants cite no authority that the pleading of these elements are not subject to the notice pleading requirements of Rule 8.

Paragraphs 73 and 86 allege Plaintiffs' reliance on the alleged misrepresentations and omissions in the "prospectus" and the Offering Memorandum.[9]

---

[9]Although Defendants question the validity of the alleged reliance, given Plaintiffs' assertions that many of them cannot read or write English, this is a matter of proof, not pleading. Further, Plaintiffs may be entitled to a presumption of reliance, *see Binder v. Gillespie*, 184 F.3d 1059, 1063-1064 (9th Cir.1999), *cert. denied*, 528 U.S. 1154 (2000), an issue that cannot be resolved at the pleading stage.

With regard to causation, "[t]he causation requirement for Rule 10b-5 actions includes 'both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentation caused the harm.'" *Livid Holdings, Ltd.*, *supra*, 416 F.3d at 949, citing *Binder v. Gillespie*, *supra*, 184 F.3d at 1063.  Paragraph 87 alleges causation as well as damages.

Therefore, these grounds for dismissal of the Second Cause of Action are DENIED.

E.  <u>THIRD CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA SECURITIES LAW</u>.

The Third Cause of Action, which incorporates all preceding allegations, is a "civil cause of action asserted by Plaintiffs individually and on behalf of CVD" against Vieira, Cary, Genske, Downey and Does 21-50 "for violation of California Corporations Code section 25400(d)."  ¶ 89.  The allegations of the Third Cause of Action are essentially the same as those set forth in the Second Cause of Action.

1.  <u>STATUTE OF LIMITATIONS</u>.

Downey moves to dismiss the Third Cause of Action, contending that this cause of action "is barred by the three year outside statute of limitations that runs from the Offering." Downey cites as authority California Corporations Code § 25504.2 and *Roberts v. Heim*, 670 F.Supp. 1466, 1488 (N.D.Cal.1987), *aff'd in part and reversed in part*, 857 F.2d 646 (9th Cir.1988), *cert. denied*, 493 U.S. 1002 (1989).

71

There is no statute of limitations set forth in California Corporations Code § 25504.2. In *Heim*, the District Court held:

> Defendant Baskin and Sears moves to dismiss the § 25506.1 claim against it. The court finds the three year statute of limitations in this section to be an absolute limit not tolled by any allegations of fraudulent concealment. The plain language of the statute is similar to that of 15 U.S.C. § 77m and the analysis of this section above is equally applicable here. Therefore, this claim is dismissed.

670 F.Supp. at 1488. *Heim* is discussing a different California Corporations Code section than is alleged in the Third Cause of Action.

Because the authority cited does not support dismissal of the Third Cause of Action as barred by the statute of limitations as a matter of law, the motion to dismiss on this ground is DENIED.

        2.   <u>FAILURE TO COMPLY WITH RULE 9(b)</u>.

Defendants argue that the allegations of fraud provide no more specificity than that discussed above.

For the reasons stated in connection with the Second Cause of Action, this ground for dismissal of the Third Cause of Action is GRANTED WITH LEAVE TO AMEND.

        3.   <u>DERIVATIVE LIABILITY ON BEHALF OF CVD FOR CALIFORNIA SECURITIES LAW VIOLATIONS</u>.

Genske moves for dismissal to the extent that the Third Cause of Action is asserted derivatively on behalf of CVD. Genske cites California Food & Agriculture Code § 54201:

72

> An association is not subject in any manner
> to the terms of the Corporate Securities Law,
> Division 1 (commencing with Section 25000),
> Title 4 of the Corporations Code, and any
> association may issue its membership
> certificates or stock or other securities as
> provided in this chapter without the
> necessity of any qualification under that
> law.

Genske acknowledges that no case law interprets this statutory provision and concedes that, by its terms, Section 54201 excludes members of CVD from asserting claims against CVD under the California Securities laws for the purchase of interests in CVD.  Genske contends, however, that California Securities laws should likewise not apply with regard to derivative claims asserted on behalf of CVD for CVD's purchase of interests in Valley Gold:

> The purpose of an agricultural cooperative is
> to promote, foster, and encourage the
> intelligent and orderly marketing of
> agricultural products through cooperation,
> eliminate speculation and waste, and make the
> distribution of agricultural products as
> efficient as possible, and to stabilize the
> marketing of agricultural products
> (California Food & Agriculture Code § 54031).
> Under the Food and Agriculture Code section
> 54,200 [sic], CVD is assumed capable of
> protecting its own interests as a producer
> and distributor of a tangible product, in
> this case milk.

> As an agricultural cooperative, CVD's purpose
> is to market products, <u>not</u> to invest its
> monies in other companies, except as they
> relate to the efficient distribution of
> agricultural products.  As set forth in this
> Complaint, the purpose of Valley Gold was to
> provide a captive purchaser for milk produced
> by, *inter alia*, Plaintiffs.  CVD's investment
> in Valley Gold (as a captive producer of
> milk) is consistent with the objectives set

forth in California Food & Agriculture Code §
54181 which allows CVD to enter into contract
and 'arrangements' to carry on its business
the distribution of mil.. [sic]

The purpose of an agricultural cooperative
and its presumed ability to look after its
own affairs should be contrasted with the
protections provided to investors pursuant to
California Corporations Code §25,000 [sic].
Under the Corporations Code, the objective is
to protect passive investors from
unscrupulous persons who solicit their
passive (and unknowledgeable) investment
capital.  It is unnecessary to engraft the
California Corporations Code Securities laws
on actions taken by CVD to distribute milk
for the benefit of its members.  The
antifraud protections of the California
Corporations Code should not be available to
CVD because of its presumably knowledgeable
management of the distribution of milk and
milk-related products.  To the extent that
CVD invested money in Valley Gold to
facilitate the marketing of milk, it should
be able to act for its members without the
cloud of California securities liability.

Section 54201 cannot be construed as Genske argues. There is

nothing in the statutory language implying that a nonprofit

cooperative association is not itself entitled to the protections

of the California Securities laws if it purchases interests

subject to those laws.

Genske's motion to dismiss the Third Cause of Action on this

ground is DENIED.

F.   <u>FIFTH CAUSE OF ACTION FOR NEGLIGENCE</u>.

The Fifth Cause of Action, which incorporates all preceding

allegations, is "asserted by Plaintiffs individually and on

behalf of CVD and VALLEY GOLD against GEORGE VIEIRA, CARY,

GENSKE-MULDER, DOWNEY BRAND and Does 51 through 60."  The Fifth

74

Cause of Action alleges in pertinent part:

105. As a professional partnership that held itself out as providing complete accounting, tax and consulting services for the dairy industry, including 1) Annual and longterm tax planning; 2) Cash flow management; 3) Breakeven analysis; 4) Industry standards; 5) Financial goal setting; 6) Financial Forecasts & Projections; 7) Management Advisory Services; 8) Investment Review; and 9) Cash flow analysis for expansion or restructuring, and as a professional partnership that was retained and paid for its services by CVD and by many of the individual member dairy farmers of CVD, including Plaintiffs, GENSKE-MULDER owed to Plaintiffs a duty of care and loyalty.

106. As an attorney retained by CVD to assist in the formation of VALLEY GOLD, the issuance of securities in VALLEY GOLD, the preparation of contracts for CVD to supply milk to VALLEY GOLD, the preparation of the "milk for equity" agreements discussed in the fourth cause of action above, the explanation to plaintiffs of their rights and duties as members of CVD, and because CVD was an agricultural cooperative operating as a trust and agent for the direct benefit of its member dairies so that CARY was operating as a subagent, and because CARY knew with reasonable certainty that Plaintiffs would rely upon his statements, opinions and work product in acquiring ownership interests in VALLEY GOLD, CARY owed to Plaintiffs a duty of care and loyalty.

107. As a professional law partnership retained by CVD and VALLEY GOLD to assist in the formation of VALLEY GOLD and in the marketing of securities for VALLEY GOLD, including the preparation of the prospectus and Offering Memorandum, and because CVD was an agricultural cooperative operating as a trust and agent for the direct benefit of its member dairies so that DOWNEY BRAND was operating as a subagent, and because DOWNEY BRAND knew with reasonable certainty that Plaintiffs would rely upon its statements, opinions and work product, including the

75

prospectus and Offering Memorandum, in
acquiring ownership interests in VALLEY GOLD,
DOWNEY BRAND owed to Plaintiffs a duty of
care and loyalty.

108. As professionals, managers, officers,
employees and consultants retained by CVD
and/or VALLEY GOLD, acting as subagents and
for the direct benefit of the beneficial
owners of CVD, including Plaintiffs, as well
as for the benefit of VALLEY GOLD and all of
its members, DOES 51 through 60 owed to
Plaintiffs a duty of care and loyalty.

109. GEORGE VIEIRA, CARY, GENSKE-MULDER,
DOWNEY BRAND and DOES 51 through 60 failed to
adequately discharge their duties to
Plaintiffs, to CVD and to VALLEY GOLD, and
failed to act with reasonable care, failed to
meet the standards of care of similar
professionals acting in the community, and
failed to conduct themselves with of the
individual member dairy farmers of CVD,
including Plaintiffs, GENSKE-MULDER owed to
Plaintiffs a duty of care and loyalty.

106. As an attorney retained by CVD to assist
in the formation of VALLEY GOLD, the issuance
of securities in VALLEY GOLD, the preparation
of contracts for CVD to supply milk to VALLEY
GOLD, the preparation of the "milk for
equity" agreements discussed in the fourth
cause of action above, the explanation to
plaintiffs of their rights and duties as
members of CVD, and because CVD was an
agricultural cooperative operating as a trust
and agent for the direct benefit of its
member dairies so that CARY was operating as
a subagent, and because CARY knew with
reasonable certainty that Plaintiffs would
rely upon his statements, opinions and work
product in acquiring ownership interests in
VALLEY GOLD, CARY owed to Plaintiffs a duty
of care and loyalty.

107. As a professional law partnership
retained by CVD and VALLEY GOLD to assist in
the formation of VALLEY GOLD and in the
marketing of securities for VALLEY GOLD,
including the preparation of the prospectus
and Offering Memorandum, and because CVD was

76

an agricultural cooperative operating as a
trust and agent for the direct benefit of its
member dairies so that DOWNEY BRAND was
operating as a subagent, and because DOWNEY
BRAND knew with reasonable certainty that
Plaintiffs would rely upon its statements,
opinions and work product, including the
prospectus and Offering Memorandum, in
acquiring ownership interests in VALLEY GOLD,
DOWNEY BRAND owed to Plaintiffs a duty of
care and loyalty.

108. As professionals, managers, officers,
employees and consultants retained by CVD
and/or VALLEY GOLD, acting as subagents and
for the direct benefit of the beneficial
owners of CVD, including Plaintiffs, as well
as for the benefit of VALLEY GOLD and all of
its members, DOES 51 through 60 owed to
Plaintiffs a duty of care and loyalty.

109. GEORGE VIEIRA, CARY, GENSKE-MULDER,
DOWNEY BRAND and DOES 51 through 60 failed to
adequately discharge their duties to
Plaintiffs, to CVD and to VALLEY GOLD, and
failed to act with reasonable care, failed to
meet the standards of care of similar
professionals acting in the community, and
failed to conduct themselves with reasonable
business judgment or prudence.

110. In its oversight of CVD and in preparing
accounting statements and business
projections for CVD, GENSKE-MULDER should
have, in the exercise of reasonable
diligence, discovered GEORGE VIEIRA's
numerous defalcations. The records of CVD
indicated a high level of milk product being
diverted out of the normal supply channels
and instead routed through CMM. GENSKE-MULDER
in the exercise of reasonable diligence
should have investigated the activity.

111. The records of CVD showed a high volume
of brokerage payments made to CMM, which
GENSKE-MULDER in the exercise of reasonable
diligence likewise should have investigated.

112. Plaintiffs are informed and believe, and
thereon allege, that the records of CVD
disclosed that CVD incurred significant legal

77

fees in 2003, because GEORGE VIEIRA used the proceeds from the sale of milk from the members of CVD, including Plaintiffs, to pay lawyers to defend him from the criminal investigations of the Securities and Exchange Commission and the United States Attorney's Office, and to negotiate the terms of a plea bargain. Plaintiffs are informed and believe, and thereon allege, that these expenses, clearly occurring outside the ordinary course of CVD's business, included payments to the high priced lawyers with the New Jersey law firm of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, and in the exercise of reasonable diligence, GENSKE-MULDER should have investigated, and disclosed to the Board of CVD the criminal conduct that GEORGE VIEIRA was being investigated for, as well as the clear inappropriate diversion of CVD's funds for GEORGE VIEIRA's personal use.

113. The records of CVD showed an unusual delay in the payment by purchasers for milk supplied by CVD, as well as nonpayment for milk, made all the more unusual because the mandatory provisions of California law requiring that payments be made in very short time frames (approximately fifteen days). In the exercise of reasonable diligence, GENSKEMULDER [sic] should have investigated the source for the delays, and discovered the fraudulent diversion of CVD's milk to CMM and thereafter to the criminal enterprise centered around Suprema Specialties, Inc.

114. After learning of the government's investigations of GEORGE VIEIRA's criminal conduct and after learning in or about the Spring of 2003 of GEORGE VIEIRA's agreement to plead guilty to securities fraud and conspiracy to commit bank and mail fraud, GENSKE-MULDER, in the exercise of reasonable diligence, should have disclosed the information to CVD's Board, to VALLEY GOLD's Board, and to Plaintiffs; and GENSKEMULDER [sic] should have undertaken a thorough investigation of the extent to which GEORGE VIEIRA had used CVD and CMM as instrumentalities of the criminal scheme for which he was being investigated and for which

78

he had agreed to plead guilty.

115. As experts in the dairy industry, GENSKE-MULDER should have had intimate knowledge of the requirements and procedures of the Milk Producers Trust Fund, and GENSKE-MULDER should have recognized that the milk supply contract proposed and ultimately adopted pursuant to which CVD supplied the majority of its member dairies' milk to VALLEY GOLD was *not* protected by the trust fund, both because VALLEY GOLD had not and never did secure the required bond, and because CVD's member dairies were equity owners of VALLEY GOLD. In the exercise of reasonable care, GENSKE-MULDER should have disclosed to CVD and Plaintiffs that their shipments of milk to VALLEY GOLD were not protected by the trust fund; and in the exercise of reasonable care, GENSKE-MULDER should have recommended against the creation of VALLEY GOLD and/or recommended other business structures that would have maintained Plaintiffs' protection through the Milk Producers Trust Fund.

116. In preparing financial projections of VALLEY GOLD's anticipated business for CVD and VALLEY GOLD, GENSKE-MULDER failed to act with reasonable care and failed to follow standard accounting practices.

117. In its work on the preparation of the prospectus and Offering Memorandum, GENSKE-MULDER failed to act with reasonable care.

118. In failing to investigate the viability and reputation of the New Jersey distributor that GEORGE VIEIRA proposed as the main buyer of cheese produced by VALLEY GOLD, and in failing to compare the terms contained in the purchase contract with that distributor against industry standards, GENSKE-MULDER failed to act with reasonable care.

119. After learning of the government's investigations of GEORGE VIEIRA's criminal conduct and after learning in or about the Spring of 2003 of GEORGE VIEIRA's agreement to plead guilty to securities fraud and conspiracy to commit bank and mail fraud,

CARY and DOWNEY BRAND, in the exercise of reasonable diligence, should have disclosed the information to CVD's Board, to VALLEY GOLD's Board, and to Plaintiffs; and CARY and DOWNEY BRAND should have undertaken a thorough investigation of the extent to which GEORGE VIEIRA had used CVD and CMM as instrumentalities of the criminal scheme for which he was being investigated and for which he had agreed to plead guilty.

120. As licensed attorneys representing clients engaged in the dairy industry, CARY and DOWNEY BRAND should have had intimate knowledge of the requirements and procedures of the Milk Producers Trust Fund, and CARY and DOWNEY BRAND should have recognized that the milk supply contract proposed and ultimately adopted pursuant to which CVD supplied the majority of its member dairies' milk to VALLEY GOLD was *not* protected by the trust fund, both because VALLEY GOLD had not and never did secure the required bond, and because CVD's member dairies were equity owners of VALLEY GOLD. In the exercise of reasonable care, CARY and DOWNEY BRAND should have disclosed to CVD and Plaintiffs that their shipments of milk to VALLEY GOLD were not protected by the trust fund; and in the exercise of reasonable care, CARY and DOWNEY BRAND should have recommended against the creation of VALLEY GOLD and/or recommended other business structures that would have maintained Plaintiffs' protection through the Milk Producers Trust Fund.

121. In their work on the preparation of the prospectus and Offering Memorandum, CARY and DOWNEY BRAND failed to act with reasonable care.

122. In proposing, preparing and recommending that Plaintiffs, CVD and VALLEY GOLD execute the illegal "milk for equity" contracts that are the subject of the fourth cause of action, above, CARY failed to act with reasonable care.

123. In his management of the day-to-day operations of CVD and VALLEY GOLD, including by diverting milk supplies from the normal

distribution channels to CMM, and in the handling of the assets, receivables, inventory and records of CVD and VALLEY GOLD, in maintaining inadequate or nonexistent controls on cash, receivables, inventory and other aspects of CVD and VALLEY GOLD's businesses, and through other business lapses and errors, GEORGE VIEIRA failed to act with reasonable care.

124. These and other negligent acts and omissions by defendants directly caused injury to Plaintiffs and to CVD and VALLEY GOLD, in a sum exceeding $20 million.

1.   STATUTE OF LIMITATIONS.

Downey moves to dismiss this cause of action on the ground that it is barred by the one-year statute of limitations set forth in California Code of Civil Procedure § 340.6.

Section 340.6 provides in pertinent part:

(a) An action against an attorney for a wrongful act or omission, other than actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first ....

...

(b) In an action based upon an instrument in writing, the effective date of which depends upon some act or event of the future, the period of limitations provided for by this section shall commence to run upon the occurrence of such act or event.

Other than citing this statute, Downey presents no analysis in support of this ground for dismissal of the Fifth Cause of Action.  Because the bar of the statute of limitations is an

affirmative defense and generally presents a question of fact, dismissal under Rule 12(b)(6) is appropriate only if it can be determined from the face of the Complaint that these claims are time-barred.  *See Morley v. Walker*, *supra*, 175 F.3d at 759; *Jablon v. Dean Witter & Co.*, *supra*, 614 F.2d at 682.  At this juncture, such a conclusion cannot be made.

Dismissal of the Fifth Cause of Action on this ground is DENIED.

### 2.  DOWNEY - DUTY OF CARE.

Downey is alleged to have been "retained by CVD and/or VALLEY GOLD, particularly to take the lead in preparing a prospectus for the offering of securities for VALLEY GOLD and thereafter in creating a (blatantly illegal) proposal for Plaintiffs to forego payment for milk supplied to VALLEY GOLD in exchange for worthless additional ownership interests in VALLEY GOLD - at a time when it should have been clear to defendants that GEORGE VIEIRA's plans for VALLEY GOLD were destined to fail."  ¶ 40.

Downey contends that it was retained by Valley Gold, but assumes for purposes of this motion that it was retained by CVD. Downey moves for dismissal of the Fifth Cause of Action on the ground that the Complaint fails to allege facts demonstrating that Downey owed the "non-client plaintiffs" a duty of care. Downey asserts that it had no attorney-client relationship with, and owes no professional duties of disclosure to, CVD's shareholder/members or its individual officers.

82

"A key element of any action for professional malpractice is the establishment of a duty by the professional to the claimant. Absent duty there can be no breach and no negligence." *Goldberg v. Frye*, 217 Cal.App.3d 1258, 1267 (1990).  *See also Skarbrevik v. Cohen, England & Whitfield*, 231 Cal.App.3d 692, 701 (1991)("An attorney generally will not be held liable to a third person not in privity of contract with him since he owes no duty to anyone other than his client.").  Whether a duty of care existed is a question of law and depends on a judicial weighing of the policy considerations for and against the imposition of liability under the circumstances.  *Goodman v. Kennedy*, 18 Cal.3d 335, 342 (1976).

In *Navellier v. Sletten*, 262 F.3d 923, 934 (9th Cir.2001), *cert. denied,* 536 U.S. 941 (2002), the Ninth Circuit, citing *Goodman v. Kennedy,* stated:

> [T]he California Supreme Court has explained that the determination of whether the duty undertaken by an attorney extends to a third party not in privity involves the balancing of several factors.  These factors include: (1) "the extent to which the transaction was intended to affect the plaintiff," (2) "the foreseeability of harm to him," (3) "the degree of certainty that the plaintiff suffered injury," (4) "the closeness of the connection between the defendant's conduct and the injury suffered", (5) "the moral blame attached to the defendant's conduct," and (6) "the policy of preventing future harm."

Plaintiffs argue that Downey owed a duty of care to Plaintiffs and/or Valley Gold.  Noting that Paragraph 43 of the Complaint alleges that CVD "operates on behalf of and for the benefit of

its member dairies, collecting proceeds from the sale of milk for the member dairies and holding those proceeds in trust and for the benefit of the member dairies" and that "CVD and its managers, consultants and employees thus are fiduciary trustees owing duties of care and loyalty directly to the members of CVD, including Plaintiffs", Plaintiffs contend that Downey owed a duty of care based on these allegations because it represented CVD. Plaintiffs also refer to the allegations in Paragraph 44 and 108:

> 44.  Moreover, as a non-profit agricultural cooperative association, and pursuant to section 54173 of the California Food and Agricultural [sic] Code, CVD acted as the agent for its member dairies in marketing, selling, storing and handling the milk produced by the member dairies; and the directors, officers, consultants and professionals retained by CVD were accordingly subagents, owing direct duties of care and trust to the member dairies, including Plaintiffs.

> ...

> 108.  As professionals, managers, officers, employees and consultants retained by CVD and/or VALLEY GOLD, acting as subagents and for the direct benefit of the beneficial owners of CVD, including Plaintiffs, as well as for the benefit of VALLEY GOLD and all of its members, DOES 51 through 60 owed to Plaintiffs a duty of care and loyalty.

Plaintiffs go on to argue that the Complaint alleges derivative claims on behalf of Valley Gold, to which Downey acknowledges a duty of care.  Finally, Plaintiffs contend that an attorney does owe a duty of care even to non-clients, citing Vapnek, et al., Cal.Prac. Guide: Professional Responsibility (T.R.G.2006) § 6:243: "These are usually situations where the nonclient was the

intended beneficiary of the attorney's services or where the foreseeability of harm to the nonclient from the attorney's professional negligence outweighs other policy considerations." Plaintiff also cite Vapnek, *id.,* §3:40.5: An "attorney's duty to communicate with a client includes the duty to communicate to persons who reasonably believe they are clients to the attorney's knowledge at least to the extent of advising them that they are not clients." Plaintiffs assert that they thought Downey was acting as their attorneys and, in failing to notify them otherwise, Downey was negligent.

Whether and to what extent Downey owed a duty of care to Plaintiffs, individually, or to CVD or Valley Gold in Plaintiffs' derivative claims, will depend on the facts as developed through discovery, summary judgment or trial.  It cannot be concluded at the pleading stage as a matter of law that Downey owed no duty of care.  The motion to dismiss the Fifth Cause of Action on this ground is DENIED.

3. <u>GENSKE - DUTY OF CARE</u>.

Genske moves to dismiss the Fifth Cause of Action on the ground that the Complaint fails to allege that Plaintiffs are its clients with regard to the Valley Gold transaction or the "milk for equity" transactions.  Genske further argues, to the extent the Complaint alleges derivatively that CVD is a client of Genske, there is no allegation that Genske has breached a duty of care to CVD or Valley Gold, contending that the Complaint fails to state what specific services Genske failed to provide or

85

failed to provide within the standard of care to either CVD or Valley Gold.

In *Bily v. Arthur Young & Co.*, 3 Cal.4th 370 (1992), the California Supreme Court held that an accounting firm can be held liable for general professional negligence in conducting an audit of financial statements only to the person or entity contracting for the accountant's services, and, in that case, the accounting firm's sole client was the company.[10]  The Supreme Court stated:

> [W]e hold that an auditor's liability for general negligence in the conduct of an audit of its client financial statements is confined to the client, i.e., the person who contracts for or engages the audit services. Other persons may not recover on a pure negligence theory.

3 Cal.4th at 406.  The Supreme Court noted, however:

> In theory, there is an additional class of persons who may be the practical and legal equivalent of 'clients.'  It is possible the audit engagement contract might expressly identify a particular third party or parties so as to make them express third party beneficiaries of the contract.  Third party beneficiaries may under appropriate circumstances possess the rights of parties to the contract ... This case presents no third party beneficiary issue.  Arthur Young was engaged by the company to provide audit reporting to the company.  No third party is identified in the engagement contract. Therefore, we have no occasion to decide whether and under what circumstances express third party beneficiaries of audit engagement contracts may recover as 'clients' under our holding.

---

[10]The California Supreme Court further held that an accountant may be held liable for negligent misrepresentation to third parties who are known to the accountant and for whose benefit the audit report was rendered.

86

*Id.* at 406 n.16.

Plaintiffs make the same arguments described above with regard to Downey's duty of care in opposing Genske's motion to dismiss.  In addition, Plaintiffs refer to the allegation in Paragraph 37 that Genske "at all times relevant hereto provided accounting and consulting, management advisory and investment services to Plaintiffs."

In reply, Genske contends that neither the Complaint nor Plaintiffs' opposition identify the consulting client, the duration of the consulting agreement, or the specific terms. Genske argues that without some description of the alleged consultant role, it is impossible to determine whether Genske had any duties to the individual Plaintiffs or whether it breached any duties.  With regard to Plaintiffs' allegations that Genske owed direct duties to Plaintiffs as subagents, Genske contends that the mere allegation of "subagency" does not create a duty where none has been assumed by Genske.  Genske cites *Mariani v. Price Waterhouse*, 70 Cal.App.4th 685, 696 (1999)("There was no allegation in the second amended (or any other) complaint that Mariani, as an individual or as general partner of one of the guarantor partnerships, engaged respondent's services.").  Genske also cites *Richard B. LeVine, Inc. v. Higashi*, 131 Cal.App.4th 566, 584 (2005):

> At bottom, the finding of an accountant-client relationship must be founded upon an agreement which, if not expressed, must at least be implied in fact.  We do not find any evidence in this case from which it can be

implied that Higashi was performing
accounting services for plaintiff, as
contrasted with the performance of services
for the partnership generally.  We do not
imply a contract between an individual
partner and the partnership's accountant from
the mere provision of a Schedule K-1 to the
individual partner.  Providing a Schedule K-1
to individual partners satisfies the
*partnership's* obligation under the Internal
Revenue Code ... Thus, the *partnership* as an
entity, rather than an individual partner,
appropriately contracts with an accountant to
perform this service.

*See also Software Design and Application, Ltd. v. Price Waterhouse, LLP,* 49 Cal.App.4th 464 (1996); *Hayes v. Arthur Young & Co.,* 1994 WL 463493 (9th Cir.1994).

Given the requirements of notice pleading, the specifics of any consulting agreement and the existence of a duty of care must be the focus of discovery, not pleading.  It is clearly alleged that the financial information Genske was including in financial statements and reports for CVD and/or Valley Gold was to be communicated to and used by Plaintiffs in their participation in the business of owning shares and providing milk to Valley Gold. Therefore, the motion to dismiss on this ground is DENIED.

4. <u>GENSKE - PROXIMATE CAUSE</u>.

Genske moves to dismiss the Fifth Cause of Action on the ground that the element of proximate cause is inadequately pleaded.  Genske asserts that the Complaint fails to allege any connection between Plaintiffs' losses, CVD's losses, or Valley Gold's losses and any accounting services provided by Genske. For example, Genske contends, "the Complaint fails to state that

as a result of ... negligent projections, Valley Gold's business failed, CVD's investment in Valley Gold was lost, or 'but for' financial projections or other information provided by Genske-Mulder Plaintiffs supplied milk to an otherwise failing Valley Gold."

However, Plaintiffs allege that as a result of Genske's accounting, Plaintiffs were induced to invest and deliver milk to CVD and Valley Gold to their direct detriment.  Given the standards governing a Rule 12(b)(6) motion, the Complaint gives adequate notice to Genske of the basis of the claimed negligence, including causation.  The motion to dismiss on this ground is DENIED.

G.   <u>SIXTH CAUSE OF ACTION FOR MISREPRESENTATION</u>.

The Sixth Cause of Action, which incorporates all preceding allegations, is asserted by Plaintiffs "individually and on behalf of CVD for intentional or negligent misrepresentation ...." against Defendants Vieira, Cary, Genske, Downey and Does 1-60.  The Sixth Cause of Action alleges in pertinent part:

> 127. These defendants made representations of material facts to CVD and Plaintiffs, or withheld material information from Plaintiffs in the face of a duty of disclosure, as recounted more fully above, in, among other allegations, the allegations contained in paragraphs 58, 68, 74, 77, 78, 79, 81, 82 and 93.
>
> 128. Defendants either actively knew, or in the exercise of reasonable diligence should have known, that the matters they misrepresented were false, and that the matters they withheld was material information that they had the duty to

disclose.

129. Plaintiffs and CVD did not know the information that was withheld, and did not know that the matters that were misrepresented were false.

130. Defendants intended that Plaintiffs and CVD rely upon the misrepresentations that were made to them.

131. Plaintiffs and CVD relied upon the misrepresentations by investing in VALLEY GOLD, by executing the supply contract between CVD and VALLEY GOLD, by entering into the "milk for equity" contracts, by continuing to provide milk to CVD even after failing to receive payment, and by entrusting the management of CVD and VALLEY GOLD to GEORGE VIEIRA, and by entrusting oversight of CVD and VALLEY GOLD to GENSKE-MULDER and other professionals. Had Plaintiffs and CVD known the truth, they would not have taken these actions.

132. Plaintiffs did not learn the truth until the last year.

133. As a result of their reliance on defendants' misrepresentations, Plaintiffs and CVD have been damaged in a sum exceeding $20 million.

134. Plaintiffs are informed and believe, and thereon allege, that in making the false statements identified above, defendants intended to cause damage to Plaintiffs and CVD, and intended to obtain benefits for themselves at the expense of Plaintiffs and CVD. Plaintiffs are informed and believe, and thereon allege, that in the conduct set forth in the cause of action, defendants acted with malice, oppression and fraud. As a result, and by way of punishment and example, punitive damages should be assessed against defendants.

Genske moves to dismiss this cause of action on the ground that the conjunctive pleading for "intentional or negligent misrepresentation" makes it impossible for Genske to determine

whether the claim is for intentional misrepresentation or negligent misrepresentation.

Although the Sixth Cause of Action alleges "intentional or negligent misrepresentation", the balance of the allegations make clear that the cause of action is for intentional misrepresentation. However, if Plaintiffs intend to state claims for both intentional and negligent misrepresentation, the Complaint should be amended to separately allege these claims as different causes of action because they are factually inconsistent.

Citing *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 216-217 (1983), Genske notes that California imposes similar specificity requirements for pleading a state law fraud claim as are imposed by Rule 9(b), and contends such a claim "requires an express identification of the speaker, the word spoken, to whom it was spoken, and the facts alleged to be false, the reason that they are false, reliance, proximate case [sic] and resulting damages."

However, the case cited by Genske does not so hold. Genske is characterizing an argument made to the California Supreme Court as the holding of the case. Furthermore, the pleading standards to be imposed are those mandated by Rule 9(b).

Although alternative legal theories can be alleged in separate claims, it is improper to join two inconsistent claims in one. The Sixth Cause of Action states a claim for intentional misrepresentation. The claim for negligent misrepresentation is

91

DISMISSED WITH LEAVE TO AMEND.

## CONCLUSION

For the reasons stated above:

1.  Defendants' Downey Brand LLP and Genske, Mulder & Company's motions to dismiss are GRANTED IN PART WITH LEAVE TO AMEND AND DENIED IN PART.

2.  Plaintiffs shall file a First Amended Complaint in accordance with the rulings made herein within 20 days of service of this Order.  Defendants shall respond within 20 days thereafter.

IT IS SO ORDERED.

Dated:   May 29, 2007                    /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE