IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUEL LOPES, et al., | No. CV-F-06-1243 OWW/SMS |
| | |
| | MEMORANDUM DECISION AND |
| | ORDER DENYING DEFENDANT |
| Plaintiff, | GENSKE, MULDER & COMPANY'S |
| | MOTION TO STRIKE [Doc. 33] |
| vs. | AND GRANTING IN PART AND |
| | DENYING IN PART MOTION TO |
| | DISMISS FIRST AMENDED |
| GEORGE VIEIRA, et al., | COMPLAINT [Doc. 32] AND |
| | GRANTING IN PART AND DENYING |
| | IN PART DEFENDANT DOWNEY |
| Defendant. | BRAND LLP'S MOTION TO |
| | DISMISS FIRST AMENDED |
| | COMPLAINT [Doc. 35] |

Plaintiffs Manuel and Mariana Lopes dba Lopes Dairy; Raymond
Lopes; Joseph Lopes and Michael Lopes, individually and dba
Westside Holstein; Alvaro Machado and Tony Estevan have filed a
First Amended Complaint ("FAC") pursuant to the Court's Order
filed on May 30, 2005 (May 30 Order).  Defendants are George and
Mary Vieira; California Milk Market, a California Corporation;
Valley Gold, LLC, a California limited liability company; Genske,
Mulder LLP, a California limited liability partnership; Anthony
Cary; Downey Brand LLP, a California limited liability
partnership; Central Valley Dairymen, Inc. (CVD), a California
Food and Agricultural Nonprofit Cooperative Association; and Does

1

1-25.[1]

Defendants Genske, Mulder & Company ("Genske") and Downey Brand LLP ("Downey") have each filed motions to dismiss pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, for failure to state a claim against them upon which relief can be granted. In addition, Genske has filed a motion to strike certain allegations of the FAC pursuant to Rule 12(f), Federal Rules of Civil Procedure.

A.   GENSKE'S MOTION TO STRIKE.

Genske moves pursuant to Rule 12(f), Federal Rules of Civil Procedure, to strike the allegations in Paragraph 41 of the FAC, which names as Defendants Does 1-100, inclusive, and the allegations in Paragraphs 62-68, 70, 80, 82-83, and 85, wherein Does 1-10 and George Vieira are referred to collectively as the "Promoters".

In moving to strike these allegations, Genske argues that Doe allegations are improper in the Ninth Circuit.

*Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir.1980), holds:

> As a general rule, the use of 'John Doe' to
> identify a defendant is not favored ...
> However, situations arise ... where the

---

[1]On October 4, 2007, Plaintiffs filed a notice of voluntary dismissal of Defendant Anthony Cary.  The Order dismissing Anthony Cary without prejudice was filed on October 10, 2007.  Because Plaintiffs will be required to file a Second Amended Complaint, all references to Anthony Cary should be deleted from any Second Amended Complaint.

Defendants George and Mary Vieira and California Milk Market filed an Answer to the FAC on July 26, 2007.

> **identity of alleged defendants will not be known prior to the filing of a complaint. In such circumstances, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds.**

Genske argues that *Civiletti* only allows Doe pleading "in limited circumstances: to protect the plaintiffs' privacy [not applicable to this motion]; in civil rights cases where the name of the government agent is not known or readily knowable; and in cases filed by *pro per* plaintiffs."

Genske cites no authority for such limitations on Doe pleading. While Doe pleading is disfavored, it is not prohibited in federal practice.

Plaintiffs contend that they have named Doe Defendants pursuant to California Code of Civil Procedure § 474 and note that "[t]he purpose of section 474 is to permit the plaintiff to avoid the bar of the statute of limitations." *Sobeck & Associates, Inc. v. B & R Investments No. 24,* 215 Cal.App.3d 861, 867 (1989). Plaintiffs also cite Rule 15(c)(1), Federal Rules of Civil Procedure:

> **An amendment of a pleading relates back to the date of the original pleading when**
>
> **(1) relation back is permitted by the law that provides the statute of limitations applicable to the action ....**

Plaintiffs argue that, when a claim is based on state law, the plaintiff must be allowed to include Doe Defendants, "for otherwise the policy of applying state law relation back rules

3

would be thwarted."

Does are alleged in causes of action for violation of federal law as well as in causes of action for violation of state law.

Genske further complains that Plaintiffs have had the benefit of discovery in *Nunes v. Central Valley Dairymen*, Merced County Superior Court case No. 147653. Genske contends that Plaintiffs know, or should know, the identities of the Doe Defendants.

Because the naming of Doe Defendants is only disfavored, the motion to strike is DENIED. Whether Plaintiffs will be able to substitute individuals for the Doe Defendants will depend on discovery and Rule 15, Federal Rules of Civil Procedure. Whether further amendment to substitute specific individuals for Doe Defendants to invoke relation back in order for purposes of applicable statutes of limitations under either federal or state law remains for further decision.

    B. <u>MOTIONS TO DISMISS</u>.

        1. <u>BACKGROUND</u>.

The FAC alleges that Plaintiffs are owners and operators of dairy farms located in Merced County, California. In the section of the FAC captioned "Summary", Plaintiffs allege:

> 1. Plaintiffs are all owners and operators of dairy farms located in Merced County, California. Through the machinations of George Vieira and his wife, Mary Vieira, facilitated by the gross negligence and/or participation of accounting, managerial and legal professionals, more than several

million dollars worth of milk produced by Plaintiffs' farms was diverted from the proper supply channels into a criminal enterprise headquartered in New Jersey.  As a result, Plaintiffs have unnecessarily incurred expenses and other damages, and Plaintiffs have not been paid for the milk that they supplied; rather, proceeds from the sale of their milk and related brokerage fees and commissions have been diverted to the criminal enterprise and to George Vieira and his wife, Mary Vieira, and their company California Milk Market, a California Corporation.  George Vieira, Mary Vieira and California Milk Market, in turn, used the diverted proceeds to purchase real estate in at least Stanislaus County, San Joaquin County and Tuolumne County.  They have more recently attempted to shelter and hide their ill-gotten proceeds by transferring parcels of real estate to third parties, either acting as nominees or without payment of fair value.

2.  The criminal enterprise that George Vieira, Mary Vieira and California Milk Market conspired with and used to divert milk payments from plaintiffs to themselves consisted of an affiliation of cheese manufacturers, bulk buyers of cheese products, and milk product brokers, together with the officers and owners who ran these businesses.

3.  The criminal enterprise centered upon a publicly traded company called Suprema Specialties, Inc., and a concerted scheme to inflate the size, profitability, growth and inventory value of Suprema Specialties, Inc. Indeed, from 1996 to 2002, Suprema Specialties, Inc. reported annual double-digit growth in sales and revenues, and it used that reported growth to raise more than $150 million from two public stock offerings and from bank loans.  These funds were then largely diverted to individual members of the criminal enterprise.

4. Suprema Specialties, Inc. created the appearance of rapid and steady growth by using fictitious invoices and fictitious

5

purchase orders, in a scheme that the Securities and Exchange Commission dubbed "Round-Tripping."  Under the Round-Tripping arrangements, Suprema Specialties, Inc. would pretend to purchase milk and milk products from milk product brokers, ostensibly to manufacture into cheese.  Suprema Specialties, Inc. would then issue checks to pay for these orders, but no product was physically shipped.  Instead, the milk product brokers and bulk cheese buyers who participated in the criminal enterprise would turn around and pretend to order manufactured cheese products from Suprema Specialties, Inc., which Suprema Specialties, Inc. would report on its books to inflate its sales and accounts receivable.  The milk product brokers and bulk cheese consumers would then use the payments that were sent to them from Suprema Specialties, Inc., after deducting commission payments for themselves, to make payments on the fictitious orders, so that Suprema Specialties, Inc. could show regular payments on its fictitious accounts receivable and keep the receivables current – a condition required for Suprema Specialties, Inc.'s large bank loans.

5.  In 2001, Suprema Specialties, Inc. reported $420 million in revenues; a substantial portion of those revenues was fictitious.  The Securities and Exchange Commission's investigation found that from 1998 to February of 2002, at least $135 million of Suprema Specialties, Inc.'s reported revenue was fictitious.

6.  In order to maintain the pretense of growth and profitability, Suprema Specialties, Inc. manufactured cheese and cheese products and it maintained warehouses of inventory.  But the actual inventory based upon the actual volume of cheese that Suprema Specialties, Inc. manufactured was too small in relation to its reported volume of sales, and Suprema Specialties, Inc. accordingly cut the cheese with starch fillers and affixed false labels to the inventory, thus fraudulently inflating both the size and the value of the inventory.

7.   Additionally, to mask its fraudulent activities, Suprema Specialties, Inc. used the same milk product brokers for its legitimate purchases of milk as it used for its fictitious purchases.  This practice, and other steps taken by the criminal enterprise, directly led to plaintiffs' catastrophic loss.  The loss primarily falls into four categories.

**SUPREMA'S BANKRUPTCY**

8.   Defendant George Vieira was retained by and controlled the day-to-day operations of and business planning for Central Valley Dairymen, an agricultural cooperative through which plaintiffs sold the milk produced by their dairy farms.  From November 2001 through March 2002, Mr. Vieira was also the Chief Operating Officer of Suprema Specialties West, Inc., a wholly owned subsidiary of Suprema Specialties, Inc.  In addition, Mr. Vieira and his wife Mary Vieira owned and controlled defendant California Milk Market, LLC, one of the milk product brokers that was a member of the criminal enterprise centered around Suprema Specialties, Inc.

9.   As part of the criminal enterprise, Mr. Vieira regularly caused Central Valley Dairymen to sell its inventory of milk to Suprema Specialties, Inc., as well as to the related subsidiaries of Suprema Specialties, Inc., much of which was routed through California Milk Market, LLC.

10.   For several years, Mr. Vieira actively hid from plaintiffs his involvement in the criminal enterprise.  Indeed, Mr. Vieira represented to the plaintiffs that the bankruptcy of Suprema Specialties, Inc. created a great opportunity for plaintiffs to enter into the cheese manufacturing business and fill the market void left when Supreme Specialties, Inc. went out of business.  Within the last year, plaintiffs have discovered the truth — that the milk they supplied to Central Valley Dairymen was diverted without payment to a criminal enterprise, that on January 7 of 2004, Mr.

7

Vieira and other leaders of the criminal
enterprise pled guilty to securities fraud
and conspiracy to engage in mail fraud and
bank fraud, and that the bankruptcy of
Suprema Specialties, Inc. did not create any
significant market void, since vast portions
of Suprema Specialties, Inc.'s reported
cheese sales were fictitious.

11.  Because of the bankruptcy of Suprema
Specialties, Inc. and Suprema Specialties
West, Inc., caused by the criminal enterprise
guided by Mr. Vieira, Plaintiffs have been
denied payment for more than one million
dollars in milk supplied through Central
Valley Dairymen to California Milk Market,
Suprema Specialties, Inc. and Suprema
Specialties West, Inc.

LOSS OF FUND PROTECTION

12.  In 1987, the State of California
established the Milk Producers Trust Fund to
provide protection to dairy farmers like
Plaintiffs.  The fund guarantees that
California milk producers will be paid for
their milk as long as the milk is sold to a
bonded California processor.  However, the
Fund does not cover milk sales that are
handled by a broker; and the Fund does not
cover milk that is sold to a processor in
which the producer holds a beneficial
interest.

13.  Mr. Vieira, while purporting to act as a
fiduciary agent for Central Valley Dairymen
and its dairy farm members (including
Plaintiffs), routed a substantial portion of
the agricultural cooperative's supply of milk
through California Milk Market, a milk
brokerage owned and controlled by Mr. Vieira
and his wife.  By routing milk through
California Milk Market, these defendants
caused Plaintiffs to lose the protection of
the Milk Producers Trust Fund.  This loss of
Trust Fund protection only added to
Plaintiffs' staggering losses.

CHURNING

14.  Additionally, as part of the Round-

8

Tripping scheme centered around Suprema Specialties, Inc., California Milk Market engaged in the fictitious sale of milk to Suprema Specialties, Inc. or its subsidiary, Suprema Specialties West, Inc.  As noted, California Milk Market also shipped legitimate milk produced by Central Valley Dairymen to Suprema Specialties, Inc. or its subsidiary, Suprema Specialties West, Inc. This milk was routed through California Milk Market rather than shipped directly from Central Valley Dairymen in order to enhance the appearance of California Milk Market's legitimacy; but in the process, California Milk Market charged a brokerage fee on each such transaction.

15.  To further mask the fraudulent Round-Tripping scheme, California Milk Market and the criminal enterprise prepared false paperwork stating that significant portions of Central Valley Dairymen's milk that was routed through California Milk Market and shipped to Suprema Specialties, Inc. and its subsidiary failed to meet quality requirements, resulting in the milk being rejected by the processor and returned to California Milk Market.  With the fictitious transaction masked in this fashion, California Milk Market and its owners and operators would then broker the milk to another legitimate processor.

16.  With each transaction, however, California Milk Market collected a brokerage fee, and Plaintiffs are informed and believe, and thereon allege, that California Milk Market, George Vieira and Mary Vieira also created fictitious shipping invoices diverting to themselves payment for transport costs that in reality were never incurred.  With the slew of fictitious transactions, California Milk Market accordingly collected fees that it had not earned, and diverted further sums that rightfully belonged to Plaintiffs into the hands of George Vieira and Mary Vieira.

CREATION OF VALLEY GOLD, LLC

17.  In addition, the criminal enterprise

9

centered around Suprema Specialties, Inc. was so lucrative and successful that Mr. Vieira decided in the winter of 2002, after the collapse of Suprema Specialties, Inc., to recreate the scheme.  To do so, however, he needed to find or create a cheese manufacturer to replace Suprema Specialties' role in the fraudulent scheme.

18.  George Vieira thus proposed to Plaintiffs and other members of Central Valley Dairymen that they purchase a cheese manufacturing plant that he would be in charge of operating.  Mr. Vieira first presented this proposal at or about the time of the 2002 annual dinner held by the members of Central Valley Dairymen.

19.  Mr. Vieira initially focused upon endeavoring to purchase a cheese plant in Manteca, California that had been operated by Suprema Specialties West, Inc., but in early 2003 recognized that it would not be possible to acquire that plant.  By March of 2003, George Vieira shifted his focus and instead launched an effort to acquire a cheese plant located in Gustine, California that was for sale by Land-O-Lakes.

20.  At this same time, in early 2003, George Vieira was already engaged in negotiations with the U.S. Attorney's offices about pleading guilty to securities fraud for his participation in the criminal enterprise's scheme to inflate the stock price of Suprema Specialties, Inc. through the use of fictitious Round-Tripping transactions.  On March 28, 2003, the U.S. Attorneys Office sent a seven page letter to Mr. Vieira's attorney stating the materials terms of the plea deal.  Mr. Vieira signed the letter indicating his consent to the plea terms on August 26, 2003.

21.  Mr. Vieira personally spearheaded the proposal to acquire the Gustine facility, and actively acted as promoter of the venture.  On April 4, 2003, he caused Valley Gold, LLC to be formed as a California limited liability company and he shortly afterward supplied a $200,000 deposit of

10

earnest money to Land-O-Lakes as a condition
of negotiating an agreement to purchase the
cheese facility, which he caused to be
signed shortly afterward.  In these tasks,
and in seeking funding for the venture from
Plaintiffs and others, George Vieira also
enlisted the assistance of Anthony Cary,
Genske-Mulder LLP and Downey Brand LLP.
Anthony Cary is and remains a licensed
attorney practicing in the Sacramento area.
Genske-Mulder was and remains a professional
partnership that specializes in providing
complete accounting, tax and consulting
services for he dairy industry.  Their
roster of clients included Central Valley
Dairymen and many of its individual diary
farm members, including Plaintiffs.  They
purportedly reviewed and helped prepare the
business plan for Valley Gold, LLC, and
recommended that Plaintiffs both invest in
Valley Gold, LLC and supply Valley Gold, LLC
with milk.  Defendant Downey Brand LLP is a
California law partnership, and it was
retained by Mr. Vieira to assist in the
formation of Valley Gold, LLC.  Genske-
Mulder and Downey Brand also prepared a
business plan and Offering Memorandum to
market and sell shares of Valley Gold, LLC,
including detailed financial forecasts, a
detailed business plan, and disclosures
required by Federal Securities law.  A true
and correct copy of one of the business
plans is attached hereto as Exhibit A.  A
true and correct copy of the Offering
Memorandum is attached hereto as Exhibit B.

22.  Plaintiffs, individually and through
Central Valley Dairymen, were induced to
invest more than $530,000 for the formation
of Valley Gold, LLC; and Plaintiffs were
also induced to supply milk to Valley Gold,
LLC.  The numerous representations made to
Plaintiffs to induce this action, including
those in the business plan and Offering
Memorandum, were materially false and
misleading.  Defendants did not even notify
the Plaintiffs that Valley Gold, LLC was not
bonded, or that by becoming investors in
Valley Gold, LLC, any sale of Plaintiffs'
milk to Valley Gold, LLC would not be
covered by the Milk Producers Trust Fund.

11

23.   On January 7, 2004, George Vieira concluded his negotiations with the U.S. Attorney's office and pled guilty for his criminal involvement in the scheme to inflate the apparent profitability of Suprema Specialties, Inc., and he was shortly afterward barred from working in the dairy and cheese business, including being barred from his role as the chief operating officer of Valley Gold, LLC.  In addition, Valley Gold, LLC defaulted on its purchase obligations for the Land-O-Lakes facility and defaulted in paying for milk supplied to it by Central Valley Dairymen.  The facility was foreclosed and plaintiffs' investments were entirely lost.

24.   As a result, Plaintiffs again were left without payment for millions of dollars worth of milk and they lost their cash investment in Valley Gold, LLC.

25.   Plaintiffs are unsophisticated dairy farmers, and they relied upon the professional advice and supposed expertise not only of Mr. Vieira, but also of Downey Brand, Genske-Mulder and Anthony Cary.  The professionals, however, all chose to parrot Mr. Vieira's assurances that he was acting to protect Plaintiffs' interests and maximize the value of their milk; and not a single professional had the courage to stand up and report the irregularities of Mr. Vieira's proposals, the colossal and unnecessary risks involved in the proposed business venture, or even the fact that Mr. Vieira was actively negotiating with the U.S. Attorney's office to plead guilty to securities and bank fraud.

26.   Those who were charged with protecting Plaintiffs' interests instead actively allowed Plaintiffs to be bilked out of more than $5 million.

The FAC alleges that Defendant Genske-Mulder "specializes in providing complete accounting, tax and consulting services for the dairy industry"; that "[t]he clients they serve produce

12

approximately 17% of the milk in the Western United States and approximately 7% nationally"; that Genske-Mulder "provides the following services to its clients, including CVD, VALLEY GOLD, and many of the Plaintiffs: 1) Annual and long-term tax planning; 2) Cash flow management; 3) Breakeven analysis; 4) Industry standards; 5) Financial goal setting; 6) Financial Forecasts & Projections; 7) Management Advisory Services; 8) Investment Review; and 4) Cash flow analysis for expansion or restructuring"; that Genske-Mulder "provided accounting and consulting, management advisory and investment services to Plaintiffs"; that Genske-Mulder "closely and directly monitored the day-to-day operations, provided management advisory, investment review, general account, and consulting services" to Valley Gold and CVD; that, as result, Genske-Mulder directly received financial benefit from Plaintiffs, CVD and Valley Gold; that Genske-Mulder, with the assistance of Defendants Cary and George Vieira, "prepared financial projections for the purpose of attracting investors" to Valley Gold, and "actively participated in the preparation of a business plan to attract investors for Valley Gold, including the preparation of grossly negligent financial forecasts for the operations of Valley Gold."  The FAC further alleges that Genske-Mulder, George Vieira and Cary acted in an advisory capacity with regard to CVD's investment in Valley Gold by Plaintiffs.

The FAC alleges that Downey Brand "was retained by CVD and/or Valley Gold, particularly to take the lead in preparing a

business plan for the offering of securities for Valley Gold and
thereafter in creating a (blatantly illegal) proposal for
Plaintiffs to forego payment for milk supplied to Valley Gold in
exchange for worthless additional ownership interests in Valley
Gold – at a time when it should have been clear to defendants
that George Vieira's plans for VALLEY GOLD were destined to
fail."

The FAC includes a section captioned "Derivative Rights".
This section of the FAC alleges in pertinent part:

43.   As a non-profit cooperative
association formed pursuant to the
provisions of Chapter 1 of Division 20 of
the California Food and Agricultural Code,
the Capper-Volstead Act (7 U.S.C.A. §§291-
292), and the Cooperative Marketing Act (7
U.S.C.A. §451, et seq.), CVD operates on
behalf of and for the benefit of its member
dairies, collecting proceeds from the sale
of milk for the member dairies, and holding
those proceeds in trust and for the benefit
of the member dairies.  CVD and its
managers, consultants and employees thus are
fiduciary trustees owing duties of care and
loyalty directly to the members of CVD,
including Plaintiffs.

44.   Moreover, as a non-profit agricultural
cooperative association, and pursuant to
section 54173 of the California Food and
Agricultural Code, CVD acted as the agent
for its member dairies in marketing,
selling, storing and handling the milk
produced by the member dairies; and the
directors, officers, consultants and
professionals retained by CVD were
accordingly subagents, owing direct duties
of care and trust to the member dairies,
including Plaintiffs.

45.  In providing services to CVD,
defendants GENSKE-MULDER, CARY, GEORGE
VIEIRA and DOWNEY BRAND therefore assumed

14

duties of care and loyalty directly to
Plaintiffs, and each of them.

46.  To the extent that the claims asserted
by Plaintiffs are derivative of the rights
of CVD, then Plaintiffs pursue those rights
on behalf of CVD and accordingly add CVD as
an involuntary party to this lawsuit so that
the full rights of CVD can be adjudicated
and any recovery distributed, as the Court
ultimately deems appropriate, to the members
of CVD.

47.  CVD continues to be controlled by
GEORGE VIEIRA and/or his affiliates and
those beholden to his desires, including Joe
Machado who, at the time of the events
described in this complaint, was
simultaneously the President of Valley Gold
and a board member of CVD and who continues
as the president or a senior board member of
CVD.  It would thus be futile for Plaintiffs
to make a demand upon CVD or its directors
to pursue the relief sought in this lawsuit,
as such a demand would be tantamount to
asking the directors to investigate their
own potential malfeasance.  Indeed, another
group of former CVD member dairies has
previously instituted legal proceedings
based upon the general criminal scheme
described above, and CVD has demonstrated
its hostility to its own former member
dairies and its refusal to hold its
managers, consultants, professionals and
accountants responsible for their misdeeds
and omissions by actively opposing the
claims instead of cooperating in securing
redress for its former members.  In fact, in
that litigation, CVD and George Vieira have
retained the same attorney to represent
them.  Further, all or substantially all of
the members of CVD who were damaged by the
acts and omissions set forth herein have
terminated their affiliation with CVD and
joined other dairy cooperatives.  The
derivative relief sought in this complaint
on behalf of CVD would thus wholly or
substantially only benefit CVD's former
members and not its present membership,
again rendering it futile to submit a demand
upon CVD's board of directors to pursue the

15

relief sought in this lawsuit.

48.  VALLEY GOLD also continues to be controlled by GEORGE VIEIRA, and it would likewise be futile for Plaintiffs to make a demand upon VALLEY GOLD to pursue the relief sought in this lawsuit.  Apart from GEORGE VIEIRA, Plaintiffs know of no person or entity that presently has any control over the operations of VALLEY GOLD.

49.  To the extent that the claims asserted by Plaintiffs are derivative of the rights of VALLEY GOLD, then Plaintiffs pursue those rights on behalf of VALLEY GOLD and accordingly add VALLEY GOLD as an involuntary party to this lawsuit so that the full rights of VALLEY GOLD can be adjudicated and any recovery distributed, as the Court ultimately deems appropriate, to the members of VALLEY GOLD.

## 2. GOVERNING STANDARDS.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001).  Dismissal of a claim under Rule 12(b)(6) is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party.

16

1  *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002).  However,

2  legal conclusions need not be taken as true merely because they

3  are cast in the form of factual allegations.  *Ileto v. Glock,*

4  *Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003).  Immunities and other

5  affirmative defenses may be upheld on a motion to dismiss only

6  when they are established on the face of the complaint.  *See*

7  *Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v.*

8  *Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).  When

9  ruling on a motion to dismiss, the court may consider the facts

10 alleged in the complaint, documents attached to the complaint,

11 documents relied upon but not attached to the complaint when

12 authenticity is not contested, and matters of which the court

13 takes judicial notice.  *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-

14 706 (9th Cir.1988).

15      3.  <u>THIRD CAUSE OF ACTION FOR SECURITIES FRAUD</u>.

16      The Third Cause of Action is alleged by Plaintiffs

17 individually and on behalf of Central Valley Dairymen, Inc.

18 ("CVD") against George Vieira, Anthony Cary, Genske, Downey and

19 Does 21-40.  The Third Cause of Action incorporates by reference

20 all preceding allegations.  Of importance to the resolution of

21 the motions to dismiss are the following allegations in the

22 Second Cause of Action for rescission, captioned "Violation of

23 Registration Requirements":

24          81.  In addition to the misleading
            statements and omissions included in the
25          business plan and Offering Memorandum,
            addressed in the following causes of action
26          in this Complaint, Plaintiffs allege that

17

VALLEY GOLD's issuance of membership interests to them and to other members of CVD, both in April of 2003 and in September of 2003, violated the requirements of the Securities Act of 1933 because these offerings were not registered as required by applicable law.

82.   For one, the number of offerees was too uncertain.  At the outset, the PROMOTERS limited the proposed investors primarily to members of CVD.  But as disclosed on the second to the last page of the business plan, attached hereto as Exhibit B, in the months after April 2003, the PROMOTERS continued to solicit investments in VALLEY GOLD and anticipated additional capital contributions of "an additional $400,000 to $800,000 by the end of August, 2003." Plaintiffs are informed and believe, and thereon allege, that in the months between April of 2003 and August of 2003, the PROMOTERS widely distributed the business plan and approached a large number of potential investors in a fashion that constituted "general solicitation or advertising" within the meaning of safe harbor exemptions to the registration requirements, as promulgated by the Securities and Exchange Commission.

83.   In addition, the offerees were not sufficiently sophisticated.  Indeed, while Plaintiffs in April of 2003 met the net asset requirement to qualify as accredited investors under the safe harbor exemptions, by the time of the September 2003 offering they no longer did.  Moreover, while Plaintiffs in April of 2003 met the net asset requirement, they were nonetheless not sophisticated and did not read English with ease; this was known to the PROMOTERS.

84.   Plaintiffs are also informed and believe, and thereon allege, that one or more of the offerees who invested in VALLEY GOLD in April of 2003 were neither accredited nor sophisticated investors. Between the two main securities offerings in 2003, VALLEY GOLD raised well in excess of $5 million in capital, such that to qualify

18

under Rule 506's safe harbor exemption to registration, all investors were required to be either accredited or sophisticated.

85.   In addition, the PROMOTERS did not provide reasonable time for the offerees to review the Offering Memorandum.   The exemption from registration in section 4(2) of the Securities Act of 1933 applies only when offerees do not need protection, both because they are sophisticated and because they have available to them sufficient information to reasonably assess the risks of investing.   By only allowing Plaintiffs and the other offerees less than ½ day to review the Offering Memorandum, the PROMOTERS precluded the offerees from having available to them sufficient information to reasonably assess the risks of the proposed investment.

The Third Cause of Action further alleges in pertinent part:

89.   In or about May or June of 2003, these defendants prepared a business plan that was thereafter used to market and sell security interests in VALLEY GOLD, including to Plaintiffs.   A true and correct copy of the business plan prepared and circulated by these defendants is attached hereto as Exhibit A.   The terms of the business plan were largely taken from an Offering Memorandum that was prepared by these defendants in April of 2003, which was likewise provided to potential investors.   A true and correct copy of the Offering Memorandum is attached hereto as Exhibit B.

90.   The interests procured from Plaintiffs in the form of membership interests in VALLEY GOLD -- a limited liability company formed under California law – constituted securities within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934 because Plaintiffs were induced to invest their money (and later their rights to payment for milk) into a common enterprise from which they expected to earn profits through the efforts and acumen of others, namely GEORGE VIEIRA and the other officers and employees of VALLEY

19

GOLD.

91.   Defendants GEORGE VIEIRA, GENSKE-MULDER, DOWNEY BRAND and DOES 21 through 40 were "sellers" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934 because the injury suffered by Plaintiffs by purchasing security interests in VALLEY GOLD flowed directly and proximately from the actions and representations of these defendants. These defendants also actively participated in the sale of ownership interests in VALLEY GOLD to Plaintiffs and were motivated by a desire to serve their own financial interests.   GEORGE VIEIRA was motivated to secure the income from being an employee and the managing member of VALLEY GOLD as well as from his plan to use VALLEY GOLD as a vehicle to continue the fraudulent Round-Tripping transactions that he had so lucratively engaged in with the criminal RICO enterprise discussed above.   GENSKE-MULDER was motivated by its anticipation of securing income as a paid consultant and as the primary accounting firm for VALLEY GOLD – an anticipation that was cemented by the close relationship between GEORGE VIEIRA and equity partners of GENSKE-MULDER.   Defendant DOWNEY BRAND was motivated by the anticipation and promise that it would be attorneys for and be paid for the rendition of legal services to VALLEY GOLD and because GEORGE VIEIRA was using the funds of CVD to pay for the services in forming and soliciting investors for VALLEY GOLD, a payment source that could only be justified as a legitimate business expense for CVD if VALLEY GOLD was successfully formed, launched and sufficiently funded to begin operations.

92.   In addition to the purchases of VALLEY GOLD as part of its initial formation, in or about late September of 2003, defendants GEORGE VIEIRA, GENSKE-MULDER, CARY and DOES 41 through 50 also induced Plaintiffs and CVD to enter into illegal and unlawful agreements to exchange milk (or accounts receivable owed to them for milk) for additional equity ownership interests in

1    VALLEY GOLD.

2    93.  The reason the "milk for equity"
     contracts were illegal and unlawful is
3    because California Food and Agricultural
     Code sections 62191, 62196 and 62200 require
4    (a) that milk producers be paid for milk
     solely in cash or with checks that are
5    reduceable to cash in no more than one
     business day; (b) that payment be made in
6    very short time periods (roughly 15 days);
     and (c) that failing to abide by these
7    requirements and endeavoring to use any
     other payment arrangement is an unlawful
8    business practice.

9    94.  In inducing Plaintiffs to enter into
     contracts to exchange milk for equity (in
10   the general form of the contribution
     agreement attached hereto as Exhibit C and
11   the assignment agreement attached hereto as
     Exhibit D), defendants GEORGE VIEIRA,
12   GENSKE-MULDER, CARY and DOES 41 through 50
     falsely represented to Plaintiffs:
13
              (a) that the contracts were proper
14            and lawful;

15            (b) that CVD was contractually
              required to supply milk to VALLEY
16            GOLD and if Plaintiffs stopped
              supplying their milk to CVD and
17            switched to another agricultural
              cooperative, they would be
18            violating the law and subject to
              substantial fines and penalties;
19
              (c) that VALLEY GOLD was doing
20            well and had sizeable orders that
              ensured that Plaintiffs would earn
21            significantly more from their
              increased ownership in VALLEY GOLD
22            than they were owed for their
              milk.
23
     95.  These representations were false, and
24   were made be defendants in order to induce
     Plaintiffs and CVD to purchase additional
25   equity ownership interests in VALLEY GOLD in
     exchange for milk.
26

                          21

96.   Defendants GEORGE VIEIRA, CARY, GENSKE-MULDER, DOWNEY BRAND and DOES 21 through 40 were also "sellers" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934 because they actively solicited Plaintiffs to purchase interests in VALLEY GOLD.

97.   In violation of the Securities Act of 1933, the Securities Exchange Act of 1934, Exchange Act Rule 10b-5 enacted under the regulatory authority of the Securities and Exchange Commission and the Sarbanes-Oxley Act of 2002, the business plan and the Offering Memorandum and the related materials and communications supplied by these defendants to Plaintiffs, including the materials used to induce plaintiffs to enter into the "milk for equity" contracts, contained material misrepresentations and omissions of material facts that caused the communications to Plaintiffs to be materially misleading, and constituted a fraudulent and deceitful manipulation and contrivance of the regulatory requirements enacted under the Federal Securities laws for the protection of parties like Plaintiffs.

98.   The business plan and the Offering Memorandum and the related materials and communications supplied by these defendants to Plaintiffs, including the materials used to induce plaintiffs to enter into the "milk for equity" contracts contained, served as manipulative and deceptive devices and contrivances intended to contravene the rules and regulations of the Securities and Exchange Commission as necessary and appropriate for the protection of investors, and thus violated section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §78j(b).)

99.   Plaintiffs purchased securities in VALLEY GOLD, both individually and through CVD, in direct reliance upon the misleading, false, incomplete and deceptive business plan and Offering Memorandum and related communications supplied by these defendants, including the materials used to induce

22

plaintiffs to enter into the "milk for equity" contracts, aquicint [sic] securities in VALLEY GOLD directly from VALLEY GOLD as the issuer of the securities.

100. Among other material misrepresentations and material omissions of material facts, these materials:

a.    Stressed that VALLEY GOLD's success was dependent upon the unique "experience and abilities of Mr. [George] Vieira [and two associates]" without disclosing that Mr. Vieira's unique experience was not formed in the successful production of cheese products, but rather in the concoction of fictitious cheese products and cheese diluted with starch fillers manufactured not for commercial success with consumers, but rather to inflate the apparent inventory value and sales volume of a by then bankrupt cheese manufacturer, for the sole purpose of perpetuating a hundreds of million dollar securities fraud on securities investors situated similarly to Plaintiffs;

b.    Disclosed that Mr. Vieira had been contacted by the U.S. Attorney's Office as part of its investigation into the bankruptcy of Suprema Specialties, Inc., without disclosing that GEORGE VIEIRA was already actively involved in negotiations with the United States Attorney's Office to plead guilty to securities and bank fraud;

c.    Failed to disclose that VALLEY GOLD was unbonded and not qualified to participate in the Milk Producers Trust Fund, which was a standard requirement for securing reliable supplies of milk product – necessary for legitimate cheese production facilities (but less important for sham facilities organized to fleece investors and banks without ever achieving commercial success);

d.    Failed to disclose that if Plaintiffs became investors in VALLEY GOLD, their supplies of milk to VALLEY GOLD would in any event fail to qualify for the

23

protections of the Milk Producers Trust Fund;

e.   Included financial projections supplied by GENSKE-MULDER that vastly exceeded the performance of any startup cheese manufacturer, with the possible exception of Suprema Specialties, Inc., whose dramatic reported growth was by then known in the financial community (but not to Plaintiffs) to have been the result of smoke, mirrors and a fraudulent Round-Tripping scheme orchestrated by a criminal enterprise headquartered in New Jersey.

101. Plaintiffs are informed and believe, and thereon allege, that GENSKE-MULDER, GEORGE VIEIRA and DOWNEY BRAND and DOES 21 through 40 all actively collaborated on preparing the business plan and the Offering Memorandum that was supplied to Plaintiffs and that were instrumental in inducing Plaintiffs and CVD to purchase initial equity interests in VALLEY GOLD.  Indeed, these defendants participated in meetings and electronic communications to discuss the best way to conceal from Plaintiffs and CVD that GEORGE VIEIRA had, one month earlier, reached an agreement with the office of the United States Attorney to plead guilty to securities fraud and to a conspiracy to commit bank and mail fraud — the active criminal conspiracy centered on the Round-Tripping scheme that led to the collapse of Suprema Specialties, Inc. and its subsidiaries.

102. The terms of the negotiated plea bargain were spelled out in a seven-page letter dated March 28, 2003 from the U.S. Attorney's Office to GEORGE VIEIRA's attorney.  And the plea deal (that was formally entered on January 4, 2004), barred GEORGE VIEIRA from acting as an officer or director of any company issuing registered securities under the Securities Exchange Act of 1934.

103. In the business plan, however, defendants disclosed none of this vital information.  Indeed, in the business plan,

24

defendants pretended that the implosion of
Suprema Specialties, Inc. and its
subsidiaries provided an advantage for the
proposed business of VALLEY GOLD because as
"one of the larger producers of ricotta in
the state" a market void and thus a market
opportunity was created when "Suprema
Specialties, Inc. ceased operations in
2002."  The business plan failed to mention
that Suprema Specialties ceased business
because its fraudulent practices, inflated
sales and falsified inventory forced it into
bankruptcy; and the business plan failed to
mention that as much as 87% of the purported
cheese production by Suprema Specialties
that led defendants to characterize it as a
large producer was fictitious, as reported
by the Securities and Exchange Commission's
investigation.

104. The Offering Memorandum provided a
brief disclosure concerning Suprema
Specialties' bankruptcy, but did so in a way
to minimize the importance of the
information and in a manner that created the
impression that GEORGE VIEIRA's sole
involvement with Suprema Specialties
occurred because he "was, for a short period
of time, an officer of Suprema West, Inc. .
. . a subsidiary of Suprema Specialties,
Inc."  The Offering Memorandum did not
disclose that GEORGE VIEIRA was not just any
officer, but was the Chief Operating Officer
and was thus directly responsible for
fraudulent financial transactions that
government officials were investigating.
The Offering Memorandum also did not
disclose that GEORGE VIEIRA had reached an
agreement with the United States Attorney's
Office to plead guilty to securities fraud
and conspiracy to commit bank and mail
fraud.  And the Offering Memorandum did not
disclose that in addition to being an
officer of Suprema Specialties West, Inc.,
GEORGE VIEIRA and his wife MARY VIEIRA were
also officers and owners of CMM, which was
also a subject of the criminal investigation
as well as a probable broker for any cheese
produced by VALLEY GOLD.

105. The Offering Memorandum stated at page

7 that VALLEY GOLD was negotiating with a "cheese distributor in New Jersey" to produce substantially all of VALLEY GOLD's production for its first two years.  The Offering Memorandum then stated that the negotiations had resulted in a contract, and that "the total amount of cheese to be purchased under this contract [is estimated] to be between 14 and 25.5 million pounds." The Offering Memorandum further disclosed that if the New Jersey distributor "for any reason [could] not fulfill its commitment to purchase the Company's product, there is no assurance that the Company would be able to find an immediate customer . . . and such a disruption could have a material adverse effect on the Company's business, operations and finances."

106. Plaintiffs are informed and believe, and thereon allege, that the New Jersey Cheese Distributor referred to in the Offering Memorandum was J.S.P. Marketing, LLC, an entity primarily owned and operated by Joseph S. Profaci.  Mr. Profaci had refused to enter into any binding or comprehensive distributorship agreement, and this was known to defendants.

107. Despite mentioning that a "contract" and "commitment" had been reached with the New Jersey distributor, the Offering Memorandum failed to disclose the identity of that distributor.  Plaintiffs are informed and believe that this omission was the result of a deliberate choice by defendants GENSKE-MULDER, GEORGE VIEIRA, DOWNEY BRAND and DOES 21 through 40 to conceal the true nature of Mr. Profaci's unwillingness to enter into a binding or comprehensive distributorship agreement.

108. In addition, and beginning in or about March of 2003, Defendants GEORGE VIEIRA with the assistance of GENSKE-MULDER and DOES 21 through 40, and knowing these representations to be false and with the intent to deceive the Plaintiffs, and to induce them into investing in VALLEY GOLD, further falsely and fraudulently represented to the Plaintiffs that:

26

      (a)   CVD had suffered financial difficulty and had defaulted on obligations to pay Plaintiffs for milk because there were limited markets for CVD's milk (when in reality, the reason CVD had suffered financially was because of the Round-Tripping scheme and the churning of commissions by CMM);

      (b)   By investing in the formation of VALLEY GOLD, Plaintiffs and CVD would solve the problem of limited demand for CVD's milk because VALLEY GOLD would purchase the bulk of CVD's milk and process it into cheese, for which there was purportedly a strong market demand (when in reality, the apparent market demand for cheese was materially distorted by the Round-Tripping scheme and the fictitious cheese sales publicly reported by Suprema Specialties, Inc. and its subsidiaries, and the purported demand for cheese from the unnamed New Jersey distributor was illusory);

      (c)   GEORGE VIEIRA was a "hands-on" owner of VALLEY GOLD;

      (d)   GEORGE VIEIRA was "Chief Operating Officer" and was going to be responsible for the day-to-day management of VALLEY GOLD;

      (e)   VALLEY GOLD committed itself to selling only to reputable buyers with solid financial standing;

      (f)   GEORGE VIEIRA could use his contacts to "sell more cheese than VALLEY GOLD could ever produce";

      (g)   With the ownership of VALLEY GOLD, Plaintiffs MANUEL LOPES, MARIANA LOPES, JOSEPH LOPES and RAYMOND LOPES would "hold all the keys to financial success";

      (h)   VALLEY GOLD would not need to invest excessive resources to make the plant operable;

      (i)   VALLEY GOLD would make

27

payments for milk received (from Plaintiffs
MANUEL LOPES, MARIANA LOPES, JOSEPH LOPES
and RAYMOND LOPES):

    1.   In accordance with
the announced in-
plant usage and
pricing at the time
of delivery

    2.   Producer payments
would be made on or
before the 28th day
of the month for
milk received
during the first 15
days of the month,
and on the 13th day
of the month for
milk received
during the
remainder of the
month;

(j)  Milk payments were dictated
by the State of California and, as
such, not negotiable;

(k)  "By having owners that live
in short proximity to the plant
and with one of the owners (GEORGE
VIEIRA) being the Chief Operating
Officer, the personnel at VALLEY
GOLD will see first hand the
company's commitment to quality"

(l)  MANUEL LOPES, MARIANA LOPES,
JOSEPH LOPES and RAYMOND LOPES'
individual ownership would not be
diluted by allowing fellow members
or others to contribute capital
monies at any time; and

(m)  In the event that VALLEY GOLD
needed additional capital, it
would offer additional ownership
interest to existing members,
first, and all other (outside)
parties, second.

109. Defendants also actively encouraged

28

Plaintiffs to invest individually in VALLEY GOLD and to agree to CVD's investment in VALLEY GOLD, while the Defendants knew of GEORGE VIEIRA's criminal activities outlined above.  In addition, VALLEY GOLD never intended to and never committed itself to selling only to reputable buyers with solid financial standing.  Instead, VALLEY GOLD dealt with members of the criminal RICO enterprise manipulated by GEORGE VIEIRA and with which he was affiliated, and whom Defendants knew were incapable of paying for millions of dollars worth of VALLEY GOLD cheese.

110.  Further, GEORGE VIEIRA's negative and toxic reputation in the cheese industry, which should have been disclosed to the investors, made it difficult for VALLEY GOLD to market and sell its cheese, and it made it difficult to obtain financing and quickly led to VALLEY GOLD's collapse.

111.  Plaintiffs were never aware of any facts that made them suspicious of the veracity of Defendants' representations, and did not begin to discover the fraud, deceit and misrepresentations of Defendants as herein alleged until less than one year ago.

112. Plaintiffs only purchased equity interests in VALLEY GOLD because of the false and misleading representations contained in the business plan and the Offering Memorandum and the accompany false and misleading statements and omissions of defendants GEORGE VIERRA [sic] and GENSKE-MULDER and DOES 21 through 40.  Further, Plaintiffs only consented to allow CVD to purchase equity interests, and CVD only purchased equity interests in VALLEY GOLD because of the false and misleading representations contained in the business plan, the Offering Memorandum and the accompany false and misleading statements and omissions of defendants GEORGE VIERRA [sic] and GENSKE-MULDER and DOES 21 through 40.  Those equity interests are now worthless.

113. As a result of defendants' violations

29

of the Federal Securities Laws, including the Securities Act of 1933, the Securities Exchange Act of 1934, Exchange Act Rule 10b-5 enacted under the regulatory authority of the Securities and Exchange Commission and the Oxley Sarbanes-Oxley Act of 2002, Plaintiffs have incurred damages by investing millions of dollars into a doomed enterprise and supplied millions more in milk to that enterprise – milk for which plaintiffs have not been paid, resulting in damages to Plaintiffs in a sum exceeding several million dollars.

**INVOLVEMENT OF CARY, DOWNEY BRAND AND GENSKE-MULDER**

114. CARY, DOWNEY BRAND and GENSKE-MULDER are sued as authors of the Offering Memorandum of business plan [sic], with direct knowledge of three primary omissions or misstatements, and direct involvement in the drafting that led to these omissions or misstatements:

a.    The Offering Memorandum and business plan did not disclose that milk shipped by CVD to VALLEY GOLD would not be protected by the milk producer's trust fund;

b.    The Offering Memorandum and business plan materially misstated the nature of negotiations with New Jersey cheese distributors; and

c.    The Offering Memorandum materially and misleadingly disclosed the nature of the investigation of GEORGE VIEIRA's criminal activity and his negotiations of a plea bargain to bank and securities fraud.

115. CARY knew that milk shipped by CVD to VALLEY would not be protected by the milk producer's trust fund because in February of 2003, he negotiated a stipulation and order in pending proceedings before the Department of Food and Agriculture that stated: "Respondent acknowledges that Central Valley Dairymen milk processed by the new entity licensed to Respondent will not be eligible

for Trust fund coverage." CARY signed this stipulation on February 18, 2003 and on February 21, 2003 was mailed a copy of the order entered upon the stipulation.

116. At the time of this stipulation, the PROMOTERS were focused on acquiring a cheese plant in Manteca.  To avoid any confusion, the Department of Food and Agriculture requested a further stipulation after the Gustine facility was purchased to make it clear that no trust fund coverage would be provided for milk shipped by CVD to VALLEY GOLD's Gustine facility.  CARY signed that stipulation on September 20, 2003, only days before Plaintiffs were asked to purchase additional interests in VALLEY GOLD with the "milk for equity" contracts.

117. The lack of trust fund coverage was never disclosed to Plaintiffs.

118. On numerous occasions throughout the early part of April of 2003, Curtis Colaw endeavored to negotiate a distributorship agreement with Mr. Profaci, including on April 1, 2003, April 2, 2003, April 17, 2003, April 18, 2003 and April 22, 2003.  As of April 22, 2003 no agreement had been reached and Mr. Profaci's reluctance to sign a binding or comprehensive distributorship agreement was apparent.  Nonetheless, Defendants drafted the Offering Memorandum to make it appear that a firm deal was relatively certain and would provide for purchase of $100 million of cheese products per year for two years.  This was materially false.

119. GEORGE VIEIRA's plea negotiations, his involvement in the events that led to the collapse of Suprema Specialties and the nature of the investigation by the United States Attorney for New Jersey were well known to Defendants and were actively investigated by DOWNEY BRAND.  But, as alleged above, Defendants drafted the Offering Memorandum to minimize and conceal this information.

120. The partners at GENSKE-MULDER who

31

1    primarily worked on preparing the Offering
     Memorandum and business plan were Peter
2    Hoekstra and Paul Anema.   From the
     information presently available to
3    Plaintiffs, it appears that Peter Hoekstra
     had primary responsibility for overseeing
4    those portions of the Offering Memorandum
     and business plan that dealt with the
5    disclosure of risks associated with the
     dairy industry and in preparing the
6    financial forecasts and projections.   Paul
     Anema assisted in these matters, and both
7    were involved in reviewing and revising the
     final forms of both documents.

8
     121. The attorneys at DOWNEY BRAND who
9    worked on preparing the Offering Memorandum
     (including those portions that were
10   subsequently incorporated into the business
     plan) were Jeffrey Koewler, Silvio
11   Reggiardo, Lisa Nixon, Joseph G. De Angeles,
     Bruce Dravis, Christopher A. Delfino,
12   Ricardo D. Bordallo and Diane Oleson.
     Jeffrey Koewler had primary responsibility
13   for preparing the Offering Memorandum and
     ensuring that it had all disclosures
14   required by California law.   Ricardo D.
     Bordallo researched the licensing
15   requirements for a milk processing plants as
     part of his work on the Offering Memorandum,
16   and thus recognized the materiality of the
     regulatory scheme and the need to disclose
17   the lack of trust fund coverage for milk
     shipped by CVD to VALLEY GOLD.   Diane
18   Oleson, at the direction of Christopher A.
     Delfino, had primary responsibility for
19   investigating GEORGE VIEIRA.

20   122. Plaintiffs are informed and believe,
     and thereon allege, that CARY prepared the
21   initial draft to disclose the criminal
     investigation of GEORGE VIEIRA, but that he
22   submitted the draft to DOWNEY BRAND and the
     other Defendants who revised the draft to
23   its current form.

24   123. DOWNEY BRAND, GENSKE-MULDER and CARY
     were all acutely aware of the PROMOTER's
25   insistence that the VALLEY GOLD be funded by
     April 22, 2003.   Their billing records show
26   frantic activity in efforts to meet that

                          32

1    date.  These defendants were thus fully
     aware that Plaintiffs would not be provided
2    an adequate amount of time to review the
     Offering Memorandum.

3
     124. The Offering Memorandum itself
4    discloses that $325,000 of the funds raised
     by the April 22, 2003 securities issuance
5    would be used to pay the bills of CARY,
     GENSKE-MULDER and DOWNEY BRAND.  These
6    defendants thus knew that a successful
     securities issuance was in their own
7    financial interests.

8         Defendants move to dismiss the Third Cause of Action on

9    various grounds.[2]

10             a.   <u>OFFERING NOT A PUBLIC OFFERING</u>.

11        Section 12(2) of the Securities Act, 15 U.S.C. §

12   77*l*(a)(2), provides in pertinent part:

13             Any person who ... offers or sells a
               security ... by the use of any means or
14             instruments of transportation or
               communication in interstate commerce or of
15             the mails, by means of a prospectus or oral
               communication, which includes an untrue
16             statement of a material fact or omits to
               state a material fact necessary in order to
17             make the statements in light of the
               circumstances under which they are made, not
18             misleading (the purchaser not knowing of

19   ─────────────────

20        [2]Genske complains that the Third Cause of Action combines
     allegations pertaining to a "1933 Act Claim (presumably § 12(2))
21   with a 1934 10b-5 claim."  Genske argues that this defect was
     present in the Complaint and has not been corrected in the FAC.
22   Plaintiffs respond that they can separate the two claims into
     separate causes of action but, because the Court did not
23   specifically direct that they do so in the May 30 Order directing
     them to file a First Amended Complaint, they did not do so.
24   Further, Plaintiffs assert, when the same conduct supports multiple
     causes of action, the conduct need only be alleged once.  Plaintiffs
25   argue that Genske places form over substance and resorts
     to the formalities of code pleading.  This may be, however,
26   Defendants should be fairly apprised that two separate claims are
     alleged.

33

> such untruth or omission), and who shall not
> sustain the burden of proof that he did not
> know, and in the exercise of reasonable care
> could not have known, of such untruth or
> omission, shall be liable ... to the person
> purchasing such security from him, who may
> sue either at law or in equity in any court
> of competent jurisdiction, to recover the
> consideration paid for such security with
> interest thereon, upon the tender of such
> security, or for damages if he no longer
> owns the security.

In the May 30 Order, the Court ruled in pertinent part:

> To the extent that the Second Cause of
> Action purports to state a claim for
> violation of Section 12(2) of the Securities
> Act of 1933, Defendants' motions to dismiss
> are GRANTED WITH LEAVE TO AMEND.  Plaintiffs
> shall amend to allege either that the
> offering of securities was a public offering
> or that the offering of securities was
> subject to registration and that the
> offering was not registered as required by
> applicable law.

Genske moves to dismiss the Third Cause of Action on the ground that the allegations do not allege a "public offering" because the FAC does not allege any use of public media to solicit investments and does not allege that a seminar whose invitees are solicited through a "general solicitation or general advertising."   Genske refers to S.E.C. Rule 502:

> *Limitations on manner of offering.*  Except
> as provided in Rule 504(b)(1), neither the
> issuer nor any person acting on its behalf
> shall offer or sell the securities by any
> form of general solicitation or general
> advertising, including, but not limited to,
> the following:
>
> 1.  Any advertisement, article, notice or
> other communication published in any
> newspaper, magazine, or similar media or
> broadcast over television or radio; and

34

> **2.  Any seminar or meeting whose attendees have been invited by any general solicitation or general advertising ....**

Plaintiffs respond by citing *Western Federal Corp. v. Erickson*, 737 F.2d 1439 (9th Cir. 1984).  There, the Ninth Circuit endorsed a flexible test for determining if the private offering exemption under Section 4(2) is available.  *Id.* at 1442. The Ninth Circuit's test considers: "(1) the number of offerees, (2) the sophistication of the offerees, (3) the size and manner of the offering, and (4) the relationship of the offerees to the issuer."  *Id.*  "The party claiming the exemption must show that it is met not only with respect to each purchaser, but also with respect to each offeree."  *Id.*  Plaintiffs argue that the FAC addresses each of these factors.  Plaintiffs refer to Paragraphs 82-83 and 85:

> 82.  For one, the number of offerees was too uncertain.  At the outset, the PROMOTERS limited the proposed investors primarily to members of CVD.  But as disclosed on the second to the last page of the business plan, attached hereto as Exhibit B, in the months after April 2003, the PROMOTERS continued to solicit investments in VALLEY GOLD and anticipated additional capital contributions of "an additional $400,000 to $800,000 by the end of August, 2003." Plaintiffs are informed and believe, and thereon allege, that in the months between April of 2003 and August of 2003, the PROMOTERS widely distributed the business plan and approached a large number of potential investors in a fashion that constituted "general solicitation or advertising" within the meaning of safe harbor exemptions to the registration requirements, as promulgated by the Securities and Exchange Commission.

35

83.   In addition, the offerees were not sufficiently sophisticated.  Indeed, while Plaintiffs in April of 2003 met the net asset requirement to qualify as accredited investors under the safe harbor exemptions, by the time of the September 2003 offering they no longer did.  Moreover, while Plaintiffs in April of 2003 met the net asset requirement, they were nonetheless *not* sophisticated and did not read English with ease; this was known to the PROMOTERS.

...

85.   In addition, the Promoters did not provide reasonable time for the offerees to review the Offering Memorandum.   The exemption from registration in section 4(2) of the Securities Act of 1933 applies only when offerees do not need protection, both because they are not sophisticated and because they have available to them sufficient information to reasonably assess the risks of investing.  By only allowing Plaintiffs and the other offerees less than ½ day to review the Offering Memorandum, the PROMOTERS precluded the offerees from having available to them sufficient information to reasonably assess the risks of the proposed investment.

Plaintiffs argue that Genske's focus on the two examples in Rule 502 ignores the language "including, but not limited to" set forth in that Rule.

Genske replies that the FAC gives no description of the number of offerees or the manner in which the Promoters approached a wide number of investors.  Genske argues that the May 30 Order

directed Plaintiffs to plead the manner in which the Business Plan and the Offering Memorandum were 'widely distributed' and the manner in which a 'large number of potential investors' were solicited.  Such information should be readily available to Plaintiffs.

> If Plaintiffs are aware of mass mailings,
> mass advertisements, or use of the general
> media, then Plaintiffs should reasonably be
> expected to plead such general solicitation.
> At the very least, Plaintiffs should be
> required to allege the basis for their
> 'information and belief" (FAC ¶¶ 82, 8) and
> the facts which support this information and
> belief.

Given the standards governing a Rule 12(b)(6) motion to dismiss and the requirements of notice pleading, Genske's motion to dismiss on this ground is DENIED.  Whether Plaintiffs can satisfy the legal requirements of the law presents factual issues that cannot be resolved at the pleading stage.

### b.  <u>OFFERING HAD TO BE REGISTERED</u>.

Genske further argues that the allegations in Paragraphs 81-85 quoted above do not suffice to allege that the offering had to be registered.  Genske complain that the FAC fails to include as an exhibit the subscription agreements signed by Plaintiffs in which Plaintiffs affirmed that they met the asset test and made other representations.  Genske contends that the FAC also fails to allege that the Offering was not exempt by complying with Rule 505, Rule 506 or Section 4(2) of the 1933 Act.  Genske further argues:

> Most importantly, the FAC fails to
> acknowledge that because Plaintiffs were
> accredited investors, they are excluded from
> the number of investor limits in Rule 505
> and 506 (see, Rule 501e. for the method of
> calculating the number of investors and the
> exclusion of accredited investors.)  The FAC
> also does not take into account the
> 'materiality' provisions of compliance with
> RULE 505 or 506 safe harbor exemption as
> allowed by RULE 508.

37

Plaintiffs are not required to allege that the offering failed to meet the safe harbor requirements of Rules 505 or 506 because the burden of claiming an exemption to the registration requirements falls on the Defendants, not the Plaintiffs.  *See Western Federal Corp. v. Erickson*, 739 F.2d 1439, 1442 (9th Cir.1984).

Plaintiffs further assert that Rule 505 only applies to offerings totaling up to $5 million for any 12-month period. Paragraph 84 of the FAC alleges that Valley Gold raised in excess of $5 million for the two 2003 offerings.  Plaintiffs contend that Rule 506 requires that all non-accredited investors be sophisticated and asserts that the FAC alleges that Valley Gold failed this test as well.

The motion to dismiss on the ground that the offering had to be registered is DENIED.

c.  <u>DOWNEY AND GENSKE NOT "SELLERS"</u>.

Downey notes that Paragraph 114 of the FAC alleges that Downey, Genske and Cary "are sued as joint authors of the Offering Memorandum and/or business plan, with direct knowledge of at least three primary omissions or misstatements ...."  Downey contends that this allegation negates any liability under Section 12(2).  Downey cites *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 536-537 (9th Cir.1989):

> Under the *Pinter* standard, we now turn to a review of the specific allegations in the investors' second amended complaint.  First, they alleged the accountants drafted financial documents and allowed Celini and

38

Binder to use these documents in selling the unregistered securities.  Second, they alleged that the lawyers, each of whom was retained by the principal defendants, drafted or approved the drafting of false or misleading prospectuses and financial documents, and directed the issuance of the securities.  Specifically, the investors alleged that (1) all the lawyers participated in meetings where the prospectuses and other promotional materials were drafted; (2) lawyers Ellis and Uhrman gave advice and counsel to the owner defendants in preparing prospectuses and other promotional materials, (3) lawyer Minkow drafted tax opinions and allowed these opinions to be included in various promotional materials, and (4) lawyer Spolin allowed his name to be used on promotional materials as general counsel to CCA.

Based on *Pinter*, we conclude that the investors failed to state a claim under section 12(2) against the accountant and lawyer defendants.  Under the *Pinter* analysis, these professionals are only subject to section 12(2) liability if they solicited the purchases and were motivated, at least in part, by financial gain. *Pinter*, 108 S.Ct. at 2079.  Here, the investors did not allege that the lawyers or accountants played any role at all in soliciting the purchases.  Rather, the investors alleged that these defendants performed their professional services in their respective capacities as accountants and lawyers.  As the Court stated in *Pinter*, '[t]he buyer does not, in any meaningful sense, "purchas[e] the security from" such a person.'  *Id.* at 2081 ....

The district court did not err in dismissing the section 12(2) claim against the accountant and lawyer defendants.

Although Paragraph 91 of the FAC alleges that Downey and Genske were "sellers", there are no allegations that either of these defendants solicited the purchases of the securities.

39

Although Plaintiffs asserted at the hearing that these Defendants are sellers because the FAC alleges a "collaborative effort", the specific allegations against these Defendants pertain to the preparation of the business plan and the Offering Memorandum, not the solicitation of investments.  Drafting documents is merely the "performance of professional services" and receiving part of the consideration is irrelevant to the issue of solicitation. *See Rocchio v. Eagle Mission, Inc.*, 1991 WL 51193 (9th Cir.1993).

Defendants' motion to dismiss the Third Cause of Action to the extent it alleges a violation of any 12(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2) is GRANTED WITHOUT LEAVE TO AMEND.  Plaintiffs have had two opportunities to allege seller liability against Genske and Downey and have been unable to do so.

### d.   JURISDICTION OVER RULE 10b-5 CLAIM.

Downey moves to dismiss this cause of action to the extent that it alleges violations of Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5, on the ground fails to adequately allege the jurisdictional element.

15 U.S.C. § 78j(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange -
>
> ...
>
> (b) To use or employ, in connection with the

purchase or sale of any security registered
on a national securities exchange or any
security not so registered, any manipulative
or deceptive device or contrivance in
contravention of such rules and regulations
as the Commission may prescribe as necessary
or appropriate in the public interest or for
the protection of investors.

Rule 10b-5, promulgated under Section 10b, provides:

It shall be unlawful for any person ... [t]o
make any untrue statement of a material fact
or to omit to state a material fact
necessary in order to make the statements
made, in the light of the circumstances
under which they were made, not misleading."

In the section of the FAC captioned "Use of
Instrumentalities of Interstate Commerce", it is alleged:

71.   In preparing the business plan and
Offering Memorandum, and in soliciting
Plaintiffs' investments in VALLEY GOLD, the
defendants made use of the instrumentalities
of interstate commerce.  DOWNEY BRAND took
the lead in preparing the Offering
Memorandum, with input from GENSKE-MULDER,
CARY, GEORGE VIEIRA and Curtis D. Colaw, an
attorney who regular represented CVD and
GEORGE VIEIRA.

72.   On April 1 and 2 of 2003, Anthony Colaw
made several telephone calls to GEORGE
VIEIRA and to a New Jersey cheese
distributor concerning the distributor's
refusal to execute a binding or
comprehensive distributorship agreement, and
the best way to spin that issue in the
Offering Memorandum and make it appear in
the Offering Memorandum that a solid
distributor existed to purchase all of the
cheese that VALLEY GOLD could manufacture.
Curtis Colaw communicated with DOWNEY BRAND
on this issue by e-mail, transmitted over
the interstate instrumentalities of the
Internet.

73.   During the first few days of April
2003, DOWNEY BRAND attorney Christopher

41

Delfino used the interstate instrumentalities of the Internet known as the world wide web to research diary risk disclosures, and he used the telephone for a conference with GENSKE-MULDER partner Paul Anema to discuss the financial and other disclosures in the Offering Memorandum.

74.  On April 7, 2003, Curtis Colaw and DOWNEY BRAND attorney Jeffrey Koewler had an extended telephone conference regarding the disclosures for the Offering Memorandum. And on April 11, 2003, the two exchanged telephone calls regarding disclosure issues related to GEORGE VIEIRA, apparently including how to disclose the investigation by the United States Attorney for the District of New Jersey into GEORGE VIEIRA's participation in bank and mail fraud relating to Suprema Specialties, as well as GEORGE VIEIRA's negotiations for a plea agreement which negotiations had by then concluded.  Indeed, on March 28, 2003, the plea bargain negotiations were reduced to a seven-page agreement by the United States Attorney for the District of New Jersey and mailed that day to GEORGE VIEIRA's criminal defense attorney.

75.  At some point apparently between April 11, 2003 and April 17, 2003, CARY was assigned the task of drafting the initial disclosure language concerning GEORGE VIEIRA and the criminal investigation involving him to be included in the Offering Memorandum. And on April 17, 2003, Curtis Colaw telephoned CARY to discuss CARY's preparation of this portion of the Offering Memorandum disclosures.

76.  Also on April 17, 2003, DOWNEY BRAND attorney Christopher Delfino discussed these disclosure issues with Jeffrey Koewler, and Christopher Delfino then assigned to DOWNEY BRAND attorney Diane Oleson the task of investigating further.  Jeffrey Koewler also telephoned Curtis Colaw and Paul Anema to discuss these disclosure issues on that same day.

77.  On April 17, 2003, Diane Oleson

accordingly conducted online research using
the interstate instrumentality of the
Internet to investigate GEORGE VIEIRA.  She
was not satisfied with the results, however,
and on April 18, 2003 telephoned a customer
service representative with the LEXIS
database service (made available to DOWNEY
BRAND over the interstate instrumentality of
the Internet).  On April 21, 2003, Diane
Oleson received a return message from LEXIS
regarding its Accurint database, a database
targeted to law enforcement agencies with
information about criminal citations,
indictments, convictions and the like.  On
April 21, 2003, Diane Oleson used the
interstate instrumentality of the Internet
to access the Accurint database in order to
further investigate GEORGE VIEIRA.

78.  DOWNEY BRAND, GENSKE-MULDER and CARY
all met with the PROMOTERS that same day,
April 21, 2003, and that evening and the
next morning, April 22, 2003, finalized the
disclosures and other terms of the Offering
Memorandum.

79.  On April 22, 2003, the Offering
Memorandum and subscription agreements were
delivered to Plaintiffs and other members of
CVD for execution and return that day.
Plaintiff MANUAL LOPES showed the Offering
Memorandum to Susan Tomsha-Miguel, who
provided tax and accounting services to the
LOPES DAIRY, and she telephoned one or more
of the Defendants around noon with some
questions about the financial projections in
the Offering Memorandum.  Shortly afterward,
Plaintiffs delivered signed subscription
agreements and checks, using the interstate
instrumentality of the interstate highway
system.

80.  On or about September 22, 2003, the
PROMOTERS mailed the "milk for equity"
contracts to Plaintiffs, in the form
attached hereto as Exhibit C.  Plaintiffs
are informed and believe, and thereon
allege, that they were returned by use of
the interstate mail system as well.

In *Errion v. Connell*, 236 F.2d 447, 455 (9th Cir.1956),

43

cited by Plaintiffs, the Ninth Circuit held:

> This court held in Fratt v. Robinson ...,
> 203 F.2d 627, 634 ... that:
>
>> '... the crookedness need not
>> appear at all in the
>> instrumentality used',
>
> but it was sufficient if it were shown that
> fraud was used or employed *in connection
> with* the use of instruments of interstate
> commerce or the mails.  Therefore, all that
> is required is a showing that instruments of
> interstate commerce or the mails were used
> and *in connection with that use* a fraudulent
> act occurred within the Western District of
> Washington ... [W]e think it sufficient to
> point out that counsel for appellants
> stipulated at the trial that instruments of
> interstate commerce were used when Amy
> Errion sold the stock at Merrill, Lynch,
> Fenner and Beane in Seattle, Washington.  An
> interstate teletype was used.  Portions of
> the securities sold consisted of General
> Motors stock which was sold on the New York
> Stock Exchange.

In *Matheson v. Armbrust*, 284 F.2d 670, 673 (9th
Cir.1960), *cert. denied*, 365 U.S. 870 (1961), Matheson, a
resident of Oregon, was the owner of all of the corporate stock
of Williamette Hauling Company.  In April 1954 Armbrust, also a
resident of Oregon, inquired of Matheson at Portland, Oregon of
the possibility of purchasing this stock.  Negotiations were
undertaken but broken off.  On May 6, 1954, Matheson at Portland,
Oregon, telephoned to Armbrust in Pasco, Washington.  During this
conversation Matheson stated that he would make Armbrust a better
price and furnish more complete financial data than during the
original negotiations if Armbrust would return to Portland and
resume negotiations.  Armbrust returned to Portland following

this telephone call and resumed negotiations which led to the sale of the securities to Armbrust on May 22, 1954.  In connection with this transaction, Matheson intentionally undertook and practiced a scheme to defraud Armbrust by making gross misstatements concerning the financial condition and earnings of the company, which Armbrust relied on.  284 F.2d at 671-672.  The Ninth Circuit held:

> The finding of fact upon which appellant relies is somewhat ambiguous, since it recites that the use of the long-distance telephone constituted a direct use of an instrumentality of interstate commerce 'in' the fraudulent scheme 'thereafter' practiced upon Armbrust.  But this ambiguity is completely resolved by the court's further finding that 'commencing with the said long-distance telephone call by Matheson on May 6, 1954, and continuing to the culmination of the transaction on or about May 22, 1954, at Portland, Oregon, Matheson intentionally undertook and practiced a scheme to defraud Armbrust. ...'
>
> As so clarified it must be held that the trial court expressly found that the fraud was practiced in connection with the use of the long-distance telephone between Oregon and Washington.  It follows that in so far as the requirements of section 10(b) are concerned, the findings of fact establish jurisdiction in the district court over the subject matter of the action.

*Id.* at 673.

Plaintiffs rely on the holding in *Matheson* to argue that the Ninth Circuit found it irrelevant that the single phone call was not used to convey the misleading information; rather, all that mattered was that the phone call was part of the process that led to the face-to-face negotiations.  Plaintiffs argue:

> Here, we have alleged extensive use of the
> telephone and internet by the defendants in
> preparing the offering memorandum,
> exchanging drafts and discussing how to spin
> unfavorable information.  And, indeed, the
> telephones were used on the very day of the
> stock sale, when Manual Lopes' agent called
> with questions about the financial
> projections in the offering memorandum.
> (First Amended Complaint at ¶ 79.)  Downey
> Brand tries to minimize this last use of the
> phones by noting that the call was initiated
> by a plaintiff, not a defendant.  But the
> one who initiates a telephone call is not
> the only one who 'uses' the phone.  The
> recipient uses the phone just as much.

In addition, Plaintiffs argue, the allegations in Paragraphs 71-80 disclose at least 14 occasions when the defendants used the phones and internet in connection with the offering of equity interests in Valley Gold.

Downey replies that *Matheson* is not controlling, arguing that "[t]he governing principle is that while an instrumentality must be used to effect the sale, it need not be used to communicate a fraudulent statement to the plaintiff."

Downey refers to the jurisdictional element set forth in 9th Cir.Civ.Jury Instr. 18.1 (2007):

> 3.  The defendant [used] [caused the use of]
> an [instrumentality of interstate commerce,
> such as mail or telephone] ... in connection
> with the [purchase] [sale] of securities,
> regardless whether the [instrumentality] ...
> itself was used to make an untrue statement
> or a material omission ....

Downey contends that Plaintiffs' argument that Defendants' use of instrumentalities of interstate commerce to gather information for the Offering Memorandum confers jurisdiction even if the

46

documents and statements about the investment are delivered in person, is contrary to the law.

Downey cites *Burke v. Triple A Machine Shop, Inc.,* 438 F.2d 978, 979 (9th Cir.1971):

> It is not contended that the mails were used.  There was no interstate negotiation or purchase of the plaintiff's stock.  We conclude that there was also no use of an 'instrumentality of interstate commerce' within the contemplation of the statute by reason of two local telephone calls to the companies' counsel who was also an assistant secretary.

*But see Spilker v. Shayne Laboratories, Inc.*, 520 F.2d 523, 526 (9th Cir.1975)("[W]e join the Fifth, Sixth, Eighth, and Tenth Circuits holding expressly that the intrastate use of the telephone confers federal jurisdiction under s 10 [sic] of the Securities Exchange Act of 1934 and S.E.C. Rule 10b-5 where the telephone calls in question are connected to the transaction of which there is complaint").

Downey also cites *Boone v. Baugh*, 308 F.2d 711 (8th Cir.1962).  However, neither of the cases cited by Downey are persuasive.  A Ninth Circuit case cited by neither party, *Hilton v. Mumaw*, 522 F.2d 588 (9th Cir.1975), held in pertinent part:

> Mumaws first argue that Hiltons have failed to show that the allegedly fraudulent acts involved 'the use of any means or instrumentality of interstate commerce, or of the mails ... We cannot agree.
>
> A draft of the 1957 contract was mailed by Cohasset's attorney to Henry Mumaw.  The jurisdictional requirement of Rule 10b-5 is satisfied even if the use of the mails is not itself a fraudulent act.  It suffices if

47

Mumaws used the mails in furtherance of the alleged fraud. *Errion v. Connell*, 236 F.2d 447, 450, 454-55 (9th Cir.1956); *Boone v. Baugh*, 308 F.2d 711, 713-14 (8th Cir.1962). From the fact that the draft was mailed with a covering letter to Henry Mumaw, it may reasonably be inferred that the draft was prepared at his request.  Preparation of the draft was clearly in furtherance of the allegedly fraudulent scheme.  We conclude that the use of the mails by Cohasset's attorney satisfies the jurisdictional requirement of Rule 10b-5.

522 F.2d at 602.  *See also* Hazen, 5 The Law of Securities Regulation, § 17.2, pp. 198-199:

While a face-to-face conversation, standing alone, will not satisfy the jurisdictional requirements, there may be jurisdiction under Rule 10b-5, if the conversations are part of a transaction that utilizes an instrumentality of interstate commerce. Thus, for example, a face-to-face conversation followed by a transaction utilizing an instrumentality of interstate commerce generally has been held to subject the speaker to Rule 10b-5 scrutiny. Nevertheless, it can be argued that the language of section 10(b) and Rule 10b-5 requires that the materially misleading statement be communicated through an instrumentality of interstate commerce.  For example, Rule 10b-5 makes it unlawful 'for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce ... to make any untrue statement of a material fact or to omit to state a material fact ....'  This language seems to contemplate that the communication will be made through the use of the jurisdictional means.  On the other hand, Rule 10b-5(c) prohibits conduct that operates as a fraud.  Similarly, the statutory language in section 10(b) of the Exchange Act prohibits the use of the jurisdictional means to employ a 'manipulative or deceptive devise or contrivance.'  Thus, it is arguable that where a face-to-face communication is part

48

> of a transaction that operates as a fraud,
> the jurisdictional means can be satisfied by
> other steps in the transaction.  It appears
> to be the majority rule that it is not
> necessary that the misrepresentation be
> communicated through an instrumentality of
> interstate commerce, so long as there is a
> connection between the use of the
> jurisdictional means and the fraud.

The FAC alleges that one of the Plaintiffs' agents used the telephone after the Offering Memorandum was disseminated by face to face meetings to question certain information in the Offering Memorandum.  In addition, the FAC alleges, similarly to *Hilton*, that drafts of the Offering Memorandum were exchanged through instrumentalities of interstate commerce.

Downey's motion to dismiss the alleged violation of Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5 for failure to adequately alleged the jurisdictional element is DENIED WITHOUT PREJUDICE.

         e.   <u>DOWNEY MADE NO STATEMENTS AND HAD NO DUTY TO DISCLOSE</u>.

Downey argues that the FAC contains no allegations that Downey was a "seller" of the securities.  Downey argues that, unless they directly market securities, attorneys are liable only for statements they "make" - statements directly attributed to the attorneys in an offering.

In so arguing, Downey cites Herpich, *Relying on Client-Supplied Information: An Attorney's Liability Exposure Under Rule 10b-5*, 43 U.Kan.L.Rev. 661, 670-671 (1995):

> Traditionally, lawyers are accountable only

49

to their clients for the sufficiency of
their legal opinions.  It is well understood
in the legal community that any significant
increase in attorney liability to third
parties could have a dramatic effect upon
out entire system of legal ethics.  An
attorney required by law to disclose
'material facts' to third parties might thus
breach his or her duty, required by good
ethical standards, to keep attorney-client
confidences.  Similarly, an attorney
required to declare publicly his or her
legal opinion of a client's actions and
statements may find it impossible to remain
as loyal to the client as legal ethics
properly require.  Cognizant of these risks,
the law, as a general rule, only rarely
allows third parties to maintain a cause of
action against lawyers for the insufficiency
of their legal opinions.  In general, the
law recognizes such suits *only if the non-
client plaintiff can prove that the attorney
prepared specific legal documents that
represent explicitly the legal opinion of
the attorney preparing them, for the benefit
of the plaintiff.*

In practice, this rule has meant that an
attorney is rarely liable to any third party
for his or her legal work unless the
attorney has prepared a signed 'opinion'
letter designed for the use of a third
party.

*See also Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1124 (5th

Cir.1988)(quoted by the law review article).

Plaintiffs, characterizing Downey's argument as an "aider

and abetter" contention, assert that Downey is not being sued as

an aider and abetter "but as a direct participant in the

preparation and drafting of the misleading offering memorandum."

Plaintiffs cite *In re Software Toolworks, Inc.*, 50 F.3d

615 (9th Cir.1994) and *Simpson v. AOL Time Warner Inc.*, 452 F.3d

1040 (9th Cir.2006), as authority that a "professional's" role in

50

drafting and editing a misleading disclosure renders the

professional directly liable for the violation.

At issue in *In re Software Toolworks* was the scienter

requirement in Rule 10b-5 on the part of auditors Deloitte &

Touche and underwriters Montgomery Securities and Paine Webber,

Inc.  In affirming summary judgment for DeLoitte & Touche on this

issue, the Ninth Circuit noted:

> The district court analyzed this issue in
> terms whether Deloitte was liable for
> 'aiding and abetting' Toolworks' primary
> violation of section 10(b) ... After the
> district court issued its opinion, however,
> the Supreme Court concluded that aiding and
> abetting liability does not exist under
> section 10(b).  *See Central Bank v. First
> Interstate Bank*, ___ U.S. ___, 114 S.Ct.
> 1439 ... (1994).
>
> Despite *Central Bank*, we nevertheless
> consider this issue because the plaintiffs'
> complaint clearly alleges that Deloitte is
> primarily liable under section 10(b) for the
> SEC letters.  In fact, the July 1 SEC letter
> stated that it 'was prepared after extensive
> review and discussions with ... Deloitte'
> and actually referred the SEC to two
> Deloitte partners for further information
> ... Similarly, the plaintiffs presented
> evidence that Deloitte played a significant
> role in drafting and editing the July 4 SEC
> letter ... This evidence is sufficient to
> sustain a primary cause of action under
> section 10(b) and, as a result, *Central Bank*
> does not absolve Deloitte on these issues.

50 F.3d at 628 n.3.

In *Simpson v. AOL Time Warner Inc.*, the Ninth Circuit

stated:

> Since *Central Bank*, it is the duty of courts
> to determine what constitutes a 'primary
> violation' of § 10(b).  With respect to the

51

1
2
3
4
5
6
7
8
9
10

> making of false statements or omissions, we
> have held that 'substantial participation or
> intricate involvement in the preparation of
> fraudulent statements is grounds for primary
> liability even though that participation
> might not lead to the actor's actual making
> of the statements.' *Howard v. Everex Sys.,
> Inc.,* 228 F.3d 1057, 1061 n.5 (9th
> Cir.2000); *see id.* at 1061 (holding that
> signing and attesting to a statement, such
> that for all intents and purposes the
> signor-attestor made the statement, is
> sufficient to be considered a primary
> violator); *see also In re Software Toolworks
> Inc. Sec. Litig.,* 50 F.3d 615, 628-29 & n.3
> (9th Cir.1994) (holding that drafting or
> editing false statements that the drafter-
> editor knows will be publicly disseminated
> is sufficient to be considered a primary
> violator).

11    452 F.3d at 1048.

12         Downey argues that this Ninth Circuit authority is not

13    controlling because the cases did not involve attorneys.  Downey

14    contends that cases involving accountants have little application

15    to Rule 10b-5 claims against attorneys.  Downey cites Haft &

16    Hudson, *Liability of Attorneys and Accountants for Securities*

17    *Transactions* § 3.2 (2007):

18         The differences between the professions
19         become most stark in connection with the
           disclosure obligations to nonclients, *i.e.,*
20         investors.  As a first (and very simplistic)
           'cut,' consider that attorneys have the
21         ethical duty not to disclose confidences of
           the client and that the attorney's role
22         usually consists of advising on disclosure
           issues and often (but not always) drafting,
23         for the client's consideration and
           modification, the offering documents to be
24         issued in final form under the client's (not
           attorney's) name; in contrast, the
25         accountant's status in a typical securities
           offering is as an *independent public*
26         accountant whose role usually consists of

52

> issuing a certificate under its name as to
> the accuracy, completeness, consistency and
> fairness of the financial statements, which
> certificate is issued only after it has
> undertaken an investigation (i.e., audit) of
> these matters.  That some courts have
> decided that the 'duty' to disclose material
> facts to nonclient investors is usually (not
> always) different for accountants and
> attorneys is not surprising.

Downey asserts that it has found no Ninth Circuit authority

holding attorneys liable to investors for Rule 10b-5 violations

contrary to "the majority view".

Downey raises a serious concern.  However, the Supreme

Court in *Central Bank* stated:

> The absence of § 10(b) aiding and abetting
> liability does not mean that secondary
> actors in the securities markets are always
> free from liability under the securities
> Acts.  Any person or entity, including a
> lawyer, accountant, or bank, who employs a
> manipulative device or makes a material
> misstatement (or omission) on which a
> purchaser or seller of securities relies may
> be liable as a primary violator under 10b-5,
> assuming *all* of the requirements for primary
> liability under Rule 10b-5 are met.

511 U.S. at 191.  It is apparent that liability of an attorney or

law firm under Section 10(b) will depend on whether a duty to the

investors exists.  *See very generally* 256 F.3d 1194 and 1997 WL

139829.  The May 30 Order recognized that the existence of a duty

on the part of Downey will depend upon the facts.  Therefore,

Downey's contention cannot be resolved at the pleading stage.

The recent Supreme Court opinion in *Stoneridge Inv. Partners, LLC*

*v. Scientific-Atlanta,* ___ U.S. ___, 2008 WL 123801 (2008), does

not change this result.  The Supreme Court held that a

corporation's vendors and suppliers, who are secondary actors or aiders and abetters, are not liable in Section 10b actions, unless the secondary actor's conduct satisfies each of the elements for liability.

Downey's motion to dismiss the alleged violation of Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5 on the ground that Downey made no statements and had no duty to disclose is DENIED WITHOUT PREJUDICE.

> f.   **FAILURE TO PLEAD SCIENTER WITH REQUISITE PARTICULARITY**.

To the extent the Third Cause of Action alleges a violation of Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5, Defendants move for dismissal on the ground that the required element of scienter is not pleaded with sufficient particularity.

15 U.S.C. § 78j(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange -
>
> ...
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5, promulgated under Section 10b, provides:

54

> It shall be unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact in order to make the statements made, in the light of the circumstances under which they were made, not misleading

17 C.F.R. § 240.10b-5.   The Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(2), provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

In the May 30 Order, the Court addressed the adequacy of pleading fraud and scienter for purposes of Rule 10b-5:

> A fair reading of the Complaint supports the inference that the Complaint alleges each professional services firm had actual knowledge of Vieira's prior fraudulent conduct, criminal wrongdoing, and plea bargain; knew that the new venture involved the same business practices and would be managed by Vieira in a comparable manner, and they intended to deceive the investing dairy participants.  What has not been alleged is who the firms' individual participants were, what they contributed, and how and when they accomplished it.  This is insufficient as to the two firms.  The allegations are otherwise sufficiently pleaded.  The motions to dismiss on this ground are GRANTED WITH LEAVE TO AMEND.

For purposes of Section 10(b), the required state of mind is the scienter requirement.  *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 975 (9th Cir.1999).  The Supreme Court has defined 'scienter' in the context of § 10(b) as

a "mental state embracing intent to deceive, manipulate, or

defraud." *Ernst & Ernst v. Hocfelder*, 425 U.S. 185, 193-194 n.12

(1976).  In the Ninth Circuit, scienter may be established by

recklessness.  *In re Silicon Graphics, id.* at 977.  As explained

in *S.E.C. v. Rubera*, 350 F.3d 1084, 1094 (9th Cir.2003):

> Scienter may be established by recklessness,
> defined as a highly unreasonable omission,
> involving not merely simple, or even
> inexcusable negligence, but an extreme
> departure from the standards of ordinary
> care, and which presents a danger of
> misleading buyers or sellers that is either
> known to the defendant or so obvious that
> the actor must have been aware of it ...
> Reckless conduct must be something more
> egregious than even 'white heart/empty head'
> good faith and represents an extreme
> departure from the standards of ordinary
> care such that the defendant must have been
> aware of it ... Recklessness satisfies the
> scienter requirement only 'to the extent
> that it reflects some degree of intentional
> or conscious misconduct.

On June 21, 2007, the United States Supreme Court decided

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ___ U.S. ___, 127

S.Ct. 2499 (2007); which addresses the adequacy of pleading

scienter in a Section 10(b) action following the enactment of the

PSLRA, which "requires [federal securities fraud] plaintiffs to

state with particularity both the facts constituting the alleged

violation, and the facts evidencing scienter, *i.e.,* the

defendant's intention 'to deceive, manipulate, or defraud." *Id*

as 2504.  The Supreme Court held:

> We establish the following prescriptions:
> *First,* faced with a Rule 12(b)(6) motion to
> dismiss a § 10(b) action, courts must, as
> with any motion to dismiss for failure to

plead a claim on which relief can be granted, accept all factual allegations as true ....

*Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice ... The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard ....

*Third,* in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences. The Seventh Circuit expressly declined to engage in such a comparative inquiry. A complaint could survive, that court said, as long as it 'alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent'; in other words, only '[i]f a reasonable person could not draw such an inference from the alleged facts' would the defendant prevail on a motion to dismiss ... But in § 21D(b)(2), Congress did not merely require plaintiffs to 'provide a factual basis for [their] scienter allegations,' ..., *i.e.*, to allege facts from which an inference of scienter rationally *could* be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a 'strong' - *i.e.*, a powerful or cogent - inference ....

The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations

57

> for the defendant's conduct, as well as
> inferences favoring the plaintiff.  The
> inference that the defendant acted with
> scienter need not be irrefutable, *i.e.*, of
> the 'smoking gun' genre, or even the 'most
> plausible of competing inferences,' ...
> Recall in this regard that § 21D(b)'s
> pleading requirements are but one constraint
> among many the PSLRA installed to screen out
> frivolous suits, while allowing meritorious
> actions to move forward ... Yet the
> inference of scienter must be more than
> merely 'reasonable' or 'permissible' – it
> must be cogent and compelling, thus strong
> in light of other explanations.  A complaint
> will survive, we hold, only if a reasonable
> person would deem the inference of scienter
> cogent and at least as compelling as any
> opposing inference one could draw from the
> facts alleged.

127 S.Ct. at 2509-2510.

Downey argues that the FAC's "bald allegations of failure to disclose and knowledge of falsity" do not properly plead scienter.  Downey claims to the extent the FAC alleges details, it fails to "connect the dots or retreat[s] behind information and belief."  Downey refers to the following allegations in the FAC:

> 72.  On April 1 and 2 of 2003, Anthony Colaw
> made several telephone calls to GEORGE
> VIEIRA and to a New Jersey cheese
> distributor concerning the distributor's
> refusal to execute a binding or
> comprehensive distributorship agreement, and
> the best way to spin that issue in the
> Offering Memorandum and make it appear in
> the Offering Memorandum that a solid
> distributor existed to purchase all of the
> cheese that VALLEY GOLD could manufacture.
> Curtis Colaw communicated with DOWNEY BRAND
> on this issue by e-mail, transmitted over
> the interstate instrumentalities of the
> Internet.

...

**74.  On April 7, 2003, Curtis Colaw and DOWNEY BRAND attorney Jeffrey Koewler had an extended telephone conference regarding the disclosures for the Offering Memorandum. And on April 11, 2003, the two exchanged telephone calls regarding disclosure issues related to GEORGE VIEIRA, apparently including how to disclose the investigation by the United States Attorney for the District of New Jersey into GEORGE VIEIRA's participation in bank and mail fraud relating to Suprema Specialties as well as GEORGE VIEIRA's negotiations for a plea agreement which negotiations had by then concluded.  Indeed, on March 28, 2003, the plea bargain negotiations were reduced to a seven-page agreement by the United States for the District of New Jersey and mailed that day to GEORGE VIEIRA's criminal defense attorney.**

**75.  At some point apparently between April 11, 2003 and April 17, 2003, CARY was assigned the task of drafting the initial disclosure language concerning GEORGE VIEIRA and the criminal investigation involving him to be included in the Offering Memorandum. And on April 17, 2003, Curtis Colaw telephoned CARY to discuss CARY's preparation of this portion of the Offering Memorandum disclosure.**

...

**122.  Plaintiffs are informed and believe, and thereon allege, that CARY prepared the initial draft to disclose the criminal investigation of GEORGE VIEIRA, but that he submitted the draft to DOWNEY BRAND and the other Defendants who revised the draft to its current form.**

Downey asserts that, although the FAC alleges that Curtis Colaw knew there was no distribution contract, the FAC does not allege that Colaw conveyed that knowledge to Downey.  Downey further contends that the FAC does not describe a source where

59

Downey could learn of Vieira's activities with Suprema Specialties or the status of the criminal investigation, other than Vieira himself, characterized by Plaintiffs as a congenital liar.

Plaintiffs respond that Paragraphs 114-124 of the FAC "reveal[] a collaborative team approach with regular meetings and discussions about the drafting of the offering memorandum - a team approach led by Downey Brand." Plaintiffs contend "[i]t is incredulous to presume that Downey Brand could complete that process and still know nothing." With regard to Downey's knowledge of Vieira's criminal problems, Plaintiffs refer to Paragraph 77 of the FAC:

> 77. On April 17, 2003, Diane Oleson [of Downey Brand] ... conducted online research using the interstate instrumentality of the Internet to investigate GEORGE VIEIRA. She was not satisfied with the results, however, and on April 18, 2003 telephoned a customer service representative with the LEXIS database service (made available to DOWNEY BRAND over the interstate instrumentality of the Internet). On April 21, 2-3, Diane Oleson received a return message from LEXIS regarding its Accurint database, a database targeted to law enforcement agencies with information about criminal citations, indictments, convictions and the like. On April 21, 2003, Diane Oleson used the interstate instrumentality of the Internet to access the Accurint database in order to further investigate GEORGE VIEIRA.

Plaintiffs contend that Downey's use of the Accurint database alleges the source of Downey's knowledge of Vieira's criminal case.

Downey, accepting Plaintiffs' characterization of the

60

Accurint database as true, requests that the Court take judicial notice that an information in *United States v. Vieira*, No. 2:04-CR-00111 SRC, charging Vieira with two counts of conspiracy to defraud the United States was not filed in the United States District Court for the District of New Jersey until January 4, 2004, nine months after the Offering Memorandum was distributed. The docket in No. 2:04-CR-00111 SRC, shows that an application for permission to enter plea of guilty, and a plea agreement were filed on January 7, 2004 and "entered" on January 12, 2004. Although there is no minute order indicating that Vieira entered a plea of guilty pursuant to the plea agreement, the docket shows that sentencing initially was set for August 15, 2007 and thereafter continued three times.  Sentencing is now set for March 19, 2008.

Genske argues that the allegations of the FAC do not meet the standard articulated in *Tellabs.*  Genske refers to the allegations in paragraph 37 that Genske "prepared financial projections for the purpose of attracting investors to VALLEY GOLD, and ... actively participated in the preparation of a business plan to attract investors for VALLEY GOLD, including the preparation of grossly negligent financial forecasts for the operations of VALLEY GOLD".  Genske also refers to the allegations in paragraph 120:

> 120.  The partners at GENSKE-MULDER who primarily worked on preparing the Offering Memorandum and business plan were Peter Hoekstra and Paul Anema.  From the information presently available to

1

2

3

4

5

> Plaintiffs, it appears that Peter Hoekstra
> had primary responsibility for overseeing
> those portions of the Offering Memorandum
> and business plan that dealt with the
> disclosure of risks associated with the
> dairy industry and in preparing the
> financial forecasts and projections.  Paul
> Anema assisted in these matters, and both
> were involved in reviewing and revising the
> final forms of both documents.

6

7

8

9

10

Genske contends that the FAC does not allege any fraud by it in connection with the financial projections or the risks associated with the dairy industry and argues that the absence of any specific allegations of misconduct compel dismissal because there is no strong inference of scienter.

11

12

13

14

Plaintiffs respond that the May 30 Order concluded that the Complaint alleged sufficient facts supporting an inference that Genske intended to defraud.  *See supra*.  The May 30 Order, however, was issued before the Supreme Court decided *Tellabs*.

15

16

Genske further argues that scienter cannot be inferred from the allegation in paragraph 124:

17

18

19

20

21

> 124.  The Offering Memorandum itself
> discloses that $325,000 of the funds raised
> by the April 22, 2003 securities issuance
> would be used to pay the bill of CARY,
> GENSKE-MULDER and DOWNEY BRAND.  These
> defendants knew that a successful securities
> issuance was in their own financial
> interests.

22

23

24

25

26

Genske contends that the "payment of professional fees, without any contextual facts, does not establish an inference that Genske-Mulder has acted with 'scienter' much less a 'strong' inference that Genske-Mulder acted with intent to defraud Plaintiffs."

Genske argues that, taken as a whole, the FAC does not plead facts sufficient to give rise to a strong inference of scienter or facts which "establish nonculpatory explanations for Genske's conduct of scienter when taking out plausible opposing inferences." Genske notes that the Offering Memorandum contains the following cautionary statements:

**OTHER INVESTMENT FACTORS**

...

**Ability to Accept Risks**.

Participation in the Company will be offered solely to prospective Investors who are willing and can afford to accept and bear for an indefinite period of time the substantial risks described herein, who do not require an immediate income from their capital contributions in the Company, and who are 'accredited Investors' as such term is defined under the Securities Act and **Exhibit B**.

...

**TERMS OF THE OFFERING**

...

**Qualifications of Investors**

An investment in the Company involves a high degree of risk and is suitable only for Investors of substantial financial means who have no need for liquidity in their investments. Accordingly, this Offering is being made only to a limited number of Investors that meet these and other requirements and that purchase Membership Interests without a view to public distribution or resale. In order to assure the Company of a prospective Investor's suitability to purchase Membership Interests, each prospective Investor will be required to represent that the person is an

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

'accredited investor' as defined in SEC Rule 501 and in <u>Exhibit B</u>.  In addition, all Investors must make certain representations in connection with their purchase of Membership Interests.

...

Method of Subscription

...

Each person desiring to purchase Membership Interests also will be required, among, [sic] other things to (a) agree not to sell or transfer any Membership Interest at any time to any person if, in the opinion of the Company, such sale or transfer would violate applicable federal or state securities laws; (b) agree not to sell or transfer any Membership Interest at any time to any person unless the Company has been offered the right to purchase the Membership Interest upon the terms and conditions set forth in the Operating Agreement; (c) represent that (i) such person can bear the economic risk of the purchase of the Membership Interest including the total loss of such person's investment and (ii) such person has sufficient knowledge and experience in business and financial matters, including the analysis of or participation in cheese production investment programs, as to be capable of evaluating the merits and risks of any investment in the Company, or that such person is being advised by others with such knowledge and experience such that such persons and they are capable of making such evaluation; and (d) represent that such person is purchasing the Membership Interest for such person's own account without a view to public distribution or resale.  Each subscriber also may be required to provide current financial and other information to the Company to enable it to determine whether such subscriber is qualified to purchase a Membership Interest in this Offering.

[Confidential Private Offering Memorandum, pages 16, 18-19, Exh.

64

B to FAC].  In addition, Genske notes that the Offering Memorandum at pages 6-17 details risks specific to Valley Gold as risks related to the cheese processing industry.  Included in the risks specific to Valley Gold are the following categories: (1) no operating history; (2) insufficient operating capital; (3) need for additional financing; (4) heavy debt load; (5) lack of diversification; (6) distribution of Company products; (7) Company's supply requirements; (8) union contracts, reduction in labor costs; (9) competition in food industry; (10) competition with other cheese manufacturers; (11) market acceptance; (12) geographic concentration; (13) unknown delivery capacity, delays in delivery of products; (14) limited trademark protection; (15) proprietary knowledge and absence of patent protection; (16) dependency on key personnel; and (17) management committee, conflicts of interest.  Included in the risks related to the cheese processing industry are the following categories: (1) low margin business; (2) change in consumer preferences and health-related concerns; (3) effect of adverse medical research relating to milk products and demand for milk products; (4) limited production capacity; (5) product liability; (6) limitation of insurance coverage; (7) risks associated with perishable food production; (8) dairy products have a limited shelf life; (9) company-specific regulation; (10) other regulatory matters; (11) possible volatility of raw milk costs; (12) environmental; (13) investors' ownership interest in Company; (14) no payment of distributions; (15) ability to accept risks; (16) restriction on

resale of Membership Interests; (17) tax matters; (18) tax classification of the Company; and (18) overall risk.

Genske argues that the FAC does not allege facts that, in April 2003, Genske knew about the March 2003 "plea letter".

The FAC alleges in Paragraph 100(b) that the "material misrepresentations and material omissions of material facts" included disclosing that Vieira "had been contacted by the U.S. Attorney's Office as part of its investigation into the bankruptcy of Suprema Specialties, Inc., without disclosing that GEORGE VIEIRA was already actively involved in negotiations with the United States Attorney's Office to plead guilty to securities and bank fraud."   The FAC alleges in pertinent part:

> 102. The terms of the negotiated plea bargain were spelled out in a seven-page letter dated March 28, 2003 from the U.S. Attorney's Office to GEORGE VIEIRA's attorney.  And the plea deal (that was formally entered on January 4, 2004), barred GEORGE VIEIRA from acting as an officer or director of any company issuing registered securities under the Securities Exchange Act of 1934.

> 103. In the business plan, however, defendants disclosed none of this vital information.  Indeed, in the business plan, defendants pretended that the implosion of Suprema Specialties, Inc. and its subsidiaries provided an advantage for the proposed business of VALLEY GOLD because as "one of the larger producers of ricotta in the state" a market void and thus a market opportunity was created when "Suprema Specialties, Inc. ceased operations in 2002."  The business plan failed to mention that Suprema Specialties ceased business because its fraudulent practices, inflated sales and falsified inventory forced it into bankruptcy; and the business plan failed to

mention that as much as 87% of the purported
cheese production by Suprema Specialties
that led defendants to characterize it as a
large producer was fictitious, as reported
by the Securities and Exchange Commission's
investigation.

104. The Offering Memorandum provided a
brief disclosure concerning Suprema
Specialties' bankruptcy, but did so in a way
to minimize the importance of the
information and in a manner that created the
impression that GEORGE VIEIRA's sole
involvement with Suprema Specialties
occurred because he "was, for a short period
of time, an officer of Suprema West, Inc. .
. . a subsidiary of Suprema Specialties,
Inc." The Offering Memorandum did not
disclose that GEORGE VIEIRA was not just any
officer, but was the Chief Operating Officer
and was thus directly responsible for
fraudulent financial transactions that
government officials were investigating.
The Offering Memorandum also did not
disclose that GEORGE VIEIRA had reached an
agreement with the United States Attorney's
Office to plead guilty to securities fraud
and conspiracy to commit bank and mail
fraud. And the Offering Memorandum did not
disclose that in addition to being an
officer of Suprema Specialties West, Inc.,
GEORGE VIEIRA and his wife MARY VIEIRA were
also officers and owners of CMM, which was
also a subject of the criminal investigation
as well as a probable broker for any cheese
produced by VALLEY GOLD.

Genske notes that Paragraph 119 of the FAC alleges:

119. GEORGE VIEIRA's plea negotiations, his
involvement in the events that led to the
collapse of Supreme Specialties and the
nature of the investigation by the United
States Attorney for New Jersey were well
known to Defendants and were actively
investigated by DOWNEY BRAND. But, as
alleged above, Defendants drafted the
Offering Memorandum to minimize and conceal
this information.

Genske argues that the FAC fails to allege that Genske drafted

any portion of the Offering Memorandum relating to the Vieira disclosure or how Genske even knew of the "plea letter" or plea negotiations.  Genske contends that, taken as a whole, the FAC merely conclusorily alleges in paragraph 114 that Genske, along with Downey Brand and Cary

> 114. ... are sued as joint authors of the Offering Memorandum and/or business plan, with direct knowledge of at least three primary omissions or misstatements, was well as direct involvement in the drafting that led to those omissions or misstatements:
>
> > a.  The Offering Memorandum and business plan did not disclose that milk shipped by CVD to VALLEY GOLD would not be protected by the milk producer's trust fund;
> >
> > b.  The Offering Memorandum and business plan materially misstated the nature of negotiations with New Jersey cheese distributors; and
> >
> > c.  The Offering Memorandum materially and misleadingly disclosed the nature of the investigation of GEORGE VIEIRA'S criminal activity and his negotiations of a plea bargain to bank and securities fraud.

Genske notes that the Offering Memorandum, in the section detailing "Risks Specific to Company", states in pertinent part:

> Dependency on Key Personnel
>
> ...
>
> Mr. Vieira, one of the principal organizers of the Company and this transaction is currently the chief executive officer of CVD.  George Vieira, was, [sic] for a short period of time, an officer of Supreme West, Inc. ('Supreme West').  Suprema West is a

68

> subsidiary of Supreme Specialties, Inc.
> ('Suprema').  Suprema and Suprema West are
> in bankruptcy.  Suprema is also the subject
> of an investigation being conducted by the
> Securities and Exchange Commission and the
> U.S. Attorney's Office.  Assertions have
> been made that financial data for Suprema
> was misrepresented.  Mr. Vieira has been
> contacted by the U.S. Attorney's Office and
> may be a subject of this investigation.  No
> formal charges have been brought against Mr.
> Vieira ....

Downey argues that this statement in the Offering

Memorandum is not misleading and that there was no duty to

disclose the offer made in the "plea letter."   Downey requests

the Court take judicial notice of the March 28, 2003 letter from

the United States Attorney, District of New Jersey, to John

Azzarello and James Cecchi, counsel for George Vieira, attached

to Downey's motion as Exhibit 4.  The letter states in pertinent

part:

> This letter sets forth the full and complete
> agreement between your client, George
> Vieira, and the United States Attorney for
> the District of New Jersey ....
>
> ...
>
> Conditioned on the understandings specified
> below, this Office will accept a guilty plea
> from George Vieira to both counts of a two-
> count information ....

Downey cites 17 C.F.R. § 229.401(f)(2):

> (f) Involvement in certain legal
> proceedings.  Describe any of the following
> events that occurred during the past five
> years and that are material to an evaluation
> of the ability or integrity of any director,
> person nominated to become a director or
> executive officer of the registrant:

69

...

> **(2)** Such person was convicted in a criminal
> proceeding or is a named subject of a
> pending criminal proceeding (excluding
> traffic violations and other minor offenses)
> ....

Downey also cites a district court decision, *In re Boston
Scientific Corp. Securities Litigation*, 490 F.Supp.2d 142
(D.Mass.2007).

In *Boston Scientific*, a pleading case, the DOJ began an
investigation of the NORS recall concerning whether Boston
Scientific Corp. (BSC) took an improper risk in marketing its
NORS stents and whether BSC officials knowingly released
adulterated medical devices into the marketplace.   The
investigation continued for many years and both BSC and two of
its senior officers were named as targets of the investigation.
490 F.Supp.2d at 147.   The Lead Plaintiff alleged that, as part
of the DOJ investigation, grand jury proceedings during the Class
Period revealed that senior officials at BSC knew that the NORS
stents had experienced a catastrophic failure rate in clinical
trials, but continued shipping them, in disregard of public
safety.   *Id.*   The Lead Plaintiff alleged that Defendants misled
the investment community by downplaying the gravity and merits of
the DOJ investigation.   *Id.*   During the Class Period, the DOJ
investigation and the risk of an adverse outcome were mentioned
in BSC's 10-K filings, which also disclosed that "'[t]here can be
no assurance that the [DOJ] investigation will result in an
outcome favorable to the Company ....'" *Id.*   BSC's SEC filings

stated that the outcome of the DOJ investigation "may" adversely affect the company.  *Id.* at 147-148.  The District Court held in pertinent part:

> Lead Plaintiff charges that Defendants misled the investment community about the ongoing DOJ investigation.  This claim fails ... BSC fulfilled its obligation by disclosing the potential risk of an adverse outcome in the DOJ investigation in BSC's 10-K filings during the class period.  The form 10-K stated that '[t]here could be no assurance that the investigation will result in an outcome favorable to the Company ....'  The public filings also stated that 'two senior officials have been advised that they are targets of the federal grand jury investigation' and that 'the Company's performance may be affected by: ... the ultimate outcome of the U.S. Department of Justice investigation.
>
> Defendants had no duty to confess guilt.  'The federal securities laws do not require a company to accuse itself of wrongdoing.'  BSC had a duty to disclose the investigation, which it did.  Although Defendants had a duty to disclose all underlying material facts that would adversely affect its business, that duty did not extend to pronouncing wrongdoing while the DOJ investigation was ongoing.
>
> BSC's disclosures of the ongoing DOJ investigation were also consistent with SEC regulations.  SEC proxy rules require additional disclosures where a director or executive officer was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding.  But neither of these scenarios was present.  And as another district court has noted, 'the SEC's proxy disclosures do not require a company's management to confess guilt to uncharged crimes or to accuse itself of antisocial or illegal policies ... There is no reason why a different rule should apply under § 10(b).'

**490 F.Supp.2d at 156-157.**

Downey also cites *Ballan v. Wilfred American Educational Corporation*, 720 F.Supp. 241, 248-249 (E.D.N.Y.1989):

Rule 10b-5 speaks of omissions to state a 'material fact' necessary to make the statements made not 'misleading.' Thus it is only 'facts' that an issuer of securities and its officer must disclose.  Defendants contend that the critical omissions of which plaintiff complains are not omissions of fact but speculations about the future or legal conclusions amounting to confessions to uncharged crimes.

Defendants do not dispute that in 1985 and 1986 they had to reveal, as they did, the investigations of Wilfed or that they were obligated to disclose, as they did, the October 21, 1986 indictments.  But they dispute plaintiff's contention that while Wilfred was under investigation and before the 1988 indictments issued, § 10(b) required defendants to tell shareholders the likelihood that Wilfred would be indicted, the consequent likelihood of its suspension from the aid programs, the likelihood that it would be charged under RICO and its assets forfeited, and the imminence of further indictments.

Wilfred was not required to disclose information of which it had no knowledge or about which it could only speculate ... Indeed, it would be misleading to do so.

Grand juries operate in secret.  Government investigations do not typically advise their targets of the likelihood of indictment. The 'imminent' indictments of Wilfred and Jakeway did not materialize until a year and a half after plaintiff's purchase.  The outcome of legal proceedings is inevitably uncertain ....

Therefore defendants were not bound to predict as the 'imminent' or 'likely' outcome of the investigations that indictments of Wilfred and its chief officer

72

1

would follow, with financial disaster in
their train.

2

3

Defendants also contend that they need not
have made confessions of guilt to uncharged
crimes or disclosed facts that tended to
incriminate them ....

4

5

...

6

7

Cases in this circuit have held ... that the
SEC's proxy disclosure rules do not require
a company's management to confess guilt to
uncharged crimes ....

8

9

10

11

*See also Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th
Cir.2002)("If the challenged statement is not false or
misleading, it does not become actionable merely because it is
incomplete").

12

13

14

15

16

    Plaintiffs refer to the allegation in Paragraph 104 of
the FAC that "[t]he Offering Memorandum ... did not disclose that
GEORGE VIEIRA had reached an agreement with the United States
Attorney's Office to plead guilty to securities fraud and
conspiracy to commit bank and mail fraud."

17

18

19

20

21

22

23

24

25

    The allegations of the FAC are inconsistent.  Paragraph
104 alleges in pertinent part that "[t]he Offering Memorandum
also did not disclose that GEORGE VIEIRA had reached an agreement
with the United States Attorney's Office to plead guilty to
securities fraud and conspiracy to commit bank and mail fraud."
Paragraph 100(b) alleges that material misrepresentations and
omissions in the Offering Memorandum and business plan included:
"Disclosed that Mr. Vieira had been contacted by the U.S.
Attorney's Office as part of its investigation into the

26

bankruptcy of Suprema Specialties, Inc., without disclosing that GEORGE VIEIRA was already actively involved in negotiations with the United State's Attorney's Office to plead guilty to securities and bank fraud."

In any event, Plaintiffs argue, the statement in the Offering Memorandum is misleading because "Mr. Vieira had not just been 'contacted' but had been engaged in extensive plea negotiations; and it is not true that Mr. Vieira 'may' be a subject of the investigation - he clearly *was* a subject of the investigation."

Genske and Downey rejoin that the New Jersey cheese distribution negotiations were accurately disclosed in the Offering Memorandum.  They note that the Offering Memorandum and subscription agreements are alleged to have been provided to Plaintiff Manual Lopes on April 22, 2003.  (FAC ¶ 79).  The Offering Memorandum, in the section captioned "Risks Specific to Company", states:

> **Distribution of Company Products.**
>
> **The Company is negotiating with a cheese distributor in New Jersey for the distributor to purchase substantially all of the Company's product over a two-year period beginning as soon as Company begins producing cheese.  At this time, the Company estimates that the total amount of cheese to be purchased under this contract to be between 14 and 25.5 pounds.  The purchase price for the cheese under the agreement will be tied to the price of that particular cheese as listed on the Chicago Cheddar Block Market except for Ricotta cheese which will have a price set for the 30 pound bags. Though many factors will affect the overall**

74

value of the agreement, a rough estimate of
the value of the proposed agreement is
approximately $1,000,000 per year and
$200,000,000 over the two-year term of the
commitment.  If any agreement is not reached
shortly to provide a purchaser of products
produced at the Cheese Plant, the Company
will not succeed and the Investors could
lose their investment.  In addition, should
the Company not be able to produce the
quality or quantity of cheese as described
in this Memorandum and as may be required by
the cheese distributor, or should the cheese
distributor for any reason not fulfill its
commitment to purchase the Company's
product, there is no assurance that the
Company would be able to find an immediate
customer for all or a portion of its
product.  As a result, the Company would
have to deal with the competitive
marketplace for cheese as described below
and could face significant disruption to its
sales with the possibility that such a
disruption could have a material adverse
effect on the Company's business, operations
and finances.  Further, the Company will
face these competitive forces should it
decide to expand its operations or, at the
end of any arrangement it may reach with a
cheese distributor, should the arrangement
not be continued.

(FAC, Ex. B, pp.7-8).  The disclaimers in the Offering

Memorandum, Defendants contend, create a strong inference that

they did not intend to make a material misrepresentation or

omission concerning the distribution negotiations because

Plaintiffs were informed that no deal was done.

Plaintiffs respond that the fraud "was in pretending that

a deal was highly likely when, in point of fact, it was already

dead in the water."  Plaintiffs refer to paragraph 118 of the

FAC:

118.  On numerous occasions throughout the

75

1

2

3

4

5

6

7

8

> early part of April of 2003, Curtis Colaw
> [an attorney who regularly represented CVD
> and Vieira - see Paragraph 71] endeavored to
> negotiate a distributorship agreement with
> Mr. Profaci, including on April 1, 2003,
> April 2, 2003, April 17, 2003, April 18,
> 2003 and April 22, 2003.  As of April 22,
> 2003 no agreement had been reached and Mr.
> Profaci's reluctance to sign a binding or
> comprehensive distributorship agreement was
> apparent.  Nonetheless, Defendants drafted
> the Offering Memorandum to make it appear
> that a firm deal was relatively certain and
> would provide for purchase of $100 million
> of cheese products per year for two years.
> This was materially false.

9

       Again, the allegations in the FAC are inconsistent.

10

Paragraph 105 alleges in pertinent part:

11

12

13

14

15

16

17

18

19

> The Offering Memorandum stated at page 7 that
> VALLEY GOLD was negotiating with a 'cheese
> distributor' in New Jersey' to produce
> substantially all of VALLEY GOLD's production for
> its first two years.  The Offering Memorandum
> then stated that the negotiations had resulted in
> a contract, and that 'the total amount of cheese
> to be purchased under this contract [is
> estimated]' to be between 14 and 25.5 million
> pounds.'  The Offering Memorandum further
> disclosed that if the New Jersey distributor 'for
> any reason [could] not fulfill its commitment to
> purchase the Company's product, there is no
> assurance that the Company would be able to find
> an immediate customer ... and such a disruption
> could have a material adverse effect on the
> Company's business, operations and finances.

20

The allegation in Paragraph 105 of the FAC that the Offering

21

Memorandum "stated that the negotiations are resulted in a

22

contract" are contradicted by the language of the Offering

23

Memorandum itself.

24

       Plaintiffs argue that Defendants knew when they prepared

25

the Offering Memorandum that the distributor was reluctant to

26

sign a distributorship agreement but that Defendants did not

disclose that a distributorship agreement "was unlikely,

uncertain and far too speculative to quantify with a monetary

value.  Plaintiffs contend:

> Instead, defendants indicated that the deal
> was anticipated and that it was sufficiently
> final and precise to provide for
> quantification at $100 million per year.
> And note the phrasing of the final quoted
> sentence: that many factors *will* affect the
> value of the contract.  This use of the term
> '*will*' as opposed to *would* or *might* or *may*
> or *hypothetically could* or any other
> conditional language deliberately masked the
> truth.
>
> This disclosure was intentionally written to
> spin a huge negative and make it sound like
> a positive.  Defendants had unsuccessfully
> tried on numerous occasions to get a
> commitment from the distributor ... And they
> knew he was reluctant to proceed.  In
> nonetheless stating that a deal was
> anticipated, defendants intentionally lied.

Plaintiffs' "spin" contention is without merit.  There is

nothing in the Offering Memorandum stating that a contract with

the cheese distributor was "anticipated" and the Offering

Memorandum clearly states that, in the absence of the distributor

contract, the investment will fail.  The disclaimers quoted above

negate any strong inference of fraud with respect to the

representations concerning the distributor contract.

Referring to the allegation in Paragraph 114(a) that the

Offering Memorandum and business plan failed to disclose that

milk shipped by CVD to Valley Gold would not be protected by the

milk producer's trust fund, Genske argues that the FAC fails to

explain, when read in totality, how the April 2003 investment in Valley Gold is affected by the protection or lack of protection by the milk producer's trust fund: "The FAC simply does not connect the April 2003 investment with the alleged lack of Trust Fund protection."

Defendants argue that ineligibility for the milk producer's trust fund is publically known and not material.

California Food & Ag. Code § 62580(h) provides:

> Except as otherwise provided by this chapter, milk shipped by a producer to a handler which meets the following criteria shall be considered for coverage pursuant to this chapter:
>
> ...
>
> (h) The producer does not have a beneficial ownership interest in the handler to whom the shipments are made.

Defendants cite *Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 27 (1st Cir.1987): "[T]he fraud on the market theory does not dispense with the requirement that there must be a duty to disclose before there can be liability."   In *Sailors v. Northern States Power Co.*, 4 F.3d 610, 613 (8th Cir.1993), the Eighth Circuit held:

> We further question Sailors' assertion that much of the information he seeks was not public.   As we have stated, having alerted the market to the existence of regulatory proceedings, NSP had no duty to inform them of each of the steps required in that process ... 'The securities laws require disclosure of information *that is not otherwise* in the public domain.' ... We have held that Rule 10b-5 does not protect 'nondisclosed facts equally known *or*

78

*available* to both parties.' ....

*See also Ward v. Succession of Freeman*, 854 F.2d 780, 793 (5th Cir.1988), *cert. denied*, 390 U.S. 951 (1989)(Because passage of a statute is "as a matter of law in the public domain," there is no duty of disclosure).

Downey also refers to the definition of "material" set forth in 17 C.F.R. § 230.405:

> Material.  The term material, when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters to which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to purchase the security registered.

Defendants argue that Valley Gold's ability to pay suppliers was material and was disclosed in the Offering Memorandum.  In the section captioned "Risks Specific to Company", the Offering Memorandum stated:

> **Insufficient Operating Capital**
> **The Offering will not provide the Company with sufficient operating capital.  The Company's requirements for operating capital will be significant.  The total amount of funds raised through this Offering will be a significant factor in determining the amount of operating capital the Company will have to begin operating the Cheese Plant.  Should the maximum amount of $4,000,000 be raised, the Company will use approximately One Million Six Hundred Seventy-Five Thousand Dollars ($1,675,000), forty-two percent (42%) of the proceeds of this Offering, to fund a portion of this operating capital.  However, if the Company only raises the minimum amount of $2,800,000 the operating capital from the Offering will be only Four Hundred Seventy-Five Thousand Dollars ($475,000).  In either event, the operating**

1
2
3
4

capital generated from this Offering will
not be sufficient to sustain the Company or
its operations.  The Company anticipates
that the proceeds of this Offering will be
sufficient to satisfy the Company's
contemplated cash requirements for
approximately 15 to 45 days following the
consummation of this Offering.

5

**Need for Additional Financing**

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Beyond this initial capital, the Company
will be required to obtain additional
operating capital and expects to do so by
obtaining a $4,000,000 line of credit.  The
Company also will need to obtain equipment
lease financing in an amount estimated to be
$4,000,000 necessary for the purchase
or lease of equipment to produce its cheese
products.  The line of credit and the
equipment lease have not been secured as of
the date of this Memorandum and if they
cannot be secured, the Company may be
required to terminate its operations or
significantly alter its operations as
described in this Memorandum.  In the event
that the Company's plans or assumptions
change, its assumptions prove to be
inaccurate, or if the proceeds of this
Offering, other capital resources and cash
flow otherwise prove to be insufficient to
fund operations (due to the possible lack of
market acceptance, other unanticipated
expenses, delays, problems or otherwise),
the Company would be required to seek
additional financing or may be required to
curtail its activities.  The Company has no
current arrangements with respect to, or
sources of, additional financing such as the
line of credit or equipment lease mentioned
above and there can be no assurance that any
additional financing will be available to
the Company on acceptable terms, or at all.
Any inability to obtain additional financing
would have a material adverse effect on the
Company, including requiring the Company to
postpone, limit or cancel future marketing
activities or curtail or cease its
operations.

25
26

Defendants contend that a supplier's inability to obtain

80

indemnity is not a fact material to an investment in Valley Gold.

Defendants further contend that ineligibility for the milk

producers trust fund is a "risk belonging to CVD if CVD decides

to sell the milk to Valley Gold" and that, if Plaintiffs have a

quarrel, it is with CVD, not Valley Gold, the Offering Memorandum

or Defendants.

Plaintiffs refer to the allegations in Paragraphs 115-116

of the FAC:

> 115.   CARY knew that milk shipped by CVD to
> VALLEY [sic] would not be protected by the
> milk producer's trust fund because in
> February of 2003, he negotiated a
> stipulation and order in pending proceedings
> before the Department of Food and
> Agriculture that stated: 'Respondent
> acknowledges that Central Valley Dairymen
> milk processed by the new entity licensed to
> Respondent will not be eligible for Trust
> fund coverage.'  CARY signed this
> stipulation on February 18, 2003 and on
> February 21, 2003 was mailed a copy of the
> order entered upon the stipulation.

> 116.   At the time of this stipulation, the
> PROMOTERS were focusing on acquiring a
> cheese plant in Manteca.  To avoid any
> confusion, the Department of Food and
> Agriculture requested a further stipulation
> after the Gustine facility was purchased to
> make it clear that no trust fund coverage
> would be provided for milk supplied by CVD
> to VALLEY GOLD's Gustine facility.  CARY
> signed that stipulation on September 20,
> 2003, only days before Plaintiffs were asked
> to purchase additional interests in VALLEY
> GOLD with the 'milk for equity' contracts.

> 117.   The lack of trust fund coverage was
> never disclosed to Plaintiffs.

Defendants' contentions that the absence of trust fund coverage

is not relevant to the claims of securities fraud "rings hollow",

Plaintiffs argue:

> Suppliers are naturally reluctant to sell
> their milk outside the protected channels
> that guaranty payment.  Not only are such
> sales subject to a greater risk premium, but
> producers who do not get paid on time are
> more likely to halt deliveries.  And the
> plaintiffs to whom defendants were pitching
> the investments in Valley Gold were not just
> any investors, they were themselves the milk
> suppliers; and the business plan on which
> the venture was premised called for the
> plaintiffs to sell their milk to Valley
> Gold.  Any material flaw in that business
> plan was *directly* material to the deal, and
> defendants knew it.  In hiding from
> plaintiffs that they would not be protected
> by the milk producers' trust fund, Genske-
> Mulder [and Downey] again demonstrated its
> scienter.

Plaintiffs' argument ignores the cases cited by
Defendants.  California Food & Ag. Code § 62580(h) is a statute
in the public domain and is very clear.   The statutory provision
coupled with case law cited above negate any strong inference of
fraud with respect to the failure to disclose ineligibility for
the milk producer's trust fund.  The Supreme Court's most recent
limitation of suppliers-customers' liability in Section 10(b)
cases also limits the effect of professionals' alleged omissions.
*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, *supra*,

Genske argues that the FAC fails to allege any facts from
which it may be inferred that Peter Hoekstra and/or Paul Anema,
who are alleged to have been involved in the drafting of the
Offering Memorandum and/or business plan had any knowledge of the
three misstatements or omissions alleged in Paragraph 114 of the
FAC.  Genske refers to Paragraph 120:

82

120.   The partners at GENSKE-MULDER who primarily worked on preparing the Offering Memorandum and business plan were Peter Hoekstra and Paul Anema.   From the information presently available to Plaintiffs, it appears that Peter Hoekstra had primary responsibility for overseeing those portions of the Offering Memorandum and business plan that dealt with the disclosure of risks associated with the dairy industry and in preparing financial forecasts and projections.   Paul Anema assisted in these matters, and both were involved in reviewing and revising the final forms of both documents.

Genske argues that the FAC does not allege any facts known to Hoekstra or Anema but undisclosed by either of them which would give rise to a reasonable inference that they knew of Vieira's criminal background, that they knew that the negotiations for the cheese distribution deal had broken down, that they hid this breakdown from Plaintiffs, that they had any knowledge of the CVD stipulations executed by Cary with the Department of Food and Agriculture or were responsible for including this knowledge in the Offering Memorandum or business plan.

Genske moves to dismiss allegations that it had any involvement in the conduct alleged in Paragraph 94 of the FAC pertaining to the "milk for equity" contracts.   Paragraph 94 alleges:

94.   In inducing Plaintiffs to enter into contracts to exchange milk for equity (in the general form of the contribution agreement attached hereto as Exhibit C and the assignment agreement attached hereto as Exhibit D), defendants GEORGE VIEIRA, GENSKE-MULDER, CARY and DOES 41 through 50 falsely represented to Plaintiffs:

  (a) that the contracts were proper and
lawful;

  (b) that CVD was contractually required to
supply milk to VALLEY GOLD and if Plaintiffs
stopped supplying their milk to CVD and
switched to another agricultural
cooperative, they would be violating the law
and subject to substantial fines and
penalties;

  (c) that VALLEY GOLD was doing well and had
sizeable orders that ensured that Plaintiffs
would earn significantly more from their
increased ownership in VALLEY GOLD than they
were owed for their milk.

Genske contends that the FAC cites no documents nor does it state

when it allegedly made these misrepresentations to Plaintiffs.

Genske acknowledges that Paragraph 100 expands these allegations

but does not state facts which strongly infer that Genske

intended to defraud Plaintiffs in connection with the September

2003 "milk for equity" transactions.

  Genske refers to the allegations set forth in Paragraph

108 of the FAC that, beginning in March of 2003, Vieira, "with

the assistance of GENSKE-MULDER" made the misrepresentations

alleged in Paragraphs 108(a)-(m).  Genske complains that the FAC

fails to state when and how Genske allegedly participated in

making these misrepresentations.

  Plaintiffs have not pleaded the scienter required for

Section 10(b)(5) with the sufficient particularity required by

*Tellabs* with regard to the cheese distribution negotiations or to

the failure to disclose that milk shipped by CVD to Valley Gold

would not be protected by the milk producer's trust fund.

Plaintiffs have had two opportunities to satisfy the pleading requirements.  These allegations are DISMISSED WITH PREJUDICE from the Section 10(b) cause of action.   In all other regards, the allegations, albeit inconsistent with regard to the disclosure of the status of George Vieira's criminal situation, suffice to state a claim upon which relief can be granted. Defendants' motions to dismiss with regard to these other allegations are DENIED.

g.  <u>FAILURE TO PLEAD LOSS CAUSATION</u>.

Downey moves to dismiss the FAC because it does not allege that Plaintiffs lost their investment because the Offering Memorandum omitted to disclose that CVD sales were not protected by the Milk Producers Trust Fund; that Valley Gold had no distributor; and that Vieira had been offered a plea bargain. Because Plaintiffs fail to plead "loss causation", the Second Cause of Action fails to state a claim upon which relief can be granted.

Plaintiffs, citing *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1421-1423 (9th Cir.1994), *cert. denied*, 516 U.S. 868 & 909 (1995), respond that "loss causation" is an affirmative defense with the burden of proof on the defendants. *In re Worlds of Wonder* discussed "loss causation" in connection with a claim under Section 11 of the 1933 Act.

In *Binder v. Gillespie*, 184 F.3d 1059 (9th Cir.1999), *cert. denied*, 528 U.S. 1154 (2000), the Ninth Circuit explained:

The causation requirement in Rule 10b-5

> securities fraud cases includes 'both
> transaction causation, that the violations
> in question caused the plaintiff to engage
> in the transaction, and loss causation, that
> the misrepresentation or omissions caused
> the harm.' ... The requirement of
> transaction causation is equivalent to the
> element of reliance, or, in tort liability
> terms, but-for causation ... The loss
> causation requirement, equivalent to
> proximate causation in tort, is satisfied if
> the plaintiff shows that 'the
> misrepresentation touches upon the reasons
> for the investment's decline in value.' ...
> That is, the plaintiff must show that the
> fraud caused, or at least had something to
> do with, the decline in the value of the
> investment after the securities transaction
> took place.

183 F.3d at 1065-1066.[3]  In *Dura Pharmaceuticals, Inc. v. Broudo*,

544 U.S. 336 (2005), a private securities fraud claim under

Section 10(b), the Supreme Court held that the statute requires

"that a plaintiff prove that the defendant's misrepresentation

(or other fraudulent conduct) proximately caused the plaintiff's

economic loss." *Id.* at 346.  The Supreme Court further ruled:

> Our holding about plaintiffs' need to *prove*
> proximate causation and economic loss leads
> us also to conclude that the plaintiffs'
> complaint here failed to adequately *allege*
> these requirements.  We concede that the
> Federal Rules of Civil Procedure require
> only 'a short and plain statement of the
> claim showing that the pleader is entitled
> to relief.' Fed. Rule Civ. P. 8(a)(2).  And
> we assume, at least for argument's sake,
> that neither the Rule nor the securities
> statutes impose any special further

---

[3]At the hearing, Plaintiffs correctly argued that this action does not involve "fraud on the market" causation.  "Fraud on the market" causation applies only to a security that is actively traded in an efficient market.  *Binder v. Gillespie*, *supra,* 183 F.3d at 1064.

requirement in respect to the pleading of proximate causation or economic loss.  But, even so, the 'short and plain statement' must provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.  *Conley v. Gibson*, 355 U.S. 41, 47 (1957) ....

...

We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-515 (2002).  But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.  At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid.  Cf. H.R. Conf. Rep. No. 104-369, p. 31 (1995)(criticizing 'abusive' practices including 'the routine filing of lawsuits ... with only [a] faint hope that the discovery process might lead eventually to some plausible cause of action').  It would permit a plaintiff 'with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence.'  *Blue Chip Stamps*, 421 U.S. at 741.  Such a rule would tend to transform a private securities action into a partial downside insurance policy.

544 U.S. at 346-348.  *See also In re Daou Systems, Inc.*, 411 F.3d 1006, 1025 (9th Cir.2005), *cert. denied,* 546 U.S. 1172 (2006), citing *Dura Pharmaceuticals, Inc.*:

Thus, to prove transaction causation, the plaintiff must show that, but for the fraud, the plaintiff would not have engaged in the transaction at issue; to prove loss

87

> causation, the plaintiff must demonstrate a
> causal connection between the deceptive acts
> that form the basis for the claim of
> securities fraud and the injury suffered by
> the plaintiff ... A plaintiff is not
> required to show 'that a misrepresentation
> was the *sole* reason for the investment's
> decline in value' in order to establish loss
> causation ... '[A]s long as the
> misrepresentation is one substantial cause
> of the investment's decline in value, other
> contributing forces will not bar recovery
> unless the loss causation requirement' but
> will play a role 'in determining recoverable
> damages.' ....

Defendants argue that is "no readily discernable causal relationship" between the failure to disclose ineligibilty of the investors for the milk producers trust fund, the allegedly misleading disclosure that Valley Gold did not have a contract with a cheese distributor, and failing to disclose that Vieira was discussing a plea bargain with the United States Attorney and the losses allegedly suffered by Plaintiffs.

Plaintiffs have in effect plead that the alleged cumulative non-disclosures caused them to invest monies which were lost as a result of alleged individual actions or omissions which caused the failure of the enterprise.  Whether this can be proved is not yet to be decided.  The motions to dismiss on this ground are DENIED.

4.  <u>FOURTH CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA SECURITIES LAW</u>.

Genske argues that the Fourth Cause of Action fails to allege fraud with the specificity required by Rule 9(b).  *See discussion infra*.

88

**5.  SIXTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION**.

Genske argues that the Sixth Cause of Action fails to allege fraud with the specificity required by Rule 9(b).  *See discussion supra*.

**7.  SEVENTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION**.

Genske moves to dismiss the Seventh Cause of Action for negligent misrepresentation on the grounds that the FAC fails to allege which matters were materially false or wrongfully withheld, and that reliance, proximate causation and damages are conclusorily alleged.

Negligent misrepresentation is simply a species of negligence.  No more is required to state a claim.  As Plaintiffs note, the May 30 Order, in the context of Rule 10b-5, ruled that the pleading of these elements are subject to the notice pleading requirements of Rule 8.

The motion to dismiss the Seventh Cause of Action is DENIED.

**8.  TONY ESTEVAN**.

Genske moves to dismiss any claims alleged against it by Plaintiff Tony Estevan for negligence or negligent misrepresentation because Tony Estevan is not listed as a client of Genske in Paragraph 38 of the FAC.  Paragraph 38 alleges:

> 38.  At all times material herein, GENSKE-MULDER, GEORGE VIEIRA and CARY, acted in an advisory capacity with regard to CVD's

89

> investment in VALLEY GOLD, and the
> individual investments made in VALLEY GOLD
> by Plaintiffs MANUAL LOPES, MARIANA LOPES,
> JOSEPH LOPES, MICHAEL LOPES, WESTSIDE
> HOLSTEIN, ALVARO MACHADO, and RAYMOND LOPES.

Plaintiffs concede that Tony Estevan was not a client of Genske.  With regard to negligent misrepresentation, Plaintiffs argue that liability does not depend on a contractual or professional relationship.  Plaintiffs cite *Murphy v. BDO Seidman, LLP,* 113 Cal.App.4th 687 (2003).

In *Murphy,* the Court of Appeal summarized the California Supreme Court's holding in *Bily v. Arthur Young & Co.*, 3 Cal.4th 370 (1992):

> *Bily* can thus be briefly summarized as
> follows: (1) ordinary negligence - *no* duty
> to third parties; (2) negligent
> misrepresentation - duty to third parties
> who would be known with *substantial
> certainty* to rely on the misrepresentation;
> and (3) intentional misrepresentation - duty
> to third parties who could be *reasonably
> foreseen* to rely on the misrepresentation.

113 Cal.App.4th at 694.  Plaintiffs also cite *Cabanas v. Gloodt Associates*, 962 F.Supp. 1295, 1308-1309 (E.D.Cal.1996), which sets forth the six factors described in *Biakanja v. Irving*, 49 Cal.2d 647, 650 (1958) for determining whether a "special relationship" exists to impose a duty.

Plaintiffs argue that, through discovery, the extent of the contacts and relationship between Tony Estevan and Genske will be determined, but for purposes of Rule 12(b)(6), the FAC adequately alleges that Genske owed a duty of care to all Plaintiffs.  This is perilously close to the case the [CAN'T

READ] seeks to avoid; *i.e.*, file a lawsuit and hope discovery will reveal as basis for suit.

Although Genske replies that it owes no duty to Estevan, this cannot be determined at the pleading stage given the holding in *Bily* as summarized by *Murphy.*

Genske's motion to dismiss on this ground is DENIED WITHOUT PREJUDICE.

9.   <u>FAILURE TO STATE A DERIVATIVE CLAIM ON BEHALF OF</u> <u>CVD</u>.

The FAC alleges a derivative claim on behalf of CVD.  In pertinent part, the FAC alleges in Paragraph 47:

> 47.  CVD continues to be controlled by GEORGE VIEIRA and/or his affiliates and those beholden to his desires, including Joe Machado who, at the time of the events described in this complaint, was simultaneously the President of Valley Gold and a board member of CVD and who continues as the president or a senior board member of CVD.  It would thus be futile for Plaintiffs to make a demand upon CVD or its directors to pursue the relief sought in this lawsuit, as such a demand would be tantamount to asking the directors to investigate their own potential malfeasance.  Indeed, another group of former CVD member dairies has previously instituted legal proceedings based upon the general criminal scheme described above, and CVD has demonstrated its hostility to its own former member dairies and its refusal to hold its managers, consultants, professionals and accountants responsible for their misdeeds and omissions by actively opposing the claims instead of cooperating in securing redress for its former members.  In fact, in that litigation, CVD and George Vieira have retained the same attorney to represent them.  Further, all or substantially all of the members of CVD who were damaged by the

acts and omissions set forth herein have
terminated their affiliation with CVD and
joined other dairy cooperatives.  The
derivative relief sought in this complaint
on behalf of CVD would thus wholly or
substantially only benefit CVD's former
members and not its present membership,
again rendering it futile to submit a demand
upon CVD's board of directors to pursue the
relief sought in this lawsuit.

Genske moves to dismiss the derivative action on behalf
of CVD, arguing that the FAC fails to allege that <u>each</u> specific
director of CVD could have been contacted and was hostile to the
prosecution of a lawsuit such as this one.

Corporations Code § 800(b) provides:

No action may be instituted or maintained in
right of any domestic ... corporation by any
holder of shares or of voting trust
certificates of the corporation unless both
of the following conditions exist:

(1) The plaintiff alleges in the complaint
that plaintiff was a shareholder, of record
or beneficially, or the holder of voting
trust certificates at the time of the
transaction or any part thereof of which
plaintiff complains or that plaintiff's
shares or voting trust certificates
thereafter devolved upon plaintiff by
operation of law from a holder who was a
holder at the time of the transaction or any
part thereof complained of; provided, that
any shareholder who does not meet these
requirements may nevertheless be allowed in
the discretion of the court to maintain the
action on a preliminary showing to and
determination by the court, by motion and
after a hearing, at which the court shall
consider such evidence, by affidavit or
testimony, as it deems material, that (i)
there is a strong prima facie case in favor
of the claim asserted on behalf of the
corporation, (ii) no other similar action
has been or is likely to be instituted,
(iii) the plaintiff acquired the shares

92

before there was disclosure to the public or to the plaintiff of the wrongdoing of which plaintiff complains, (iv) unless the action can be maintained the defendant may retain a gain derived from defendant's willful breach of a fiduciary duty, and (v) the requested relief will not result in unjust enrichment of the corporation or any shareholder of the corporation; and

(2) The plaintiff alleges in the complaint with particularity plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort, and further alleges that plaintiff has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file.

Rule 23.1, Federal Rules of Civil Procedure, provides:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.   The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if, necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.   The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders

> or members similarly situated in enforcing
> the right of the corporation or association.
> The action shall not be dismissed or
> compromised without the approval of the
> court, and notice of the proposed dismissal
> or compromise shall be given to shareholders
> or members in such manner as the court
> directs.

A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir.1999). Rule 23.1, however, does not establish the circumstances under which demand would be futile. *See Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 96 (1991). The law of the state of incorporation determines these standards. *In re Silicon Graphics, id.* at 990. As explained in *Country National Bank v. Mayer*, 788 F.Supp. 1136, 1144 (E.D.Cal.1992):

> A derivative action is a suit brought on
> behalf of a corporation in order to redress
> a grievance suffered by the corporation ...
> Under California law, such an action
> ordinarily must be instituted by the
> directors of the corporation ... The so-
> called 'business judgment rule' provides
> that the judgment of shareholders and courts
> cannot supplant the decisions of the
> directors of a corporation relative to the
> day-to-day management of the corporation ...
> 'Under this rule, a director is not liable
> for a mistake in business judgment which is
> made in good faith and in what he or she
> believes to be the best interests of the
> corporation, where no conflict of interest
> exists.' ....
>
> 'The business judgment rule applies to all
> discretionary decisions by the board,

including the decision not to pursue a cause
of action.' ... Because of the rule, a
shareholder must plead and prove that he has
made a demand upon the directors to act and
that they refused or failed to act ... If
the board refuses in good faith and in the
reasonable exercise of its business judgment
to commence the action, the shareholder may
not institute the action.

In *Reed v. Norman*, 152 Cal.App.2d 892, 898 (1957), the Court of
Appeals holds:

While it is the general rule that in a
derivative action the plaintiff must plead a
demand upon and refusal by the directors to
act, it is equally well settled that such
demand and refusal need not be alleged if
the facts pleaded demonstrate such a demand
would have been futile.

Judge Karlton in *Country National Bank* explains:

The precomplaint demand requirement may be
excused when the plaintiff demonstrates that
demand would be 'futile' ... Many decisions
by the California courts interpreting the
futility exception to the demand requirement
are of little assistance in disposing of the
matter at bar since they discuss the
substantive requirements in light of
California's pleading standard.
Nonetheless, upon close examination of
California decisions, certain standards
emerge.  Without question, futility is
demonstrated under California's substantive
law where the directors are involved or not
disinterested in the actions for which
plaintiff seeks relief ... Moreover, a case
which preceded California's current pleading
requirement reveals that allegations of
domination of the board by a president of a
corporation who is adverse to plaintiff's
position suffice to demonstrate futility.
*See Wickersham v. Crittenden*, 106 Cal. 329
... (1895)(it was 'averred in the complaint,
as a reason for not making a request of the
directors of the bank to bring this action
that the directors were all under the
control of Crittenden and acting in

95

conjunction with him'); *see also Miles v. McFarland*, 104 Cal.App. 513, 519 ... (1930)(demand futile where plaintiff alleges corporation is in hands of hostile representative).  When demand is excused, the court suspends deference to the directors' business judgment because the board as a unit is unable to fulfill its role as the corporation's decisionmaker.

788 F.Supp. at 1144-1145.  In *Shields v. Singleton*, 15 Cal.App.4th 1611, 1622 (1993), the Court of Appeals explained:

> [T]he general allegations which plaintiff here indiscriminately levels against all the directors of the Company are insufficient to establish that demand on the board would have been futile.  As the court below noted, in order to evaluate the demand futility claim, the court must be apprised of facts specific to each director from which it can conclude that that particular director could or could not be expected to fairly evaluate the claims of the shareholder plaintiff. 'The task of demanding action ... is not onerous.  No policy recommends eviscerating the demand requirement as plaintiff would have us do.'  (*Greenspun v. Del E. Webb Corp.* (9th Cir.1980) 634 F.2d 1204, 1210).

The May 30 Order, after reciting this authority, ruled in pertinent part:

> The allegations in Paragraph 48 concerning the futility of a demand on Valley Gold satisfy the requirements of California law and Rule 23.1.  It is alleged that Valley Gold is controlled by Defendant Vieira and that "Plaintiffs know of no other person or entity that presently has any control over the operations of VALLEY GOLD."
>
> However, the allegations in Paragraph 47 do not satisfy the requirements of California law and Rule 23.1 concerning futility. The allegations are conclusory.  Plaintiffs must allege with specificity facts with regard to each director of CVD from which it may be inferred that the particular director could

96

> or could not be expected to fairly evaluate
> the claims that Plaintiffs seek to prosecute
> in a derivative action on behalf of CVD, and
> Plaintiffs must describe with more
> particularity the lawsuit allegedly brought
> by other members of CVD which CVD allegedly
> actively opposed.
>
> The motion to dismiss the Complaint to the
> extent that Plaintiffs purport to bring
> derivative actions on behalf of CVD is
> GRANTED WITH LEAVE TO AMEND.

Genske notes that an action is pending in the Merced County Superior Court, *Nunes, et al. v. Central Valley Dairymen, Inc., et al.*, No. 147653. Genske attaches as an exhibit a copy of the Third Amended Complaint filed in the *Nunes* action and asserts that directors of CVD are plaintiffs in that action. Genske argues that Paragraph 47 of the FAC quoted above fails to allege with specificity why they should be allowed to prosecute a derivative action on behalf of CVD, particularly where other directors are plaintiffs in the *Nunes* action and in effect have done so. Genske further complains that the FAC fails to state any details about the *Nunes* action and that the allegations remain conclusory and do not satisfy the requirements concerning futility.

Plaintiffs respond that Paragraph 47 of the FAC adequately alleges futility. Plaintiffs contend that the fact that directors of CVD are plaintiffs in the *Nunes* action demonstrates futility:

> Even though they themselves had been damaged
> by defendants' acts, these directors were
> unable to convince CVD to join in the
> litigation; instead, the directors had to

1      sue on their own, and they had to sue their
       own cooperative.

2          Paragraph 47 of the FAC fails to provide the information

3  required by the May 30 Order and the legal authority cited

4  therein.   There are no allegations of the number of directors of

5  CVD, what approach, if any, was made to them by the Plaintiffs in

6  this action, or which of the CVD directors are parties to the

7  *Nunes* action.

8          Defendants' motion to dismiss the derivative claim

9  against CVD is GRANTED WITHOUT LEAVE TO AMEND, as prior leave to

10 amend was granted.[4]

11         10.   <u>FAILURE TO STATE A DERIVATIVE CLAIM ON BEHALF OF</u>

12 <u>VALLEY GOLD</u>.

13         The FAC alleges a derivative action on behalf of Valley

14 Gold.   Paragraphs 48-49 of the FAC allege:

15         48.   VALLEY GOLD also continues to be
           controlled by GEORGE VIEIRA, and it would
16         likewise be futile for Plaintiffs to make a
           demand upon VALLEY GOLD to pursue the relief
17         sought in this lawsuit.   Apart from GEORGE
           VIEIRA, Plaintiffs know of no person or
18         entity that presently has any control over
           the operations of VALLEY GOLD.
19
           49.   To the extent that the claims asserted
20         by Plaintiffs are derivative of the rights
           of VALLEY GOLD, then Plaintiffs pursue those
21         rights on behalf of VALLEY GOLD and
           accordingly add VALLEY GOLD as an
22         involuntary party to this lawsuit so that
           the full rights of VALLEY GOLD can be
23         adjudicated and any recovery distributed, as

24   _____

25      [4]Because of this ruling, Downey's contention that the FAC does
   not "clearly allege" that Downey caused injury to CVD is not
26 discussed.

                                    98

the Court ultimately deems appropriate, to
the members of VALLEY GOLD.

The only cause of action in the FAC brought on behalf of
Valley Gold, as well as the other Plaintiffs, is the Fifth Cause
of Action for Negligence.  The Fifth Cause of Action, after
incorporating all preceding allegations, alleges in pertinent
part:

> ...

> 136. As the managing member of VALLEY GOLD,
> and as the founder and beneficial owner of
> Premio Investment Company, the largest
> single owner of VALLEY GOLD, and because he
> exercised nearly complete control over the
> operations of VALLEY GOLD, defendant GEORGE
> VIEIRA further owed a duty of care and
> loyalty to the minority investors of VALLEY
> GOLD, including Plaintiffs, as well as to
> VALLEY GOLD itself.

> ...

> 139. As a professional law partnership
> retained by CVD and VALLEY GOLD to assist in
> the formation of VALLEY GOLD and in the
> marketing of securities for VALLEY GOLD,
> including the preparation of the business
> plan and Offering Memorandum, and because
> CVD was an agricultural cooperative
> operating as a trust and agent for the
> direct benefit of its member dairies so that
> DOWNEY BRAND was operating as a subagent,
> and because DOWNEY BRAND knew with
> reasonable certainty that Plaintiffs would
> rely upon its statements, opinions and work
> product, including the business plan and
> Offering Memorandum, in acquiring ownership
> interests in VALLEY GOLD, DOWNEY BRAND owed
> to Plaintiffs a duty of care and loyalty.

> 140. As professionals, managers, officers,
> employees and consultants retained by CVD
> and/or VALLEY GOLD, acting as subagents and
> for the direct benefit of the beneficial
> owners of CVD, including Plaintiffs, as well

99

as for the benefit of VALLEY GOLD and all of its members, DOES 51 through 60 owed to Plaintiffs a duty of care and loyalty.

141. GEORGE VIEIRA, CARY, GENSKE-MULDER, DOWNEY BRAND and DOES 51 through 60 failed to adequately discharge their duties to Plaintiffs, to CVD and to VALLEY GOLD, and failed to act with reasonable care, failed to meet the standards of care of similar professionals acting in the community, and failed to conduct themselves with reasonable business judgment or prudence.

...

146. After learning of the government's investigations of GEORGE VIEIRA's criminal conduct and after learning in or about the Spring of 2003 of GEORGE VIEIRA's agreement to plead guilty to securities fraud and conspiracy to commit bank and mail fraud, GENSKE-MULDER, in the exercise of reasonable diligence, should have disclosed the information to CVD's Board, to VALLEY GOLD's Board, and to Plaintiffs; and GENSKE-MULDER should have undertaken a thorough investigation of the extent to which GEORGE VIEIRA had used CVD and CMM as instrumentalities of the criminal scheme for which he was being investigated and for which he had agreed to plead guilty.

...

148. In preparing financial projections of VALLEY GOLD's anticipated business for CVD and VALLEY GOLD, GENSKE-MULDER failed to act with reasonable care and failed to follow standard accounting practices.

149. In its work on the preparation of the business plan and Offering Memorandum, GENSKE-MULDER failed to act with reasonable care.

150. In failing to investigate the viability and reputation of the New Jersey distributor that GEORGE VIEIRA proposed as the main buyer of cheese produced by VALLEY GOLD, and in failing to compare the terms contained in

100

            the purchase contract with that distributor
            against industry standards, GENSKE-MULDER
            failed to act with reasonable care.

            ...

            156. These and other negligent acts and
            omissions by defendants directly caused
            injury to Plaintiffs and to CVD and VALLEY
            GOLD, in a sum exceeding $20 million.

     Genske argues that the FAC fails to explain how Valley

Gold, which is alleged to have made numerous misrepresentations

and omissions in the Offering Memorandum and the business plan,

is the victim of any fraud.  Genkse contends that Plaintiffs'

attempt to assert claims derivatively on behalf of Valley Gold

because Valley Gold made misrepresentations and thereby obtained

money and milk from Plaintiffs "simply turns the legal and

financial relationships on their head."

     The derivative claims on behalf of Valley Gold in the FAC

are not alleged in connection with the negligent

misrepresentation and intentional misrepresentation causes of

action.  As Plaintiffs assert, a derivative claim for negligence

is asserted because Valley Gold was Genske's client on whose

behalf Genske prepared financial forecasts and other work.

Plaintiffs argue with regard to the negligence claim:

            [T]he damage to Valley Gold did not occur
            from raising funds, but in how it chose to
            invest those funds.  Relying upon Genske-
            Mulder's grossly negligent financial
            projections and business plan, Valley Gold
            decided to buy a cheese plant.  That
            investment choice was poor, and as a result,
            Valley Gold lost all of its capitalization.

     Defendant's motion to dismiss the derivative claim on

101

behalf of Valley Gold is DENIED.  Resolution of this claim for relief must await summary judgment or trial.

<u>CONCLUSION</u>

For the reasons stated above:

1.   Defendant Genske, Mulder & Company's motion to strike is DENIED;

2.   Defendants Genske, Mulder & Company and Downey Brand LLP's motions to dismiss pursuant to Rule 12(b)(6) are GRANTED IN PART WITHOUT LEAVE TO AMEND, GRANTED IN PART WITH LEAVE TO AMEND, AND DENIED IN PART;

3.   Plaintiffs shall file a Second Amended Complaint in accordance with the rulings made herein within 20 days of service of this Memorandum Decision and Order.  Defendants shall respond within 20 days thereafter.

IT IS SO ORDERED.

Dated:   __March 12, 2008__          _____/s/ Oliver W. Wanger_____
                                        **UNITED STATES DISTRICT JUDGE**