**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

MANUEL LOPES, et al.,     )    No. CV-F-06-1243 OWW/SMS
)
)    MEMORANDUM DECISION AND
)    ORDER GRANTING IN PART AND
        Plaintiffs,  )    DENYING IN PART PLAINTIFFS'
)    MOTION TO COMPEL PRODUCTION
    vs.          )    OF DISCOVERY AND FOR
)    SANCTIONS (Doc. 104),
)    DENYING DEFENDANT DOWNEY
GEORGE VIEIRA, et al.,   )    BRAND'S MOTION FOR
)    PROTECTIVE ORDER (Doc. 106),
)    AND DENYING DEFENDANT DOWNEY
        Defendants.  )    BRAND'S MOTION FOR SUMMARY
)    JUDGMENT AGAINST PLAINTIFF
_____)    VALLEY GOLD LLC ON THE ISSUE
OF ATTORNEY-CLIENT PRIVILEGE
(Doc. 96)

On August 3, 2009, Plaintiffs moved to compel defendant Downey Brand LLP ("Downey Brand") to produce (1) all billing records and/or invoices related to Valley Gold, LLC ("Valley Gold") or Central Valley Dairymen ("CVD") for the period January 1, 2003 through December 31, 2004; (2) all versions or drafts of any private Offering Memorandum prepared for Valley Gold; (3) all documents that reflect, refer, or relate to Downey Brand's

preparation of a confidential private Offering Memorandum for Valley Gold; (5) all communications that refer or relate to what disclosures should or should not be included in the confidential private Offering Memorandum prepared for Valley Gold; (6) all communications that refer or relate to the distribution of the confidential private Offering Memorandum to Valley Gold or its investors; (7) all communications that refer or relate to the confidential private Offering Memorandum prepared for Valley Gold; (8) all documents that refer or relate to the investigation of George Vieira conducted by the Securities and Exchange Commission and/or U.S. Attorney's Office; (9) all communications that refer or relate to the investigation of George Vieira conducted by the Securities and Exchange Commission and/or U.S. Attorney's Office; (10) all documents that refer or relate to any investigation of George Vieira; (11) all documents that refer or relate to any due diligence review of George Vieira, whether performed by Downey Brand, Anthony Cary, Curtis Colaw, Genske Mulder or any other person or entity; (12) all documents that refer or relate to potential disclosure issues either addressed or considered during the preparation of the confidential private Offering Memorandum prepared for Valley Gold; (13) all documents related to any negotiations or agreements between Valley Gold and Joseph Profaci or J.S.P. Marketing, LLC; (14) all documents that refer or relate to any communication between Valley Gold and Joseph Profaci or J.S.P. Marketing, LLC during the years 2002 to present; (15) all documents related to any agreement between CVD

and Joseph Profaci or J.S.P. Marketing, LLC; (16) all documents that reflect or relate to any negotiations or discussions between Valley Gold and a cheese distributor in New Jersey to purchase Valley Gold's products; (17) all documents that reflect or refer to any negotiations or discussions with any cheese distributors for the purchase of Valley Gold's products; (18) the original or best available copy of the "AGREEMENT TO CONTRIBUTE ADDITIONAL CAPITAL BY OWNER" for each owner or investor; (19) all documents that refer or relate to the "AGREEMENT TO CONTRIBUTE ADDITIONAL CAPITAL BY OWNER;" (20) the original or best available copy of the "CONTINUATION OF AGREEMENTS TO FOREGO MILK PAYMENTS IN RETURN FOR AN INCREASED STAKE IN VALLEY GOLD, LLC" for each owner or investor; and (21) all documents that relate to the "CONTINUATION OF AGREEMENTS TO FOREGO MILK PAYMENTS IN RETURN FOR AN INCREASED STAKE IN VALLEY GOLD, LLC."[1]

On August 7, 2009, Downey Brand responded by filing a motion for a protective order requiring Plaintiffs to return Downey Brand's bills for services rendered to Valley Gold, Downey Brand's drafts of limited offering to investors prepared for Valley Gold, and all other privileged and confidential Valley Gold documents in Plaintiffs' possession (Doc. 106).  In

_____

[1]The requested discovery pertaining to a cheese distributor is irrelevant and is DENIED.  The Court dismissed Plaintiffs' claims that the disclosure in the Offering Memorandum regarding a cheese distributor was in violation of law.  The requested discovery as to CVD is DENIED. Evidence presented in connection with Downey Brand's motions for summary judgment against Plaintiffs, heard on December 21, 2009, establishes that Downey Brand did not represent CVD.

compliance with Local Rule 37-251, Plaintiffs and Downey Brand filed joint statements of discovery disagreements on August 31, 2009 (Docs. 109, 110 & 111). The joint statement of discovery disagreement filed in support of Downey Brand's motion for protective order is limited solely to billing statements submitted by Downey Brand to Valley Gold. (Doc. 110).

Following a status conference on September 10, 2009, Downey Brand submitted an amended privilege log (Doc. 120), and both parties submitted numerous documents *in camera* (Doc. 121). Magistrate Judge Snyder heard argument on October 9, 2009, and requested further briefing of the question of Valley Gold's continued existence as a legal entity relative to its capability to assert the attorney-client privilege. Thereafter, both parties submitted supplemental points and authorities (Docs. 134, 135, 137 & 138).

On July 10, 2009, Downey Brand filed a motion for summary judgment against Plaintiff Valley Gold, (Doc. 96), on the grounds that communications between Downey Brand and Valley Gold are within the attorney-client privilege; that the filing of a derivative action on behalf of Valley Gold does not waive the attorney-client privilege; that Downey Brand cannot defend itself against the claims made derivatively on behalf of Valley Gold absent waiver of the attorney-client privilege; that Valley Gold, the holder of the attorney-client privilege refuses to waive the privilege.

Although the motions raise multiple issues, the gravamen of

both is whether the attorney-client privilege shields documents formulated and prepared during Downey Brand's representation of Valley Gold in preparation of Valley Gold's initial corporate offering. In light of the parties' arguments, the documents, and pertinent law and facts, Valley Gold cannot invoke the attorney-client privilege to shield its communications with Downey Brand and related professionals in the course of Valley Gold's incorporation and preparation of the Offering Memorandum for the limited public offering of its stock.

**A. <u>Background</u>.**

Securities fraud linked to Suprema Specialties, which forms the background of this case, spawned multiple civil and criminal cases, the allegations of which are a matter of public record.[2]

In 2002 and 2003, the Plaintiffs were milk producers and members of Central Valley Dairymen, an agricultural cooperative managed by defendant George Vieira, who was its chief executive officer for over ten years (Plaintiffs' Second Amended Complaint, Doc. 71-2 at 25). Vieira regularly sold milk to Suprema Specialities of Paterson, New Jersey, a now defunct producer and distributor of gourmet Italian cheeses, and its West Coast subsidiary, Suprema West. From October or November 2001 to March 2002, Vieira was the Chief Operations Officer of Suprema West.

---

[2]**The factual background set forth in this Memorandum Decision and Order is based on allegations in various pleadings filed in actions against George Vieira and/or Suprema Specialties. No opinion is expressed as to the truth or falsity of these allegations.**

*In re Suprema Specialties, Inc. Securities Litigation*, 2008 WL 2323363 at *3 (D.N.J. June 2, 2008) (Nos. 02-168(WHW) and 02-3099(WHW)).  *See also* Plaintiffs' Second Amended Complaint, Doc. 71-2 at 25 (alleging that Vieira managed Suprema West for one year).  Vieira also owned and operated West Coast Commodities, one of Suprema's seven largest accounts, and California Milk Market, Inc., from 1998 to March 2002.  *In re Suprema Specialties, Inc. Securities Litigation*, 2008 WL 2323363 at *3.

"In 2000 and 2001, Suprema reported dramatic growth in sales and receivables, which it attributed primarily to growth in sales of its domestically manufactured hard cheeses."  *In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256, 263 (3d Cir. 2006). Federal investigators later discovered that the secret of Suprema's explosive growth was a fraudulent scheme known as round-trip sales, in which "Suprema purportedly sold hard cheese products to entities posing as customers, which then sold the fictitious products to entities posing as suppliers. The 'suppliers,' in turn, sold the products back to Suprema.  In most cases, the customer and the supplier in these sales shared a common owner who would reap commissions on the fictitious transactions." Id. at 265.  "From at least 1989 through the first quarter of 2002, Suprema engaged in bogus round-tripping transactions with [West Coast Commodities] and [California Milk Market], both of which were owned or operated by Vieira."  U.S. Securities and Exchange Commission, "SEC Sues 10 Defendants for Securities Fraud Arising from $700 Million Round-Tripping Scheme

at Suprema Specialties," Litigation Release No. 18534 (January 7, 2004).  The fraudulent activities enabled Suprema to increase its borrowing from banks and to inflate its stock price by overstating its inventory and receivables.  *Smith v. Suprema Specialties, Inc.*, 2007 WL 1217980 (D.N.J. April 23, 2007) (No. CIV. 02-168(WHW)).  In 2002, the fraudulent scheme unraveled, federal authorities seized corporate records, and Suprema filed for bankruptcy.  *Suprema Specialties, Inc. Securities Litigation*, 438 F.3d at 265-66.

Vieira played a key role in Suprema's business.  He was a principal of one of the companies that acted as Suprema's ostensible customer or supplier. *Id.* at 266; *Suprema Specialties, Inc. Securities Litigation*, 2008 WL 2323363 at *3.  He signed false audit confirmations that were provided to Suprema's auditors and was paid commissions for his participation  in the fraudulent scheme.  *Suprema Specialties, Inc. Securities Litigation*, 438 F.3d at 265-66.  He also coordinated the flow of false invoices and checks in the round-tripping scheme.  *Id.*

On January 7, 2004, Vieira, pled guilty to conspiracy to defraud the United States and securities fraud.  *See United States v. Vieira, United States v. Vieira*, No. 2:04-CR-00111 SRC, United States District Court for the District of New Jersey; *Suprema Specialties, Inc. Securities Litigation*, 438 F.3d at 266; *Suprema Specialties, Inc. Securities Litigation*, 2008 WL 2323363 at *3.  In his plea agreement, Vieira stated that Suprema's sales to West Coast Commodities were overstated by about $34 million

7

and its sales to California Milk Market were overstated by at least one million dollars. *Suprema Specialties, Inc. Securities Litigation*, 2008 WL 2323363 at *3. Vieira was sentenced to four months imprisonment and to pay restitution in the total amount of $6,648,050.35.

In 2003, Vieira was one of the principal organizers of an effort "to assemble a group of investors to purchase a cheese manufacturing plant in Gustine, California" (Doc. 71-2 at 4-5). *See also Joe Nunes, et al. v. Downey Brand LLP*, 2006 WL 2147613 at *1 (Cal. Ct. App. August 30, 2006)(No. F048496). On April 4, 2003, Vieira formed Valley Gold as a limited liability company to accomplish this objective (Plaintiffs' Second Amended Complaint, Doc. 71-2 at 4-5).[3] Downey Brand prepared the Offering Memorandum for Valley Gold, although its name did not appear on the offering memorandum dated April 22, 2003. *Nunes*, 2006 WL 2147613 at *1. The Offering Memorandum disclosed that negotiations were under way for an agreement by which Valley Gold would purchase all of its milk requirements from Central Valley Dairymen (Plaintiffs' Second Amended Complaint, Doc. 71-2 at 24). It also disclosed that Valley Gold was negotiating with a New Jersey distributor that intended to purchase "substantially all" of the cheese that Valley Gold produced. *Id.* Addressing the knowledge and experience of its anticipated employees, the

---

[3] Although the offering memorandum discloses the involvement of others, the record does not establish that anyone other than Vieira participated on behalf of Valley Gold in its incorporation and limited private offering.

memorandum reported, "The people that are coming over from Suprema Specialties, Inc. in Manteca, California will be able to bring with them new ideas and practices that can enhance productivity, quality and yields" (Plaintiffs' Second Amended Complaint, Doc. 71-2 at 7). The Offering Memorandum, in the section detailing "Risks Specific to Company", states in pertinent part:

> **Dependency on Key Personnel**
>
> ...
>
> Mr. Vieira, one of the principal organizers of the Company and this transaction is currently the chief executive officer of CVD. George Vieira, was, [sic] for a short period of time, an officer of Supreme West, Inc. ('Supreme West'). Suprema West is a subsidiary of Supreme Specialties, Inc. ('Suprema'). Suprema and Suprema West are in bankruptcy. Suprema is also the subject of an investigation being conducted by the Securities and Exchange Commission and the U.S. Attorney's Office. Assertions have been made that financial data for Suprema was misrepresented. Mr. Vieira has been contacted by the U.S. Attorney's Office and may be a subject of this investigation. No formal charges have been brought against Mr. Vieira ....

The Offering Memorandum failed to disclose that George Vieira, who was to be Valley Gold's manager, was then negotiating a plea agreement to securities fraud charges arising from his management role at Suprema West.

At some point after Vieira pled guilty to securities fraud in January 2004, Valley Gold defaulted on its loan obligations, and the Gustine manufacturing plant was foreclosed (Plaintiffs'

Second Amended Complaint, Doc. 71 at 7-8).  Plaintiffs lost investments totaling $530,000 and were not paid for their milk, which Central Valley Dairymen had shipped to Valley Gold (Plaintiffs' Second Amended Complaint, Doc. 71 at 7-8).

Plaintiffs are proceeding in this action pursuant to the Second Amended Complaint filed on April 2, 2008.  (Doc. 71). Downey Brand and Valley Gold are named as Defendants, among others.  Plaintiffs applied for an Order authorizing service of the summons and Second Amended Complaint on the California Secretary of State because Tim Brasil, Valley Gold's registered agent for service of process could not be found at the address designated for personal service as the building at the address was closed and vacant.  (Doc. 73).  Pursuant to Order filed on April 10, 2008, service of summons and the Second Amended Complaint was authorized to be made on the California Secretary of State.  (Doc. 75).  Service of the summons and Second Amended Complaint was made on the Secretary of State on April 15, 2008, who forwarded the summons and Second Amended Complaint to Valley Gold, LLC at 240 North Avenue, Gustine, California 95322 by certified mail, return receipt requested.  (Doc. 78).  No appearance has been made by Valley Gold in this action.  In a letter dated May 26, 2009 from James Kirby, counsel for Downey Brand, to Joe Machado, "Chairman Valley Gold LLC," 2904 North Village Drive, Merced, California, regarding this action, Mr. Kirby states: "This letter confirms that Valley Gold LLC has instructed Downey Brand LLP to assert all available privileges in

10

this matter." (Exh. 7, Doc. 99). Mr. Kirby avers:

> 4. Joe Machado is President of the Valley Gold Management Committee. Exhibit 7 is an accurate copy of my letter to Mr. Machado confirming that Valley Gold was continuing in this matter the instructions Valley Gold gave Downey Brand in the *Nunes* matter - to assert all privileges.

(Exh. 9, Doc. 99). As of August 13, 2009, the California Secretary of State certified that the status of Valley Gold is "ACTIVE (GOOD STANDING)," that "[t]he records of this office indicate the entity is authorized to exercise all of its powers, rights and privileges in the State of California," but that "[n]o information is available from this office regarding the financial condition, business activities or practices of the entity." (Exh. 18, Doc. 111). Attached to Exhibit 18 is a copy of a Statement of Information for Valley Gold filed with the Secretary of State on June 3, 2005, listing Ted Kern as the Chief Operating Officer, and Joe Machado, Tim Brasil, Dennis Nunes, Frank Borba, Joe Lopes, and Everett Vaz as Managers, and Anthony Cary as agent for service of process. (Exh. 18, Doc. 111). No explanation is given when Tim Brasil became Valley Gold's designated agent for service of process. However, as of April 4, 2008, Tim Brasil is listed as Valley Gold's agent for service of process on the California Secretary of State's website, California Business Portal, kepler.ss.ca.gov/corpdata. Counsel for Plaintiffs, Mr. Applegate, avers:

> 5. The listed agent for service, Mr. Tim Brasil, was never available when the process servers sought him out. Further, the Gustine

address listed with the Secretary of State (and also listed on Valley Gold, LLC's formation documents) at 240 North Avenue was abandoned and vacant. And my understanding is that Valley Gold, LLC defaulted on a secured note that it used to purchase the plant, and the property was foreclosed in the fall of 2005.

...

7. I further know of no business activity that Valley Gold, LLC, has conducted since the plant was foreclosed. Since 2005, none of the plaintiffs have been advised of any meetings of Valley Gold, LLC. And Valley Gold, LLC's Statement of Information filed with the Secretary of State has not been updated since June of 2005 ... Under California Corporations Code section 17060, an updated statement is required every two years.

...

9. The Operating Agreement provides, at section 1.4, that Valley Gold's principal office shall be located at 240 North Avenue in Gustine, California, and documents required by Corporations Code section 17058 shall be maintained there. That property, as noted, was foreclosed.

10. Section 6.3 of the Operating Agreement states that 'The Company shall hold an annual meeting of the Members for the lection [sic] of Managers on such date, and at such time and place, within the State of California.' No annual meeting for Valley Gold has been held since 2005.

11. Section 5.1 of the Operating Agreement vests day-to-day authority over the operations of Valley Gold in its management committee (the members of which, as noted, are supposed to be elected every year). As set forth in Section 5.2, however, the management committee can only act by majority vote with a quorum present, after at least 48 hours notice. A quorum, in turn, requires the participation of at least one-half of the

> total managers.

> 12.  I have not seen any information suggesting that any management committee meeting for Valley Gold has occurred since 2005, much less a meeting with a quorum present, and much less a meeting where, by a majority vote, the management committee made arrangements for the custody of Valley Gold's records, or provided any instructions on whether to assert any evidentiary privileges that might cover its records.

Ted Kern, COO of Valley Gold from March, 2005, avers that Valley Gold "closed its doors in January, 2006."  (Exh. 10, Doc. 154-3).

B.  <u>Attorney-Client Privilege</u>.

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law."  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The privilege exists "(1) [w]here legal advice of any kind is sought, (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or by the legal advisor, (8) unless the protection be waived."  *In re Fischel*, 557 F.2d 209, 211 (9th Cir. 1977).  The party asserting the privilege bears the burden of proof and must make a prima facie showing that the documents it seeks to protect as privileged satisfy these eight essential elements.  *In re Grand Jury Investigation (United States v. The Corporation)*, 974 F.2d 1068, 1070 (9th Cir. 1992).  That the privilege is limited to communications made in confidence is key to the privilege.

13

*Fischel*, 557 F.2d at 211.   It does not conceal "everything said and done in connection with an attorney's legal representation of a client," but is limited to "the substance of the client's confidential communication to the attorney."  *Id.* at 211-12.  "An attorney's involvement in, or recommendation of, a transaction does not place a cloak of secrecy around all the incidents of such a transaction."  *Id.* at 212.  The privilege is intended "to protect and foster the client's freedom of expression," "not to permit his attorney to conduct the client's business affairs in secret." *Id.* at 211.

     The client asserting the privilege has the burden of demonstrating its application.  *United States v. Blackman*, 72 F.3d 1418, 1423 (9th Cir. 1995), *cert. denied*, 519 U.S. 911 (1996); *Clarke v. American Commerce Nat'l Bank,* 974 F.2d 127, 130 (9th Cir. 1992).  Blanket assertions of the attorney-client privilege are disfavored.  Nonetheless, "where the attorney-client privilege is concerned, hard cases should be resolved in favor of the privilege."  *Upjohn*, 449 U.S. at 393.  "[A]n uncertain privilege, or one which purports to be certain but results in widely varying application by the courts, is little better than no privilege at all."  *Id.*

     The privilege promotes public policy by recognizing that sound legal advice and advocacy depends on the client's frank and complete communication with its attorney.  *Upjohn*, 449 U.S. at 389.  The cost of this public benefit is "the withholding of relevant information from the factfinder."  *In re Hunt*, 153 B.R.

                              14

445, 450 (N.D. Tex. 1992), *citing Fisher v. United States*, 425
U.S. 391, 403 (1976). "Because the attorney-client privilege has
the effect of withholding relevant information from the
factfinder, it is applied only when necessary to achieve its
limited purpose of encouraging full and frank disclosure by the
client to his or her attorney." *Clarke*, 974 F.2d at 129. The
privilege must be narrowly construed. *In re Grand Jury
Investigation No. 83-2-35*, 723 F.2d 447, 451 (6th Cir. 1983),
*cert. denied sub nom. Durant v. United States*, 467 U.S. 1246
(1984). "Whatever their origins, these exceptions to the demand
for every man's evidence are not lightly created nor expansively
construed, for they are in derogation of the search for truth."
*United States v. Nixon*, 418 U.S. 683, 710 (1974). "[S]ince the
privilege has the effect of withholding relevant information from
the factfinder, it applies only where necessary to achieve its
purpose," which is to encourage the client to disclose fully to
its attorney all facts relating to its legal problem. *Fisher*,
425 U.S. at 403; *United States v. Osborn*, 561 F.2d 1334, 1339
(9th Cir. 1977).

The attorney-client privilege protects communications, not
facts. *Upjohn Co.*, 449 U.S. at 395. A client may not refuse to
disclose a relevant fact simply because he incorporated it into
his communication with counsel. *Id.* at 396. Opposing parties
may question corporate employees and officers to ascertain facts
relevant to the pending litigation even if the particular fact
was disclosed to counsel in a communication protected by the

attorney-client privilege. *Id.* But opposing parties may not simplify the discovery process by demanding copies of attorney-client communications in which the facts are included. *Id.* For example, in *Upjohn*, the government could question Upjohn's employees about facts that had been transmitted to the corporate counsel in response to his questionnaire but could not subpoena the questionnaires themselves. *Id.*

C. **Ability of Valley Gold to Invoke Attorney-Client Privilege**.

The threshold issue in resolving Plaintiffs' motion to compel and Downey Brand's motion for protective order is whether Valley Gold can invoke the attorney-client privilege in this case. The record in this action and applicable legal authorities demonstrate that Valley Gold cannot invoke the attorney-client privilege.[4]

Plaintiffs argue that Valley Gold no longer has the ability to assert the attorney-client privilege as to documents in Downey Brand's possession. Downey Brand argues the contrary. Downey Brand asserts that Valley Gold has the legal capacity to sue. *See* Rule 17(b)(3), Federal Rules of Civil Procedure (capacity to sue determined by the law of the state where the court is located). California Corporations Code § 17003(b) provides:

> Subject to any limitations contained in the

---

[4]This conclusion makes unnecessary resolution of issues of waiver of the attorney-client privilege, the crime-fraud exception to the attorney-client privilege, and the extent to which the privilege applies to the documents sought to be discovered.

> articles of incorporation and to compliance
> with this title and any other applicable
> laws, a limited liability company organized
> under this title shall have all of the powers
> of a natural person in carrying out its
> business activities, including, without
> limitation, the power to:
>
> ...
>
> (b) Sue, be sued, complain and defend any
> action, arbitration, or proceeding, whether
> judicial, administrative, or otherwise, in
> its own name.

Downey Brand argues that Valley Gold is no longer doing any

business is irrelevant to its legal capacity to sue or be sued,

citing *Telink, Inc. v. United States*, 24 F.3d 42 (9th Cir.1994).

In *Telink,* the United States argued that Telink had no

standing to petition for a writ of error coram nobis that the

indictment to which the defendant plead nolo contendere failed to

state a criminal offense.  The Ninth Circuit ruled:

> The government contends that Telink has no
> standing because the California corporation
> is no longer an operating entity.  Both
> parties agree that Telink is a 'defunct'
> corporation.  The government argues that a
> 'defunct' corporation, like a dead person,
> cannot seek coram nobis relief ....
>
> We reject the contention that Telink has no
> standing.  Although not currently operating,
> Telink has not undergone corporate
> dissolution.  Under California law, a
> corporation may be dissolved in only two
> ways: through a court order for an
> involuntary dissolution proceeding ... or
> through the filing of a certificate of
> dissolution with the Secretary of State in a
> voluntary proceeding ... Neither step has
> been taken.  Telink therefore remains a
> corporate entity.  Telink has standing.

24 F.3d at 44-45.

17

Plaintiffs respond that Valley Gold's capacity to sue or be sued is irrelevant to the determination whether Valley Gold may invoke the attorney-client privilege. Even dissolved corporations have the capacity to be sued. *See* California Corporations Code § 2011(a); *Penasquitos, Inc. v. Superior Court*, 53 Cal.3d 1180, 1185 (1991).

Plaintiffs contend that because Valley Gold no longer functions as an ongoing business, it no longer retains any right to assert or waive the attorney-client privilege shielding its agents' communications with Downey Brand attendant to its incorporation and private offering of its stock. Plaintiffs base their argument on the Supreme Court's ruling in *Weintraub*, *supra*, 471 U.S. 343.

In *Weintraub,* the Supreme Court held that the debtor's trustee in bankruptcy had the power to waive the corporation's attorney-client privilege with respect to prebankruptcy communications. When corporate control passes to new management, the authority to assert and waive the attorney-client privilege on behalf of the corporation also passes. *Weintraub*, 471 U.S. at 349. This means that

> New managers installed as a result of a
> takeover, merger, loss of confidence by
> shareholders, or simply normal succession,
> may waive the attorney-client privilege with
> respect to communications made by former
> officers and directors. Displaced managers
> may not assert the privilege over the wishes
> of current managers, even as to statements
> that the former might have made to counsel
> concerning matters within the scope of their
> corporate duties . . . . . See generally *In*

> *re O.P.M. Leasing Services, inc.,* [670 F.2d
> 383, ] 386 [(2d Cir. 1982)]; *Citibank [, NA]
> v. Andros*, [666 F.2d 1192,] 1195 [(8th Cir.
> 1981)]; *In re Grand Jury Investigation,* 599
> F.2d 1224, 1236 (CA3 1979); *Diversified
> Industries, Inc. v. Meredith,* 572 F.2d 596,
> 611, n. 5 (CA8 1978)(en banc).

*Weintraub,* 471 U.S. at 349.  Because the Bankruptcy Code does not

address the attorney-client privilege issue, the Supreme Court

analyzed "the roles played by the various actors of a corporation

in bankruptcy to determine which is most analogous to the role

played by the management of a solvent corporation."  *Id.* at 351.

Since a corporation's directors or managers control the use or

waiver of attorney-client privilege outside the bankruptcy

process, the Court sought to identify the actor in bankruptcy

whose role most resembles that of the management of a solvent

corporation that is operating as an ongoing concern.  *Id.* at 351-

52.  In *Weintraub*, that person was the bankruptcy trustee by

virtue of the trustee's nearly complete control of the

corporation in the course of its Chapter 7 liquidation.

Similarly, in *Commodity Futures Trading Comm'n v. Standard

Forex, Inc.*, 882 F.Supp. 40, 42-43 (E.D.N.Y. 1995), Yuanyi Lao,

Standard Forex's former corporate manager, appealed a magistrate

judge's order transferring control of the corporation's attorney-

client privilege to a corporate receiver.  Finding that the

magistrate's orders appointing the receiver vested in the

receiver the essential powers of management including the power

to sue and be sued on behalf of the corporation, the district

court determined that the receiver, nor prior management, then

possessed ultimate control of the corporation.  *Id. at* 42-43.  To avoid chilling the public interest underlying the attorney-client privilege (as expressed in *Upjohn*, 449 U.S. at 389), however, the district court opined that a court should not transfer the attorney-client privilege to a successor in control of the corporation in the absence of a valid need to control the privilege as to attorney-client communications conducted by prior management.  *Standard Forex*, 882 F.Supp. at 43.  Because transferring Forex's attorney-client privilege would enable the receiver (1) to assist the plaintiff, the Commodity Futures Trading Commission ("CFTC"), in evaluating Standard Forex's violations of the Commodities Exchange Act and (2) to initiate legal action against third parties to recover assets of Standard Forex, the court determined that transferring Standard Forex's attorney-client privilege to the receiver was appropriate.  *Id.*

Plaintiffs phrase the applicable question as "Who has the authority to speak for the company *now*?" (doc. 135 at p. 3).

Seizing upon the Court's terminology in *Weintraub*, Plaintiffs argue that Valley Gold's president no longer retains authority to invoke the attorney-client privilege because Valley Gold is insolvent and inactive.  Addressing a bankruptcy case, the *Weintraub* Court used the terms *solvent* and *insolvent* to distinguish corporations that are being administered by a bankruptcy trustee from corporations being administered by their managers or corporate officers and board in the ordinary course of business.  *See* 471 U.S. at 348-49.  A careful reading of

*Weintraub* reflects that the decision distinguished bankrupt and non-bankrupt corporations, not solvent and insolvent corporations that have not filed for bankruptcy or become subject to receivership. *See also Standard Forex, Inc.*, 882 F.Supp. at 42 (rejecting the solvency language as *dicta*). Plaintiffs cannot transfer the power to assert or waive the attorney-client privilege from Valley Gold's officers and management simply by asserting the apparent insolvency of Valley Gold.

More pertinent, there appears to be no one to transfer or receive the power. The distinction between an insolvent corporation and a corporation subject to bankruptcy or a receivership is clearer when endeavoring to identify the person or entity that has succeeded to corporate control in lieu of prior corporate management. Although Valley Gold may be insolvent, as Plaintiffs contend, no non-affiliated person or entity analogous to a receiver or bankruptcy trustee has succeeded to Valley Gold's corporate management.

Plaintiffs cite additional cases that are similarly distinguishable because Valley Gold has not been wound down or dissolved either by operation of California law or as part of bankruptcy or other proceedings relating to insolvency. In *In re JMP Newcor International, Inc.,* 204 B.R. 963 (Bankr.N.D.Ill. 1997), the court addressed the application of the attorney work-product privilege to documents it had previously found discoverable. It had been previously concluded that the corporation's attorney-client privilege ceased to exist after the

bankruptcy plan was confirmed, and the Creditors Committee ceased to exist.  *Id.* at 964.  *See also Lewis v. United States*, 2004 WL 3203121 at \*4 (W.D. Tenn. December 7, 2004), *aff'd*, 2005 WL 1926655 (W.D.Tenn. June 20, 2005) (concluding that the corporation in question was functionally "dead," in that it was bankrupt and had "no assets, liabilities, directors, shareholders, or employees").  Similarly, a corporation dissolved pursuant to California law may not invoke or waive the attorney-client privilege even when it must defend itself as a party to litigation.  *City of Rialto v. United States Department of Defense*, 492 F.Supp.2d 1193, 1197 (C.D.Cal. 2007).

Only one case cited by Plaintiffs is arguably on point. *Gilliland v. Geramita*, 2006 WL 2642525 (W.D.Pa. September 14, 2006).[5]  *But see Overton v. Todman & Co., CPAs, P.C.*, 249 F.R.D. 147, 148 (S.D.N.Y. 2008) (refusing to apply *Gilliland* where corporate officers submitted affidavits alleging that corporation continued to function and that they were the officers). Characterizing the case as "a novel question regarding the application of the attorney-client privilege for a corporation

---

[5]  **Downey Brand contends that *Gilliland* is inapplicable, both because it is unpublished and because it relies on an obscure provision of Pennsylvania law.  That unpublished cases are not precedent is obvious.  *See* Circuit Rule 36-3 (c).  Nonetheless, *Gilliland* is valuable for its recognition of the lack of precedent as well as insight as to how another federal court has dealt with this issue.  The court in *Gilliland* addressed the question of applicable law and observed, "Given the paucity of precedent on this issue, the parties have not pointed to any differences between Pennsylvania, Delaware and federal common law, nor has the Court discovered any such differences."  2006 WL 2642525 at \*2 n. 2.**

that has ceased operations," a Pennsylvania District Court considered who could assert or waive the privilege for a corporation that had not been legally dissolved but whose chief executive office had died, whose other officers had apparently resigned, and whose management included no remaining officer, manager, or director to exercise the privilege. *Gilliland*, 2006 WL 2642525 at *3. In concluding that the disputed documents had to be produced, the court reasoned that, in the absence of a person with authority to invoke the privilege on behalf of the corporation, the defendant law firm could not meet its burden of proving that the privilege had been validly asserted. *Id.* at *4.

Plaintiffs assert that, pursuant to California Corporations Code § 17151, the management of a limited liability company is either vested in all of its members, or if the articles of organization or the operating agreement so provide, managerial authority is vested in a selected subset of managers.[6]

---

[6]California Corporations Code § 17151 provides in pertinent part:

> (a) The articles of organization may provide that the business and affairs of the limited liability company shall be managed by or under the authority of one or more managers who may, but need not be, members.

> (b) If the limited liability company is to be managed by one or more managers and not by all its members, the articles of organization shall contain a statement to that effect. Neither the names of the managers nor the number of managers need be specified in the articles of organization, but if management is vested in only one manager, the articles of organization shall so state.

23

Plaintiffs, relying on Section 5 of the Operating Agreement,
(Exh. D, Doc. 111), contend that managerial authority could only
be exercised by majority vote of seven duly elected Managers,
citing California Corporations Code § 17156.[7]

Section 5 of the Operating Agreement pertains to the
management of Valley Gold.  (Exh. D, Doc. 111):

5.1 Management of Company by the Managers.

(a) Rights, Powers, Duties and
Obligations of Managers.  The management of
the Company shall be vested in a Management
Committee comprised of each of the Managers
of the Company ('Management Committee' or
'Managers').  Except as to those matters in
which the approval of the Members is
expressly required by this Agreement, the
Management Committee shall have all of the
rights, powers and authority generally
conferred by law or otherwise necessary,
advisable or consistent with accomplishing
the purposes of the Company.  It shall be the
responsibility and duty of the Management
Committee to (i) carry out the purposes of
the Company as set forth in Section 1.3
hereof; (ii) carry out and implement all
decisions which are authorized by the Members
pursuant to Section 6.4 hereof; and (iii)
conduct the ordinary and usual business and
affairs of the Company ....

(b) Election of Managers.  The
Company (and the Management Committee) shall
have seven (7) Managers.  Each Manager shall
continue to serve on the Management Committee

_____

[7]California Corporations Code § 17156 provides:

Except as otherwise provided in the articles
of organization or the operating agreement, if
the members have appointed more than one
manager, decisions of the managers shall be
made by majority vote of the managers if at a
meeting, or by unanimous written consent.

24

until the Manager is not re-elected at an Annual Meeting of Members, or until the occurrence of one or more of the events described below in Sections 5.1(c) through 5.1(e). ... 'Managers' or 'Management Committee' shall mean the Manager or Managers elected or appointed to manage the affairs and operations of the Company in accordance with the terms and conditions of this Agreement.  The initial managers serving on the Management Committee of the Company shall be Tim Brasil, Avery Vaz, Dennis Nunes, Frank Borba, Joe Holman, Joe G. Machado, and Joe Nunes.

...

5.2 Meetings of Management Committee. Meetings of the Management Committee may be called by any Manager or by the President ... A majority of the authorized number of Managers constitutes a quorum of the Management Committee for the transaction of business.  Except to the extent that this Agreement expressly requires the approval of all Managers, every act or decision done or made by a majority of the Managers present at a meeting duly held at which a quorum is present is the act of the Management Committee ....

Any action required or permitted to be taken by the Management Committee may be taken by the Managers without a meeting, if a majority of the Managers individually or collectively consent in writing to such action, unless the action requires the unanimous vote of the Managers, in which case all Managers must consent in writing.  Such action by written consent shall have the same force and effect as a majority vote or unanimous vote, as applicable, of such Managers.

The provisions of this Section 5.2 govern meetings of the Management Committee if the Managers elect, in their discretion, to hold meetings.  However, nothing in this Section 5.2 or in this Agreement is intended to require that meetings of the Management Committee be held, it being the intent of the

Members that meetings of the Management Committee not be required.

Downey Brand asserts that Plaintiffs' contention that managerial authority of Valley Gold could only be exercised by majority vote of seven duly elected Managers is without merit. Downey Brand refers to Section 5.6 of the Operating Agreement:

5.6 Officers

(a) Appointment of Officers. The Management Committee may appoint, but shall not be obligated to appoint, officers at any time with such duties and powers as set forth in this Section 5.6 or as otherwise determined by the Management Committee. The officers of the Company shall serve at the pleasure of the Management Committee, subject to all rights, if any, of an officer under any contract of employment. Any individual may hold any number of offices. The officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be determined from time to time by the Management Committee. The Management Committee may appoint any one or more Managers to fill one or more offices.

...

(d) Duties and Powers of the President. The President shall be the chief executive officer of the Company and shall have general and active management of the business of the Company and shall see that all orders and resolutions of the Members and the Management Committee are carried into effect. He or she shall have the general powers and duties of management usually vested in the office of president of a corporation, and shall have such other powers and duties as may be prescribed by the Management Committee or this Agreement. The President shall execute contracts, except where contracts are required or permitted by law to be otherwise signed and executed, and except where the signing and execution thereof shall be expressly delegated by the

26

Management Committee to some other officer or
agent of the Company.

Downey Brand contends that, because the Operating Agreement
authorized the Management Committee to appoint a President,
represented by Downey Brand to be Joe Machado, vested with the
"general and active management of the business of the Company"
and "the general powers and duties of management usually vested
in the office of president of a corporation," Mr. Machado has the
authority to assert the attorney-client privilege of behalf of
Valley Gold.

Plaintiffs contend that, under the Operating Agreement, the
Members were appointed to a one-year term, subject to re-election
or replacement at the annual meeting of the Members.  Plaintiffs
cite California Corporations Code § 17152(d):

> If management of the limited liability
> company is vested in one or more managers
> pursuant to a statement in the articles of
> organization:
> ...
>
> (d) Unless they have earlier resigned or been
> removed, managers shall hold office until the
> expiration of the term for which they were
> elected or, if no term was provided, until
> their successors have been elected and
> qualified.

Plaintiffs refer to Section 6.3(a) of the Operating Agreement
that "[t]he Company shall hold an annual meeting of the Members
for the election of Managers on such date, and at such time and
place, within the State of California."  (Exh. D, Doc. 111).
Plaintiffs argue that, because Valley Gold "elected to be managed
by a subset of managing members, its ability to continue as a

27

business was dependent upon this continued annual election of managing members." Plaintiffs rely on Section 5.1(b) that "[e]ach Manager shall continue to serve on the Management Committee until the Manager is not re-elected at an Annual Meeting of the Members" in contending that the Operating Agreement is "very clear in providing that managing members had to be re-elected at each annual meeting, and any managers who were not re-elected would immediately cease to have managerial authority." Plaintiffs further rely on Section 5.1(g) of the Operating Agreement:

> (g) Election to Continue the Company/Replacement of the Manager. If a Manager ceases to be a Manager of the Company for any reason and there are no remaining Managers, the Company shall dissolve unless a Majority Interest of the Members elect to continue the Company in effect and appoint a new Manager in accordance with the provisions of this Section 5.1(g). If a Manager ceases to be a Manager of the Company for any reason and there are remaining Managers, the Company shall not dissolve and a new Manager may be appointed by a Majority Interest of the Members.

(Exh. D, Doc. 111). Plaintiffs argue:

> Under these provisions, Valley Gold, LLC no longer has anyone to act as its manager. The management terms of the original seven managing members expired long ago. No manager has been re-elected since 2004 (if then), and the company has not even endeavored to meet with a quorum of managing members since mid-2005. The annual meetings mandated by the Articles of Organization for the election of managers have not occurred for five years. And the members have never appointed a single replacement manager to run the company to forestall the requirement under section 5.1(g) of the Articles of

Organization that Valley Gold, LLC dissolve.

Downey Brand argues that Plaintiffs' assumption that the Managers' terms were limited to one year is baseless. Downey Brand refers to California Corporations Code § 17152(d):

> If management of the limited liability
> company is vested in one or more managers
> pursuant to a statement in the articles of
> organization:
>
> (d) Unless they have earlier resigned or been
> removed, managers shall hold office until the
> expiration of the term for which they were
> elected or, if no term was provided, until
> their successors have been elected and
> qualified.

Downey Brand contends that the Operating Agreement does not provide that Managers cease to be Managers if the annual meeting of the Members is not held, nor have Plaintiffs presented admissible evidence that Valley Gold did not hold annual meetings of the Members, arguing that the averments in Mr. Applegate's declaration are not based on personal knowledge and are hearsay. Because Plaintiffs left Valley Gold in 2005, Downey Brand asserts that Plaintiffs' contention that no annual meetings were held is speculation and entitled to no weight. Downey Brand does not point to evidence that annual meetings have been held, but argues only that Plaintiffs are not in a position to know whether or not Valley Gold has conducted the annual meetings required by its operating agreement. However, Downey Brand points to no evidence that any annual meetings have been conducted since Valley Gold ceased operations in January, 2006. Despite dramatic changes in Valley Gold's operations following consummation of Vieira's plea

agreement in January 2005, the only Valley Gold Statement of Information is the original filed with the California Secretary of State in June 2005 (Doc. 134-2 at 5-7), despite the requirement that corporations update their statements of information every two years. *See* California Corporations Code § 17060. That the 2005 Statement of Information is outdated is evident both from the fact that Plaintiff Joe Lopes is named as a manager on the Statement, and from Plaintiffs' inability to serve the corporation on the most recent designated agent for service of process, Tim Brasil, who cannot be found. The principal place of business (240 North Avenue, Gustine, California) has been abandoned and lost through foreclosure. Since no annual meetings have been held, no managers have been re-elected at an annual meeting, as required by § 5.1(b).

Plaintiffs argue that the officers of Valley Gold, including its purported president, Joe Machado, were simply agents of Valley Gold to whom the Management Committee delegated various managerial duties. Plaintiffs cite California Corporations Code § 17154(b) in contending that there is no authority under California law for officers to act on behalf of a limited liability company:

> Officers, if any, shall be appointed in accordance with the written operating agreement or, if no such provision is made in the operating agreement, any officers shall be appointed by the managers and shall serve at the pleasure of the managers, subject to the rights, if any, of an officer under any contract of employment ....

30

Plaintiffs argue that Section 17154(b) "*allows* the managing members of a limited liability company to appoint officers to carry out the duties that the managing members delegate to them." However, Plaintiffs assert, "the officers do not have independent authority; they serve at the direction and pleasure of the managing members, and are merely extensions of the managing members themselves." Because Valley Gold's officers were simply agents to whom specified duties had been delegated by the Management Committee, Plaintiffs argue it follows that the officers' authority to act for Valley Gold ceased at the time the managing members' authority ceased. *See* Fletcher *Cyclopedia of the Law of Corporations* § 509 (delegated authority of an agent terminates at the same time the principal's authority terminates). Plaintiffs also refer to Restatement (Second) of the Law of Agency, § 110: "Unless otherwise agreed, the loss or destruction of the subject matter of the authority or the termination of the principal's interest therein terminates the agent's authority to deal with reference to it." Plaintiffs contend that, while Mr. Machado was delegated authority from the Management Committee to handle the day-to-day operations of Valley Gold, "when those operations were destroyed by the failure of the business, so too was Mr. Machado's authority to act on behalf of Valley Gold." Finally, Plaintiffs refer to Restatement (Second) of the Law of Agency § 109 in contending that Mr. Machado is no longer authorized to act for Valley Gold even if the managing members never convened another meeting to formally

end his appointment:

> The authority of an agent terminates or is suspended when he has notice of a change in value of the subject matter or a change in business conditions from which he should infer that the principal, if he knew of it, would not consent to the further exercise of the authority.

Downey Brand maintains that because Valley Gold retains a president/chairman of the management committee, Joe Machado, its situation is distinguishable from the defunct medical corporations in *Gilliland*. Unlike *Overton*, Downey Brand provides no affidavit from Joe Machado confirming the invocation of the attorney-client privilege in this action or that Joe Machado is currently authorized to act on behalf of Valley Gold. Plaintiffs counter that Joe Machado's "presidency" does not comply with the provisions of Valley Gold's operating agreement, which plaintiffs contend require annual re-election of the management committee. Section 5.1(b) of the operating agreement provides that each manager "shall continue to serve on the Management Committee *until the manager is not re-elected at an Annual Meeting of the Members* or until the occurrence of one or more events described below in Sections 5.1(c) through 5.1(e)[death, disability, resignation, removal, or personal dissolution or bankruptcy]" (doc. 137 at 9)(emphasis added).

Plaintiffs contend that no annual meeting has been held since 2005. Presenting the classic challenge to plaintiffs to prove a negative,

Section 5.1(g) provides, in pertinent part, "If . . . there

32

are no remaining Managers, the Company *shall dissolve* unless a Majority Interest of the Members elect to continue the Company in effect . . ." (doc. 137 at 10) (emphasis added).  The Operating Agreement requires Valley Gold to dissolve.  California Corporations Code § 17350(a) provides that Valley Gold must dissolve and wind up its operations as its Operating Agreement provides.[8]  Sections 17352 through 17354 set forth the procedures for a limited liability corporation to wind down its affairs and dissolve.  Nothing indicates that Valley Gold's managers have followed these procedures.  Nor has any member or manager initiated action under § 17351 for a court decree of dissolution, as is appropriate when the business of the corporation has been abandoned.[9]

---

[8]California Corporations Code § 17350 provides:

> A limited liability company shall be dissolved and its affairs shall be wound up upon the happening of the first to occur of the following:
>
> (a) At the time specified in the articles of organization, if any, or upon the happening of the events, if any, specified in the articles of organization or a written operating agreement.
>
> (b) By the vote of a majority in interest of the members, or a greater percentage of the voting interests of members as may be specified in the articles of organization or a written operating agreement.

[9]California Corporations Code § 17351(a) provides:

> Pursuant to an action filed by any manager or by any member or members, a court of competent jurisdiction may decree the dissolution of a

33

Valley Gold's annual meetings have not been held, no manager has been re-elected at an annual meeting, and no managers remain under the terms of the Operating Agreement.  Joe Machado cannot continue to be Valley Gold's president/chairman since he served at the pleasure of a management committee that no longer exists (Operating Agreement, § 5.6(a), Doc. 137 at 11).  That Section 5.6 of the Operating Agreement grants Valley Gold's president the power to generally and actively manage Valley Gold's business, as Downey Brand contends, is meaningless as Joe Machado no longer validly holds the office of president/chairman and Valley Gold no longer conducts any business.  Nonetheless, until Valley Gold has been dissolved in compliance with California law, it continues to exist as a corporate entity.

Under the reasoning of *Gilliland*, because Valley Gold has no corporate manager or officer to assert or waive the attorney-client privilege, it follows that Valley Gold does not retain the attorney-client privilege in this action.  As in *Gilliland* and

limited liability company whenever the following occurs:

(1) It is not reasonably practicable to carry on the business in conformity with the articles of organization or operating agreement.

...

(3) The business of the limited liability company has been abandoned.

....

34

*Weintraub*, Valley Gold's ability to invoke or waive the attorney-client privilege does not exist in the fiction of its corporate survival, as an inactive corporation that has not complied with California corporations law regarding its required corporate information.  In *Weintraub*, the Court considered whether the results of its analysis interfered with policies or federal interests underlying bankruptcy.  471 U.S. at 351-52, 353.  Since Valley Gold is not in bankruptcy, a different policy analysis pertains to applying  *Weintraub* to decide who may exercise the attorney-client privilege of behalf of Valley Gold.  *Weintraub* analyzed federal bankruptcy interests in a single sentence, emphasizing the potential for mischief by the corporation's pre-bankruptcy corporate management:

> [T]he rule suggested by respondents–that the debtor's directors have this power–would frustrate an important goal of the bankruptcy laws.  In seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors.  It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files.  *To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets. The Code's goal of uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power that might effectively thwart an investigation into their own conduct.*

*Weintraub*, *supra,* 471 U.S. at 353-54 (citations omitted)(emphasis

added).

In an action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") (42 U.S.C. § 9601 *et seq.*), a special master recommended granting the plaintiff's motion to compel production of documents relating to a corporation that had been acquired by the defendant corporation nearly fifty years earlier. *City of Rialto*, *supra,* 492 F.Supp.2d at 1193. The court agreed. Although *City of Rialto*'s holding is distinguishable from this case in that it addressed a corporation dissolved nearly fifty years before Rialto brought its case, the court's policy reasoning is instructive:

> A dissolved corporation does not have the same concerns as a deceased natural person and therefore has less need for the privilege after dissolution is complete. As there are usually no assets left and no directors, the protections of the attorney-client privilege are less meaningful to the typically dissolved corporation. Moreover, because the attorney-client privilege has the effect of withholding relevant information from the factfinder, it should be applied only when necessary to achieve its limited purpose of encouraging full and fair disclosure by the client to his or her attorney. The privilege is to be strictly construed. Here, strictly construing the privilege, the Court finds that Kwikset, a dissolved corporation, has less need for the protections provided by the privilege than a natural person would. The Court and the litigants' need for full disclosure of information outweighs Kwikset's need for protection of its pre-dissolution attorney-client communications. As such, this Court agrees with the Special Master and finds that Kwikset lost its right to assert the attorney-client privilege when its dissolution was complete in 1958.

*City of Rialto*, 492 F.Supp.2d at 1200-01 (citations omitted).

36

Even though Valley Gold continues to exist as a corporate entity under California law, the policies underlying the attorney-client privilege do not favor recognizing that it retains the right to assert or waive the privilege in this instance. Valley Gold retains no known assets. It has no known corporate headquarters. The location of its corporate records and agent for service of process are unknown. Its management no longer functions; it carries out no ongoing business; and it has no activities of any kind. It has not amended its California corporate registration to reflect a current address, managers, or agent for service of process. Valley Gold no longer pursues its corporate purpose of manufacturing and marketing cheese. Its shareholders long ago concluded that their investments were lost and that their outstanding invoices would not be paid. Losses associated with investing in Valley Gold and selling it milk forced several investor-dairymen out of business and spawned multiple lawsuits. Valley Gold has little to gain and more importantly, nothing to protect if Downey Brand successfully invokes attorney-client privilege on its behalf.

On the other hand, Plaintiffs' allegations and the public record support the inference that Valley Gold's incorporators disregarded their fiduciary duty to corporate investors. As in *Weintraub*, Downey Brand's invocation of Valley Gold's attorney-client privilege threatens Plaintiffs' ability to uncover evidence of fraud or misappropriation of corporate assets by Valley Gold, its agents, or its management, as well as Downey

Brand's own alleged participation in those bad acts. Whether in the interests of perpetuating further fraud or simply to promote a new business venture, Vieira acted to promote his own interests at Valley Gold shareholders' expense, failing to disclose fully the nature of his role in the Suprema round-tripping scam and the status of the criminal case against him. If Vieira breached his fiduciary duty to Valley Gold and its shareholders, he was in a conflict position, the attorney-client privilege does not apply to his communications to Downey Brand as Valley Gold's agent in the course of Valley Gold's incorporation.

D. **Work-Product Doctrine**.

Downey Brand has clarified that its invocation of the work-product doctrine applies only to Plaintiffs' Requests for Documents Nos. 18-21, i.e., (18) the original or best available copy of the "AGREEMENT TO CONTRIBUTE ADDITIONAL CAPITAL BY OWNER" for each owner or investor; (19) all documents that refer or relate to the "AGREEMENT TO CONTRIBUTE ADDITIONAL CAPITAL BY OWNER;" (20) the original or best available copy of the "CONTINUATION OF AGREEMENTS TO FOREGO MILK PAYMENTS IN RETURN FOR AN INCREASED STAKE IN VALLEY GOLD, LLC" for each owner or investor; and (21) all documents that relate to the "CONTINUATION OF AGREEMENTS TO FOREGO MILK PAYMENTS IN RETURN FOR AN INCREASED STAKE IN VALLEY GOLD, LLC."

Although the contested materials are not protected by the attorney-client privilege, whether Downey Brand can withhold under the work-product privilege must be decided because the

work-product doctrine applies to the attorney, rather than the client.  *See Rhone-Poulenc Rorer, Inc. v. Home Indemn. Co.,* 32 F.3d 851, 866 (3rd Cir.1994).

The work-product doctrine, originally promulgated in *Hickman v. Taylor*, 329 U.S. 495 (1947), recognized that public policy is served by protecting from disclosure to adverse parties, written memoranda and private and personal recollections prepared by attorneys in the course of their legal duties.  *Upjohn*, *supra,* 449 U.S. at 397-98.  The work-product privilege belongs to both the attorney and the client.  *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 62 (7th Cir.1980).  The work-product protection continues even after the litigation is completed.  *FTC v. Grolier, Inc.*, 462 U.S. 19, 26 (1983).  The work- product privilege was substantially incorporated into F.R.Civ.P 26(b)(3)(A).  *Id.*  The pertinent portion of that rule provides:

> Ordinarily, a party may not discover documents and tangible things that are *prepared in anticipation of litigation or for trial* by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).

(Emphasis added).  Such documents may only be ordered produced upon an adverse party's demonstration of "substantial need [for] the materials" and "undue hardship [in obtaining] the substantial equivalent of the materials by other means."  *Id.*

In *In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management)*, 357 F.3d 900 (9th Cir.2004), the Ninth Circuit addressed application of the work-product doctrine to dual

39

purpose documents, joining those Circuits in employing the "because of" standard articulated in the Wright & Miller Federal Practice treatise. *Id.* at 907. The EPA informed Ponderosa Paint Manufacturing, Inc. that it was under investigation for violating federal waste management laws. Ponderosa hired attorney McCreedy to advise and defend it in anticipated civil and criminal litigation with the Government. McCreedy, on behalf of Ponderosa, hired Torf, an environmental consultant, to assist him in preparing a legal defense for Ponderosa and as an environmental consultant on Ponderosa's cleanup efforts at the sites that aroused the EPA's suspicions. Seeking to avoid litigation, Ponderosa submitted numerous documents to the EPA pursuant to an Information Request from the EPA and an Administrative Consent Order between Ponderosa and the EPA. Many of these documents were prepared by Torf. The EPA was satisfied that Ponderosa complied with both the Information Request and the Consent Order. However, a grand jury investigating Ponderosa issued a subpoena to Torf for "any and all records relating in any way to any work" regarding "the disposal of waste material ... from Ponderosa Paint[.]" *Id.* at 907. In adopting the "because of" standard, the Ninth Circuit stated:

> This formulation states that a document should be deemed prepared 'in anticipation of litigation' and thus eligible for work product protection under Rule 26(b)(3) if 'in light of the nature of the document and the factual situation in a particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." Charles Alan Wright, Arthur

40

> B. Miller, and Richard L. Marcus, 8 *Federal*
> *Practice & Procedure*, § 2024 (2nd ed. 1994)
> ....

*Id.* The Ninth Circuit cited *United States v. Adlman*, 134 F.3d 1194 (2nd Cir.1998) as presenting a comprehensive discussion of the "because of" standard:

> The 'because of' standard does not consider whether litigation was a primary or secondary motive behind the creation of a document. Rather, it considers the totality of the circumstances and affords protection when it can fairly be said that the 'document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation[.]' *Adlman*, 134 F.3d at 1195. Here, there is no question that all of the documents were produced in anticipation of litigation. McCreedy hired Torf because of Ponderosa's impending litigation and Torf conducted his investigations because of that threat. The threat animated every document Torf prepared, including the documents prepared to comply with the Information Request and Consent Order, and to consult regarding the cleanup.

*Id.* at 908. The Ninth Circuit rejected the Government's argument that the withheld documents would have been created in substantially similar form in any event to comply with the Information Request and the Consent Order, and, therefore, were not protected by the work product doctrine:

> The question of entitlement to work product protection cannot be decided simply by looking at one motive that contributed to a document's preparation. The circumstances surrounding the document's preparation must also be considered. In the 'because of' Wright & Miller formulation, 'the nature of the document *and* the factual situation of the particular case' are key to a determination of whether work product protection applies.

41

Wright & Miller § 2024 (emphasis added).
When there is a true independent purpose for
creating a document, work product protection
is less likely, but when two purposes are
profoundly interconnected, the analysis is
more complicated.

Here, Ponderosa's response to the Information
Request and its accession to the Consent
Order were done under the direction of an
attorney in anticipation of litigation.  By
cooperating with the EPA, Ponderosa sought to
avoid litigation ... Having chosen to pursue
a criminal investigation, the government now
seeks to capitalize on Ponderosa's earlier
cooperation and obtain all of Torf's
documents pertaining to the disposal of
Ponderosa's waste material.  The withheld
documents, however, just like the others,
were prepared by Torf, at least in part, to
help McCreedy advise and defend Ponderosa in
anticipated litigation with the government.
Thus, the withheld documents fall within the
broad category of documents that were
prepared for the overall purpose of
anticipated litigation.

To the extent that *Adlman* suggests there is
no work product protection when, *viewed in
isolation of the facts of the case*, a
document can be said to have been created for
a nonlitigation purpose, we believe the
better view is set forth in two Seventh
Circuit cases.  In the first, *In re Special
September 1978 Grand Jury*, 640 F.2d 49 (7th
Cir.1980)('*Special September'*), the court
extended work product protection to materials
that were produced both in anticipation of
litigation and for the filing of Board of
Education reports required under state law.
Work product protection was proper because,
by the time the law firm's client received
the Board's request for the required reports,
the client had already received a subpoena
from a federal grand jury.  The so-called
'independent' purpose of complying with the
Board's request was grounded in the same set
of facts that created the anticipation of
litigation, and it was the anticipation of
litigation that prompted the law firm's work
in the first place.

42

In the later case, *United States v. Frederick*, 182 F.3d 496, 501-02 (7th Cir.1999), the Seventh Circuit held that 'a dual-purpose document - a document prepared for use in preparing tax returns *and* for use in litigation - is not privileged; otherwise, people in or contemplating would be able to invoke, in effect, an accountant's privilege, provided that they used their lawyer to fill out their tax returns.'

*Frederick* does not discuss or distinguish *Special September*, but the two cases can be reconciled by the extent to which the so-called independent purpose is truly separable from the anticipation of litigation. In *Frederick*, at issue were accountants' worksheets, albeit prepared by a lawyer, in preparation of his clients' tax returns. Although his clients were under investigation (which the court acknowledged was a 'complicating factor'), work product protection was ultimately inappropriate because tax return preparation is a readily separable purpose from litigation preparation and 'using a lawyer in lieu of another form of tax preparer' does nothing to blur that distinction. *Frederick*, 182 F.3d at 501. In *Special September*, on the other hand, the materials used to prepare the Board of Elections reports were complied by lawyers and were necessarily created in the first place *because of* impending litigation.

Similarly here, by hiring McCreedy who in turn hired Torf, Ponderosa was not assigning an attorney a task that could just as well have been performed by a non-lawyer. The company hired McCreedy only after learning that the federal government was investigating if for criminal wrongdoing; a circumstance virtually necessitating legal representation. Torf assisted McCreedy in preparing Ponderosa's defense. He also acted as an environmental consultant on the cleanup. Although in that capacity he could have been retained by Ponderosa directly, this circumstance does not preclude the application of the work-product privilege to documents produced in that capacity, if the documents were *also* produced 'because of'

43

litigation.  The challenged documents were prepared under the direction of McCreedy, who was providing legal advice to Ponderosa in anticipation of the impending litigation.

We conclude that the withheld documents, notwithstanding their dual purpose character, fall within the ambit of the work product doctrine.  The documents are entitled to work product protection because, taking into account the facts surrounding their creation, their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole.

*Id.* at 908-910.

Here, the contested materials were prepared for a securities offering and capital raising effort.  There was then no prospect of or pending litigation.  The documents and materials all related to corporate fund raising to advance the interests of management and investors.  Because the contested materials were not prepared in anticipation of trial or for use in litigation, this aspect of work-product privilege does not apply.  Downey Brand does not describe legal strategy, mental sense impressions, legal research, or evaluation that is denied the opponent in the context of litigation.  The policy objectives of the work-product doctrine are not served by withholding.

<u>CONCLUSION</u>

For the foregoing reasons:

1.  Plaintiffs' motion to compel discovery is GRANTED IN PART AND DENIED IN PART;

2.  Downey Brand's motion for a protective order as to the requested information is DENIED; the disputed information and

materials shall be produced;

    3.  Downey Brand's motion for summary judgment against Plaintiff Valley Gold on the issue of the attorney-client privilege is DENIED.

    4.  Counsel for Plaintiffs shall prepare and lodge a form of order consistent with this Memorandum Decision within five (5) court days following service of this Memorandum Decision.

IT IS SO ORDERED.

Dated:   **February 1, 2010**           **/s/ Oliver W. Wanger**
                                      UNITED STATES DISTRICT JUDGE