1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT FOR THE

7                    EASTERN DISTRICT OF CALIFORNIA

8

9  MANUEL LOPES, et al.,          )      No. CV-F-06-1243 OWW/SMS
                                  )
10                                )      MEMORANDUM DECISION GRANTING
                                  )      IN PART, DENYING IN PART AND
11              Plaintiffs,       )      DEFERRING IN PART DEFENDANTS
                                  )      DOWNEY BRAND AND GENSKE
12         vs.                    )      MULDER'S MOTIONS FOR SUMMARY
                                  )      JUDGMENT AS TO JOSEPH LOPES
13                                )      AS TRUSTEE FOR THE RAYMOND
   GEORGE VIEIRA, et al.,         )      LOPES FAMILY TRUST (Docs.
14                                )      116, 146, 273, 277)
                                  )
15              Defendants.       )
                                  )
16 _____)

17

18      Downey Brand LLP ("Downey Brand") moves for summary judgment

19 against Joseph Lopes as trustee for the Raymond Lopes family

20 trust ("Raymond Lopes" or "Lopes") on all causes of action in the

21 Second Amended Complaint ("SAC").[1]  As grounds, Downey Brand

22 asserts that Raymond Lopes cannot establish that Downey Brand

23 made affirmative representations to him or owed him a duty to

24 _____

25      [1]Raymond Lopes, initially a plaintiff in this action, died on
   January 28, 2010.  Joseph Lopes as trustee of the Raymond Lopes
26 family trust, was substituted as plaintiff on August 9, 2010.
   (Doc. 286).

                                  1

disclose facts; that Raymond Lopes has no evidence of scienter or negligence, *i.e.,* that Downey Brand knew or should have known that George Vieira was negotiating a plea bargain to criminal charges; that Raymond Lopes cannot establish reliance because he did not read the Offering Memorandum Downey Brand assisted Valley Gold LLC in preparing; and that Raymond Lopes cannot establish a proximate causal link between Downey Brand's alleged conduct in assisting with the Offering Memorandum and his claimed damages. Downey Brand moves for summary judgment as to the Fourth, Sixth and Seventh Causes of Action on the grounds that Raymond Lopes cannot establish reliance because he did not read the Offering Memorandum which he contends omitted material facts.  Downey Brand moves for partial summary judgment on Raymond Lopes' claim for damages based on his cooperative, Central Valley Dairymen's, failure to pay him for milk on the grounds that he has no standing to pursue the claim and there is no actual or proximate causal link between this damages claim and Downey Brand's alleged omission of facts from the Offering Memorandum.

    Genske Mulder and Company ("Genske Mulder") moves for summary judgment on the following grounds:

        1.   On Plaintiff's Fourth Cause of Action (Federal Securities Fraud, Securities Exchange Act of 1934) on the grounds that Raymond Lopes did not read the Offering Memorandum before he invested $200,000 in Valley Gold, and did not receive any oral or written representations from Genske Mulder when he invested in Valley Gold or the "milk for equity" transaction; and on the grounds that Genske Mulder was not a "primary violator," but, at best, was a mere aider and

abettor who is not liable to Plaintiff in a
private action under Securities and Exchange
Act §10(b) and SEC Rule 10b-5;

2.   On Plaintiff's Fifth Cause of Action
(State Securities Fraud) on the grounds that
Raymond Lopes did not read the Offering
Memorandum before he invested in Valley Gold
and did not receive any oral or written
representations from Genske Mulder when he
invested in Valley Gold or the "milk for
equity" transaction;

3.   On Plaintiff's Sixth Cause of Action
(Negligence) on the grounds that Raymond
Lopes did not engage Genske Mulder to advise
him on the Valley Gold investment, the "milk
for equity" transaction, or his decision to
continue selling milk to Central Valley
Dairymen ("CVD") although CVD was late in
paying for the milk, and, therefore, Genske
Mulder did not owe any duty to Raymond Lopes
in negligence;

4.   On Plaintiff's Seventh Cause of Action
(Intentional Misrepresentation) on the
grounds that Raymond Lopes did not receive or
rely on any material misrepresentation or
omission by Genske Mulder; and

5.   On Plaintiff's Eighth Cause of Action
(Negligent Misrepresentation) on the grounds
that Raymond Lopes did not receive or rely on
any misrepresentation made by Genske Mulder.

A.   <u>GOVERNING STANDARDS</u>.

Summary judgment is proper when it is shown that there

exists "no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an

element of a claim or a defense, the existence of which may

affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v.*

*Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th

3

Cir.1987).  **Materiality is determined by the substantive law governing a claim or a defense.**  *Id.*  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  *Id.*

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial."  *Id.*  The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint."  *Id.*  The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995).  This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff."  *Id.*  The more

implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id.*  In *Scott v. Harris*, ___ U.S. ___, 127 S.Ct. 1769, 1776 (2007), the Supreme Court held:

> When opposing parties tell different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

As explained in *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099 (9th Cir.2000):

> The vocabulary used for discussing summary judgments is somewhat abstract.  Because either a plaintiff or a defendant can move for summary judgment, we customarily refer to the moving and nonmoving party rather than to plaintiff and defendant.  Further, because either plaintiff or defendant can have the ultimate burden of persuasion at trial, we refer to the party with and without the ultimate burden of persuasion at trial rather than to plaintiff and defendant.  Finally, we distinguish among the initial burden of production and two kinds of ultimate burdens of persuasion: The initial burden of production refers to the burden of producing evidence, or showing the absence of evidence, on the motion for summary judgment; the ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial.

> A moving party without the ultimate burden of persuasion at trial - usually, but not always, a defendant - has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment ... In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does

1    not have enough evidence of an essential
2    element to carry its ultimate burden of
     persuasion at trial ... In order to carry its
3    ultimate burden of persuasion on the motion,
     the moving party must persuade the court that
4    there is no genuine issue of material fact
     ....

5    If a moving party fails to carry its initial
     burden of production, the nonmoving party has
6    no obligation to produce anything, even if
     the nonmoving party would have the ultimate
7    burden of persuasion at trial ... In such a
     case, the nonmoving party may defeat the
8    motion for summary judgment without producing
     anything ... If, however, a moving party
9    carries its burden of production, the
     nonmoving party must produce evidence to
10   support its claim or defense ... If the
     nonmoving party fails to produce enough
11   evidence to create a genuine issue of
     material fact, the moving party wins the
12   motion for summary judgment ... But if the
     nonmoving party produces enough evidence to
13   create a genuine issue of material fact, the
     nonmoving party defeats the motion.

14   210 F.3d at 1102-1103.

15        B.   **PLAINTIFFS' OBJECTIONS TO DECLARATION OF TED KERN**.

16        For the reasons stated in open court at the hearing on

17   September 21, 2010, Plaintiff's objections to the Declaration of

18   Ted Kern are overruled and Defendants' objections to Plaintiffs'

19   Supplemental Brief Regarding the Deposition Testimony of Ted Kern

20   filed on January 20, 2010 are overruled except that  Plaintiff's

21   Exhibits 13, 57 and 59 will be disregarded in resolving the

22   motion for summary judgment.

23        C.   **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' GROUNDS NOT**
24   **ALLEGED IN SECOND AMENDED COMPLAINT**.

25        In opposing these motions for summary judgment, Plaintiffs
26

                                    6

rely on evidence of a Valley Gold Offering Memorandum marked draft dated April 21, 2003 which was allegedly provided by Tim Brasil to Plaintiffs on April 22, 2003.   Plaintiffs assert that the April 21, 2003 draft of the Offering Memorandum does not disclose that George Vieira was the subject of a criminal investigation by the United States in New Jersey. The section of the Offering detailing "Risks Specific to Company," provided to Plaintiffs on April 23, 2003 states:

> **Dependency on Key Personnel**
>
> ...
>
> Mr. Vieira, one of the principal organizers of the Company and this transaction is currently the chief executive officer of CVD. George Vieira, was, [sic] for a short period of time, an officer of Supreme West, Inc. ('Supreme West').  Supreme West is a subsidiary of Supreme Specialties, Inc. ('Suprema').  Suprema and Suprema West are in bankruptcy.  Suprema is also the subject of an investigation being conducted by the Securities and Exchange Commission and the U.S. Attorney's Office.  Assertions have been made that financial data for Suprema was misrepresented.  Mr. Vieira has been contacted by the U.S. Attorney's Office and may be a subject of this investigation.  No formal charges have been brought against Mr. Vieira ....

Defendants complain that it was not until Plaintiffs' opposition to their motions for summary judgment were filed, that Plaintiffs contended that the draft Offering Memorandum provided to them did not disclose the criminal investigation of George Vieira.  In addition, Defendants complain that Plaintiffs seek to withstand summary judgment on the ground that they relied on

7

statements in the Offering Memorandum about the profitability of the cheese plant while it was owned by Land O' Lakes, low estimates of the expense of refurbishing the plant, and financial forecasts generated by Genske Mulder, none of which are alleged in the Second Amended Complaint.  Because they did not allege these claims their Second Amended Complaint, Plaintiffs should not be allowed to withstand summary judgment on this ground.

At the September 21, 2010 hearing, Plaintiff was ordered to file a motion for leave to amend the SAC pursuant to Rules 15 and 16, Federal Rules of Civil Procedure, setting the motion for hearing on October 19, 2010.  Because resolution of the motion to amend will dictate the scope of a number of factual and legal issues involved in these motions for summary judgment, decision on these issues is deferred until that time.  The issues resolved in this Memorandum Decision are not impacted by the motion to amend.

D.  **SEPARATE STATEMENTS OF UNDISPUTED FACTS**.

1.  **Downey Brand**.

DBUDF 1: Downey Brand did not represent CVD in the Valley Gold matter and has never represented CVD.  **Supporting Evidence**: Jeffrey M. Koewler, a partner in Downey Brand, who was personally involved in Downey Brand's representation of Valley Gold, avers that Downey Brand did not represent CVD in conjunction with the Valley Gold Offering or in any other matter.  (Doc. 142; Decl. of Koewler, ¶ 2).

*Plaintiff's Response*: UNDISPUTED.

1     DBUDF 2: Downey Brand spoke to George Vieira's criminal

2 attorney, James Cecchi, who related the facts regarding George

3 Vieira disclosed in the Valley Gold Offering Memorandum.  Mr.

4 Cecchi did not disclose that Vieira was involved in plea

5 negotiations.

6               *Plaintiff's Response*: UNDISPUTED.

7     DBUDF 3: Raymond Lopes did not read the Offering Memorandum

8 or anything prepared by Valley Gold's accountants, Genske Mulder,

9 before investing in Valley Gold.

10              *Plaintiff's Response*: Undisputed but irrelevant.

11 Plaintiff refers to the Declaration of Michael Lopes (Doc. 165):

12        6.  On April 22, 2003, Tim Brasil delivered a
packet of documents to my father Raymond

13        Lopes.  He also delivered a packet to my
brother, Joseph.  The packet included an

14        Offering Memorandum, an Operating Agreement
and a Subscription Packet.

15

16        7.  I keep the books for my father's dairy,
and I read through the documents that had
been delivered to him.  I was attending

17        college at Cal Poly, and I read the documents
between classes.  The Offering Memorandum did

18        not include any mention of George Vieira
being investigated, or being accused of a

19        crime, being contacted by the United States
Attorney's Office or being connected with the

20        bankruptcy of Supreme Specialties.

21        8.  I did notice that according to the
Offering Memorandum, Land O' Lakes, who was

22        selling the Gustine plant, had sold over $100
million in cheese from the plant in 2001, and

23        earned a sizeable profit.  I noticed that the
forecasts for Valley Gold's sales were much

24        lower - around $50 to $60 million per year.
I thus believed that the forecasts were on

25        the conservative side.

26        9.  Everything looked fine to me, and I told

1          my father that I had read the documents and
2          everything looked good.  I also discussed the
         documents with my aunt, Mariana Lopes, and
3          with my brother, Joseph.  Mariana told me
         that she had had her accountant, Susan
4          Miguel, review the documents.  Tim Brasil
         also told me that the Valley Gold management
5          committee (which had seven members that were
         elected in early April) had met with the
6          Downey Brand attorneys and Genske Mulder
         accountants and gone over everything in
7          detail and were satisfied that we were making
         a good investment.

8 Plaintiff also refers to a section of the Offering Memorandum,

9 which states:

10          The Operating Projections and the financial
         figures contained in this Memorandum were
11          prepared by the Company's accountants.

12      Downey Brand asserts that Plaintiffs' quotation is

13 selective.  Downey Brand refers to the entire provision:

14          ... During the approximate two-year period
         that Land O' Lakes owned the Cheese Plant,
15          the revenues of the Cheese Plant have been as
         follows: $103,000,000 in 2001, and
16          $72,000,000 in 2002.  The net profit and loss
         for this same period has been as following: a
17          net operating profit in 2001 of $2,700,000
         and a net operating loss of $3,100,000.  Land
18          O' Lakes also took a one-time charge of
         $7,000,000 in 2002, resulting in a loss of
19          over $10,000,000 in 2002 ....

20          ...

21          The Operating Projections and the financial
         figures and projections contained in this
22          Memorandum were prepared by the Company's
         accountants.  These financial documents,
23          figures and projections are based, in large
         part, on financial documents provided to the
24          Company by Land O' Lakes and George Vieira.
         The Company has reviewed certain financial
25          data prepared by Land O' Lakes regarding the
         operation of the Cheese Plant.  The financial
26          documents provided to the Company by Land O'

Lakes were not prepared specifically for the
Company.  The financial documents were
prepared by Land O' Lakes for their own
internal use.  The Company has not obtained
an independent audit of Land O' Lakes'
operations to verify the accuracy of such
information.  Further, Land O' Lakes is a
corporation with facilities and operations in
numerous states and revenue in the billions
of dollars.  The Cheese Plant is just a
portion of Land O' Lakes overall business
operations.  As a result, the financial
information provided by Land O' Lakes to the
Company regarding the Cheese Plant may
reflect costs and savings that won't be
realized by the Company in its operations of
the Cheese Plant.  Further, after the Company
has had the opportunity to operate the Cheese
Plant for a period of time, the Company may
decide to adopt different accounting
practices which, if these practices had been
adopted by Land O' Lakes, would have changed
the financial information provided to the
Company.

(Doc. 142, Ex. 1).

*Court Ruling*: UNDISPUTED that Raymond Lopes did not personally read the Offering Memorandum.

DBUDF 4:  Raymond Lopes has never retained Downey Brand to represent him nor has he ever spoken to, or recalls anything said by a Downey Brand attorney related to the Valley Gold Offering, CVD, or his milk.

*Plaintiff's Response*: UNDISPUTED.

DBUDF 5: Within a few months after Valley Gold opened, CVD was late in paying Raymond Lopes for milk because Valley Gold was not paying CVD.

*Plaintiff's Response*: UNDISPUTED.

DBUDF 6: Downey Brand did not prepare contracts in which

11

Raymond Lopes agreed to forgo payment for his milk in return for a larger equity interest in Valley Gold ("milk for equity" contracts) or play any other role in suggesting that Raymond Lopes agree to the milk for equity contracts or otherwise forgo milk payments.

*Plaintiff's Response*: UNDISPUTED.

DBUDF 7: The failure of Valley Gold was not caused by George Vieira's criminal conduct, but ultimately by the lack of milk sufficient to allow the company to continue operations.

Supporting Evidence: Declaration of Ted Kern quoted *supra*.

*Plaintiff's Response*: Disputed.  Plaintiff asserts that Valley Gold never earned a profit and that the cheese yields that Mr. Kern relied upon to state that Valley Gold could have continued in business are not physically possible, relying on the Declaration of James Grubele, a dairy industry consultant:

> 5.  Depending upon the type of cow providing the milk, there are some generally accepted yield percentages in the dairy industry for the production of cheese; based upon Holstein cows, they include the following:

| Cheese Type | Standard Yield |
|---|---|
| a. Cheddar: | 9.93% |
| b. Provolone: | 9.2% |
| c. Mozzarella | 9.2% |
| d. Jack | 10.6% |

> 6.   While it is possible to modestly improve the yields of cheese processing by fortifying some milk with powder, there are some general industry recognized limits to the amount of the increased yield that is achievable.  The

following standard yields and yield increases based upon adding powder to milk represent the generally accepted yields in the dairy industry.  I have also provided a yield increase that in my opinion while unlikely, would represent the highest potential yield increase based upon adding powdered milk ('Max W/P').  Any claimed yields relying on adding powder, that are in excess of the specified 'Max W/P' yields are set forth below, in my opinion are false and inaccurate.

| Cheese Type | Average Yield | W/Powder | Max W/P |
|---|---|---|---|
| Cheddar: | 9.93% | 10.3% | 10.3% |
| Provolone | 9.2% | 9.53% | 9.53% |
| Mozzarella | 9.2% | 9.53% | 9.53% |
| Jack | 10.6% | 10.9% | 10.9% |

(Doc. 168).

*Court Ruling*: DISPUTED.

2.  Genske Mulder.

As to the Fourth and Fifth Causes of Action:

GMUDF 1: Raymond Lopes invested $200,000 in Valley Gold.

*Plaintiff's Response*: UNDISPUTED.

GMUDF 2: Raymond Lopes did not read the Valley Gold Offering Memorandum or any other documents before investing in Valley Gold.

*Plaintiff's Response*: UNDISPUTED.

GMUDF 3: Raymond Lopes would not have invested in Valley Gold had he read the Offering Memorandum's disclosure of George Vieira's criminal problems.

*Plaintiff's Response*: UNDISPUTED.

13

1  **GMUDF 4:   Before he invested in Valley Gold, Raymond Lopes**
2  **did not discuss the Valley Gold offering with anyone at Genske**
3  **Mulder.**

4  *Plaintiff's Response*: UNDISPUTED.

5  **GMUDF 5: Before he invested, Raymond Lopes discussed the**
6  **Valley Gold offering with his sister-in-law Plaintiff Mariana**
7  **Lopes, who said the Valley Gold investment was a "good thing" and**
8  **that it was a place to "put the milk" [i.e. there was no other**
9  **customer for his milk other than the to-be-formed Valley Gold]**
10 **and so the Valley Gold investment was a "good thing."**

11 *Plaintiff's Response*: UNDISPUTED.

12 **GMUDF 6: Before he invested, Raymond Lopes believed his**
13 **sister-in-law Plaintiff Mariana Lopes that there was no other**
14 **place to "put the milk" and so the Valley Gold investment was a**
15 **"good thing."**

16 *Plaintiff's Response*: UNDISPUTED.

17 **GMUDF 7: Before he invested, Raymond Lopes discussed the**
18 **Valley Gold offering with his sons, Plaintiffs Michael and Joseph**
19 **Lopes, who said, "Do what you want."**   <u>**Supporting Evidence**</u>:
20 **Deposition of Raymond Lopes (Doc. 116-3, Exh. B, 49:9-11).**

21 *Plaintiff's Response*: Undisputed as phrased.
22 **Plaintiff asserts that Michael Lopes said more than "do what you**
23 **want."   Plaintiff refers to the Declaration of Michael Lopes:**

24        **Everything looked fine to me, and I told my**
       **father that I had read the documents and**
25        **everything looked good.**

26 **As to the Sixth, Seventh and Eighth Causes of Action:**

14

1  **GMDUF 8: Genske Mulder prepared tax returns for Raymond**
2  **Lopes.**

3       *Plaintiff's Response*: UNDISPUTED.

4       **GMUDF 9: Other than tax return preparation, Genske Mulder**
5  **was not engaged to perform any other professional services for**
6  **Raymond Lopes.**

7       *Plaintiff's Response*: UNDISPUTED.

8       **GMUDF 10: Raymond Lopes did not discuss his investment in**
9  **Valley Gold with anyone at Genske Mulder.**

10       *Plaintiff's Response*: UNDISPUTED.

11      **GMUDF 11: Raymond Lopes did not discuss with anyone at**
12  **Genske Mulder continuing to sell his milk to CVD even though it**
13  **was paying late.**

14       *Plaintiff's Response*: UNDISPUTED.

15      **GMUDF 12: Raymond Lopes contacted Tim Brasil, the CVD board**
16  **president, when he was not paid timely for his milk.  Mr. Brasil**
17  **gave various excuses for the late payments.**

18       *Plaintiff's Response*: UNDISPUTED.

19      **GMUDF 13: Raymond Lopes did not ask Genske Mulder about the**
20  **"milk for equity" transaction.  Raymond Lopes does not recall**
21  **what he was told before signing the "milk for equity" papers.**

22       *Plaintiff's Response*: UNDISPUTED.

23      **GMUDF 14: Raymond Lopes does not know if Genske Mulder did**
24  **something to cause him to lose money on his milk sales:**

25       *Plaintiff's Response*: UNDISPUTED.

26      **GMUDF 15: Raymond Lopes does not know any Genske Mulder**

accountant.

*Plaintiff's Response*: UNDISPUTED.

3.   <u>Plaintiff's Separate Statement of Undisputed Facts</u>.[2]

PLUDF A: On March 25, 2003, Downey Brand led a meeting at its Stockton office, attended by accountants from Genske Mulder, attorneys Anthony Cary and Curtis Colaw, George Vieira and some local board members from CVD.  The purpose of the meeting was to address the steps needed to secure capitalization for Valley Gold, LLC and complete the acquisition by Valley Gold of a cheese plant in Gustine, California.

*Court Ruling*: UNDISPUTED

PLUDF B: Downey Brand took responsibility for preparing the Offering Memorandum to secure investments in Valley Gold; Genske Mulder took the lead in preparing financial forecasts.

PLUDF C: Downey Brand's lead attorney, Jeffrey Koewler, understood that the Offering Memorandum needed to "meaningfully convey pertinent information to potential investors."

*Court Ruling*: UNDISPUTED.  Mr. Koewler's deposition testimony in the *Nunes* case was:

> Q.  BY MR. REILLY: Did you prepare the
> Offering documents with the intention to
> meaningfully convey pertinent information to
> potential investors?

---

[2]Defendants object to Plaintiffs' Exhibits C, D, F, X, Y and Z attached to Doc. 172 on various grounds.  However, Plaintiff's separate statement of undisputed facts makes no reference to these exhibits.

16

1      ...

2          **A.  Yes.**

3  **(Doc. 172, Exh. J, p. 80:4-81:7).**

4          **PLUDF D: On April 11, 2003, Mr. Koewler called James Cecchi,**

5  **an attorney in New Jersey who was representing George Vieira in a**

6  **criminal investigation being conducted by the United States**

7  **Attorney's Office and the Securities and Exchange Commission. Mr.**

8  **Koewler read a disclosure statement that had already been drafted**

9  **concerning Mr. Vieira's involvement or potential involvement in**

10 **the criminal investigation, and sought Mr. Cecchi's confirmation**

11 **that the proposed disclosure was accurate.  Mr. Cecchi confirmed**

12 **that it was.**

13         *Court Ruling*: **UNDISPUTED**

14         **PLUDF E: Despite recognizing the need for a disclosure,**

15 **despite having already drafted disclosure language, and despite**

16 **Mr. Cecchi's confirmation that the disclosure was adequate,**

17 **Downey Brand did not add the disclosure about the United States**

18 **Attorney's criminal investigation in the Offering Memorandum that**

19 **it was preparing until April 22, 2003, ten days later.**

20 <u>**Supporting Evidence**</u>**: Doc. 172, Exh. 1, Confidential Private**

21 **Offering Memorandum, Copy No. 11, delivered to Manuel Lopes on**

22 **April 22, 2003, doc. 51034.6; Doc. 172, Exh. L, draft**

23 **Confidential Private Offering Memorandum, doc. 510334.5, stamped**

24 **"DRAFT 4/21/03 11:47 3847.57 AM"; Doc. 172, Exh. J, Deposition of**

25 **Jeffrey Koewler,** *Nunes v. Central Valley Dairymen,* **Merced County**

26 **Superior Court, Case No. 147653, 91:23-93:15:**

1       Q.  BY MR. REILLY: I have marked as Exhibit
     229 a draft of the confidential private
2       offering memorandum.  Do you recognize this
     as draft No. 5 prepared by Downey Brand?
3

4       A.  That's the number on the footer, so I am
     assuming that it is, but I don't recall draft
     No. 5 specifically.
5

6       Q. Okay.  Up on the top right-hand corner it
     says 'Draft 4/21/03,' and then there appears
     to be a time.  Do you understand what that
7       stamp means?

8       A.  I don't.  I don't know what it means.  I
     don't use that draft stamp in the documents I
9       usually prepare.

10       Q.  Does Mr. Delfino?

11       A.  He may.  I don't know.

12       Q.  Do you know what the purpose of that
     stamp is?
13

14       A.  I don't.  I could speculate, but I don't
     know.

15       Q.  Do you have any information at all as to
     what information is contained in that series
16       of numbers?

17       A.  I could speculate, but I don't know.

18       *Defendants' Response*: Defendants object to

19  Plaintiff's Exhibit L, described by Plaintiff as "Redline Version

20  of Valley Gold Offering Memorandum" dated April 21, 2003, on the

21  grounds of relevance and lack of authentication.  Defendants

22  assert that Exhibit L was not produced by any Plaintiff or Susan

23  Miguel although subpoenaed by Downey Brand.

24       *Court Ruling*: DISPUTED.

25    PLUDF F: On April 21, 2003, Downey Brand led a meeting of

26  the management committee of Valley Gold and went over the

18

Offering Memorandum as it existed on that day.  On forms prepared by Downey Brand, the management committee voted on April 21, 2003 to approve the April 21, 2003 version of the Offering Memorandum and to "authorize and direct the Designated Officers, acting individually or collectively, to take all steps necessary to complete the offering on behalf of the Company, including the acceptance of subscriptions for Membership interests ...."

<u>Supporting Evidence</u>: Doc. 172, Exh. M, Minutes of Management Committee of Valley Gold, April 21, 2003:

...

... Mr. Koewler also discussed the status of the Private Offering Memorandum ('Memorandum').  The most recent draft of the Memorandum was distributed to the Committee for review.

...

The following action was taken at the meeting:

...

<u>Private Offering Memorandum</u>

RESOLVED, to approve this Memorandum as attached hereto, and to authorize and direct the Designated Officers, acting individually or collectively, to take all steps necessary to complete the offering on behalf of the Company, including the acceptance of subscriptions for Membership Interests in the Company and the expenditure of proceeds in accordance with the terms of the Memorandum

...

Vote: Passed Unanimously.

Doc. 172, Exh. J, Deposition of Mr. Koewler, 81:8-82:11,

testifying to his belief that the Minutes were prepared by Downey Brand.

*Defendants' Response*: Defendants object to Exhibit M on the grounds of relevance and authentication.

*Court Ruling*: Defendants' objections to Exhibit M are disregarded.  Defendants make no showing that the meeting did not occur or that the minutes do not accurately reflect what occurred at that meeting.  Although a copy of the Offering Memo approved at the April 21, 2003 meeting is not attached to the minutes, the minutes are relevant to Plaintiff's claim that they were provided a copy of a draft of the Offering Memorandum by Tim Brasil on April 22, 2003 that is different from the final Offering Memorandum provided to the Valley Gold investors on April 23, 2003, if Plaintiffs are given leave to amend to include this claim.

PLUDF G: On April 22, 2003, Tim Brasil, one of the designated officers of Valley Gold, LLC, distributed subscription packets to Joseph Lopes, Raymond Lopes, and Manuel and Mariana Lopes.  These packets were all the April 21, 2003 version that the management committee had approved - the version without any disclosure concerning the United States Attorney's investigation into criminal activity in which George Vieira might be involved. Supporting Evidence: Doc. 166, Decl. of Susan Miguel, principal of the tax and accounting services firm, Ag & Merchants Business Services, who provided payroll, tax and accounting services to Lopes Dairy, owned by Manuel and Mariana Lopes, and Homen Dairy,

owned by Jose and Durvalina Homen:

2.  Late morning on April 22, 2003, Mr. and Mrs. Homen visited my office. They had with them financial forecast sheets on oversize paper, as well as an Operating Agreement, Offering Memorandum and Subscription Packet for Valley Gold ....

3.  I spent some time looking over the financial forecast sheets, which each had Genske Mulder's name on the lower corner. The set included forecasted balance sheets extending several years into the future, forecasted income and expense statements for the same period, and a cash flow summary.  I do not believe that the set included a detailed breakdown of forecasted expenses, which I saw a month or so later.

4.  I checked that the forecasted income and expense results tracked accurately to the forecasted balance sheets, and I checked that the income and expense sheets included the appropriate components for a cheese manufacturing facility (cost of materials, production costs and administrative expenses), and I checked that the depreciation and interest expense figures were reasonable in light of the proposed purchase of the Gustine cheese plant for $7.5 million, with $5 million in seller financing from Land O' Lakes.

5.  I did not have sufficient data to test the reasonableness of the sales forecasts or the estimates for production and administrative costs, but I noticed that annual sales for Valley Gold were forecast at slightly more than $60 million per year.  In the Offering Memorandum, I saw the report that Land O' Lakes had sold $103 million of cheese from the Gustine plant in 2001.

6.  Mr. and Mrs. Homen wanted to know if I saw any problems with the proposed investment, and I explained that from the risk summary in the Offering Memorandum it looked like there were a variety of things that could go wrong.  Mr. Homen responded that the management committee for Valley Gold

(of which he was a member) had gone over those risks in detail in a meeting with George Vieira and the attorneys and accountants the previous day, and were satisfied that the risk items had been appropriately addressed.  I wished them well with the investment, and cautioned them that they shouldn't go forward unless they trusted George Vieira.  They assured me that they did.

7.  In my review of the documents that morning, I did not see any mention of George Vieira's involvement with Supreme [sic] Specialties, or any reference to him possibly being the subject of a criminal investigation by the United States Attorney's office.  If that disclosure had been included, I believe I would have noticed.

8.  I helped Mr. and Mrs. Homen fill out the information required for the Subscription Packet ... Mr. Homen said they had to turn in the packet the next day and had been told to date the documents for April 23, 2003, so I wrote in the April 23rd date.

9.  The next day, on April 23, 2003, Manuel and Mariana Lopes came to my office with the same Offering Memorandum, Operating Agreement and Subscription Packet.  I told Mariana that I had already had a little time to go through the documents with another client, and I mentioned that I had looked over financial forecasts that Genske Mulder had prepared.

10.  With Mr. and Mrs. Lopes, I spent most of the little time available to look over the Operating Agreement.  It appeared to me that the Operating Agreement gave George Vieira a lot of authority, and I gave a similar caution as I had to Mr. and Mrs. Homen: that they shouldn't go forward unless they trusted George Vieira.

11.  I also noticed that the Operating Agreement had a footer on each page with the word 'Draft.'  I asked Mariana Lopes why they had draft documents; she had not noticed the footer before.  I tried to reach one of the attorneys at Downey Brand to ask about the

22

'draft' designation, but could not reach anyone.  I then tried to reach Mr. Hoekstra at Genske Mulder; he was not in, but I left a message.

12.  I then helped Mr. and Mrs. Lopes fill out the information required for the Subscription Packet, again changing the documents from being for Mr. Lopes as an individual to being for the partnership that owned the dairy - the Lopes Dairy Partnership.  While I was doing that, I also had my sister make a copy of the Operating Agreement, which I kept in my files and have produced in this lawsuit.  A true and correct copy of the Operating Agreement that Mr. and Mrs. Lopes brought to my office on April 23, 2003 is attached to the group of plaintiffs' exhibits as Exhibit E.

13.  Mrs. Lopes said they had to drop off the Subscription Packet at 3:00 pm, which constrained the available time.  I did not have time to make a copy of the Offering Memorandum.

14.  Right as Mr. and Mrs. Lopes were leaving, Mr. Hoekstra returned my call.  He told me that he had gotten through to the Downey Brand attorneys, and had been assured that the only changes were for minor typographical type errors.  He explained that there was limited time to get the offering done and the investments collected, in light of the closing date under the contract to purchase the Gustine plant, and they had distributed the documents before the final clean-up was done.  But again, he assured me that the only changes would be non-substantive corrections of typographical errors and formatting.  He also told me that Genske Mulder had spent a lot of time putting the financial forecasts together and ensuring that the forecasts were realistic.  Indeed, he stated that the forecasts were on the conservative side, and expressed his belief that profits from the plant would exceed expectations.

Doc. 164, Decl. of Mariana Lopes, ¶¶ 17-19:

23

17.   On April 22, 2003, Tim Brasil delivered a packet of documents to our home, with an Offering Memorandum, an Operating Agreement and a Subscription Packet.  I was also given a copy of the financial forecasts Genske Mulder had prepared, with their name on the bottom of each page.  I don't recall whether Tim Brasil delivered those with other documents, or whether I received them from another member of the management committee.

18.   Tim Brasil said that my husband and I needed to fill out and sign the Subscription Packet and turn it in at 3:00 pm the next day.

19.   I read through the documents.  A lot of the technical provisions I did not understand, but I understood the basics.  I did not see any mention of George Vieira being investigated, or being accused of a crime, being contacted by the United States Attorney's Office or being connected with the bankruptcy of Suprema Specialties.  I believe I would have noticed if the documents had included any mention of George Vieira being the possible subject of any type of criminal investigation.

Doc. 165, Decl. of Michael Lopes at ¶ 6-7:

6.   On April 22, 2003, Tim Brasil delivered a packet of documents to my father Raymond Lopes.  He also delivered a packet to my brother, Joseph.  The packet included an Offering Memorandum, an Operating Agreement, and a Subscription Packet.

7.   I keep the books for my father's dairy, and I read through the documents that had been delivered to him.  I was attending college at Cal Poly, and I read the documents between classes.  The Offering Memorandum did not include any mention of George Vieira being investigated, or being accused of a crime, being contacted by the United States Attorney's Office or being connection with the bankruptcy of Suprema Specialties.

*Court Ruling*: DISPUTED.  Defendants referred to

24

evidence at the September 21, 2010 hearing that Tim Brasil denies providing the April 21, 2003 drafts to Plaintiff.

PLUDF H: The disclosure that Downey Brand added to the Offering Memorandum on April 22, 2003 stated that "Mr. Vieira has been contacted by the U.S. Attorney's Officer and may be a subject of this investigation." In reality, Mr. Vieira was a subject of the investigation and was actively involved in negotiations for a plea deal. Supporting Evidence: April 22, 2003 Offering Memorandum at page 12; Depo. Cecchi 19:1–22 and Exh. 34 (Plaintiffs' Exh. BB); Carella, Byrne, Gilfillah, Cecchi, Stewart & Olstein invoices authenticated by Depo. Cecchi 29:23-53:9 and marked as Exhs. 35-43 (Plaintiffs' Exhs. N-V).

*Defendants' Response*: Defendants object to Plaintiffs' Exhibits N-V on the grounds of relevance and as not being authenticated as being transmitted to Genske Mulder. The bills are addressed to CVD, there are no fax headers indicating that CVD faxed the bills to Genske Mulder, and Mr. Cecchi of the Carella firm testified that he block billed for services to multiple parties. Defendants object to Plaintiffs' Exhibit BB, described on the list of exhibits as "Plea offer letter and agreement between U.S. Attorney's Office and George Vieira" dated March 28, 2003. Defendants object to Exhibit BB on the grounds of relevance, noting that George Vieira did not sign the plea agreement until August 2003 and it was not filed in the criminal action in New Jersey until January 7, 2004.

*Court Ruling*: Absent evidence that Defendants knew

about the plea offer letter at the time of the Offering
Memorandum, Exhibit BB is only relevant to reflect what Downey
Brand disclosed based on its then knowledge, and whether it was
communicated to Genske Mulder.  As to Exhibits N-V, unless
Plaintiff can establish that these bills were in fact provided to
Genske Mulder by CVD, they are not relevant.

PLUDF I: Genske Mulder received copies every month of
Carella, Byrne, Bain, Gilfillah, Cecchi, Stewart & Olstein
invoices for representing George Vieira in the criminal
investigation by the United States Attorney's Office.  The
billing entries plainly demonstrate that Mr. Vieira was actively
negotiating a guilty plea, spending full days in meetings with
his lawyers and the United States Attorney.  <u>Supporting Evidence</u>:
Doc. 169, Decl. of Douglas Applegate ¶¶ 13-14:

13.  Mr. Cecchi also authenticated numerous
billing invoices for his firm's work on
behalf of George Vieira.  True and correct
copies of those invoices are attached to
Plaintiffs' Exhibits as Exhibits N through V.

14.  The billing invoices contain fax headers
that show they were transmitted to Genske
Mulder every month.  And the billing entries
leave no doubt that Mr. Vieira was actively
negotiating a criminal plea that was
envisioned to include a prison sentence.
Defendants have contended that they could not
have known about the true extent of Mr.
Vieira's criminal acts, but the information
was in their hands all along.

*Court's Ruling*: There is nothing in Exhibits N, O,
or P from which it could reasonably be inferred that Mr. Vieira
was actively negotiating a plea deal.  Ex. Q, an invoice to CVD

dated December 26, 2002, contains billing descriptions
"Conference with JEC regarding review of timeline of significant
events and regarding strategy for future plea negotiations with
AUSA Neils" and "Conference with JEC regarding status of plea
negotiations with AUSA Neils."  Exhibit R, an invoice to CVD
dated January 14, 2003, contains billing descriptions "Conference
with JEC regarding strategy for further plea negotiations with
AUSA Neils," "Conference with JEC regarding defense litigation
strategy and regarding strategy for plea negotiations with AUSA
Neils," "Conference with JES re: status of plea negotiations with
AUSA Neils and re: production of electronic financial records,"
and "Conference with JEC regarding plea negotiations with AUSA
Lynn Neils."  Exhibit S, an invoice to CVD dated February 13,
2003, contains billing descriptions "Review CMM and WCC
documents; review attorney's notes of meetings with the
government in preparation for client's meeting with AUSA Neils on
1/9/03," "Review attorney's notes of client debriefings and
review CMM documents in preparation for meeting with AUSA Neils
on 1/8/03," "Conference with JEC regarding preparation of client
for meeting with AUSA Neils on 1/9/03; review SEC correspondence
related to production of CMM's electronic financial records,"
"Meet and prepare client for interview with Govt.," "Review
Suprema/A and J documents; review attorney's notes of client
debriefings and proffer meetings with AUSA Neils and SEC
attorneys; meeting with Tom Camp, Kevin O'Brien, JEC and George
Vieira to review documents and prepare Mr. Vieira for proffer

meeting with the government on 1/9/03; conference with JEC regarding status of client's efforts to cooperate with the government and regarding the review of documents and attorney's notes of client debriefings," "Prepare for and attend Proffer," "Review notes of client debriefings and prior meetings with the government; attend proffer meeting at U.S. Attorney's office with George Vieira, JEC, Tom Camp, AUSA Lynn Neils, representatives of the FBI, SEC and Dept. of Agriculture; conference with JEC regarding strategy for plea negotiations with AUSA Neils," "Prepare and participate in Proffer," and "Attend proffer meeting with George Vieira, JEC, Tom Camp, representatives of the SEC, FBI and Dept. of Agriculture, and AUSA Lynn Neils; conference with AUSA Lynn Neils, FBI agent Sica and JEC to discuss plea offer terms from the government; review attorney's notes of prior plea negotiations with AUSA Neils."   Exhibit T, an invoice to CVD dated March 17, 2003, contains billing descriptions "Telephone calls regarding meeting with AUSA," "Telephone call with AUSA Lynn Neils, Telephone call with George Vieira and conference with JEC regarding plea negotiations and client's cooperation with the government," "Review notes for proffer," "Conference with JEC to review status of plea negotiations with Ausa Neils and to discuss strategy for meeting on 2/13/03," "Telephone conference with George Vieira and JEC to discuss and prepare for meeting with Ausa Neils on 2/13/03; Conference with JEC to prepare for meeting with SEC and U.S. Attorney's office on 2/13/03," "Review notes of prior client meetings with the

Government; Review documents of CMM, WCC and Suprema subpoenaed by the Government; Attend meeting with JEC and client to debrief client and prepare client for interview with Ausa Lynn Neils and government officials on 2/13/30," "Prepare for and attend Proffer meeting at U.S. Attorney's Office with JEC and George Vieira wherein client is debriefed by Ausa Lynn Neils, SEC Attorneys and government officials in connection with government's investigation into the business activities of Suprema," and "Conference with JEC regarding plea negotiations with Ausa Lynn Neils."  Exhibit U, an invoice to CVD dated April 11, 2003 contains billing descriptions "Telephone conference with client to discuss ... status of plea negotiations with the government," "Telephone conference with Ausa Neils regarding plea negotiations; Conference with JEC regarding plea negotiations with the government," "Draft memorandum to file detailing discussions with Ausa Neils on 3/24/03 concerning the parameters of a cooperating plea agreement with the government; Review attorney's notes of client debriefings and prior plea negotiations with Ausa Neils," "Conference with JAA regarding plea; telephone calls with LN regarding plea," "Conference with JEC and telephone conference with Ausa Neils regarding the terms and conditions of a cooperating plea agreement with the Government; Review U.S. sentencing guidelines," "Review attorney's notes of client's proffer sessions; Review U.S. sentencing guidelines; Conference with JEC regarding defense strategy for plea negotiations," "Review and draft memorandum to

file summarizing history of plea negotiations with Ausa Lynn Neils," "Review JAA memo on plea negotiations," and "Review cooperating plea agreement from Ausa Neils; Review Federal Criminal code and discuss with JEC."   Exhibit V is a copy of a letter dated June 5, 2003 to George Vieira containing Carella, Byrne's statement for services rendered through May 31, 2003. Because George Vieira was the CEO of CVD and the bills were sent to CVD, it is not readily discernable from them that George Vieira personally was under criminal investigation as opposed to CVD.   Further, absent evidence that CVD provided copies on these invoices to Genske Mulder every month and evidence that Genske Mulder shared any information gleaned from these bills with Downey Brand, Exhibits N-V are not chargeable to Downey Brand. George Vieira's attorney had a confidential relationship and there is no evidence he ever communicated the particulars of the plea deal to Genske Mulder or Downey Brand before April 23, 2003.


     PLUDF J: If he had known that George Vieira was the subject or even potential subject of a criminal investigation, the Lopes would not have invested in Valley Gold or shipped their milk to Valley Gold. <u>Supporting Evidence</u>: Doc. 164, Decl. of Mariana Lopes, ¶ 36; Doc. 165, Decl. of Michael Lopes, ¶¶ 18-20.

                    *Court Ruling*: UNDISPUTED.

     PLUDF K: The Offering Memorandum stated that Land O' Lakes sold $103 million of cheese from the Gustine plant in 2001. <u>Supporting Evidence</u>: Doc. 172, Exh. 1, April 22, 2003 Offering

Memorandum, page 5: "During the two-year period that Land O'Lakes owned the Cheese Plant, the revenues of the Cheese Plant have been as follows: $103,000,000 in 2001, and $72,000,000 in 2002."; Doc. 172, Exh. L, April 21, 2003 redline version of Offering Memorandum, page 5 (same).

*Court Ruling*: UNDISPUTED.

PLUDF L: In reality, Land O' Lakes only sold $76.9 million of cheese from the Gustine plant in 2001.  It sold $25.9 million in the last five months of 2000, after purchasing the plant from Beatrice Cheese in July, 2000.  The $103 million figure in the Offering Memorandum was the combined total for both years (rounded up).  Supporting Evidence: Doc. 172, Exh. G, Land O'Lakes 2001 10K at pps. 32 and 37.

*Defendants' Response*: Exhibit G is described as "10K filing of Land O' Lakes for the 2001 calendar year" dated March 29, 2002.  Defendants object to Exhibit G on the grounds of relevance and authentication, and contend that the date of the document is for events 14 months before the sale of Valley Gold securities, and does not relate to gross sales for the Gustine cheese plant, the purpose for which it was offered.

*Court Ruling*: Exhibit G states in relevant part:

YEAR ENDED DECEMBER 31, 2001 COMPARED TO YEAR
ENDED DECEMBER 31, 2000

Net Sales

...

Dairy Foods.  Net sales in 2001 increased
$378.2 million, or 11.8%, to $3,572.4

31

million, compared to net sales of $3,194.2
million in 2000 ... [T]he Gustine, CA cheese
facility, acquired in July 2000, contributed
$76.9 million in incremental sales to our
dairy operations ....

...

YEAR ENDED DECEMBER 31, 2000 COMPARED TO YEAR
ENDED DECEMBER 31, 1999

Net Sales

...

Dairy Foods.  Net sales in 2000 decreased
$98.9 million, or 2.9%, compared to net sales
of $3,291.1 million in 1999 ... The
acquisition[] of ... the Gustine, CA cheese
plant contributed ... $25.9 million ... in
incremental sales to our dairy operations
....

The Offering Memorandum states in relevant part:

... During the approximate two-year period
that Land O' Lakes owned the Cheese Plant,
the revenues of the Cheese Plant have been as
follows: $103,000,000 in 2001, and
$72,000,000 in 2002.  The net profit and loss
for this same period has been as following: a
net operating profit in 2001 of $2,700,000
and a net operating loss of $3,100,000.  Land
O' Lakes also took a one-time charge of
$7,000,000 in 2002, resulting in a loss of
over $10,000,000 in 2002 ....

...

The Operating Projections and the financial
figures and projections contained in this
Memorandum were prepared by the Company's
accountants.  These financial documents,
figures and projections are based, in large
part, on financial documents provided to the
Company by Land O' Lakes and George Vieira.
The Company has reviewed certain financial
data prepared by Land O' Lakes regarding the
operation of the Cheese Plant.  The financial
documents provided to the Company by Land O'
Lakes were not prepared specifically for the

Company.  The financial documents were
prepared by Land O' Lakes for their own
internal use.  The Company has not obtained
an independent audit of Land O' Lakes'
operations to verify the accuracy of such
information.  Further, Land O' Lakes is a
corporation with facilities and operations in
numerous states and revenue in the billions
of dollars.  The Cheese Plant is just a
portion of Land O' Lakes overall business
operations.  As a result, the financial
information provided by Land O' Lakes to the
Company regarding the Cheese Plant may
reflect costs and savings that won't be
realized by the Company in its operations of
the Cheese Plant.  Further, after the Company
has had the opportunity to operate the Cheese
Plant for a period of time, the Company may
decide to adopt different accounting
practices which, if these practices had been
adopted by Land O' Lakes, would have changed
the financial information provided to the
Company.

(Doc. 142, Ex. 1).  DISPUTED.

PLUDF M: If the Lopes had known the historical performance

at the plant was dramatically overstated in the Offering

Memorandum, they would not have invested in Valley Gold.

Supporting Evidence:  Doc. 164, Decl. of Mariana Lopes, ¶ 35:

35.  We also would not have invested in
Valley Gold if we had known that Land O'Lakes
actual sales from the Gustine plant in 2001
were nowhere near $103 million, and that the
financial figures in the Offering Memorandum
were false.

*Court Ruling*: UNDISPUTED.

PLUDF N: The financial forecasts prepared by Genske Mulder

were based upon the plant processing 16.5 loads of milk per day

in July 2003, and 21 loads of milk per day by October 2003.  The

financial forecasts were based upon the plant processing 27 loads

33

of milk per day starting in January, 2004.  **Supporting Evidence**:
Doc. 172, Exh. B, "Valley Gold, LLC Financial Statement Forecasts
for the Months Ended May 31, 2003, June 30, 2003, July 31, 2003,
August 31, 2003, September 30, 2003, October 31, 2003, November
30, 2003, December 31, 2003 and the Years Ended December 31,
2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011 and 2012," dated
May 15, 2003, and provided to the "board of directors" of Valley
Gold.  Referring to Exhibit B, Plaintiffs assert:

> Divide the forecasted milk component of cost
> of goods sold by the forecast price of $9.98
> per hundredweight and multiple [sic] by 100
> to determine the total number of pounds of
> milk forecast for any period.  Divide by the
> number of days in the period, and divide by
> 50,000 to get the number of loads per day.

*Defendants' Response*: Defendants assert that
Plaintiffs have not testified that they received a copy of
Exhibit B before they decided to invest in Valley Gold and object
to Exhibit B on the grounds that it is not authenticated as
required by Rule 901(a), Federal Rules of Evidence.

*Court Ruling*: In the absence of evidence that
Plaintiffs reviewed Exhibit B before April 23, 2003, when they
invested in Valley Gold, Exhibit B is not relevant to Plaintiffs'
claims that misrepresentations in the Offering Memorandum caused
them to invest in Valley Gold as they could not have relied upon
it in making their Valley Gold investment decision.  However,
Exhibit B may be relevant to certain Plaintiffs' decisions to
enter into the milk for equity contracts.  As to the absence of
authentication, Defendants present no evidence that the copy

attached as Exhibit B is not authentic, i.e., what it purports to be.

PLUDF O: The Gustine plant's maximum capacity was only 15 to 20 loads of milk per day; and George Vieira never planned to run the plant at full capacity to avoid overtime expense.  <u>Supporting Evidence</u>: Doc. 172, Exh. W, Depo. of George Vieira at 378:13-, 379:13 in *Nunes v. Central Valley Dairymen*, Merced County Superior Court, Case No. 147653:

Q.  I want to stay with the Profaci verbal agreement.  He was going to buy seven loads per week or per day of cheese?

A.  Per week.

Q. ... So in order to produce seven loads per week, Valley Gold would have to take in about 50 loads of milk per week?

A.  Correct, sir.

Q.  And when it started, its capacity was 15 to 20 loads of milk per day?

A.  That's what the capacity of the plant was.

Q.  So if it had wanted to, it had the capacity to turn out three loads of cheese per day or about 21 loads per week?

A.  Yes.  It just didn't have the capital to do that, sir.

MR. KOHLS: Assuming a seven-day week?

MR. REILLY: Q.  Was the plant intended to operate seven days a week?

A.  We tried to run it five to six days a week, sir, because we didn't want to get into overtime.

Q.  So the plan at start-up of the company

35

was that you would run 40 t0 48 hours a week?

A.   Yeah.   No, it was six days that we were eventually going to try to run, six days of production a week.

PLUDF P: The financial projects and the Offering Memorandum stated that the Gustine plant would need $700,000 in upgrades, including $500,000 for ricotta manufacturing equipment.

Supporting Evidence: Doc. 172, Exh. 1, p. 5:

> In addition to regular maintenance and upkeep the Company must undertake as part of taking-over a company that had been winding down its operations, the Company proposes to upgrade the Cheese Plant by obtaining the equipment necessary to produce ricotta cheese.   It is estimated that the total cost of upgrades to the Cheese Plant shall be $700,000 which includes approximately $500,000 for the ricotta cheese production equipment.

Doc. 172, Exh. B, Genske Mulder's financial statement forecasts dated May 15, 2003.

> Court Ruling: Whether this projection is stated in Exh. B is not immediately apparent.   Plaintiffs do not refer to a page or line cite.   As noted above, Defendants object to Exhibit B.   DISPUTED.

PLUDF Q: George Vieira had concluded, however, that the plant needed $2.5 million to $3 million in equipment repairs not including any ricotta equipment.   Supporting Evidence: Doc. 172, Exh. W, Depo. of George Vieira at 362:6-364:20 in *Nunes v. Central Valley Dairymen*, Merced County Superior Court, Case No. 147653:

> MR. REILLY: Q.   My question was, as part of your due diligence, did you do an assessment

36

1  of what improvements if any would have to be
   made to the Gustine facility in order for it
2  to become a profitable cheese plant under the
   ownership of Valley Gold?
3
   A.  I mentioned that we'd probably have to
4  spend over $3 million upgrading it.

5  Q.  Did you do anything in writing with
   regards to what would be needed to be done to
6  that facility to make it operational?

7  A.  I don't remember, sir, if I did or
   didn't.
8
   Q.  Am I correct that it was your assessment
9  during your due diligence process that it
   would take up to $3 million to make the Land
10 of Lakes facility operational?

11 A.  Between 2 and a half and 3, yes, sir.
   That was my estimation.
12
   Q.  And what needed to be done to make it
13 operational?

14 A.  We needed to get the floors done, because
   that was an issue with the health department.
15 The brining system needed to be
   reconditioned.  The packaging equipment did
16 not - was having too much problems with
   leaks, you know, where the cheese would go
17 bad if we didn't redo the packaging
   equipment.  The refrigeration, there was a
18 couple of things.  We needed a blaster for
   the ricotta.  There's a few other things.
19 Oh, the double Os.  Some of the double Os had
   to be reconditioned where we made the cheese
20 in.

21    PLUDF R: Genske Mulder did not make any effort to compare

22 the forecasted figures with the historical plant operations,

23 plant capacity or industry standards.  Supporting Evidence: Doc.

24 172, Exh. I, Deposition of Paul Anema, pp. 47:8-48:6:

25    Q.  And on page six, you see the first full
      paragraph, the first sentence, 'The operating
26    projections and the financial figures and

                            37

projections contained in this memorandum were prepared by the company's accountants." [¶] That refers to Genske Mulder?

A.   I can't say that for certain.  I would assume that, but I didn't prepare the memorandum so I don't - I can't say what the mindset was.

Q.   In April of 2003, were you aware of any other accountants that were providing work to Valley Gold?

A.   No.

Q.   That paragraph also states that the company has reviewed certain financial data prepared by Land O'Lakes regarding the operation of the cheese plant. [¶] Were you aware that that financial data had been provided to the company prior to April 22, 2003?

A.   I don't have any recollection about any financial data from Land O'Lakes.

Q.   Do you recall at any point in time reading that sentence and saying I didn't know there were financial documents?

A.   No, I don't recall ever reading that.

*Court Ruling*: It is unclear whether this deposition testimony refers to the May 15, 2003 financial forecasts or some earlier document pertaining to the Offering Memorandum.  Nor is it clear that Mr. Anema's deposition testimony supports the facts as stated by Plaintiffs.  DISPUTED.

PLUDF S: The Lopes relied upon the financial forecasts prepared by Genske Mulder in investing in Valley Gold and in continuing to supply milk to Valley Gold.  <u>Supporting Evidence</u>: Doc. 164, Decl. of Mariana Lopes, ¶¶ 32-34:

32.  In late 2004 or early 2005, the new

38

Valley Gold management distributed another report, along with new financial forecasts. A true and correct copy of that report and its forecasts are attached to plaintiffs' exhibits as Exhibit D.

33.  It was the forecasts in Exhibit D that I was referring to in my deposition when I stated that I had received financial forecasts in 2005 after investing in Valley Gold.  That is clear from my deposition transcript, which notes that I was pointing at the document that had been marked as Exhibit 25.  Exhibit 25 to my deposition was the financial forecasts by Valley Gold's new management, not the Genske Mulder forecasts.

34.  I received the Genske Mulder forecasts much earlier, and had been told by members of Valley Gold's management committee that Genske Mulder had completed its analysis and determined that the plant would 'cash flow' and turn a profit back in April of 2003, before the offering documents were circulated to the investors.  Indeed, my husband and I would not have invested in Valley Gold if Genske Mulder (or another accounting firm that we trusted) had not reviewed the proposal and verified that the planned purchase and operation of the Gustine cheese plant was financially sound.  Genske Mulder had been CVD's accountants for over ten years, and my husband and I trusted them – as did all of the Valley Gold members.

Doc. 165, Decl. of Michael Lopes, ¶¶ 17, 18 and 21:

17.  My brother and I would not have invested in Valley Gold without the assurance that Genske Mulder had reviewed the proposal and verified that the planned purchase and operation of the Gustine cheese plant was financially sound.  Without an accounting review by accounts [sic] we trusted, I would also have told my father not to invest.  On dairy matters, my father is the expert, but when it comes to investments, handling money, bookkeeping and similar financial matters, he relies on me.

18.  My brother, father and I also would not

39

have invested in Valley Gold if we had known
that Land O' Lakes' actual sales from the
Gustine plant in 2001 were nowhere near $103
million, and that the financial figures in
the Offering Memorandum were false.

...

21.  If at any time, Valley Gold's
accountants and financial professionals had
explained that the fixed asset costs and
overhead expenses for Valley Gold were too
high to ever allow Valley Gold to realize a
profit, we would have stopped shipping milk
to Valley Gold.  But right up until the end,
George Vieira and Mr. Kern said that the
plant would soon turn the corner and start to
make money.

*Court Ruling*: This evidence raises the issue
whether Mrs. Lopes relied directly on the Genske Mulder financial
figures or on Valley Gold management's interpretation of those
figures.  Although tenuous, there remains an issue as to the
reliance of the Lopes on Genske Mulder's figures and their
accuracy.  DISPUTED.

   E.   <u>COMMERCIAL TRANSACTION</u>.

   At the September 21, 2010 hearing, Genske Mulder argued that
summary judgment as to the securities causes of action should be
granted on the ground that the investment in Valley Gold was not
a securities transaction but, rather, a COMMERCIAL transaction.
In its memorandum of points and authorities filed on September
14, 2009, (Doc. 116-1), in the course of arguing that Raymond
Lopes cannot prove the element of reasonable reliance in support
of the securities claim, stated in a footnote:

As discussed in *Reves v. Ernst & Young* (1990)
494 U.S. 56, not all interests labeled as

40

securities are 'securities' for the purposes of the Securities Exchange Act of 1934. *Reves* suggests that some securities sales were really commercial transactions and not passive investments. Mr. Lopes' evidence is that the Valley Gold and the 'Milk for Equity' transactions have all the appearances of a commercial transaction (Valley Gold was established and Mr. Lopes invested to have a place [customer] for his milk ... Mr. Lopes exchanged 'Milk for Equity' to receive 'equity' in Valley Gold in lieu of receiving nothing.) These transactions have all the indicia of a commercial transaction in contrast to investment transactions.

In *Reves*, a 23,000-member agricultural cooperative sold promissory notes payable on demand by the holder in order to raise money to support the cooperative's general business operations. Although the notes were uncollateralized and uninsured, they paid a variable rate of interest that was adjusted monthly to keep it higher than the rate paid by local financial institutions. The notes were not traded on an exchange, but they were offered over an extended period to both members and nonmembers of the cooperative. Advertisements for the notes characterized them as investments. After the cooperative filed for bankruptcy, a class of noteholders filed suit under Section 10(b) of the Securities Exchange Act of 1934 against the accounting firm that had audited the cooperative's financial statements. The District Court in *Reves* ruled for plaintiffs, but the Eighth Circuit reversed, holding that the demand notes were not securities within the meaning of the 1934 Act because the demand notes did not satisfy the elements of the test developed in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

1   The Supreme Court in *Reves* reversed the Eighth Circuit, holding

2   in pertinent part that, under the circumstances, the demand notes

3   fell under the "note" category of instruments that are securities

4   within the meaning of Section 3(a)(10) because the notes did not

5   closely resemble any categories of instruments that are not

6   properly viewed as securities, the transaction was most naturally

7   conceived by both the sellers and the purchasers as an investment

8   in a business enterprise rather than as a purely commercial or

9   consumer transaction, there was common trading of the notes, it

10  would have been reasonable for a prospective purchaser to

11  perceive the notes as investments, and there was no risk-reducing

12  factor to suggest that the notes were not securities, since the

13  notes were uncollateralized and unsecured and would escape

14  federal regulation entirely if federal securities laws did not

15  apply to them.   The Supreme Court stated:

16              ... If the note is exchanged to facilitate
                the purchase and sale of a minor asset or
17              consumer good, to correct for the seller's
                cash-flow difficulties, or to advance some
18              other commercial or consumer purpose, on the
                other hand, the note is less sensibly
19              described as a 'security.'

20  494 U.S. at 66.

21      15 U.S.C. § 78c(a)(10) defines "security" to include:

22              any note, stock, treasury stock, security
                future, bond, debenture, certificate of
23              interest or participation in any profit-
                sharing agreement ..., any collateral-trust
24              certificate, preorganization certificate or
                subscription, transferrable share, investment
25              contract, voting-trust certificate,
                certificate of deposit for a security, any
26              put, call, straddle, option, or privilege on

                            42

1
2
3
4
5

> any security, certificate of deposit, or
> group or index of securities (including any
> interest therein or based on the value
> thereof), ... or in general, any instrument
> commonly known as a 'security'; or any
> certificate of interest in or participation
> in, temporary or interim certificate for,
> receipt for, or warrant or right to subscribe
> to or purchase any of the foregoing ....

6   The Valley Gold Offering Memorandum refers to the membership

7   interests in Valley Gold as "securities" and further provided in

8   pertinent part:

9
10
11
12

> THESE SECURITIES ARE SUBJECT TO RESTRICTIONS
> ON TRANSFERABILITY AND RESALE AND MAY NOT BE
> TRANSFERRED OR RESOLD EXCEPT AS PERMITTED
> UNDER THE SECURITIES ACT OF 1933, AS AMENDED
> ... AND APPLICABLE STATE SECURITIES LAWS,
> PURSUANT TO REGISTRATION OR EXEMPTION
> THEREFROM.

13   The *Reves* dicta upon which Genske Mulder relies is discussing the

14   characterization of a note as a security, not the acquisition of

15   a membership interest in a company through a private offering.

16   Genske Mulder cites no authority that the motive of a person

17   acquiring the membership interest is relevant to a determination

18   of that membership interest as a security and provides successful

19   authority that a membership interest that depends upon the

20   business management of the enterprise to realize a return on the

21   capital (assets) committed to the enterprise, is not a security.

22   As the *Reves* Court explained:

23
24
25
26

> The fundamental purpose undergirding the
> Securities Acts is 'to eliminate serious
> abuses in a largely unregulated securities
> market.' ... In defining the scope of the
> market that it wished to regulate, Congress
> painted with a broad brush.  It recognized
> the virtually limitless scope of human

43

ingenuity, especially in the creation 'of
countless and variable schemes devised by
those who seek the use of the money of others
on the promise of profits,' ... and
determined that the best way to achieve its
goal of protecting investors was 'to define
"the term 'security' in sufficiently broad
and general terms so as to include within
that definition the many types of instruments
that in our commercial world would fall
within the ordinary concept of a security."'
... Congress therefore did not attempt
precisely to cabin the scope of the
Securities Acts.  Rather, it enacted a
definition of 'security' sufficiently broad
to encompass any instrument that might be
sold as an investment.

494 U.S. at 60-61.   Here, Plaintiff's essential claim is that

Valley Gold was undercapitalized and, in return for equity

interests in Valley Gold, the investors would provide additional

capital funding for Valley Gold.  Return of and on this capital

was dependent on Valley Gold's success.  Plaintiff's milk, an

assert, was delivered to CVD which in turn sold it to Valley Gold

to make into cheese.  Plaintiff's payment for the milk came from

CVD, not directly from Valley Gold.  Therefore, summary judgment

on the ground that the membership interest acquired by Plaintiff

in Valley Gold in April 2003 was a commercial transaction is

DENIED.

As to the equity interests acquired by Plaintiff in

September 2003 pursuant to the "milk for equity" transaction, the

record establishes that Plaintiff acquired additional membership

interests in Valley Gold in lieu of payment by CVD for his milk,

because Valley Gold was unable to fully pay CVD for the milk

shipped to Valley Gold.  Nonetheless, given the broad definition

of a security and the absence of authority that the motive of an acquirer of a membership interest in a company is at all relevant, summary judgment on the ground that the membership interests in Valley Gold acquired by Plaintiff pursuant to the "milk for equity" transaction is DENIED based on Plaintiff's theory that CVD and Valley Gold through inaccurate financial statements and information induced the transfer of assets in the form of milk to a business venture, the success of which depended on the management efforts and business acumen of CVD and Valley Gold managements, and Plaintiff's return depended upon such efforts of others over which Plaintiff had no control.

F.   **FIFTH CAUSE OF ACTION**.

The Fifth Cause of Action for violation of California Corporations Code § 25400(d).[3]

The Court previously dismissed without leave to amend Plaintiffs' Third Cause of Action in the First Amended Complaint

---

[3]California Corporations Code § 25400(d) makes it unlawful for any person, directly or indirectly:

> If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false and misleading.

45

1  for violation of Section 12(2) of the Securities Act, 15 U.S.C. §

2  77*l*(a)(2), against Downey Brand and Genske Mulder on the ground

3  that neither were "sellers" within the meaning of the Act.  *Lopes*

4  *v. Vieira*, 543 F.Supp.2d 1149, 1170-1171 (E.D.Cal.2008):

> Downey notes that Paragraph 114 of the FAC
> alleges that Downey, Genske and Cary "are
> sued as joint authors of the Offering
> Memorandum and/or business plan, with direct
> knowledge of at least three primary omissions
> or misstatements ...."  Downey contends that
> this allegation negates any liability under
> Section 12(2).  Downey cites *Moore v. Kayport
> Package Exp., Inc.*, 885 F.2d 531, 536-537 (9th
> Cir.1989):

> > Under the *Pinter* standard, we now
> > turn to a review of the specific
> > allegations in the investors'
> > second amended complaint.  First,
> > they alleged the accountants
> > drafted financial documents and
> > allowed Celini and Binder to use
> > these documents in selling the
> > unregistered securities.  Second,
> > they alleged that the lawyers, each
> > of whom was retained by the
> > principal defendants, drafted or
> > approved the drafting of false or
> > misleading prospectuses and
> > financial documents, and directed
> > the issuance of the securities.
> > Specifically, the investors alleged
> > that (1) all the lawyers
> > participated in meetings where the
> > prospectuses and other promotional
> > materials were drafted; (2) lawyers
> > Ellis and Uhrman gave advice and
> > counsel to the owner defendants in
> > preparing prospectuses and other
> > promotional materials, (3) lawyer
> > Minkow drafted tax opinions and
> > allowed these opinions to be
> > included in various promotional
> > materials, and (4) lawyer Spolin
> > allowed his name to be used on
> > promotional materials as general
> > counsel to CCA.

46

Based on *Pinter*, we conclude that the investors failed to state a claim under section 12(2) against the accountant and lawyer defendants.  Under the *Pinter* analysis, these professionals are only subject to section 12(2) liability if they solicited the purchases and were motivated, at least in part, by financial gain. *Pinter*, 108 S.Ct. at 2079.  Here, the investors did not allege that the lawyers or accountants played any role at all in soliciting the purchases.  Rather, the investors alleged that these defendants performed their professional services in their respective capacities as accountants and lawyers.  As the Court stated in *Pinter*, '[t]he buyer does not, in any meaningful sense, "purchas[e] the security from" such a person.' *Id.* at 2081 ....

The district court did not err in dismissing the section 12(2) claim against the accountant and lawyer defendants.

Although Paragraph 91 of the FAC alleges that Downey and Genske were "sellers", there are no allegations that either of these defendants solicited the purchases of the securities.  Although Plaintiffs asserted at the hearing that these Defendants are sellers because the FAC alleges a "collaborative effort", the specific allegations against these Defendants pertain to the preparation of the business plan and the Offering Memorandum, not the solicitation of investments.  Drafting documents is merely the "performance of professional services" and receiving part of the consideration is irrelevant to the issue of solicitation.  *See Rocchio v. Eagle Mission, Inc.*, 1991 WL 51193 (9th Cir.1993).

Defendants' motion to dismiss the Third Cause of Action to the extent it alleges a violation of any [sic] 12(2) of the

47

1             **Securities Act, 15 U.S.C. § 77*l*(a)(2) is
2             GRANTED WITHOUT LEAVE TO AMEND.  Plaintiffs
              have had two opportunities to allege seller
3             liability against Genske and Downey and have
              been unable to do so.**

4      In *Kamen v. Lindly*, 94 Cal.App.4th 197, 206 (2001),  the

5  Court of Appeals held:

6             **In light of the vast majority of federal
              cases that have construed section 9 of the
7             Securities Exchange Act of 1934 and
              Corporations Code sections 25400 and 25500,
8             we conclude that civil liability pursuant to
              Corporations Code section 25500 applies only
9             to a defendant who is either a person selling
              or offering to sell or buying or offering to
10            buy a security.**

11 *See also Murphy v. BDO Seidman, LLP,* 113 Cal.App.4th 687, 705-706

12 (2003); *Openwave Systems, Inc. v. Fuld*, 2009 WL 1622164 at *9

13 (N.D.Cal., June 6, 2009).

14     At the September 21, 2010 hearing, Plaintiff argued that

15 Defendants are sellers within in the meaning of Section 25400(d)

16 because each was paid for their professional services in the

17 preparation of the Offering Memorandum and because Genske Mulder

18 was paid for its professional services in connection with the

19 "milk for equity" transaction.  However, for the reasons

20 articulated in the Order dismissing the Third Cause of Action of

21 the First Amended Complaint, *supra*, Defendants were not "sellers"

22 within the meaning of Section 25400(d); they did not solicit or

23 play any role in inducing Plaintiff to purchase a security.

24     Paragraph 131 of the Fifth Cause of Action alleges that

25 "[a]s a result of defendants' violations of the California

26 Securities Laws, including the provisions of Corporations Code

section 25400(d), Plaintiffs were induced to exchange milk for worthless equity interests in CVD and have incurred damages of several million dollars."   At the hearing on the motions for summary judgment on December 21, 2009, Plaintiffs conceded that an omission or failure to disclose does not violate California Corporations Code § 25400(d), only an affirmative misrepresentation does.   However, at the hearing on September 21, 2010, Plaintiff requested leave to file a supplemental brief addressing whether an omission can support such a claim. Plaintiff's supplemental brief was filed on September 29, 2010. Because, as ruled above, Plaintiff cannot proceed against Defendants as to the Fifth Cause of Action, the Court does not address whether an omission can support a claim for violation of California Corporations Code § 25400(d).

Summary judgment for the moving Defendants on the Fifth Cause of Action is GRANTED.

G.   <u>DAMAGES FOR UNPAID MILK</u>.

Defendants move for summary judgment as to the claims in the Second Amended Complaint for damages for milk marketed to Valley Gold by CVD for which Raymond Lopes was not paid by CVD.

Defendants argue that CVD may have a claim against Valley Gold for breach of contract, contending that CVD is the only party with standing to sue for the loss.   Defendants cite *Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 107 (1968)(discussing the difference between a shareholder's derivative action and a shareholder's suit against a corporation in his or her individual

49

capacity).  Because the Court dismissed the derivative claims against CVD, Raymond Lopes does not have standing to recover CVD damages from Downey Brand and Genske Mulder resulting from Valley Gold's failure to pay for milk delivered by CVD to Valley Gold.

Defendants further argue that Raymond Lopes cannot recover for the unpaid milk as consequential damages because Raymond Lopes cannot establish loss causation, i.e., that these damages were caused by the alleged failure to disclose.  Defendants contend that damages in an action under California Corporations Code § 25400(d) are limited by California Corporations Code § 25500:

> Any person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to any other person who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter as a result of such act or transaction.  Such damages shall be the difference between the price at which such other person purchased or sold securities and the market value which such securities would have had at the time of his purchase or sale in the absence of such act or transaction, plus interest at the legal rate.

Defendants argue there is no logical causal connection between the Offering Memorandum's omission of facts about George Vieira's plea negotiations in the federal criminal prosecution and CVD's failure to pay Raymond Lopes for his milk, especially when Raymond Lopes agreed to forgo payments even after he learned of Valley Gold's financial difficulties.

Defendants cite *Ambassador Hotel Co., Ltd. v. Wei-Chuan*

50

*Investment,* 189 F.3d 1017, 1030 (9th Cir.1999):

> The usual measure of damages for securities
> fraud claims under Rule 10b-5 is out-of-
> pocket loss; that is, the difference between
> the value of what the plaintiff gave up and
> the value of what the plaintiff received.
> Consequential damages may also be awarded if
> proved with sufficient certainty [to have
> resulted from the fraud.]

Downey Brand refers to *Madigan, Inc. v. Goodman*, 498 F.2d 233, 239 (7th Cir.1974) and *Grubb v. Federal Deposit Insurance Corp.*, 868 F.2d 1151, 1166 (10th Cir.1989).  In *Madigan, Inc.*, the Seventh Circuit held:

> We agree that if plaintiffs can establish the
> requisite causal nexis at trial, they are
> entitled to recover out-of-pocket
> consequential damages suffered as a result of
> holding Fidelity stock.  We reject the
> contention that consequential damages are
> recoverable only if incurred while the stock
> was held.  When a securities transaction
> causes plaintiffs to wind up with less money
> than they began with, there is no reason in
> the policy of the securities laws why their
> right to recovery should depend on exactly
> when the loss was realized or on whether the
> loss was fully reflected in the securities'
> price.
>
> Accordingly, capital contributions and other
> expenses to save Fidelity may be recoverable.
> Plaintiffs must show that each expenditure
> for which recovery is sought was a reasonable
> effort to, e.g., minimize plaintiffs' losses,
> or fulfill a fiduciary obligation to Fidelity
> policyholders, or comply with the
> requirements of regulatory agencies.  They
> must also show that the danger from which
> Fidelity was being saved was the pre-existing
> insolvency concealed by defendants, and that
> but for defendants' misrepresentations,
> plaintiffs would not have made these
> expenditures.

In *Grubb,* the Eighth Circuit, relying on *Madigan, Inc.,* refused

to allow as consequential damages capital contributions made after the party knew of the corporation's financial difficulties. Downey Brand also cites *In re Crazy Eddie Securities Litigation*, 948 F.Supp. 1154, 1174 (E.D.N.Y.1996), which disallowed as consequential damages money paid to vendors for goods because those payments were made long after the payor became aware of the adverse condition of the company and were "too attenuated from Antar's fraud to be recoverable as consequential damages."

Relying on these cases, Defendants argue that Raymond Lopes' claim is even more attenuated:

> They sent milk to CVD, which continued to sell milk to Valley Gold even after the Lopes (and CVD) knew Valley Gold was having financial difficulties and knew CVD producers were not being paid for their milk in a timely fashion as a result.  The relationship between any failure to disclose facts about Vieira in the Valley Gold Offering and CVD's later failure to pay the Lopes for milk (assuming there could be some relationship) is simply too remote and attenuated.

Downey Brand argues that, because of the remoteness of the alleged damage from the alleged injury-causing event and the speculative nature of the harm, damages for unpaid milk are not available under common law fraud or negligence theories.  Downey Brand cites *Agnew v. Parks*, 172 Cal.App.2d 756, 768 (1959) ("Damage to be subject to a proper award must be such as follows the act complained of as a legal certainty [and cannot be] too remote, speculative and uncertain.")

Plaintiff did not respond to these grounds for summary judgment in his opposition brief.  At the September 21, 2010

hearing, Plaintiff argued that, relying on Mr. Kern's declaration, it was necessary that Plaintiff continue providing his milk to CVD for sale to Valley Gold in order for Valley Gold's continued survival.  Plaintiff argued that, because he did not get paid for the milk he shipped to CVD for sale by CVD to Valley Gold pursuant to a supply agreement between CVD and Valley Gold, he has standing to seek damages from the moving Defendants for his unpaid milk.

Even if Plaintiff has standing to seek damages for unpaid milk from the moving Defendants, the case authority cited by Defendants establishes that he cannot recover these damages pursuant to the Fourth and Fifth Causes of Action.  Here, the record is established that Valley Gold began being late in paying CVD for milk in September 2003 and that Plaintiff continued to ship his milk to CVD notwithstanding his knowledge that Valley Gold was unable, at least in part, to make timely payments to CVD.

Defendants' motion for summary judgment on these grounds is GRANTED.

<u>CONCLUSION</u>

For the reasons stated:

1.  The motions for summary judgment by Downey Brand and Genske Mulder are GRANTED IN PART, DENIED IN PART and DEFERRED IN PART;

2.  Counsel for Defendants shall prepare and lodge a form of order consistent with this Memorandum Decision within five (5)

1    **court days following service of this Memorandum Decision.**

2        IT IS SO ORDERED.

3    **Dated:   September 30, 2010          /s/ Oliver W. Wanger**
                                    UNITED STATES DISTRICT JUDGE