IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUEL LOPES, et al., | No. CV-F-06-1243 OWW/SMS |
| | |
| | MEMORANDUM DECISION AND |
| | ORDER GRANTING PLAINTIFFS' |
| Plaintiffs, | MOTION FOR LEAVE TO MODIFY |
| | SCHEDULING ORDER AND TO FILE |
| vs. | THIRD AMENDED COMPLAINT |
| | (Doc. 304) |
| | |
| GEORGE VIEIRA, et al., | |
| | |
| Defendants. | |
| | |

Before the Court is Plaintiffs' motion for leave to modify the Scheduling Order and to file a Third Amended Complaint.

Defendants Downey Brand LLP ("Downey Brand") and Genske Mulder & Company ("Genske Mulder") filed motions for summary judgment against the Plaintiffs in this action in late 2009.  The motions were heard on December 21, 2009.  In opposing these motions for summary judgment, Plaintiffs relied on evidence of a Valley Gold Offering Memorandum marked "draft" which was allegedly provided by Tim Brasil to Plaintiffs on April 22, 2004. Plaintiffs asserted that the April 21, 2004 draft of the Offering

1

Memorandum does not disclose that George Vieira was the subject of a criminal investigation by the United States in New Jersey. The section of the Offering detailing "Risks Specific to Company," provided to Plaintiffs on April 23, 2004 states:

> **Dependency on Key Personnel**
>
> ...
>
> **Mr. Vieira, one of the principal organizers of the Company and this transaction is currently the chief executive officer of CVD. George Vieira, was, [sic] for a short period of time, an officer of Supreme West, Inc. ('Supreme West'). Suprema West is a subsidiary of Supreme Specialties, Inc. ('Suprema'). Suprema and Suprema West are in bankruptcy. Suprema is also the subject of an investigation being conducted by the Securities and Exchange Commission and the U.S. Attorney's Office. Assertions have been made that financial data for Suprema was misrepresented. Mr. Vieira has been contacted by the U.S. Attorney's Office and may be a subject of this investigation. No formal charges have been brought against Mr. Vieira ....**

Defendants complained that it was not until Plaintiffs' opposition to their motions for summary judgment were filed, that Plaintiffs contended that the draft Offering Memorandum provided to them did not disclose the criminal investigation of George Vieira. In addition, Defendants complained that Plaintiffs seek to withstand summary judgment on the ground that they relied on statements in the Offering Memorandum about the profitability of the cheese plant while it was owned by Land O' Lakes, low estimates of the expense of refurbishing the plant, and financial forecasts generated by Genske Mulder, none of which are alleged

1  in the Second Amended Complaint.  Because Plaintiffs did not

2  allege these claims their Second Amended Complaint, Defendants

3  argued that Plaintiffs cannot defeat summary judgment on this

4  ground.

5      After the motions for summary judgment were taken under

6  submission, two of the Plaintiffs died, necessitating

7  substitutions and amended motions for summary judgment.  At the

8  hearing on September 21, 2010, Plaintiffs were ordered to file a

9  motion for leave to amend the Scheduling Order and to file a

10 Third Amended Complaint.  Plaintiffs timely complied with this

11 Order and have lodged a proposed Third Amended Complaint ("TAC").

12     Here, the First Amended Scheduling Conference Order filed on

13 July 28, 2008, (Doc. 86), states:

14        IV.  Orders Re Amendments to Pleadings.

15        1.  The pleadings are settled.  The
   Defendants designated as Does 1-25,
16        inclusive, are DISMISSED without prejudice.

17     The proposed TAC includes the following allegations

18 (highlighted in blue) that were not alleged in the Second Amended

19 Complaint:

20        62. During the period from March 25, 2003
   through May 1, 2003, at the PROMOTERS'
21        direction and with the substantial
   participation, assistance and input from
22        DOWNEY BRAND and GENSKE MULDER, six versions
   of the Offering Memorandum were prepared,
23        designated in the lower left hand corner with
   control numbers from 509121.1 through
24        509121.6, two versions of the Subscription
   Agreement were prepared, designated in the
25        lower left hand corner with the control
   numbers 512253.1 and 512253.2, and four
26        primary versions of the Operating Agreement

were prepared, designated in the lower left hand corner with the words "Draft Dated" followed by a the numerical designation for a date. For example, the third iteration of the Operating Agreement included a footer in the lower left hand corner of each page stating: "Draft Dated 4/21/2003." The fourth and final version of the Operating Agreement included in the lower left hand corner the designation: "Draft Dated 4/22/2003."

63. At some point between April 22, 2003 and May 1, 2003, the footer on the "final" version of the Operating Agreement was changed to read "5/01/03 #511731.4" and the signature pages were changed. DOWNEY BRAND did not, however, designate this slightly revised document as a new version (version five), keeping instead the designation of the document as being version four.

64. On ~~or about~~ April 22, 2003, the PROMOTERS ~~for the first time~~ caused either the fourth or fifth version of the Offering Memorandum ~~attached hereto as Exhibit B, together with accompanying subscription agreements~~, to be delivered to Plaintiffs ~~and other members of CVD.~~, together with the second version of the Subscription Agreement and the third version of the Operating Agreement.

65. The PROMOTERS informed Plaintiffs Manual and Mariana Lopes that the deal would collapse unless ~~the~~their subscription agreements ~~and investment checks were~~was executed and returned ~~that same~~the next day, April 22, 2003~~23~~, 2003. Several other investors were similarly told that their subscription agreements needed to be turned in on April 23, 2003. On the basis of the documentary records produced in this litigation, Plaintiffs are informed and believe, and thereon allege, that the PROMOTERS needed to document significant investor commitments for the Bank of Stockton, as part of the PROMOTERS request for bank approval for CVD to participate as an investor in Valley Gold, LLC. That approval was requested on April 23, 2003.

66. Plaintiffs signed the subscription

4

agreements and delivered checks totaling $534,000 as their initial investment in VALLEY GOLD ~~that same day, April 22~~. Manual and Mariana Lopes submitted their signed subscription agreement on April 23, 2003.

67. On or about September 22, 2003, the PROMOTERS solicited additional investments by Plaintiffs in VALLEY GOLD, in the form of a swap of additional equity in VALLEY GOLD in exchange for supplying milk to VALLEY GOLD. At the time that the PROMOTERS solicited this additional "milk for equity" investment in VALLEY GOLD, no Offering Memorandum was supplied to Plaintiffs. However, between April 22, 2003 and September 22, 2003, copies of the business plan that is attached hereto as Exhibit A, or similar iterations of that business plan, were ~~made available~~provided to Plaintiffs, as were the financial projections that are attached hereto as Exhibit C.

...

74. On April 18, 2003, DOWNEY BRAND faxed version four of the Offering Memorandum using the interstate instrumentality of the telephone lines to investors Joe Nunes, Evaristo Vaz, Joe Machado, Dennis Nunes, Jose Homen and Frank Borba, with instructions to read the document carefully over the weekend, in preparation for a meeting at DOWNEY BRAND's Stockton office on Monday, April 21, 2003. A true and correct copy of version four of the Offering Memorandum is attached hereto as Exhibit D.

75. DOWNEY BRAND, GENSKE-MULDER and CARY all met with the PROMOTERS ~~that same day, April 21, 2003~~, and and Joe Nunes, Everisto Vaz, Joe Machado, Tim Brasil, Dennis Nunes, Jose Homen and Frank Borba on April 21, 2003 at 1:30 pm. The attendees reached the meeting by using the interstate highway system. Between April 18, 2003 and April 21, 2003, DOWNEY BRAND further revised the Offering Memorandum, creating version 5 of that document. A true and correct redline of version 5, showing the changes from version 4, is attached hereto as Exhibit E.

76. At that ~~evening and the next morning~~, April 2221, 2003, ~~finalized~~ meeting, the attorneys from DOWNEY BRAND discussed ~~the disclosures and other~~ terms of the Offering Memorandum. in great detail, and secured the approval of the management committee of Valley Gold to approve the Offering Memorandum and direct the company's officers to deliver it and the subscription agreements to the potential investors in Valley Gold. Although the attorneys at DOWNEY BRAND had known since April 11, 2003 that George Vieira was the potential subject of a criminal investigation into Suprema Specialties, and although they had already drafted disclosure language on the issue which they read to George Vieira's criminal defense attorney on April 11, 2003, and although DOWNEY BRAND had prepared both versions 4 and 5 of the Offering Memorandum after April 11, 2003, DOWNEY BRAND did not disclose or discuss the issue during the April 21, 2003 meeting, and did not include the disclosure in either version 4 or version 5 of the Offering Memorandum.

77. ~~On April 22, 2003~~Rather, the disclosure language which appears in the "final" version of the Offering Memorandum ~~and subscription agreements were delivered~~was added by DOWNEY BRAND on April 22, 2003. Thereafter, at approximately 2:09 pm on April 22, 2003, Patty Bernard from DOWNEY BRAND used the interstate instrumentality of the Internet ~~to Plaintiffs and other members of CVD for execution and return that day. Plaintiff MANUAL LOPES showed the Offering Memorandum~~e-mail to ~~Susan Tomsha-Miguel, who provided tax and accounting services to the LOPES DAIRY, and she telephoned one or more of the Defendants around noon with some questions about the financial projections in the~~ Paul Anema at GENSKE-MULDER both Word and WordPerfect files containing version six of the Offering Memorandum. ~~Shortly afterward, Plaintiffs delivered signed subscription agreements and checks,~~ version 4 of the Operating Agreement and version 2 of the Subscription Agreement. She separately faxed resumes of Reyad Mahmoud and Jose Fernandes, using the interstate instrumentality of the

1        ~~interstate highway system.~~ telephone lines.

2        ...

3        FOURTH CAUSE OF ACTION
         Securities Fraud: Securities Act of 1934

4
5        112. Plaintiffs incorporate by reference as
         though set forth in full the allegations of
6        paragraphs 1 through 111-11, above.

7        113. This is a civil cause of action asserted
         by Plaintiffs (except Maria Machado and
8        Antonio Estevam) individually and on behalf
         of CVD against GEORGE VIEIRA, CARY, GENSKE-
9        MULDER, DOWNEY BRAND, and DOES 21 through 40,
         inclusive.

10       114. The business plan and the Offering
         Memorandum and the related materials and
11       communications supplied by these defendants
         to Plaintiffs, including the materials used
12       to induce plaintiffs to enter into the "milk
         for equity" contracts contained, served as
13       manipulative and deceptive devices and
         contrivances intended to contravene the rules
14       and regulations of the Securities and
         Exchange Commission as necessary and
15       appropriate for the protection of investors,
         and thus violated section 10(b) of the
16       Securities Exchange Act of 1934 (15 U.S.C.
         §78j(b)) by and through the use of the
17       instrumentalities of interstate commerce, as
         set forth in paragraphs 68-78, supra.

18
19       115. The interests procured from Plaintiffs
         in the form of membership interests in VALLEY
20       GOLD -- a limited liability company formed
         under California law – constituted securities
21       within the meaning of the Securities Act of
         1933 and the Securities Exchange Act of 1934
22       because Plaintiffs were induced to invest
         their money (and later their rights to
23       payment for milk) into a common enterprise
         from which they expected to earn profits
24       through the efforts and acumen of others,
         namely GEORGE VIEIRA and the other officers
25       and employees of VALLEY GOLD.

26       116. In violation of the Securities Exchange
         Act of 1934, Exchange Act Rule 10b-5 enacted

                              7

under the regulatory authority of the Securities and Exchange Commission and the Sarbanes-Oxley Act of 2002, the business plan and the Offering Memorandum and the related materials and communications supplied by these defendants to Plaintiffs, contained material misrepresentations and omissions of material facts that caused the communications to Plaintiffs to be materially misleading, and constituted a fraudulent and deceitful manipulation and contrivance of the regulatory requirements enacted under the Federal Securities laws for the protection of parties like Plaintiffs.

~~Among other material misrepresentations and material omissions of material facts, these materials:~~

**SUPPRESSION OF THE FINAL VERSION OF THE OFFERING MEMORANDUM**

117. On the afternoon of April 22, 2003, DOWNEY BRAND sent an e-mail to Paul Anema at GENSKE-MULDER with electronic versions of the Offering Memorandum (version six), the Subscription Agreement (version two) and the Operating Agreement for Valley Gold (version four). Paul Anema, however, did not deliver any of these materials to Plaintiffs.

118. Rather, earlier on April 22, 2003, Tim Brasil, one of GEORGE VIEIRA's friends and a member of Valley Gold's management committee, distributed investment packets to Manual and Mariana Lopes, Joseph Lopes and Raymond Lopes. These investment packets consisted of either version 4 or version 5 of the Offering Memorandum, version 2 of the Subscription Agreement, and version 3 of the Operating Agreement for Valley Gold.

119. Manual and Mariana Lopes were instructed to sign the Subscription Agreement and return the packet to CARY the next day, which they did. In addition, a meeting was scheduled for all of the investors, on or about May 1, 2003 at the Gustine factory. Those Plaintiffs who had not previously turned in their investment packets to CARY were instructed that after May 1, 2003, the investment would close.

Accordingly, Raymond Lopes and Joseph and Michael Lopes took the signed Subscription Agreements and the other investment documents to the May 1, 2003 meeting and gave them to CARY and/or members of the Valley Gold management committee.

120. At that May 1, 2003 meeting, CARY had new documents that he said were not materially different than what had previously been distributed. The Plaintiffs were all instructed to pick up the new documents, sign them, and turn them back in. The documents from May 1, 2003 may have consisted solely of the Operating Agreement, which DOWNEY BRAND had revised that day, or it may have included the final Offering Memorandum as well. In either event, Plaintiffs were only given access to the documents long enough to pick them up, find a space at the table in order to sign the documents, and to then turn them in.

121. At the conclusion of the May 1, 2003 meeting, CARY collected *all* of the materials that had been previously distributed.

122. Approximately two months later, after the cheese plant was operating and long after the initial investments were completed, the Plaintiffs received bound investment packets for their records, including the final, fully executed Operating Agreement, the final transfer documents from the sale of the factory from Land O' Lakes to Valley Gold, and the final Offering Memorandum, among other items. Plaintiffs had no reason to suspect that the Offering Memorandum in this packet was different than what they had previously received.

123. The only version of the Offering Memorandum that Plaintiffs were given an opportunity to read included *no* disclosures at all about the criminal investigation into Suprema Specialties and the investigation into George Vieira.

124. DOWNEY BRAND intentionally and materially assisted the PROMOTERS in concealing from Plaintiffs the information

9

about the criminal investigation into George
Vieira.  DOWNEY BRAND did so by, among other
things: (a) waiting until April 22, 2003 to
insert the disclosure into the final version
of the Offering Memorandum that by design,
Plaintiffs were not given any opportunity to
review; (b) by intentionally failing to
discuss the issue at the April 21, 2003
meeting with the management committee members
for Valley Gold; (c) by omitting the
disclosure from the Offering Memorandum that
was faxed to the management committee members
on April 18, 2003, with a cover letter that
indicated that all substantive information
for the Offering Memorandum was included with
that draft; (d) by failing to maintain
document control over versions four and five
of the Offering Memorandum; (e) by
transmitting even the final version of the
Offering Memorandum in electronic format, in
which it could easily and surreptitiously be
changed; and (f) by requiring that Plaintiffs
surrender all of the documents that they had
been given to review.

OTHER MISSTATEMENTS AND OMISSIONS

125. Even the final version of the Offering
Memorandum, which Plaintiffs were not given
the opportunity to read, included materially
misleading provisions; these materials:

a. Stressed that VALLEY GOLD's success was
dependent upon the unique "experience and
abilities of Mr. [George] Vieira [and two
associates]" without disclosing that Mr.
Vieira's unique experience was not formed in
the successful production of cheese products,
but rather in the concoction of fictitious
cheese products and cheese diluted with
starch fillers manufactured not for
commercial success with consumers, but rather
to inflate the apparent inventory value and
sales volume of a by then bankrupt cheese
manufacturer, for the sole purpose of
perpetuating a hundreds of million dollar
securities fraud on securities investors
situated similarly to Plaintiffs;

b. Disclosed that Mr. Vieira had been
contacted by the U.S. Attorney's Office as

10

part of its investigation into the bankruptcy of Suprema Specialties, Inc., without disclosing that GEORGE VIEIRA was already actively involved in negotiations with the United States Attorney's Office to plead guilty to securities and bank fraud;

Included financial projections supplied by GENSKE-MULDER that vastly exceeded the performance of any startup cheese manufacturer, with the possible exception of Suprema Specialties, Inc., whose dramatic reported growth was by then known in the financial community (but not to Plaintiffs) to have been the result of smoke, mirrors and a fraudulent Round-Tripping scheme orchestrated by a criminal enterprise headquartered in New Jersey.

c. Included financial figures for the historical operation of the cheese facility that were false, combining 18 months of operating data from Land O'Lakes and reporting it as having been achieved in the 2001 calendar year;

d. Falsely stated that the Land O' Lakes financial documents had been reviewed by GENSKE-MULDER; and

e. Falsely stated that the other financial projections and figures in the Offering Memorandum had been provided by GENSKE-MULDER.

126. The final version of the Offering Memorandum provided a brief disclosure concerning Suprema Specialties' bankruptcy, but did so in a way to minimize the importance of the information and in a manner that created the impression that GEORGE VIEIRA's sole involvement with Suprema Specialties occurred because he "was, for a short period of time, an officer of Suprema West, Inc. . . . a subsidiary of Suprema Specialties, Inc." The Offering Memorandum did *not* disclose that GEORGE VIEIRA was not just any officer, but was the Chief Operating Officer and was thus directly responsible for fraudulent financial transactions that government officials were investigating. The

11

Offering Memorandum also did *not* disclose that GEORGE VIEIRA had reached an agreement with the United States Attorney's Office to plead guilty to securities fraud and conspiracy to commit bank and mail fraud. And the Offering Memorandum did *not* disclose that in addition to being an officer of Suprema Specialties West, Inc., GEORGE VIEIRA and his wife MARY VIEIRA were also officers and owners of CMM, which was also a subject of the criminal investigation as well as a probable broker for any cheese produced by VALLEY GOLD.

127. As a result of defendants' violations of the Federal Securities Laws, including the Securities Exchange Act of 1934, Exchange Act Rule 10b-5 enacted under the regulatory authority of the Securities and Exchange Commission and the Oxley Sarbanes-Oxley Act of 2002, Plaintiffs have incurred damages by investing millions of dollars into a doomed enterprise and supplied millions more in milk to that enterprise – milk for which plaintiffs have not been paid, resulting in damages to Plaintiffs in a sum exceeding several million dollars.

**INVOLVEMENT OF CARY, DOWNEY BRAND AND GENSKE-MULDER**

128. CARY, DOWNEY BRAND and GENSKE-MULDER are sued as authors of the Offering Memorandum ~~of,~~ business plan and financial projections, with direct knowledge of three primary omissions or misstatements, and direct involvement in the drafting that led to the concealment of the final version of the Offering Memorandum and the omission that the Offering Memorandum materially and misleadingly disclosed the nature of the investigation of GEORGE VIEIRA's criminal activity and his negotiations of a plea bargain to bank and securities fraud.

129. GEORGE VIEIRA's plea negotiations, his involvement in the events that led to the collapse of Suprema Specialties and the nature of the investigation by the United States Attorney for New Jersey were well known to Defendants and were actively

investigated by DOWNEY BRAND. But, as alleged above, Defendants drafted the Offering Memorandum to minimize and conceal this information.

130. The partners at GENSKE-MULDER who primarily worked on preparing the Offering Memorandum and business plan were Peter Hoekstra and Paul Anema. From the information presently available to Plaintiffs, it appears that Peter Hoekstra had primary responsibility for overseeing those portions of the Offering Memorandum and business plan that dealt with the disclosure of risks associated with the dairy industry and in preparing the financial forecasts and projections. Paul Anema assisted in these matters, and both were involved in reviewing and revising the final forms of both documents.

131. The attorneys at DOWNEY BRAND who worked on preparing the Offering Memorandum (including those portions that were subsequently incorporated into the business plan) were Jeffrey Koewler, Silvio Reggiardo, Lisa Nixon, Joseph G. De Angeles, Bruce Dravis, Christopher A. Delfino, Ricardo D. Bordallo and Diane Oleson. Jeffrey Koewler had primary responsibility for preparing the Offering Memorandum and ensuring that it had all disclosures required by California law. Diane Oleson, at the direction of Christopher A. Delfino, had primary responsibility for investigating GEORGE VIEIRA.

132. Plaintiffs are informed and believe, and thereon allege, that CARY prepared the initial draft to disclose the criminal investigation of GEORGE VIEIRA, but that he submitted the draft to DOWNEY BRAND and the other Defendants who revised the draft to ~~its current form~~the form that was added on April 22, 2002 to the final version of the Offering Memorandum – after version five had already been approved by the Valley Gold management committee and circulated to Plaintiffs.

133. DOWNEY BRAND, GENSKE-MULDER and CARY were all acutely aware of the PROMOTER's insistence that the VALLEY GOLD be funded by

13

~~April 22~~May 1, 2003.  Their billing records show frantic activity in efforts to meet that date. These defendants were thus fully aware that Plaintiffs would not be provided an adequate amount of time to review the Offering Memorandum.

134. The Offering Memorandum itself discloses that $325,000 of the funds raised by the April 22, 2003 securities issuance would be used to pay the bills of CARY, GENSKE MULDER and DOWNEY BRAND. These defendants thus knew that a successful securities issuance was in their own financial interests.

135. At the meeting on April 21, 2003 with the members of Valley Gold's management committee, DOWNEY BRAND's attorneys intentionally avoided discussing the criminal investigation into George Vieira and Suprema Specialties. Defendants knew that the investors in Valley Gold were a close-knit group that talked often; and they knew that information that they disclosed at the April 21, 2003 meeting would be shared with the other investors, including Plaintiffs.

136. The financial projections prepared by GENSKE-MULDER were used by VALLEY GOLD to solicit Plaintiffs to make further investments in VALLEY GOLD through the milk for equity contracts; GENSKE-MULDER was aware that the projections were going to be used to seek company financing – either from an outside source, or from the existing investors. But in preparing the financial projections, GENSKE-MULDER intentionally omitted information that it knew made the projections false and misleading, and which violated industry standards of care for the preparation of compilations. Thus, for example, GENSKE-MULDER knew that George Vieira had negotiated a royalty payment of a penny per pound for all cheese sold by Valley Gold, but omitted that expense in the financial projections. GENSKE-MULDER knew that Valley Gold had entered into an agreement to purchase CVD's milk at a 20 cent surcharge per hundred weight, but omitted that expense in the financial projections. GENSKE-MULDER knew that the revenue

14

projections set forth in the Offering Memorandum of $100 million per year were vastly different than the figures in the financial projections.

137. In addition, the financial projections included historic data on cheese and milk prices that was flatly incorrect. And the financial projections included capacity projections and equipment requirement figures that were materially different than what George Vieira actually believed the plant would need.

138. As a result of defendants' violations of the Federal Securities Laws, including the Securities Exchange Act of 1934, Exchange Act Rule 10b-5 enacted under the regulatory authority of the Securities and Exchange Commission, and the Oxley Sarbanes-Oxley Act of 2002, Plaintiffs have incurred damages by investing millions of dollars into a doomed enterprise and supplied millions more in milk to that enterprise – milk for which plaintiffs have not been paid, resulting in damages to Plaintiffs in a sum exceeding several million dollars.

FIFTH CAUSE OF ACTION
Violation of California Securities Law

139. Plaintiffs incorporate by reference as though set forth in full the allegations of paragraphs 1 through ~~123,~~138, above.

140. This is a civil cause of action asserted by Plaintiffs individually and on behalf of CVD against GEORGE VIEIRA, CARY, GENSKE-MULDER, DOWNEY BRAND and DOES 21 through 50, inclusive for violation of California Corporations Code section 25400(d).

141. By virtue of the misrepresentations and omissions discussed above, including the materially false, misleading and incomplete business plan and Offering Memorandum attached hereto as Exhibits A and B, the concealment of the final version of the Offering Memorandum, and the errors and omissions in the GENSKE-MULDER financial projections, defendants GEORGE VIEIRA, CARY,

15

GENSKE-MULDER, DOWNEY BRAND and DOES 21 through 50 induced Plaintiffs and CVD to purchase security interests in VALLEY GOLD by knowingly and intentionally misstating and omitting material facts in an deliberate effort to induce Plaintiffs and CVD to purchase those security interests.

142. In addition to the initial purchases of VALLEY GOLD interests at or about the time of its formation, in or about late September of 2003, defendants GEORGE VIEIRA, GENSKE-MULDER, CARY and DOES 41 through 50 also induced Plaintiffs and CVD to enter into illegal and unlawful agreements to exchange milk (or accounts receivable owed to them for milk) for additional ownership interests in VALLEY GOLD.

143. The reason the "milk for equity" contracts were illegal and unlawful is because California Food and Agricultural Code sections 62191, 62196 and 62200 require (a) that milk producers be paid for milk solely in cash or with checks that are reduceable to cash in no more than one business day; (b) that payment be made in very short time periods (roughly 15 days); and (c) that failing to abide by these requirements and endeavoring to use *any* other payment arrangement is an unlawful business practice.

144. In inducing Plaintiffs to enter into contracts to exchange milk for equity (in the general form of the contribution agreement attached hereto as Exhibit C and the assignment agreement attached hereto as Exhibit D), defendants GEORGE VIEIRA, GENSKE MULDER, CARY and DOES 41 through 50 falsely represented to Plaintiffs:

(a) that the contracts were proper and lawful;

(b) that CVD was contractually required to supply milk to VALLEY GOLD and if Plaintiffs stopped supplying their milk to CVD and switched to another agricultural cooperative, they would be violating the law and subject to substantial fines and penalties;

16

(c) that VALLEY GOLD was doing well and had sizeable orders that ensured that Plaintiffs would earn significantly more from their increased ownership in VALLEY GOLD than they were owed for their milk.

145. These representations were false, and were made be defendants in order to induce Plaintiffs and CVD to purchase additional equity ownership interests in VALLEY GOLD in exchange for milk.

146. As a result of defendants' violations of the California Securities Laws, including the provisions of Corporations Code section 25400(d), Plaintiffs were induced to exchange milk for worthless equity interests in CVD and have incurred damages of several million dollars.

SIXTH CAUSE OF ACTION
Negligence

147. Plaintiffs incorporate by reference as though set forth in full the allegations of paragraphs 1 through ~~131,14~~6, above.

148. This is a civil cause of action asserted by Plaintiffs individually and on behalf of CVD and VALLEY GOLD against GEORGE VIEIRA, CARY, GENSKE-MULDER, DOWNEY BRAND and DOES 51 through 60.

...

151. As a professional partnership that held itself out as providing complete accounting, tax and consulting services for the dairy industry, including 1) Annual and longterm tax planning; 2) Cash flow management; 3) Breakeven analysis; 4) Industry standards; 5) Financial goal setting; 6) Financial Forecasts & Projections; 7) Management Advisory Services; 8) Investment Review; and 9) Cash flow analysis for expansion or restructuring, and as a professional partnership that was retained and paid for its services by CVD and by many of the individual member dairy farmers of CVD, including some of the Plaintiffs, GENSKE MULDER owed to Plaintiffs a duty of care and

1    loyalty.

2    152. As the author of the financial
     projections that GENSKE-MULDER knew would be
3    distributed to potential investors or
     financing sources for Valley Gold, including
4    Plaintiffs, GENSKE-MULDER had a duty of due
     care to Plaintiffs to ensure that the
5    financial projections met the industry
     standards for compilations and generally
6    accepted accounting principals.

7    ...

8    154. As a professional law partnership
     retained by CVD and VALLEY GOLD to assist in
9    the formation of VALLEY GOLD and in the
     marketing of securities for VALLEY GOLD,
10   including the preparation of the business
     plan and Offering Memorandum, and because CVD
11   was an agricultural cooperative operating as
     a trust and agent for the direct benefit of
12   its member dairies so that DOWNEY BRAND was
     operating as a subagent, and because DOWNEY
13   BRAND knew with reasonable certainty that
     Plaintiffs would rely upon its statements,
14   opinions and work product, including the
     business plan and Offering Memorandum, in
15   acquiring ownership interests in VALLEY GOLD,
     DOWNEY BRAND owed to Plaintiffs a duty of
16   care and loyalty.

17   155. As the preparers of the Offering
     Memorandum that Defendants knew would be
18   provided to plaintiffs and relied upon them
     in making a decision on investing in Valley
19   Gold, DOWNEY BRAND owed a duty of care to
     Plaintiffs to include all material
20   information known to them but unknown to
     Plaintiffs, and a duty to avoid misstatements
21   in those documents.

22   156. As professionals, managers, officers,
     employees and consultants retained by CVD
23   and/or VALLEY GOLD, acting as subagents and
     for the direct benefit of the beneficial
24   owners of CVD, including Plaintiffs, as well
     as for the benefit of VALLEY GOLD and all of
25   its members, DOES 51 through 60 owed to
     Plaintiffs a duty of care and loyalty.

26

18

157. GEORGE VIEIRA, CARY, GENSKE-MULDER, DOWNEY BRAND and DOES 51 through 60 failed to adequately discharge their duties to Plaintiffs, to CVD and to VALLEY GOLD, and failed to act with reasonable care, failed to meet the standards of care of similar professionals acting in the community, and failed to conduct themselves with reasonable business judgment or prudence.

158. In its oversight of CVD and in preparing accounting statements and business projections for CVD, GENSKE-MULDER should have, in the exercise of reasonable diligence, discovered GEORGE VIEIRA's numerous defalcations. The records of CVD indicated a high level of milk product being diverted out of the normal supply channels and instead routed through CMM. GENSKE-MULDER in the exercise of reasonable diligence should have investigated the activity.

159. The records of CVD showed a high volume of brokerage payments made to CMM, which GENSKE-MULDER in the exercise of reasonable diligence likewise should have investigated.

160. Plaintiffs are informed and believe, and thereon allege, that the records of CVD disclosed that CVD incurred significant legal fees in 2003, because GEORGE VIEIRA used the proceeds from the sale of milk from the members of CVD, including Plaintiffs, to pay lawyers to defend him from the criminal investigations of the Securities and Exchange Commission and the United States Attorney's Office, and to negotiate the terms of a plea bargain. Plaintiffs are informed and believe, and thereon allege, that these expenses, clearly occurring outside the ordinary course of CVD's business, included payments to the high priced lawyers with the New Jersey law firm of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, and in the exercise of reasonable diligence, GENSKE-MULDER should have investigated, and disclosed to the Board of CVD the criminal conduct that GEORGE VIEIRA was being investigated for, as well as the clear inappropriate diversion of CVD's funds for GEORGE VIEIRA's personal use.

19

161. The records of CVD showed an unusual delay in the payment by purchasers for milk supplied by CVD, as well as nonpayment for milk, made all the more unusual because the mandatory provisions of California law requiring that payments be made in very short time frames (approximately fifteen days). In the exercise of reasonable diligence, GENSKE MULDER should have investigated the source for the delays, and discovered the fraudulent diversion of CVD's milk to CMM and thereafter to the criminal enterprise centered around Suprema Specialties, Inc.

162. After learning of the government's investigations of GEORGE VIEIRA's criminal conduct and after learning in or about the Spring of 2003 of GEORGE VIEIRA's agreement to plead guilty to securities fraud and conspiracy to commit bank and mail fraud, GENSKE-MULDER, in the exercise of reasonable diligence, should have disclosed the information to CVD's Board, to VALLEY GOLD's Board, and to Plaintiffs; and GENSKE MULDER should have undertaken a thorough investigation of the extent to which GEORGE VIEIRA had used CVD and CMM as instrumentalities of the criminal scheme for which he was being investigated and for which he had agreed to plead guilty.

163. As experts in the dairy industry, GENSKE-MULDER should have had intimate knowledge of the requirements and procedures of the Milk Producers Trust Fund, and GENSKE-MULDER should have recognized that the milk supply contract proposed and ultimately adopted pursuant to which CVD supplied the majority of its member dairies' milk to VALLEY GOLD was *not* protected by the trust fund, both because VALLEY GOLD had not and never did secure the required bond, and because CVD's member dairies were equity owners of VALLEY GOLD. In the exercise of reasonable care, GENSKE-MULDER should have disclosed to CVD and Plaintiffs that their shipments of milk to VALLEY GOLD were not protected by the trust fund; and in the exercise of reasonable care, GENSKE-MULDER should have recommended against the creation of VALLEY GOLD and/or recommended other

20

business structures that would have maintained Plaintiffs' protection through the Milk Producers Trust Fund.

164. In preparing financial projections of VALLEY GOLD's anticipated business for CVD and VALLEY GOLD, GENSKE-MULDER failed to act with reasonable care and failed to follow standard accounting practices.

165. In its work on the preparation of the business plan and Offering Memorandum, GENSKE-MULDER failed to act with reasonable care.

166. In failing to investigate the viability and reputation of the New Jersey distributor that GEORGE VIEIRA proposed as the main buyer of cheese produced by VALLEY GOLD, and in failing to compare the terms contained in the purchase contract with that distributor against industry standards, GENSKE-MULDER failed to act with reasonable care.

167. After learning of the government's investigations of GEORGE VIEIRA's criminal conduct and after learning in or about the Spring of 2003 of GEORGE VIEIRA's agreement to plead guilty to securities fraud and conspiracy to commit bank and mail fraud, CARY and DOWNEY BRAND, in the exercise of reasonable diligence, should have disclosed the information to CVD's Board, to VALLEY GOLD's Board, and to Plaintiffs; and CARY and DOWNEY BRAND should have undertaken a thorough investigation of the extent to which GEORGE VIEIRA had used CVD and CMM as instrumentalities of the criminal scheme for which he was being investigated and for which he had agreed to plead guilty.

168. As licensed attorneys representing clients engaged in the dairy industry, CARY and DOWNEY BRAND should have had intimate knowledge of the requirements and procedures of the Milk Producers Trust Fund, and CARY and DOWNEY BRAND should have recognized that the milk supply contract proposed and ultimately adopted pursuant to which CVD supplied the majority of its member dairies' milk to VALLEY GOLD was *not* protected by the

21

trust fund, both because VALLEY GOLD had not and never did secure the required bond, and because CVD's member dairies were equity owners of VALLEY GOLD.  In the exercise of reasonable care, CARY and DOWNEY BRAND should have disclosed to CVD and Plaintiffs that their shipments of milk to VALLEY GOLD were not protected by the trust fund; and in the exercise of reasonable care, CARY and DOWNEY BRAND should have recommended against the creation of VALLEY GOLD and/or recommended other business structures that would have maintained Plaintiffs' protection through the Milk Producers Trust Fund.

169. In their work on the preparation of the business plan and Offering Memorandum, CARY and DOWNEY BRAND failed to act with reasonable care.

...

172. In December of 2003, GENSKE-MULDER prepared a chart comparing the sales price that Valley Gold was obtaining for its cheese compared with the industry price on the Chicago Mercantile Exchange (an industry price for cheaper types of cheese than Valley Gold was actually producing). As itemized in the chart that is attached hereto as Exhibit H, Valley Gold was selling its cheese at more than a 44% discount. GENSKE-MULDER owed a duty of care to Valley Gold and to the Plaintiffs to disclose this information. It failed to do so.

173. These and other negligent acts and omissions by defendants directly caused injury to Plaintiffs and to CVD and VALLEY GOLD, in a sum exceeding $20 million.

SEVENTH CAUSE OF ACTION
Intentional Misrepresentation

174. Plaintiffs incorporate by reference as though set forth in full the allegations of paragraphs 1 through ~~155,~~173, above.

175. This is a civil cause of action asserted by Plaintiffs individually and on behalf of CVD for intentional misrepresentation

against GEORGE VIEIRA, CARY, GENSKEMULDER, DOWNEY BRAND and DOES 1 through 60.

176. These defendants made representations of material facts to CVD and Plaintiffs, or withheld material information from Plaintiffs in the face of a duty of disclosure, as recounted more fully above.

177. Defendants actively knew that the matters they misrepresented were false, and that the matters they withheld was material information that they had the duty to disclose.

178. Plaintiffs did not know the information that was withheld, and did not know that the matters that were misrepresented were false.

179. Defendants intended that Plaintiffs rely upon the misrepresentations that were made to them. In addition, Defendants made representations to the management committee of Valley Gold, knowing and expecting that the substance of those representations would be communicated to Plaintiffs. For example, prior to April 22, 2003, GENSKE-MULDER prepared false and fraudulent financial projections similar to those that are attached hereto as Exhibit C, and GENSKE-MULDER presented them to, among others, John Nunes to demonstrate that the proposed cheese plant operations would meet cash flow needs and be viable. John Nunes relayed that information to various of the investors, including Mariana Lopes.

180. GENSKE-MULDER further knew that the financial projections that are attached hereto as Exhibit C would be provided to the investors and the Plaintiffs; and while some of the investors were not sophisticated in accounting matters, GENSKE-MULDER knew and expected that those who were more sophisticated would talk to those who were less sophisticated and thus influence their decisions. Thus, if GENSKE-MULDER had prepared accurate financial projections that included the information it already knew about the cheese plant operations, Plaintiffs like Michael Lopes, or Plaintiffs' advisers

23

like Susan Miguel, would have alerted the others to the problems.

181. Plaintiffs relied upon the misrepresentations and material omissions by investing in VALLEY GOLD, by executing the supply contract between CVD and VALLEY GOLD, by entering into the "milk for equity" contracts, by continuing to provide milk to CVD even after failing to receive payment, and by entrusting the management of CVD and VALLEY GOLD to GEORGE VIEIRA, and by entrusting oversight of CVD and VALLEY GOLD to GENSKE-MULDER and other professionals. Had Plaintiffs known the truth, they would not have taken these actions.

182. Plaintiffs did not learn the truth until the last year preceding the filing of the initial complaint in this action.

183. As a result of their reliance on defendants' misrepresentations, Plaintiffs have been damaged in a sum exceeding $5 million.

184. Plaintiffs are informed and believe, and thereon allege, that in making the false statements identified above, defendants intended to cause damage to Plaintiffs, and intended to obtain benefits for themselves at the expense of Plaintiffs. Plaintiffs are informed and believe, and thereon allege, that in the conduct set forth in the cause of action, defendants acted with malice, oppression and fraud. As a result, and by way of punishment and example, punitive damages should be assessed against defendants.

EIGHTH CAUSE OF ACTION
Negligent Misrepresentation

185. Plaintiffs incorporate by reference as though set forth in full the allegations of paragraphs 1 through 165,184, above.

186. This is a civil cause of action asserted by Plaintiffs individually and on behalf of CVD for negligent misrepresentation against GEORGE VIEIRA, CARY, GENSKE MULDER, DOWNEY BRAND and DOES 1 through 60.

24

187. These defendants made representations of material facts to Plaintiffs, or withheld material information from Plaintiffs in the face of a duty of disclosure, as recounted more fully above.

188. Defendants should have known that the matters they misrepresented were false, and that the matters they withheld was material information that they had the duty to disclose.

189. Plaintiffs did not know the information that was withheld, and did not know that the matters that were misrepresented were false.

190. Defendants intended that Plaintiffs rely upon the misrepresentations that were made to them.

191. Plaintiffs relied upon the misrepresentations by investing in VALLEY GOLD, by executing the supply contract between CVD and VALLEY GOLD, by entering into the "milk for equity" contracts, by continuing to provide milk to CVD even after failing to receive payment, and by entrusting the management of CVD and VALLEY GOLD to GEORGE VIEIRA, and by entrusting oversight of CVD and VALLEY GOLD to GENSKE-MULDER and other professionals. Had Plaintiffs known the truth, they would not have taken these actions.

192. Plaintiffs did not learn the truth until the last year before the filing of the initial complaint in this action.

193. As a result of their reliance on defendants' misrepresentations, Plaintiffs have been damaged in a sum exceeding $5 million.

Plaintiffs' motion to amend relies solely on the standards governing a motion to amend under Rule 15, Federal Rules of Civil Procedure.  However, because a Rule 16 scheduling order is in place, resolution of this motion to amend is governed by Rule 16,

25

Federal Rules of Civil Procedure.  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-608 (9th Cir.1992).  Rule 16(b) provides that "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge."  As explained in *Mammoth Recreations, Inc.*:

> 'A court's evaluation of good cause is not coextensive with an inquiry into the propriety of the amendment under ... Rule 15.' ... Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to impose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment.  The district court may modify the pretrial schedule 'if it cannot reasonably be met despite the diligence of the party seeking the extension.'  Fed.R.Civ.P. 16 advisory committee's notes (1983 amendment) ... Moreover, carelessness is not compatible with a finding of diligence and offers no reason for relief ... Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification ... If that party was not diligent, the inquiry should end.

975 F.2d at 609.  Further, "[a]s a practical matter, extraordinary circumstances is a close correlate of good cause."  *Id.* at 610.  "'The district court is given broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order ... will not be disturbed unless they evidence a clear abuse of discretion.'"  *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1087 (9th Cir.2002).

1    If "good cause" within the meaning of Rule 16(b) is shown,

2  the party seeking leave to amend must then demonstrate that leave

3  to amend is appropriate under Rule 15, Federal Rules of Civil

4  Procedure.  *See Johnson v. Mammoth Recreations, Inc.*, *supra*, 975

5  F.2d at 608.

6    Rule 15(a) of the Federal Rules of Civil Procedure provides

7  that a party may amend its pleadings "by leave of court" and that

8  "leave shall be freely given when justice so requires."  Fed.R.

9  Civ.P. 15(a).  This rule should be applied with "extreme

10  liberality" in favor of allowing amendments.  *See Jones v. Bates*,

11  127 F.3d 839, 847 n. 8 (9th Cir. 1997).  The Ninth Circuit has

12  also held that a court should consider four factors in

13  determining whether to grant leave to amend.  They are (1) undue

14  delay; (2) bad faith; (3) futility of amendment; and

15  (4) prejudice to the opposing party.  *See United States v. Pend*

16  *Oreille Pub. Util. Dist. No.1*, 926 F.2d 1502, 1511-151212 (9th

17  Cir. 1991) (leave to amend should have been granted in the

18  absence of prejudice and bad faith and where amendment was not

19  frivolous); *DCD Programs Ltd. v. Leighton*, 833 F.2d 183, 186 (9th

20  Cir. 1987).  "These factors, however, are not of equal weight in

21  that delay, by itself, is insufficient to justify denial of leave

22  to amend."  *DCD Programs*, 833 F.2d at 186; *see also Jones*, 127

23  F.3d at 847 n.8.  "[I]t is the consideration of prejudice to the

24  opposing party that carries the greatest weight ... Absent

25  prejudice, or a strong showing of any of the remaining *Foman*

26  factors, there exists a *presumption* under Rule 15(a) in favor of

27

granting leave to amend." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir.2003). "While Fed. R. Civ. P. 15(a) encourages leave to amend, district courts need not accommodate futile amendments." *Newland v. Dalton*, 81 F.3d 904, 907 (9th Cir. 1996) (citing *Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1293 (9th Cir. 1983). There are cases holding that denial of leave to amend is not an abuse of discretion when the motion for leave to amend is an attempt to avoid pending summary judgment. *See Schlacter-Jones*, 936 F.2d 435, 443 (9th Cir.1991), ("A motion for leave to amend is not a vehicle to circumvent summary judgment"), *overruled on other grounds*, *Cramer v. Consolidated Freightways, Inc.*, 255 F.3d 683 (9th Cir.2001).

As to the omissions and misstatements in the Offering Memorandum, Plaintiffs assert that the Second Amended Complaint alleged that the Offering Memorandum contained errors, misstatements, misleading statements and omissions that led them to invest in Valley Gold. Plaintiffs assert:

> Through discovery, plaintiffs identified omissions and misstatements that were not directly mentioned in the complaint [sic] (other than through catch-all phrasing). Specifically, plaintiffs contend that the disclosure language that Downey Brand included in the Offering Memorandum about George Vieira's criminal investigation was added *after* the document was circulated to them; and they contend they were never given any opportunity to review any version of the Offering Memorandum that contained that disclosure. They contend that the historical operating figures provided in the Offering Memorandum were false. And they contend that

28

1
2
3

> contrary to the statements in the Offering
> Memorandum, the financial figures and
> historical operating results for the Valley
> Gold cheese factory were *not* reviewed by
> Genske-Mulder or any other accountant.

Plaintiffs argue that these contentions were "highlighted" in Plaintiffs' opposition to the motions for summary judgment filed on November 23, 2009 and that their contention that they were not given the final version of the Offering Memorandum to review was established during depositions taken in July, 2009. Plaintiffs contend that Defendants have been aware of these issues since these events.  Plaintiffs argue that they were hampered in discovering "precisely how it came about that the George Vieira disclosures were hidden from them" until Downey Brand's assertion of the attorney-client privilege and work product doctrine was resolved by the Court in its Memorandum Decision filed on February 1, 2010, as reconsidered concerning the work product doctrine by Memorandum Decision filed on June 23, 2010.  These decisions were delayed by the Court's heavy caseload.  Plaintiffs assert that the proposed Third Amended Complaint now traces the facts in detail because this information has been made available and that further information will be provided when Downey Brand attorney Mr. Koewler is deposed. Plaintiffs contend that Defendants "have always had access to the crucial information, and thus can hardly claim to be prejudiced by the amendment that Plaintiffs propose."

As to the financial projections and reliance, Plaintiffs note that they opposed Genske Mulder's motions for summary

judgment by addressing how they relied on the financial projections that Genske Mulder prepared in entering into the "milk for equity" contracts and also asserted that they indirectly relied on those forecasts in making their initial investments in Valley Gold, since Genske Mulder had shared those forecasts with the Valley Gold management committee, "co-investors with Plaintiffs who were also friends and collegues who shared information."  Plaintiffs note that, "[i]n a reply brief," Plaintiffs asserted that Genske Mulder "learned very quickly after issuing the financial forecasts that Valley Gold was not operating at all as projected, but was rather selling cheese at prices dramatically below cost."  Plaintiffs argue that they should be allowed to include these allegations pursuant to the proposed Third Amended Complaint because "this information was known to defendants long ago, since we discovered it from the files in the prior State Court litigation that defendants were parties to," Plaintiffs referring to the Declaration of Douglas Applegate filed on October 7, 2010, (Doc. 306):

> 4.   That opposition [to Defendants' motions for summary judgment] also cited to a state court deposition of Joe Nunes, in which he testified that Genske Mulder had shared their financial forecasts with him prior to the initial investments in Valley Gold, to show that the company operations would cash flow out.  I apparently failed to attach the correct pages; they are accordingly attached hereto as Exhibit C, and are the subject of an additional allegation in the proposed Third Amended Complaint.

Exhibit C to Mr. Applegate's declaration is a partial copy of the

1  deposition of Joe Nunes taken on November 29, 2006 in *Nunes, et*

2  *al. v. Central Valley Dairymen, et al.*, No. 147653, Merced County

3  Superior Court:

4          Q.  I'd like to refer you to the second
           portion of it, which is the Valley Gold, LLC,
5          financial statement forecast, which is
           previously marked Exhibit 2.  Have you seen
6          this before?

7          A.  Yes.

8          Q.  When did you first see this?

9          A.  I don't know exactly.

10         Q.  Do you know where you first saw it?

11         A.  I think this was at Genske Mulder's
           office.
12
           Q.  Do you know what circumstances you first
13         saw Exhibit 2?

14         ...

15         A.  When they were doing financial studies to
           see if we can cash flow out.
16
           ...
17
           MR. PEARSON: Q.  Do you know, referring to
18         the third page.

19         A.  Which one?  This one?

20         Q.  This is on Genske Mulder & Company, LLP
           letterhead.  Do you see that?
21
           A.  Yes.
22
           Q.  Did you read that when you were shown
23         Exhibit 2?

24         A.  Not that I can recall.

25         Q.  Did anyone explain to you what a forecast
           was?
26

                              31

1          A.  Forecast, yes.

2          Q.  What do you recall the explanation being
           as to what a forecast was?
3
           A.  Forecast is they're what could happen if
4          everything falls into place.

5          Q.  So you take a set of assumptions and you
           make a projection based upon the assumptions
6          all taking place, correct?

7          A.  Yes.

8          Q.  And if any of those assumptions didn't
           occur, then the projection isn't going to be
9          correct?

10         A.  Yes.

11         Q.  Has anyone told you that, besides your
           lawyer, that the projections ever done by
12         Genske Mulder were done incorrectly?

13         A.  No.

14         Q.  Has Jack Miguel ever criticized anything
           Genske Mulder did or didn't do insofar as
15         their work for Central Valley Dairymen or
           Valley Gold?
16
           A.  Not that I know of.
17
           Q.  Not to your ears anyways?
18
           A.  No.
19
           ...
20
           MR. PEARSON: Q.  Do you recall who explained
21         at Genske Mulder what the forecast was?  Was
           that Paul Anema, Pete Hoekstra or somebody
22         else?

23         A.  It was probably those two.  One or the
           ....
24
      Plaintiffs argue that, by allowing the proposed Third
25
Amended Complaint, "the pending motions can be resolved on their
26

merits rather than on procedural technicalities."

Defendants oppose Plaintiffs' motion, noting that Plaintiffs give no explanation for the long delay in proposing these amendments.  Defendants assert that the additional factual allegations have been known to Plaintiffs since 2003/2004 and cite *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994), *cert denied sub. nom Payne v. Kaplan*, 516 U.S. 810 (1995):

> Kaplan had already amended the complaint twice, and 'a district court's discretion over amendments is especially broad "where the court has already given a plaintiff one or more opportunities to amend the complaint."' ... '[L]ate amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action.'

Defendants contend that they will be prejudiced if the amendments are allowed because discovery, with the exception of the deposition of Ted Kerns, has been closed since before the motions for summary judgment were filed in August 2009 and because two of the Plaintiffs, Alvaro Machado and Raymond Lopes have died since this action was filed and cannot be redeposed.[1]  Defendants argue that the proposed amendments will require re-deposition of Plaintiffs because certain of the proposed allegations contradict Plaintiffs' prior deposition testimony and because certain of the allegations (e.g., that Genske Mulder provided management advisory and investment services to some Plaintiffs) will have to

---

[1] Summary judgment for Defendants has been granted as to Alvaro Machado and the Machado Family Trust.

33

be examined through additional discovery.  Further, Defendants
contend, Plaintiffs new allegations will necessarily require
reconstruction of oral statements made in management committee
meetings seven years ago and require the depositions of those
committee members.  Defendants note that management committee
member Joe Nunes died in September 2010 and management committee
member Jose Homen has become to ill to be deposed.

Defendants also argue that the proposed amendments are
subject to a motion to dismiss for failure to state a claim upon
which relief can be granted.  Defendants note that the proposed
Third Amended Complaint names Maria Machado and Antonio Estevam
as Plaintiffs even though the Court granted summary judgment
against them, reasserts claims about a purchaser of cheese and
the milk producer's trust fund, which were dismissed by the Court
in 2008, alleges that Downey Brand drafted the milk for equity
agreements, even though Plaintiffs have conceded this is not
true.  In addition, Defendants argue that the proposed Third
Amended Complaint is contradicted by certain Plaintiffs'
deposition testimony and other concessions by Plaintiffs.

Plaintiffs' alleged failure to explain the delay in seeking
leave to amend and seeking leave to amend after summary judgment
motions is argued to support denying Plaintiffs' motion.  At the
hearing, Plaintiffs' counsel asserted that much of the new
information in the TAC was not known or knowable until
Plaintiffs' received documents from Downey Brand after resolution
of the attorney-client privilege dispute.  This assertion is in

part belied by the TAC's allegations that Plaintiffs' discovered the facts upon which this action is based within one year of the filing of the action in 2006.  It is arguable that Defendants are prejudiced by this late motion to amend because Defendants were not able to conduct timely discovery concerning Plaintiffs' new allegations.  However, because of Plaintiffs' counsel's medical issues, trial of this action has been continued to June 14, 2011. The continuance of the trial date will give Defendants ample time to conduct discovery concerning these new allegations and to supplement their replies to their motions for summary judgment to address the issues and factual claims asserted by Plaintiffs in their oppositions to the motions for summary judgment.  The pleading objections can be resolved by Plaintiffs by omitting material previously decided and dismissed from the action. Defendants' contentions that the proposed TAC is subject to dismissal for dismissal for failure to state a claim can be resolved in the context of their supplemental oppositions to the motions for summary judgment.  Because litigation should be resolved on the merits and because any prejudice to Defendants resulting from Plaintiffs' untimely motion to amend will be negated by allowing all parties to re-open discovery to address these new allegations and to file supplemental replies in support of their motions for summary judgment, Plaintiffs' motion is GRANTED.

        For the reasons stated:

        1.   Plaintiffs' motion for leave to modify the Scheduling

Order and to file a Third Amended Complaint is GRANTED;[2]

2.   Plaintiffs shall file the Third Amended Complaint within five court days of the filing date of this Memorandum Decision and Order;

3.   Plaintiffs' counsel and counsel for Downey Brand and Genske Mulder shall schedule any additional discovery requested by either Downey Brand or Genske Mulder forthwith and complete it within 60 days.  Plaintiffs shall cooperate fully in facilitating the completion of this additional discovery;

4.   Any supplemental oppositions to the summary judgment motions shall be filed before January 25, 2011.  Defendants' supplemental replies shall be filed on or before February 15, 2011.  These supplemental motions shall be heard on Monday, March 7, 2011.

IT IS SO ORDERED.

Dated:   October 25, 2010              /s/ Oliver W. Wanger
                                  UNITED STATES DISTRICT JUDGE

---

[2]The proposed TAC lists parties and claims that have been dismissed by prior orders of the Court.  Plaintiffs' counsel and counsel for Downey Brand and Genske Mulder shall file a stipulation within thirty (30) days of the filing date of this Memorandum Decision and Order listing those parties and claims that have been previously dismissed or with respect to which summary judgment for either Downey Brand or Genske Mulder has been granted.