1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4

| | |
|---|---|
| MANUEL LOPES and MARIANA LOPES, dba LOPES DAIRY; JOSEPH LOPES, Trustee of the RAYMOND LOPES FAMILY TRUST as successor-in-interest to RAYMOND LOPES; JOSEPH LOPES and MICHAEL LOPES, individually and dba WESTSIDE HOLSTEIN; MARIA MACHADO, Trustee of the Machado Family Trust and as the successor-in-interest to ALVARADO MACHADO and TONY ESTEVAM,<br><br>     Plaintiffs,<br><br>v.<br><br>GEORGE VIERIA; MARY VIERIA; CALIFORNIA MILK MARKET, a California Corporation; VALLEY GOLD LLC, a California Limited Liability Company; GENSKE-MULDER LLP, a California Limited Liability Partnership; ANTHONY CARY; DOWNEY BRAND LLP, a California Limited Liability Partnership; CENTRAL VALLEY DAIRYMEN, INC., a California Food and Agricultural Nonprofit Cooperative Association, and DOES 1 through 25, inclusive,<br><br>     Defendants. | 1:06-cv-01243 OWW SMS<br><br>MEMORANDUM DECISION RE DEFENDANTS DOWNEY BRAND LLP'S AND GENSKE, MULDER & COMPANY'S MOTIONS FOR SUMMARY JUDGMENT AGAINST JOSEPH LOPES AS TRUSTEE OF THE ESTATE OF RAYMOND LOPES; MANUEL AND MARIANA LOPES; JOSPEH AND MICHAEL LOPES; AND VALLEY GOLD<br><br>(DOCS. 139, 145, 150, 151, 273, 277, 341, 342) |

## I.   INTRODUCTION

Defendant Downey Brand LLP ("Downey Brand"), a law firm, moves for summary judgment against Plaintiff Joseph Lopes as trustee of the Estate of Raymond Lopes (Doc. 277); Plaintiffs

1

Manuel and Mariana Lopes (Doc. 139); Plaintiffs Joseph and Michael Lopes dba Westside Holsteins (Doc. 151); and Plaintiff Valley Gold (Doc. 341). Joseph Lopes as trustee of the Estate of Raymond Lopes filed an opposition (Doc. 284), to which Downey Brand replied (Doc. 288). Manuel and Mariana Lopes and Joseph and Michael Lopes filed an opposition (Doc. 155), to which Downey Brand replied (Docs. 185, 188). Downey Brand filed a combined supplemental reply to the individual Plaintiffs on February 15, 2011 (Doc. 344), the individual Plaintiffs filed a supplemental opposition on March 15, 2011 (Doc. 363), and Downey Brand filed a second supplemental reply on March 25, 2011 (Doc. 367). Plaintiffs filed an opposition on behalf of Valley Gold (Doc. 349), to which Downey Brand replied (Doc. 351).

Defendant Genske Mulder and Company ("Genske Mulder"), a certified public accounting firm, moves for summary judgment against Joseph Lopes as trustee of the Estate of Raymond Lopes (Doc. 273); Manuel and Mariana Lopes (Doc. 145); Joseph and Michael Lopes (Doc. 150); and Plaintiff Valley Gold (Doc. 342). Joseph Lopes as trustee of the Estate of Raymond Lopes filed an opposition (Doc. 284), to which Genske Mulder replied (Doc. 285). Manuel and Mariana Lopes and Joseph and Michael Lopes filed an opposition (Doc. 155), to which Genske Mulder replied (Docs. 179, 193). Genske Mulder filed a combined supplemental reply against the individual Plaintiffs on February 14, 2011 (Doc. 343), the

individual Plaintiffs filed a supplemental opposition on March

15, 2011 (Doc. 364), and Genske Mulder filed a second

supplemental reply on March 25, 2011 (Doc. 366). Plaintiffs filed

an opposition derivatively on behalf of Valley Gold (Doc. 346),

to which Genske Mulder replied (Doc. 350).

## II.   FACTUAL BACKGROUND

### A.   PROCEDURAL HISTORY

Plaintiffs' Complaint was filed September 11, 2006 (Doc. 1),

a First Amended Complaint was filed June 22, 2007 (Doc. 30), and

a Second Amended Complaint ("SAC") was filed April 2, 2008 (Doc.

71). The SAC asserts the following Cause of Actions against

Downey Brand and Genske Mulder: (1) Fourth Cause of Action for

securities fraud: Securities Exchange Act of 1934; (2) Fifth

Cause of Action for violation of California securities law; (3)

Sixth Cause of Action for negligence; (4) Seventh Cause of Action

for intentional misrepresentation; and (5) Eighth Cause of Action

for negligent misrepresentation. All allegations asserted

derivatively on behalf of Central Valley Dairymen ("CVM") were

dismissed. Doc. 340, ¶ 3.

Downey Brand and Genske Mulder filed motions for summary

judgment against Plaintiffs in late 2009, which were heard on

December 21, 2009. Summary judgment was granted against Plaintiff

Antonio Estevam (Doc. 297) and Plaintiff Maria Machado as trustee

of the Machado Family Trust (Doc. 298). By memorandum decision

and order dated September 30, 2010, summary judgment was granted
in part, denied in part, and deferred in part against Joseph
Lopes as trustee for the Estate of Raymond Lopes. Doc. 301. The
memorandum decision granted Downey Brand's and Genske Mulder's
motions for summary judgment on (1) the Fifth Cause of Action
against Joseph Lopes as trustee for the Estate of Raymond Lopes
and (2) claims for consequential damages under the Fourth and
Fifth Cause of Actions for failure to receive payment for milk
shipped to Central Valley Dairymen, Inc. ("CVD"). Doc. 301, 48,
53.

In opposing Defendants' summary judgment motions, Plaintiffs
relied on claims that were not alleged in the SAC. Plaintiffs
were granted leave to file a Third Amended Complaint ("TAC")
(Doc. 329), which they filed November 1, 2010 (Doc. 330). The
Fourth through Eighth Cause of Actions asserted against Downey
Brand and Genske Mulder in the SAC remain in the TAC. Plaintiffs
also assert the Sixth Cause of Action for Negligence derivatively
on behalf of Valley Gold.

Plaintiffs were permitted to, but did not, file supplemental
oppositions to the summary judgment motions before January 25,
2011 (Doc. 329, 36). Downey Brand filed a combined supplemental
reply on February 15, 2011 (Doc. 344), and Genske Mulder filed a
combined supplemental reply on February 14, 2011 (Doc. 343).
Plaintiffs were permitted to file supplemental oppositions on or

before March 15, 2011 (Doc. 352), and did so (Docs. 363, 364).

Downey Brand and Genske Mulder filed second supplemental replies

March 25, 2011 (Docs. 366, 367). The motions were heard April 1

and 6, 2011.

B.   **DOWNEY BRAND LLP**

1.   **Undisputed Facts**

The individual Plaintiffs have never retained Downey Brand

to represent them nor have they ever spoken to, or recall

anything said by a Downey Brand attorney related to the Valley

Gold offering, CVD, or their milk.

On March 25, 2003, Downey Brand led a meeting at its

Stockton office to discuss the steps needed to secure

capitalization for Valley Gold and to complete Valley Gold's

acquisition of a cheese plant in Gustine, California. Genske

Mulder accountants, Valley Gold counsel Anthony Cary, Valley Gold

manager Curtis Colaw, George Vieira, and local CVD board members

were present.

Paul Anema, a Genske Mulder partner, drafted Valley Gold's

business plan; Downey Brand was not retained to prepare Valley

Gold's business plan and played no role in preparing it. Downey

Brand was not retained to give Valley Gold financial or business

advice of any kind. Downey Brand took responsibility for

preparing the Offering Memorandum. Downey Brand's lead attorney,

Jeffrey Koewler, understood that the Offering Memorandum needed

to "meaningfully convey pertinent information to potential investors."

On April 11, 2003, Mr. Koewler called James Cecchi, a New Jersey attorney who represented Mr. Vieira in the United States Attorney's Office and the Securities and Exchange Commission's New Jersey Suprema Specialties criminal investigation of Mr. Vieria. Mr. Koewler read a disclosure statement that had already been drafted concerning Mr. Vieira's involvement or potential involvement in the criminal investigation. Mr. Cecchi confirmed that the disclosure was accurate. The disclosure regarding Mr. Vieira was inserted in the final Offering Memorandum on April 22, 2003.

Mr. Cecchi did not disclose that Vieira was involved in plea negotiations. Mr. Cecchi had a confidential, attorney-client relationship with Mr. Vieria and there is no evidence that Mr. Cecchi either communicated the specific terms of the plea bargain to Genske Mulder or Downey Brand before April 23, 2003. Doc. 340, ¶ 5. The court made the undisputed factual finding that Genske Mulder and Downey Brand could not disclose before April 23, 2003, that Mr. Vieria was in plea negotiations in New Jersey in the Supreme Specialties investigation. *Id.*

On April 21, 2003, Downey Brand led a meeting of the Valley Gold Management Committee and reviewed the then-existing draft of the Offering Memorandum. The Valley Gold Management Committee

voted to approve the April 21, 2003 version of the Offering

Memorandum and to "authorize and direct the Designated Officers,

acting individually or collectively, to take all steps necessary

to complete the offering on behalf of the Company, including the

acceptance of subscriptions for Membership interests ...." The

draft Offering Memorandum and documents in the offering packet

urged potential investors to consult their own attorneys and

financial advisors before investing in Valley Gold.

On April 22, 2003, Tim Brasil, one of the designated

officers of Valley Gold, distributed the April 21, 2003 version

of the Offering Memorandum to Joseph Lopes, Raymond Lopes, Manuel

Lopes, and Mariana Lopes. The April 21, 2003 version did not

include any disclosure concerning the New Jersey United States

Attorney's Office's criminal investigation of Mr. Vieira. Raymond

Lopes, Manuel Lopes and Joseph Lopes did not read the Offering

Memorandum before investing in Valley Gold.

The final Offering Memorandum contains the following

disclosure:

> Mr. Vieria, one of the principal organizers of the Company
> and this transaction is currently the chief executive
> officer of CVD. George Vieria, was, for a short period of
> time, an officer of Suprema West, Inc. ("Suprema West").
> Suprema West is a subsidiary of Suprema Specialties, Inc.
> ("Suprema"). Suprema and Suprema West are in bankruptcy.
> Suprema is also the subject of an investigation being
> conducted by the Securities and Exchange Commission and the
> U.S. Attorney's Office. Assertions have been made that
> financial data for Suprema was also misrepresented. Mr.
> Vieira has been contacted by the U.S. Attorney's Office and

may be a subject of this investigation. No formal charges
have been brought against Mr. Vieira.

("Vieira Disclosure") Doc. 330, Ex. B, 12.

Plaintiffs acknowledge that, had they read the disclosure

about Mr. Vieira that was included in the final Offering

Memorandum, they would not have invested in Valley Gold and that

the Vieria Disclosure was sufficient to apprise a potential

investor of possible problems involving Mr. Vieira.

No Downey Brand representative was present when the Offering

Memorandum was given to potential investors. Downey Brand was not

aware of, exercised no control over, and did not impose any

limitations on the time given to potential investors to review

the Offering. Downey Brand advised Valley Gold to urge potential

investors to consult their own attorneys and financial advisors

before investing. At a meeting attended by potential investors,

Downey Brand attorneys said the same thing to potential

investors.

Valley Gold's cheese plant opened for business in May 2003,

and received substantial quantities of milk from CVD. By August

or September of 2003, Valley Gold had not paid CVD for the milk

it received from CVD. CVD could not pay milk producers on time,

and eventually could not pay them at all.

Downey Brand did not prepare the "Milk for Equity"

agreements in which the individual Plaintiffs agreed to forgo

payment for their milk in return for a larger equity interest in

Valley Gold. Downey Brand did not play any other role in suggesting that the individual Plaintiffs agree to enter into the "Milk for Equity" contracts or that Plaintiffs otherwise forgo milk payments.

On January 7, 2004, Mr. Vieira was indicted for securities fraud and entered a guilty plea in New Jersey pursuant to a plea agreement. On January 25, 2004, a story about the guilty plea appeared in a local paper, the Modesto Bee. Valley Gold's Management Committee learned of the plea and discussed it in late January 2004.

### 2.   Disputed Facts

Downey Brand contends that it kept the Vieria Disclosure as a separate document for two reasons: (a) the paragraph was being circulated to persons who could verify its accuracy until the April 21, 2003 meeting to approve the final offering; and (b) Downey Brand wanted the Valley Gold Management Committee to focus specifically on it during the meeting. Plaintiffs argue that the disclosure was intentionally concealed.

Downey Brand contends that the Committee discussed the Vieira Disclosure at length and approved the specific language before it was inserted in the final Offering Memorandum. In his December 17, 2010 deposition, Joe Machado states that during the April 21, 2003 meeting, the disclosure paragraph was discussed:

1

2

> Q. Okay. Do you recall this paragraph, and including this paragraph in the final version of the offering, being discussed at the April 21st, 2003 meeting?
> A. Yes. And I believe we discussed that. They took George out of the room, you know, went to a different room, and we stayed with Tony Cary, Curtis Colaw and the Downey Brand attorneys, you know, and we talked all that out there. And George was taken out of the room and I believe that's when we discussed this stuff.

3

4

5

6

7

Doc. 343-13, 10. Pointing to the minutes of the April 21, 2003

8

Committee meeting, Plaintiffs contend that approval of the

9

Offering Memorandum was not conditioned on the addition of the

10

paragraph. The minutes, however, state: "The most recent *draft* of

11

the Memorandum was distributed to the Committee for review." Doc.

12

358, Ex. M, 2 (emphasis added).

13

14

Downey Brand contends that, assuming Plaintiffs were given a

15

draft, Downey Brand was not aware the Committee intended to

16

distribute a draft or that a draft was given to potential

17

investors. Downey Brand states that it advised the Committee not

18

to share drafts with anyone beyond those persons assisting in

19

preparing the Offering.

20

21

Downey Brand contends that Mariana Lopes and Michael Lopes

22

did not read the Offering Memorandum before investing in Valley

23

Gold. Mariana Lopes and Michael Lopes contend that they read the

24

Offering Memorandum before investing in Valley Gold.

25

The parties dispute the reason for Valley Gold's ultimate

26

failure. Downey Brand contends that Valley Gold ultimately failed

27

for three interrelated reasons: when the plant first opened, CVD

28

flooded it with four times as much milk as the Committee had

anticipated, creating four times as much debt for excess milk;

investors refused to give personal guarantees to obtain

financing; and, without personal guarantees, Valley Gold could

not obtain financing.

C.   GENSKE, MULDER & COMPANY, LLP

1.   Undisputed Facts

Joseph and Michael Lopes are brothers, nephews of Manuel and

Mariana Lopes, sons of Raymond Lopes, and nephews of Tim Brasil.

Mariana Lopes, who is married to Manuel Lopes, is Raymond Lopes'

sister-in-law.

Tim Brasil was a member of the Valley Gold Management

Committee from the date Valley Gold was formed in 2003 until

2005. Jose "Joe" G. Machado was on the Valley Gold Management

Committee from 2002 to May 2005. Joe Machado was the chairman of

the Valley Gold Management Committee when it was initially

formed. Joseph Lopes was a member of the Valley Gold Management

Committee soon after it was formed in 2003 through 2005 or 2006.

The Valley Gold Management Committee knew about Mr. Vieira's

criminal investigation both before the sale of Valley Gold

Securities and on April 21, 2003.

Valley Gold engaged Genske Mulder to provide limited

professional services: (1) to decide which accounting software

Valley Gold should use; (2) to provide monthly bookkeeping; (3)

to prepare Valley Gold's 2003 tax return; (4) to compile
financial forecasts; (5) to compile the business plan; and (6) to
compile risk information for the operating agreement. Genske
Mulder provided a list of dairy industry "Risk Factors" for the
business plan. Valley Gold did not engage Genske Mulder to: (a)
investigate Mr. Vieria; (b) advise it about the Milk Producer's
Fund; (c) investigate the viability and reputation of the New
Jersey Distributor, Mr. Profaci; (d) advise it about the sales
price of cheese; or (e) obtain financing for Valley Gold.

Before April 22, 2003, Genske Mulder disclosed its financial
forecasts to members of the Valley Gold Management Committee. The
financial forecasts projected Valley Gold could be profitable.

In the weeks before April 22, 2003, Tim Brasil and other
Management Committee members regularly discussed with the
individual Plaintiffs how the Valley Gold venture was
progressing. After one meeting, the Management Committee members
also met with the rest of the investors at Mallard's Restaurant
in Modesto and discussed the proposed investment with them. These
discussions included the disclosure that Genske Mulder had
investigated the proposed venture and concluded it could make a
profit.

The Management Committee members believed that the financial
forecasts were based upon a plan to initially process five loads

of milk daily and gradually increase production thereafter. This was discussed in meetings that Genske Mulder attended.

Genske Mulder prepared tax returns for Raymond Lopes. Other than tax return preparation, Genske Mulder was not engaged to perform any other professional services for Raymond Lopes. Raymond Lopes does not know any Genske Mulder accountant. Raymond Lopes did not discuss with anyone at Genske Mulder (1) his investment in Valley Gold, (2) whether he should continue to sell his milk to CVD even though it was paying late, or (3) the "Milk for Equity" transaction. Genske Mulder did not provide any professional services to Manuel and Mariana Lopes. Mariana Lopes is not aware of any intentional act by Genske Mulder to harm her. Genske Mulder served as accountant for Joseph and Michael Lopes and their dairy, Westside Holsteins. Genske Mulder prepared these Lopes' tax returns and helped them with financial statements. Genske Mulder did not give Joseph Lopes advice about the "Milk for Equity" transaction.

On April 21, 2003, Tim Brasil gave Mariana Lopes, Raymond Lopes, Michael Lopes and Joseph Lopes a draft Offering Memorandum. Mr. Brasil told Michael Lopes to review the draft and take it to "whoever you need to feel comfortable."

Before investing in Valley Gold, Raymond Lopes did not read the Valley Gold Offering Memorandum or any other documents and did not discuss the Valley Gold offering with anyone at Genske

13

Mulder. Before he invested, Raymond Lopes discussed the Valley Gold offering with Mariana Lopes, who said the Valley Gold investment was a "good thing" and that it was a place to "put the milk," i.e., there was no other customer for his milk other than the to-be-formed Valley Gold, and so the Valley Gold investment was a "good thing." Before he invested, Raymond Lopes also discussed the Valley Gold offering with Joseph and Michael Lopes. Michael Lopes told his father that he read the documents and everything looked good. Raymond Lopes would not have invested in Valley Gold had he read the Vieira Disclosure.

Manuel Lopes did not read the draft Offering Memorandum nor did anyone read the documents to him. Mariana Lopes, Manuel Lopes' wife, read the entire draft Offering Memorandum, but did not understand the entire document. Mariana Lopes told her husband that everything looked good. Mariana Lopes did not read the final Offering Memorandum.

Manuel and Mariana Lopes sought advice about the Valley Gold investment from only one person: their accountant Susan Miguel. Manuel and Mariana Lopes gave Ms. Miguel the draft Offering Memorandum. Ms. Miguel advised Manuel and Mariana Lopes to "be careful," which Manuel Lopes understood to mean that Manuel and Mariana Lopes might lose their entire investment. Ms. Miguel also advised Manuel and Mariana Lopes that "it was a lot of money to invest." Ms. Miguel called Downey Brand to ask questions about

14

the draft Offering Memorandum, but no one was available. Ms. Miguel called Genske Mulder and spoke with someone (possibly Peter Hoekstra), who said they would call Downey Brand with Ms. Miguel's questions. Manuel and Mariana Lopes left Ms. Miguel's office before Genske Mulder returned her call. Mariana Lopes does not know what questions Ms. Miguel was going to ask Downey Brand and Genske Mulder and does not recall what Ms. Miguel said Genske Mulder told her. Ms. Miguel did not advise Manuel and Mariana Lopes to review the final Offering Memorandum before investing in Valley Gold. Mariana Lopes did not receive a call from Ms. Miguel and assumed Ms. Miguel's questions were answered. Mariana Lopes did not have any additional communication with Ms. Miguel before they decided to invest in Valley Gold.

Joseph Lopes skimmed the April 21, 2003 version of the Offering Memorandum before he invested in Valley Gold. Michael Lopes read the April 21, 2003 version of the Offering Memorandum and decided with Joseph Lopes to invest in Valley Gold. Neither Joseph Lopes nor Michael Lopes read the final Offering Memorandum.

Joe Machado, Mr. Brasil, and the Boards of CVD and Valley Gold stated that the draft Offering Memorandum was substantively the same version as the final Offering Memorandum. Manuel and Mariana Lopes gave Valley Gold the draft and final Offering Memorandums when they subscribed to the Valley Gold investment.

Mariana Lopes acknowledged the signatures of Manuel and Mariana Lopes on the Subscription Package.

The CVD directors told Plaintiffs that everyone was going to make a lot of money. Mr. Brasil, Joe Machado, Mr. Vieira and Mr. Cary told Joseph Lopes that the Valley Gold investment would be a home for their milk. Mr. Vieira, Alvaro Machado, and Paul Anema of Genske Mulder told Michael Lopes that investing in Valley Gold was a "good deal". Mr. Vieira, Joe Machado, the CVD Board, Peter Hoekstra, Mr. Cary, and Genske Mulder told Mariana Lopes that Valley Gold would be a "good investment."

Michael Lopes did not review any financial forecasts. Michael Lopes did not attend the April 21, 2003 meeting and did not know what was discussed at that meeting. Mariana Lopes never saw the financial forecasts before investing in Valley Gold. She did not understand them and was not able to interpret them. Susan Miguel, Mariana Lopes' accountant, received the financial forecasts from another client. Joe Nunes understood that a financial forecast was based on assumptions actually occurring, and told Mariana Lopes that "everything looks fine." Manuel Lopes never discussed financial performance of the Gustine Plant while it was owned by Land O'Lakes or how much cheese from the plant Land O'Lakes might sell.

At a March 2003 meeting regarding the formation of Valley Gold, Mr. Hoekstra emphasized the need for a line of credit for

Valley Gold, without which Valley Gold would run out of money. The compiled financial forecast dated May 15, 2003 was a representation by Valley Gold Management. The financial forecast assumed that Valley Gold would get an operating line of credit of $4,000,000 and $650,000 in equipment financing. Valley Gold was not able to obtain an operating line of credit because all Valley Gold investors were not able, or were unwilling, to personally guarantee the debt.

CVD first began paying late for milk during the summer of 2003, because Valley Gold did not pay CVD for its milk. The Valley Gold Management Committee knew in September 2003 that it could not pay its bills. Raymond Lopes contacted Mr. Brasil when he was not paid timely for his milk, and Mr. Brasil gave various excuses for the late payments. Manuel and Mariana Lopes sold milk to CVD until July 2005, when they left CVD. Mariana Lopes did not contact Genske Mulder about the August 2003 milk payment. In September 2004, Valley Gold owed Manuel and Mariana Lopes $500,000 for unpaid milk.

In January 2004, Valley Gold's Management Committee knew that George Vieria had pled guilty to Federal criminal charges in New Jersey.

The Valley Gold Management Committee met with the New Jersey distributor, Mr. Profaci, and discussed selling cheese to him. The Valley Gold Management Committee was aware that Mr. Profaci

was engaging in sharp practices and successfully sued him to recover the price of cheese sold to him.

The Valley Gold Management Committee did not consider suing Genske Mulder for professional negligence. No demand was ever made on the Valley Gold Management Committee by the Individual Plaintiffs that Valley Gold sue Genske Mulder for professional negligence.

### 2.   Disputed Facts

Plaintiffs contend that Genske Mulder's accountants had no prior experience with cheese manufacturing. Mr. Hoekstra states in his deposition that he previously had experience with one cheese plant. Doc. 358-18, 73.

Genske Mulder contends that Valley Gold investors were present at the April 21, 2003 meeting. Pointing to the minutes of the April 21, 2003 meeting, Plaintiffs contend that only advisers and the Management Committee were present:

```
Joe G. Machado
Joe Nunes
Joe Homen
Tim Brasil
Dennis Nunes
Frank Borba
Jeffrey Koewler
Christopher Delfino
Tony Carey
Curtis Colaw
Peter Hoekstra
Paul Anema
George Vieria
```

Doc. 358, Ex. M, 2.

Plaintiffs contend that in preparing the financial forecasts, Genske Mulder did not make any effort to compare the forecasted figures with the historical plant operations, plant capacity or industry standards.

Plaintiffs assert that Land O' Lakes only sold $76.9 million of cheese from the Gustine plant in 2001. It sold $25.9 million in the last five months of 2000, after purchasing the plant from Beatrice Cheese in July, 2000. The $103 million figure in the Offering Memorandum was the combined total for both years (rounded up).

Plaintiffs contend that Genske Mulder's financial projections and the Offering Memorandum stated that the Gustine plant would need $700,000 in mechanical upgrades, including $500,000 for Ricotta cheese manufacturing equipment. Plaintiffs further contend that Mr. Vieira had concluded that the plant needed $2.5 million to $3 million in equipment repairs not including any Ricotta cheese equipment.

Genske Mulder contends that the financial forecast dated May 15, 2003 assumed that Valley Gold would receive 5 loads of milk per day from CVD. Plaintiffs contend that Genske Mulder's financial forecasts were based upon the Valley Gold Gustine plant processing 16.5 loads of milk per day in July 2003, and 21 loads of milk per day by October 2003, and 27 loads of milk per day starting in January 2004. Plaintiffs assert that the Gustine

19

plant's maximum capacity was only 15 to 20 loads of milk per day, and Mr. Vieira never planned to run the plant at full capacity to avoid overtime expense.

Genske Mulder contends that Valley Gold did not operate as assumed in the financial forecast because it received 20 loads of milk per day from CVD soon after it began operations. It is undisputed that CVD made the decision to ship 20 loads of milk per day to Valley Gold; however the effect of this larger quantity of milk is disputed. Genske Mulder contends that this larger quantity of milk caused operational and financial stress on Valley Gold. Plaintiffs contend that the larger quantity of milk was within Genske Mulder's financial projections.

It is disputed whether Plaintiffs relied upon the financial forecasts prepared by Genske Mulder in investing in Valley Gold. Genske Mulder contends that Mariana Lopes never discussed the financial forecasts with anyone. Pointing to Mariana Lopes' deposition and Susan Miguel's declaration, Plaintiffs contend that Ms. Miguel reviewed the financial forecasts on Mariana Lopes' behalf.

Genske Mulder rejoins that it terminated its professional relationship with Valley Gold in July 2003 (except for the preparation of the 2003 tax return) because Valley Gold was no longer able to pay Genske Mulder's billings. Plaintiffs contend that Genske Mulder prepared: (1) Valley Gold's 2003 yearend

financial statements, dated March 17, 2004; (2) an analysis of the cheese sale prices for Valley Gold dated December 15, 2003; (3) an ownership structure report for Valley Gold dated March 10, 2005; and (4) a letter regarding inventory controls for Valley Gold with a facsimile transmission dated June 14, 2004.

Genske Mulder argues, without supporting evidence, that in December 2003 Valley Gold's Management Committee and its manager Katien Mehta knew that it was selling cheese at a discount. Genske Mulder contends that Valley Gold failed due to lack of financing. Genske Mulder states that Valley Gold needed investor guarantees to get financing, which not all of the investors could or would give. Valley Gold investors would not guarantee a line of credit, so none was obtained. Plaintiffs contend that the members of Valley Gold provided their own financing by foregoing payment for their milk in a sum of nearly $20 million, which was greater than the operating line of credit Genske Mulder projected would be needed.

Genske Mulder asserts that it was not the proximate cause of Valley Gold's purchase of more milk (from CVD) than it could process or finance. Plaintiffs contend that Valley Gold never purchased or processed more milk than Genske Mulder had projected they would need to purchase and process as part of the financial forecasts.

21

1  Genske Mulder contends that it was not the proximate cause

2  of Valley Gold's termination of operations in approximately June

3  2005. Genske Mulder asserts that Valley Gold has not produced any

4  evidence that it has suffered any damage proximately caused by

5  Genske Mulder's alleged negligence, nor did the accountants cause

6  Valley Gold's inability to obtain financing after it commenced

7  operating or the proximate cause of Valley Gold selling its

8  cheese at a discount.

9

10  Plaintiffs rejoin that if Genske Mulder prepared competent

11  financial forecasts that included and correctly analyzed the

12  information available to it (regarding milk purchase prices,

13  cheese sale prices, manufacturing volume, plant equipment costs

14  and overhead), Genske Mulder would have disclosed that Valley

15  Gold could never turn a profit – a disclosure that in turn would

16  have from the inception prevented the Valley Gold venture from

17  going forward. Plaintiffs argue that these errors and omissions

18  were a proximate cause for the formation of Valley Gold, which

19  predestined its failure; even if the precise timing of the

20  failure was not attributable to Genske Mulder, it was necessarily

21  linked to the members' willingness to forego payment for their

22  milk.

23

24  ### III. <u>LEGAL STANDARD</u>

25

26  Summary judgment is proper if "the pleadings, the discovery

27  and disclosure materials on file, and any affidavits show that

28

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986) (internal quotation marks omitted). A fact is material if it could affect the outcome of the suit under the governing substantive law; "irrelevant" or "unnecessary" factual disputes will not be counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

If the moving party would bear the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, if the non-moving party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that there is an absence of evidence" to support the non-moving party's case. *Id.*

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse

party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In ruling on a motion for summary judgment, a court does not make credibility determinations or weigh evidence. *See Anderson*, 477 U.S. at 255. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Soremekun*, 509 F.3d at 984. "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id.*

## IV.   DISCUSSION

### A.   PLAINTIFFS' REQUESTS TO CLARIFY PREVIOUS RULINGS

In their supplemental opposition to Genske Mulder's motions for summary judgment, Plaintiffs request clarification of two previous rulings. Doc. 364, 2. Genske Mulder objects to Plaintiffs' request to clarify the court's prior ruling as an improper motion to reconsider without a motion under Rule 54(b) or a motion addressed to the court's inherent power to correct manifest error.

Rule 54(b) provides:

> [A]ny order or other decision, however designated, that
> adjudicates fewer than all the claims or the rights and
> liabilities of fewer than all the parties does not end the
> action as to any of the claims or parties and may be revised
> at any time before the entry of a judgment adjudicating all
> the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). A district court may reconsider its prior

rulings, so long as it has jurisdiction over a case. *United

States v. Smith*, 389 F.3d 944, 948 (9th Cir. 2004).

### 1.   Milk Losses

Plaintiffs assert that the court's conclusion that it could

not determine as a matter of law that the "Milk for Equity"

agreements did not involve securities is incongruous with the

ruling that Plaintiffs are not entitled to recover for their milk

losses.

Summary judgment was granted to Downey Brand and Genske

Mulder as to Plaintiffs' claims for damages for unpaid milk due

to Plaintiffs' lack of standing. Because the derivative claims

against CVD were dismissed, the court held that the individual

Plaintiffs did not have standing to recover CVD damages from

Downey Brand and Genske Mulder resulting from Valley Gold's

failure to pay for milk delivered by CVD to Valley Gold. Doc.

301, 49-50. Plaintiffs' lack of standing remains unchanged.

### 2.   Sellers under California Securities Act

The court previously ruled that Downey Brand and Genske

Mulder were not "sellers" within the meaning of California

Securities Act § 25400(d). Plaintiffs contend that the court did not address authorities submitted in Plaintiffs' brief of September 29, 2010 (submitted without prior leave from the court following the September 21, 2010 hearing), showing that those who materially assist in the sale of securities with material misstatements or omissions are jointly and severally liable with the actual sellers of securities under California Corporations Code Sections 25403(b), 25504, 25504.1 and 25504.2.

Even if Plaintiffs' late-provided legal authorities are considered, the prior ruling remains unchanged. No private right of action exists under Section 25403. *Appollo Capital Fund, LLC v. Roth Capital Partners*, *LLC*, 158 Cal.App.4[th] 226, 255, 70 Cal.Rptr.3d 199 (2007). With respect to Sections 25504, 25504.1 and 25504.2, the Fifth Cause of Action in the TAC is asserted for violation of California Corporations Code Section 25400(d). Section 25500 creates a private right of action for violations of Section 25400. *See* Cal. Corp. Code § 25500; *Kamen v. Lindly*, 94 Cal.App.4[th] 197, 206 (2001) ("Section 25500 creates the private right to action and establishes the circumstances under which a person who has engaged in the conduct proscribed by section 25400 may be held liable for damages."). The previous ruling quoted *Kamen*:

> In light of the vast majority of federal cases that have construed section 9 of the Securities Exchange Act of 1934 and Corporations Code sections 25400 and 25500, we conclude that civil liability pursuant to Corporations Code section

> 25500 applies only to a defendant who is either a person selling or offering to sell or buying or offering to buy a security.

*Id.* The *Kamen* holding specifically states:

> Corporations Code sections 25504 and 25504.1 . . . specifically impose liability not only on the buyer or seller of a security but on controlling persons, associates and agents as well as aiders and abettors. These statutes indicate that the Legislature knows how to establish secondary liability when it wants to do so, yet failed to do so with respect to Corporations Code section 25400.

*Id.* at 204. Under *Kamen*, there is no liability for aiding and abetting under Section 25400. *Id.* Plaintiffs' supplemental authority does not provide authority to impose joint and several liability on Downey Brand and Genske Mulder or alter the previous ruling that Downey Brand and Genske Mulder are not sellers within the meaning of Section 25400(d).

Plaintiffs' request for clarification is DENIED.

B.   <u>PLAINTIFFS' OFFER OF PROOF</u>

Plaintiffs filed an offer of proof describing their "anticipated expert testimony." Doc. 362. In the offer of proof, Plaintiffs do not identify any experts nor describe any specific evidence, including any expert reports or specific opinions. Rather, Plaintiffs state that their expert will testify that Downey Brand failed to meet the applicable standard of care in drafting the Valley Gold Offering Memorandum and that Genske Mulder failed to meet the applicable standard of care in preparing financial forecasts for Valley Gold. Genske Mulder

27

objects that Plaintiffs' offer of proof is not evidence and should be disregarded.

Only admissible evidence may be considered in deciding a motion for summary judgment. *Soremekun*, 509 F.3d at 984 (citing Fed. R. Civ. P. 56(e)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id*.

Plaintiffs' offer of proof is not admissible evidence. "Proof of professional negligence requires testimony of experts as to the standard of care in the relevant community." *U.S. Fidelity & Guar. Co. v. Lee Investments LLC*, ---F.3d---, 2011 WL 1458793, *9 (9th Cir. 2011) (quoting *Huang v. Garner*, 157 Cal.App.3d 404, 413, 203 Cal.Rptr. 800 (1984), *disapproved on other grounds by Aas v. Superior Court*, 24 Cal.4[th] 627, 101 Cal.Rptr.2d 718 (2000)). Plaintiffs' offer of proof does not provide such standard of care testimony from identified experts in the legal and accounting communities. Instead, Plaintiffs have offered only conclusions of law without the necessary foundation.

Plaintiffs' offer of proof is insufficient and REJECTED.

C.   DOWNEY BRAND'S MOTIONS FOR SUMMARY JUDGMENT - INDIVIDUAL PLAINTIFFS

Downey Brand moves for summary judgment against the individual Plaintiffs on the remaining Cause of Actions asserted against it, i.e., the Fourth, Sixth, Seventh, and Eighth Causes of Action. Summary judgment has been granted in favor of Downey

Brand on the Fifth Cause of Action and for claims related to lost milk payments.

### 1.   Plaintiffs' Claims

At the hearing, Plaintiffs' counsel was asked to explain with particularity Plaintiffs' claims against Downey Brand. After years in litigation and continually evolving theories of liability, Plaintiffs' claims, as listed below, are the final iteration; Plaintiffs will not be permitted to alter these theories, or assert additional theories, against Downey Brand.

### a)   Misrepresentation

Plaintiffs assert a misrepresentation claim against Downey Brand for including the following sentence in the Offering Memorandum:

> The Operating Projections and the financial figures and projections contained in this Memorandum were prepared by the Company's accountants.

Doc. 330, Ex. B, 6. Genske Mulder's financial forecasts were originally attached as an exhibit to the Offering Memorandum. The financial forecasts were later removed from the Offering Memorandum, but the above sentence was not deleted. Based on this sentence, Plaintiffs allege that they believed Genske-Mulder (1) reviewed the Land O'Lakes financial documents and (2) provided the other financial projections and figures in the Offering Memorandum. Doc. 330, ¶ 125(d)-(e). The full paragraph containing the sentence reads:

1
2
3
4
5
6
7
8
9
10
11
12
13
14

> The Operating Projections and the financial figures and projections contained in this Memorandum were prepared by the Company's accountants. These financial documents, figures and projections are based, in large part, on financial documents provided to the Company by Land O'Lakes and George Vieira. The Company has reviewed certain financial data prepared by Land O'Lakes regarding the operation of the Cheese Plant. The financial documents provided to the Company by Land O'Lakes were not prepared specifically for use by the Company. The financial documents were prepared by Land O'Lakes for their own internal use. The Company has not obtained an independent audit of Land O'Lakes' operations to verify the accuracy of such information. Further, Land O'Lakes is a corporation with facilities and operations in numerous states and revenue in the billions of dollars. The Cheese Plant is just a portion of Land O'Lakes overall business operations. As a result, the financial information provided by Land O'Lakes to the Company regarding Cheese Plant may reflect costs and savings that won't be realized by the Company in its operations of the Cheese Plant. Further, after the Company has had the opportunity to operate the Cheese Plant for a period of time, the Company may decide to adopt different accounting practices which, if these practices had been adopted by Land O'Lakes, would have changed the financial information provided to the Company.

Doc. 330, Ex. B, 6.

15
16

> b)   Concealment of the Vieira Disclosure

17
18

Plaintiffs also allege that Downey Brand intentionally

19

concealed a disclosure regarding Mr. Vieira's criminal

20

investigation. The final Offering Memorandum contains the

21

following disclosure:

22
23
24
25
26
27

> Mr. Vieria, one of the principal organizers of the Company and this transaction is currently the chief executive officer of CVD. George Vieira, was, for a short period of time, an officer of Suprema West, Inc. ("Suprema West"). Suprema West is a subsidiary of Suprema Specialties, Inc. ("Suprema"). Suprema and Suprema West are in bankruptcy. Suprema is also the subject of an investigation being conducted by the Securities and Exchange Commission and the U.S. Attorney's Office. Assertions have been made that financial data for Suprema was also misrepresented. Mr. Vieira has been contacted by the U.S. Attorney's Office and may be a subject of this investigation. No formal charges have been brought against Mr. Vieira.

28

("Vieira Disclosure") Doc. 330, Ex. B, 12. The draft Offering

Memorandum that Tim Brasil gave Plaintiffs did not include this

paragraph.

The TAC alleges that Downey Brand intentionally assisted Mr.

Vieira in concealing the Vieria Disclosure by:

> (a) waiting until April 22, 2003 to insert the disclosure
> into the final version of the Offering Memorandum that by
> design, Plaintiffs were not given any opportunity to review;
> (b) by intentionally failing to discuss the issue at the
> April 21, 2003 meeting with the management committee members
> for Valley Gold; (c) by omitting the disclosure from the
> Offering Memorandum that was faxed to the management
> committee members on April 18, 2003, with a cover letter
> that indicated that all substantive information for the
> Offering Memorandum was included with that draft; (d) by
> failing to maintain document control over versions four and
> five of the Offering Memorandum; (e) by transmitting even
> the final version of the Offering Memorandum in electronic
> format, in which it could easily and surreptitiously be
> changed; and (f) by requiring that Plaintiffs surrender all
> of the documents that they had been given to review.

Doc. 330, ¶ 124.

### c)   Business Plan

At the hearing, Plaintiffs did not assert their claims

against Downey Brand for misrepresentations or omissions in the

business plan. It is undisputed that Genske Mulder drafted Valley

Gold's business plan and that Downey Brand played no role in its

preparation. Downey Brand was not retained to provide Valley Gold

financial or business advice. There is no genuine issue of

material fact that Downey Brand made any material misstatements

or omissions in Valley Gold's business plan.

Summary judgment is GRANTED to Downey Brand as to any claims of misstatements or omissions in Valley Gold's business plan.

### 2. Fourth Cause of Action: Securities Fraud, Securities Exchange Act of 1934

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

15 U.S.C. § 78j. Rule 10b-5, promulgated under Section 10(b), makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b-5.

The elements of a claim under Section 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission; (2) scienter (i.e, knowledge of falsity or a wrongful state of mind); (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation (i.e., a causal

connection between the material misrepresentation and the loss).

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-342, 125 S.Ct.

1627 (2005).

### a)   Material Misrepresentation or Omission

#### (1)   Primary Violator

Downey Brand argues that Valley Gold made the offering and

all statements in the Offering Memorandum are attributable to

Valley Gold, not Downey Brand. Citing *Ziemba v. Cascade Intern.,*

*Inc.*, 256 F.3d 1194, 1205 (11th Circuit 2001), Downey Brand

contends that Plaintiffs cannot assert claims against attorneys

based on their "significant role in drafting, creating, reviewing

or editing allegedly fraudulent letters or press releases."

Plaintiffs do not address this argument.

In *Central Bank of Denver v. First Interstate Bank of*

*Denver,* 511 U.S. 164, 191, 114 S.Ct. 1439 (1994), the Supreme

Court held that Section 10(b) liability does not extend to aiders

and abetters. Congress subsequently passed the Private Securities

Litigation Reform Act of 1995 ("PSLRA"), which permits the SEC to

prosecute aiders and abettors. The PSLRA, however, does not

permit private cause of actions for aiding and abetting.

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S.

148, 158, 128 S.Ct. 761 (2008).

Private plaintiffs may bring suits against any person or

entity, including attorneys and accountants, under Section 10(b)

for primary violations, if all of the requirements for primary liability under Rule 10b-5 are met. *Cent. Bank,* 511 U.S. at 191. With respect to the making of false statements or omissions, the Ninth Circuit has found a primary violation where a defendant (a) signs a public filing containing a material misstatement or (b) substantially participates or is intricately involved in the preparation of fraudulent statements even though that participation might not lead to the actor's actual making of the statements. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 & n.5 (9th Cir. 2000); *see also In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 628-29 & n.3 (9th Cir. 1994) (concluding that a plaintiff may plead, with sufficient particularity, a claim for primary liability by alleging facts showing that a defendant engaged in "extensive review and discussions" regarding allegedly false statements, or that defendant "played a significant role in drafting and editing" those statements).

Downey Brand did not sign the Offering Memorandum. But it is undisputed that Downey Brand "took responsibility" for preparing and did prepare the Offering Memorandum. Downey Brand has not offered any evidence to show that it did not "substantially participate" or was not otherwise "intricately involved" in the preparation of the allegedly fraudulent statements and concealment. There is a genuine issue of material fact whether Downey Brand is a primary violator.

(2)   <u>Material Misrepresentation</u>

Plaintiffs' misrepresentation claim is based solely on the following sentence:

> The Operating Projections and the financial figures and projections contained in this Memorandum were prepared by the Company's accountants.

Doc. 330, Ex. B, 6.

Downey Brand contends that the TAC does not plead any misrepresentation claims against Downey Brand. The TAC, however, alleges:

> Even the final version of the Offering Memorandum, which Plaintiffs were not given the opportunity to read, included materially misleading provisions; these materials: . . .
>
> d.   Falsely stated that the Land O'Lakes financial documents had been reviewed by GENSKE MULDER; and
>
> e.   Falsely stated that the other financial projections and figures in the Offering Memorandum had been provided by GENSKE MULDER.

Doc. 330, 35-36.

Downey Brand contends that the court previously made the factual finding that Plaintiffs did not review the Financial Statement Forecasts and did not rely on them in making their investment decision to purchase Valley Gold securities. Doc. 340, ¶ 6. Downey Brand also argues that the Offering Memorandum adequately warns that the Land O' Lakes data was unverified:

> The Company has reviewed certain financial data prepared by Land O'Lakes regarding the operation of the Cheese Plant. The financial documents provided to the Company by Land O'Lakes were not prepared specifically for use by the Company. The financial documents were prepared by Land O'Lakes for their own internal use. The Company has not

35

1
2
　　　　obtained an independent audit of Land O'Lakes' operations to
　　　　verify the accuracy of such information.

3
Doc. 330, Ex. B, 6. Plaintiffs' misrepresentation claim against

4
Downey Brand is tenuous. Drawing all inferences in Plaintiffs'

5
favor, however, a reasonable fact finder could find that a

6
potential investor could be misled by the statement, if believed,

7
that "[t]he Operating Projections and the financial figures and

8
9
projections contained in this Memorandum were prepared by the

Company's accountants." Doc. 330, Ex. B, 6.
10

11
　　　　　　　　　　　　(3)　 <u>Material Omission</u>

12

13
　　　　Plaintiffs also allege that Downey Brand intentionally

14
concealed the disclosure regarding Mr. Vieira's criminal

15
investigation.

16
　　　　Downey Brand argues that there is no evidence that it

17
concealed the Vieira Disclosure. Downey Brand contends that the

18
Vieira Disclosure was kept separate because (a) the paragraph was

19
being circulated to persons who could verify its accuracy up

20
until the April 21, 2003 meeting to approve the final offering;

21
22
and (b) Downey Brand wanted the Valley Gold Management Committee

23
to focus specifically on it during the meeting. Doc. 344, Ex. 7,

24
¶ 3.

25
　　　　The TAC alleges that:

26
　　　　At the meeting on April 21, 2003 with the members of Valley
27
　　　　Gold's management committee, DOWNEY BRAND's attorneys
　　　　intentionally avoided discussing the criminal investigation
28
　　　　into George Vieira and Suprema Specialties. Defendants knew

1
2
3

that the investors in Valley Gold were a close-knit group
that talked often; and they knew that information that they
disclosed at the April 21, 2003 meeting would be shared with
the other investors, including Plaintiffs.

Doc. 330, ¶ 135. It is undisputed that the Valley Gold Board knew

about Mr. Vieira's criminal investigation before April 21, 2003.

Downey Brand argues that the Vieira Disclosure was discussed with

the Committee well before the final version of the Offering

Memorandum was distributed to investors, the Committee approved

the Vieira Disclosure when it approved the final version of the

Offering Memorandum on April 21, 2003, and the language was

inserted the following morning when final versions were assembled

and sent to Valley Gold for distribution to potential investors.

Doc. 344, Ex. 7, ¶ 4.

    Downey Brand contends that there is no evidence that Downey

Brand knew drafts of the Offering Memorandum were being

distributed. Mr. Koewler declares:

Downey Brand was not aware, if this was the case, that the
Committee intended to distribute a draft of the Offering
(the Draft) to potential investors or that the Draft was
given to anyone outside the Committee itself and
professionals assisting with the preparation of the
Offering. In fact, Downey Brand advised the Committee from
the beginning of its representation of Valley Gold that
drafts were not to be shared with anyone beyond the circle
of those assisting in preparing the Offering. The Committee
was told that all potential investors must receive the same
information regarding their investment in Valley Gold.

Doc. 344, Ex. 7, ¶ 5.

    Downey Brand further contends that there is no evidence that

Downey Brand limited review of the Offering Memorandum. It is

37

undisputed that no Downey Brand representative was present when the Offering Memorandum was given to potential investors. Downey Brand was not aware of, exercised no control over, and did not condone any limitations on the time given to potential investors to review the Offering. Downey Brand advised Valley Gold to urge potential investors to consult their own attorneys and financial advisors before investing. At a meeting attended by potential investors, Downey Brand attorneys said the same thing to potential investors.

Plaintiffs rejoin that the facts are capable of a sinister interpretation, and it is for the jury to decide whether Downey Brand suppressed the Vieira Disclosure. At the April 1, 2011 hearing, Plaintiffs' counsel pointed to the following evidence to support their allegation of concealment:

- Plaintiffs allege that Mr. Machado has testified inconsistently regarding whether Mr. Vieira's criminal investigation was discussed at the April 21, 2003 Valley Gold Management Committee meeting.

- Plaintiffs allege that Downey Brand has not explained why the Vieira Disclosure was not in the draft Offering Memorandum and why they could not edit or add to the language in the Offering Memorandum instead of keeping it separate.

- Plaintiffs allege that Mr. Machado testified that the

packets of investment materials were in Downey Brand's office, ready to be passed out on April 21, 2003, and that Mr. Machado picked up his packet from Downey Brand's Stockton office that day.

- Plaintiffs allege that Tim Brasil picked up his packet on April 21, 2003 in Stockton (i.e., in Downey Brand's office).

- The Vieira Disclosure was delivered at 2:03 PM April 22, 2003. Plaintiffs allege that Mr. Homen had the investment packets the morning of April 22, 2003, and that Mariana, Michael, and Joseph Lopes testified that Tim Brasil delivered the Offering Memorandum to them before lunch on April 22, 2003.

- Plaintiffs allege that the only source of payment of Downey Brand's fees was from the money raised from the Offering. The Offering Memorandum states that Downey Brand is being paid from the Offering proceeds (Downey Brand and Genske Mulder received $325,000 of professional fees combined).

- Plaintiffs assert that there was no discussion in the April 21, 2003 Committee meeting minutes and no Committee remembers whether there would be a final version of the Offering Memorandum.

Plaintiffs' concealment theory against Downey Brand is tenuous. Plaintiffs' evidence, however, is sufficient to create an issue of material fact. Drawing all inferences in Plaintiffs'

favor, as is required at the summary judgment stage, a reasonable fact finder could conclude that Downey Brand concealed the Vieira Disclosure.

### b)   Duty

Downey Brand further argues that it is entitled to summary judgment because it did not owe a duty of disclosure to Plaintiffs.

Section 10(b) and Rule 10b-5 are violated for nondisclosure only when the defendant has a duty to speak. *Clark*, 511 U.S. at 1447. Downey Brand contends that it did not owe a duty to communicate to the individual Plaintiffs, and cites a non-precedential Fifth Circuit case, *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1124 (5th Cir. 1988) (holding that attorneys who served as bond counsel for underwriters did not have a duty of disclosure to third party non-clients).

In determining whether a duty to disclose exists, the essential inquiry in the Ninth Circuit is one of recklessness under the scienter requirement of Rule 10b-5: (1) whether the failure to disclose is "highly unreasonable"; and (2) whether it constitutes an "extreme departure from standards of ordinary care." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1570 (9th Cir. 1990) (rejecting the "flexible duty standard"[1] in *White v.*

---

1 The "flexible duty" test requires courts to consider the following factors: (1) the relationship of defendant to plaintiff; (2) defendant's access to the information as compared to that of plaintiff; (3) defendant's

*Abrams*, 495 F.2d 724, 735-36 (9th Cir. 1974), because "it is essentially a negligence standard"). The Ninth Circuit has held that an attorney who undertakes to make representations to prospective purchasers of securities is under an obligation, imposed by Section 10(b), to tell the truth about those securities; that an attorney may have an attorney-client relationship with the seller of securities is irrelevant. *Thompson v. Paul*, 547 F.3d 1055, 1063 (9th Cir. 2008).

There is a genuine issue of material fact whether the alleged misstatement and concealment about the Vieira criminal investigation and whether the statement that the accountants reviewed and analyzed the financial forecast data for the investment transactions were recklessly unreasonable or an extreme departure from standards of ordinary care. Drawing all inferences in favor of Plaintiffs, a reasonable trier of fact could find that Downey Brand's alleged misstatement and actions were highly unreasonable or an extreme departure from standards of ordinary care, and that Downey Brand owed a duty to Plaintiffs under Section 10(b).

---

benefit derived from the relationship; (4) defendant's awareness of whether plaintiff was relying on their relationship in making his or her investment decisions; and (5) defendant's activity in initiating the transaction in question.

*Id.* at 1570 n.9.

c)   **Scienter**

Section 10(b) requires an element of scienter; it does not impose liability for negligence alone. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375 (1976). Scienter "refers to a mental state embracing intent to deceive, manipulate or defraud." *Id.* Recklessness is sufficient to support liability under § 10(b) of the Securities Exchange Act of 1934. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1283 (9th Cir. 1982).

> Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063 (9th Cir. 2000) (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (en banc) (internal quotation marks and citations omitted)).

"Cases where intent is a primary issue generally are inappropriate for summary judgment unless all reasonable inferences that could be drawn from the evidence defeat the plaintiff's claims." *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1283 (9th Cir. 1982) (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980)). Here, all reasonable inferences that can be drawn from Plaintiffs' evidence leave the issue whether Downey Brand misstated and omitted the disclosure as

42

analyzed above. Intent, scienter, and what was actually disclosed and not disclosed must be resolved by the trier of fact.

### d)  Reliance

Reliance upon a defendant's deceptive acts is an essential element of Section 10(b) private cause of action. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,* 552 U.S. 148, 159, 128 S.Ct. 761 (2008). "It ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability." *Id.*

#### (1)  Failure to Read Offering Memorandum

Downey Brand contends that summary judgment should be granted because Plaintiffs did not read the Offering Memorandum before investing in Valley Gold, and therefore did not rely on any misstatements or omissions in the Offering Memorandum. It is undisputed that Raymond Lopes, Manual Lopes, and Joseph Lopes did not read the Offering Memorandum before investing in Valley Gold. Plaintiffs assert that Plaintiffs directly relied on the misrepresentations, through others who read the Offering Memorandum on their behalf. In the securities law context, a plaintiff may rely on statements made indirectly to him. *See Zante v. Insurcorp et al.*, 2010 WL 5477768, *7 (D. Nev. 2010); *see also Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1283-84 (9th Cir.1982) (reversing a district court's grant of summary

judgment on a federal securities fraud claim where triable issues of fact remained as to indirect reliance).

With respect to the allegations of concealment, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 128 S.Ct. 761 (2008). Rather, the investor must show that facts withheld were material in the sense that a reasonable investigator would have considered them important in making the investment decision. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-154, 92 S.Ct. 1456 (1972); *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963-964 (9th Cir. 1990). "In a nondisclosure case under Rule 10b-5, a finding of materiality creases a presumption of reliance." *Kidwell ex rel. Penfold v. Meikle*, 597 F.2d 1273, 1293 (9th Cir. 1979). "Facts are considered material if there is a substantial likelihood that a reasonable shareholder would consider them important when making an investment decision." *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1281 (9th Cir. 1982). "A finding of nonreliance implies that plaintiffs would have acted no differently had they known the truth." *Id.* at 1283.

Here, it is undisputed that none of Plaintiffs would not have invested in Valley Gold if they had known Mr. Vieira was the subject of a criminal investigation. The Vieira Disclosure was

material, and Plaintiffs do not need to show more reliance on the alleged omission.

### (2)   Draft Documents

Downey Brand further argues that Plaintiffs cannot rely on representations made in the draft Offering Memorandum. Downey Brand cites Ninth Circuit dictum:

> [W]e conclude that the [final offering document] contained no actionable misrepresentations. We refer to the [final offering document] rather than the [preliminary offering document] as the source of the alleged misrepresentations because we conclude that at the very least, [plaintiff] did not reasonably rely on the [preliminary offering document], which was stamped "draft" on nearly every page; therefore, at a minimum, knowledge of changes made in the [offering document] must be imputed to [plaintiff].

*Shawmut Bank, N.A. v. Kress Assoc.*, 33 F.3d 1477, 1485 n.1 (9th Cir. 1994). There is a dispute as to what was disclosed about Mr. Vieira and the accountants' work and analysis in the financial forecasts and related documents. Downey Brand also argues that where, as here, offering memoranda contain "integration" and "no reliance" clauses, investors cannot reasonably rely on drafts. Downey Brand cites *One-O-One Enter., Inc. v. Caruso*, 848 F.2d 1283, 1286-87 (D.C. Cir. 1988) and another case that relies on *One-O-One*, *Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000).

The parole evidence rule generally provides that terms set forth in a writing intended by parties as a final expression of their agreement may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. Cal. Code Civ.

Pro. § 1856(a). The Seventh Circuit in *One-O-One,* 848 F.2d at

1287, explains:

> We have here the case of "a party with the capacity and
> opportunity to read a written contract, who [has] execute[d]
> it, not under any emergency, and whose signature was not
> obtained by trick or artifice"; such a party, if the parol
> evidence rule is to retain vitality, "cannot later claim
> fraud in the inducement."

Here, Plaintiffs allege that Downey Brand intentionally assisted

Mr. Vieira in concealing the disclosure about Mr. Vieira's

criminal investigation. Under California law, when fraud or

illegality is alleged, the parol evidence rule does not apply,

and evidence which varies or contradicts the terms of an

integrated contract are admissible. *Nagrampa v. MailCoups, Inc.*,

469 F.3d 1257, 1291 (9th Cir. 2006). The parole evidence rule does

not bar Plaintiffs' allegations of reliance on the draft Offering

Memorandum.

### e)   Loss Causation

Downey Brand asserts that Plaintiffs have no evidence to

establish a causal connection between the alleged omissions and

the loss of their investments in Valley Gold. Downey Brand

contends that Valley Gold failed not due to any of its conduct,

but because it ran up excessive debt, the investors refused to

personally guarantee Valley Gold's debt, and Valley Gold could

not obtain financing without personal guarantees. Plaintiffs

counter that they provided financing by agreeing to forego

payment for their milk and that the financial projections were

46

incorrect, predestining Valley Gold's failure. Loss causation is a material fact in dispute.

There are genuine issues of material fact that preclude summary judgment on the Fourth Cause of Action. Downey Brand's motion for summary judgment as to the Fourth Cause of Action is DENIED.

### 3.   Sixth Cause of Action: Negligence

"The elements of a cause of action for negligence are (1) a legal duty to use reasonable care, (2) the breach of that duty, and (3) proximate [or legal] cause between the breach and (4) the plaintiff's injury." *Mendoza v. Los Angeles*, 66 Cal.App.4th 1333, 1339 (1998). "Proof of professional negligence requires testimony of experts as to the standard of care in the relevant community." *U.S. Fidelity & Guar. Co. v. Lee Investments LLC*, ---F.3d---, 2011 WL 1458793, *9 (9th Cir. 2011) (quoting *Huang v. Garner*, 157 Cal.App.3d 404, 413 (1984), *disapproved on other grounds by Aas v. Superior Court*, 24 Cal.4th 627 (2000)).

### a)   Duty

"The existence of a legal duty to use reasonable care in a particular factual situation is a question of law for the court to decide." *Vasquez v. Residential Inv., Inc.*, 118 Cal.App.4th 269, 278, 12 Cal.Rptr.3d 846 (2004).

Citing *Heliotis v. Schuman,* 181 Cal.App.3d 646, 650-51, (1986), and *La Jolla Cove Apartments, Inc. v. Superior* Court, 121

Cal.App.4[th] 773, 784 (2004), Downey Brand contends that it did not have a duty to disclose facts to the individual Plaintiffs, unless the firm also expressly agreed to represent these Plaintiffs. *Heliotis* holds that an attorney who acts as a conduit for sellers in a real estate transaction does not have a real estate broker's duty to disclose known facts that are not readily observable by the purchaser because it would "compromise the underpinnings of the attorney-client relationship-an attorney's duties to his or her client to keep confidences, to zealously represent the client, and to give undivided loyalty to the client." *Heliotis,* 181 Cal.App.3d at 650-51. *La Jolla Cove Apartments* holds that corporate counsel's duty is first and foremost to the entity, and corporate counsel does not have a duty to disclose privileged information to those with which the corporation has a dispute. *La Jolla Cove Apartments*, 121 Cal.App.4[th] at 787-788.

As a general rule, privity of contract is required to establish a professional negligence claim in California. *Giacometti v. Aulla, LLC,* 187 Cal.App.4[th] 1133, 1137, 114 Cal.Rptr.3d 724 (2010). "An attorney's liability for professional negligence does not ordinarily extend beyond the client except in limited circumstances." *St. Paul Title Co. v. Meier*, 181 Cal.App.3d 948, 950, 226 Cal.Rptr. 538 (1986). In determining whether to impose a legal duty in the absence of privity of

contract, courts examine the factors set forth in *Biakanja v.*

*Irving*, 49 Cal.2d 647, 320 P.2d 16 (1958):

> The determination whether in a specific case the defendant
> will be held liable to a third person not in privity is a
> matter of policy and involves the balancing of various
> factors, among which are the extent to which the transaction
> was intended to affect the plaintiff, the foreseeability of
> harm to him, the degree of certainty that the plaintiff
> suffered injury, the closeness of the connection between the
> defendant's conduct and the injury suffered, the moral blame
> attached to the defendant's conduct, and the policy of
> preventing future harm....

*Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 398, 11 Cal.Rptr.2d 51

(1992) (quoting *Biakanja*, 49 Cal.2d at 650-651). Applying the

*Biakanja* factors, the California Supreme Court has held that

attorneys owe a duty of care to intended third party

beneficiaries. *See Lucas v. Hamm,* 56 Cal.2d 583, 595, 15

Cal.Rptr. 821 (1961) (holding that attorney owed duty to intended

beneficiaries of will). In *Bily*, 3 Cal.4th at 376, the California

Supreme Court examined the *Biakanja* factors and concluded that an

auditor does not owe a general duty of care regarding the conduct

of an audit to persons other than his or her client.

Here, Downey Brand is not in privity of contract with

Plaintiffs. Plaintiffs were not the intended beneficiaries of the

Offering Memorandum, Valley Gold; as investors in Valley Gold,

Plaintiffs were indirect beneficiaries. It is disputed whether

Plaintiffs suffered harm as a result of Downey Brand's alleged

misrepresentations and omissions, and there is a dispute

regarding the closeness of the connection between Downey Brand's

49

alleged conduct and Plaintiffs' injury. Imposing a duty on Downey Brand for general negligence would impose liability "far out of proportion to its fault." *Bily*, 3 Cal.4[th] at 398. Downey Brand did not owe a general duty of care to the individual Plaintiffs and cannot be liable under a general theory of negligence.

Downey Brand's motions for summary judgment as to the Sixth Cause of Action is GRANTED.

### 4.  Seventh Cause of Action: Intentional Misrepresentation

Intentional misrepresentation is "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true." 5 Witkin, Summary of California Law, § 767, 1115 (2005) (quoting Cal. Civ. Code § 1710(1)). The elements of a claim of fraud by intentional misrepresentation are:

1. The defendant made a representation as to a past or existing material fact;

2. The representation was false;

3. The defendant must have known that the representation was false when made [or must have made the representation recklessly without knowing whether it was true or false];

4. The defendant made the representation with an intent to defraud the plaintiff, that is, [he] must have made the representation for the purpose of inducing the plaintiff to rely upon it and to act or to refrain from acting in reliance thereon;

5. The plaintiff was unaware of the falsity of the representation; must have acted in reliance upon the truth of the representation and must have been justified in relying upon the representation;

6. And, finally, as a result of the reliance upon the truth of the representation, the plaintiff sustained damage.

Cal. Jury Instr. 12.31 (2011). "[I]ntentional concealment of a material fact is an alternative form of fraud and deceit equivalent to direct affirmative misrepresentation." *Stevens v. Superior Court*, 180 Cal.App.3d 605, 608, 225 Cal.Rptr. 624 (1986).

### a)   Duty

"California has long adopted the view that an attorney may not, with impunity, either conspire with a client to defraud or injure a third person or engage in intentional tortious conduct toward a third person." *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz*, 57 Cal.App.3d 104, 109, 128 Cal.Rptr. 901 (1976). For intentional misrepresentation, a duty is owed to the "persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation." *Bily*, 3 Cal.4[th] at 415 (quoting Rest.2d Torts, § 531).

It is undisputed that Downey Brand knew the Offering Memorandum was going to be supplied to potential investors, and its intended use was to secure financing for Valley Gold. A reasonable trier of fact could find that Downey Brand owed a duty to the individual Plaintiffs for purposes of the intentional misrepresentation claim.

### b)   Other Elements

Downey Brand contends that summary judgment must be granted

on Plaintiffs' intentional misrepresentation claim for the same reasons asserted against Plaintiffs' 10b-5 claim. For the same reasons, issues of material fact preclude summary judgment on Plaintiffs' 10b-5 claim against Downey Brand.

Downey Brand's motion for summary judgment as to the Seventh Cause of Action is DENIED.

### 5. Eighth Cause of Action: Negligent Misrepresentation

Negligent misrepresentation is "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." 5 Witkin, Summary of California Law, § 767, 1115 (2005) (quoting Cal. Civ. Code § 1710(2)). The elements of negligent misrepresentation are "(1) a misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) ignorance of the truth and justifiable reliance thereon by the party to whom the misrepresentation was directed, and (5) damages." *Fox v. Pollack*, 181 Cal.App.3d 954, 962, 226 Cal.Rptr. 532 (1986).

#### a) Duty

For negligent misrepresentation, a duty is owed to the person or class of persons to whom or for whom the representation is made. *Bily*, 3 Cal.4th at 408 (adopting the approach in Rest.2d

Torts, § 552).

It is undisputed that Downey Brand drafted the Offering Memorandum for potential investors, and that Downey Brand knew it was going to be provided to potential investors, with the intended purpose of obtaining financing for Valley Gold. A reasonable trier of fact could find that Downey Brand owed a duty to the individual Plaintiffs for purposes of the of the negligent misrepresentation claim. This issue cannot be resolved as a matter of law.

### b)   <u>Affirmative Misstatement</u>

Downey Brand argues that negligent misrepresentation requires an affirmative statement of fact, and Plaintiffs have failed to plead or prove an affirmative misstatement of fact.

Negligent misrepresentation requires a positive assertion; an implied assertion or representation is not enough. *OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 157 Cal.App.4th 835, 854, 68 Cal.Rptr.3d 828 (2007). "[W]hen the defendant purports to convey the 'whole truth' about a subject, 'misleading half-truths' about the subject may constitute positive assertions for the purpose of negligent misrepresentation." *Id.*

Here, Plaintiffs assert two claims against Downey Brand: one for a misrepresentation and one for concealment. The misrepresentation claim is a positive assertion. A reasonable

1   person could find that the assertions regarding Mr. Vieira in the

2   draft Offering Memorandum were misleading half-truths, and the

3   omission/concealment of the Vieira Disclosure were positive

4   assertions for the purpose of negligent misrepresentation.

5       Downey Brand's motion for summary judgment as to the Eighth

6   Cause of Action is DENIED.

7

8       D.   **DOWNEY BRAND'S MOTION FOR SUMMARY JUDGMENT AGAINST**
            **VALLEY GOLD (DERIVATIVE CLAIM)**

9

10      Downey Brand moves for summary judgment on Plaintiffs'

11  derivative claim for negligence (Sixth Cause of Action) asserted

12  on behalf of Valley Gold.

13

14          1.   Procedural Issue

15      Plaintiffs argue that Downey Brand's motion for summary

16  judgment is procedurally flawed. Plaintiffs contend that Valley

17  Gold, a defunct limited liability company, is not a Plaintiff in

18  the lawsuit and has no means of appearing in the action.

19  Plaintiffs argue that "the plaintiffs seeking relief in this

20  lawsuit are equity members of Valley Gold, not Valley Gold

21  itself." Doc. 349, 4. For this reason alone, Plaintiffs assert

22  that Downey Brand's motion for summary judgment on the derivative

23  claim for Valley Gold should be denied.

24

25      In a derivative suit, the corporation is the real party in

26  interest, and the stockholder bringing the suit on the

27  corporation's behalf is a nominal plaintiff. *Ross v. Bernard*, 396

28

U.S. 531, 538, 90 S.Ct. 733 (1970); *Gagnon Co. v. Nevada Desert Inn*, 45 Cal.2d 448, 453, 289 P.2d 466 (1955). Downey Brand correctly argues that a derivative action may be defeated if a defendant establishes that the corporation cannot prove its cause of action. *See Frederick v. First Union Securities, Inc.*, 100 Cal.App.4th 694, 697, 122 Cal.Rptr.2d 774 (2002).

### 2.   Statute of Limitations

Downey Brand argues that Valley Gold's derivative claim is time barred.

A legal malpractice claim must be filed "within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission." Cal. Code Civ. P. § 340.6. "[T]he accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause." *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1109, 245 Cal.Rptr. 658 (1988), The *Jolly* court explains:

> [T]he limitations period begins once the plaintiff "has notice or information of circumstances to put a reasonable person on inquiry ...." A plaintiff need not be aware of the specific "facts" necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.

*Id.* at 1110-1111 (internal citations omitted).

1       The original Complaint was filed September 11, 2006. Doc. 1.

2   It is undisputed that Valley Gold's Management Committee knew

3   that Mr. Vieira was the subject of criminal investigations before

4   April 2003, that it knew Valley Gold could not pay for milk in

5   September 2003, and that Mr. Vieira pleaded guilty to a felony in

6   January 2004. Valley Gold's Management Committee had sufficient

7   facts before September 2005 to suspect Downey Brand of the

8   alleged wrongdoing.

9       Plaintiffs contend that Valley Gold did not learn of Downey

10  Brand's alleged negligence until after September 2005.

11  Plaintiffs, however, only point to Tim Brasil's deposition

12  testimony:

13      Q.   Was there ever any discussion at management committee
             meetings of filing a lawsuit against Downey Brand
             because of the offering to investors?
14      A.   No.

15  Doc. 358-4, 17. There is an absence of evidence to show that

16  Valley Gold's derivative claim against Downey Brand is not time-

17  barred. Downey Brand's motion for summary judgment as to Valley

18  Gold's derivative claim is GRANTED.

19      E.   <u>GENSKE MULDER'S MOTIONS FOR SUMMARY JUDGMENT AGAINST
             THE INDIVIDUAL PLAINTIFFS</u>

20      Genske Mulder moves for summary judgment against the

21  individual Plaintiffs on the Fourth, Sixth, Seventh, and Eighth

22  Cause of Actions. Summary judgment has been granted in favor of

23  Genske Mulder on the Fifth Cause of Action and for claims for

56

lost milk.

### 1.   Plaintiffs' Claims

At the hearing, Plaintiffs' counsel was asked to clarify Plaintiffs' claims against Genske Mulder. Plaintiffs' claims, as listed below, will remain unchanged; Plaintiffs shall not further change their theories against Genske Mulder.

### a)   Omissions from Financial Forecasts

Plaintiffs assert that Genske Mulder's financial figures were based on known, false information, and that if Genske Mulder had compiled the financial forecasts based on all information known to them, the forecasts would have shown that Valley Gold could never be profitable. Plaintiffs assert the following omissions:

(1)   Plaintiffs allege that the forecasts should have been based on a projection of 5 loads of milk per day, but that the forecasts were based on projections estimating 16.5 loads per day. Plaintiffs also allege that the forecasts assume 30 loads of milk per day in the future, when the plant only had the capacity to process 20 loads per day.

(2)   Plaintiffs allege that the forecasts did not include the 20 cent premium for milk.

(3)   Plaintiffs allege that the forecasts did not include George Vieira's negotiated royalty payment of a penny per pound for all cheese sold by Valley Gold.

(4)   Plaintiffs allege that the forecasts did not include the real cost of necessary equipment.

(5)   Plaintiffs allege that the projections included historic data on cheese and milk prices that was incorrect.

### b)   Breach of Accounting Standards in Preparing Financial Forecasts

The TAC also alleges that Genske Mulder breached the accounting standards of care in creating the financial forecasts:

> As the author of the financial projections that GENSKE-MULDER knew would be distributed to potential investors or financing sources for Valley Gold, including Plaintiffs, GENSKE-MULDER had a duty of due care to Plaintiffs to ensure that the financial projections met the industry standards for compilations and generally accepted accounting principals.

Doc. 330, ¶ 152.

### c)   Business Plan and Offering Memorandum

Genske Mulder asserts that no statement in the business plan or the risk factors Genske Mulder provided for the Offering Memorandum have been proven to be incorrect. Plaintiffs have provided no evidence to refute this argument. Summary judgment is GRANTED as to claims against Genske Mulder arising from omissions or misrepresentations in the business plan and Offering

Memorandum.

### d)   Other Allegations

It is undisputed that Valley Gold engaged Genske Mulder to provide limited professional services: to decide which accounting software Valley Gold should use; to provide monthly bookkeeping; to prepare Valley Gold's 2003 tax return; to compile financial forecasts; to compile the business plan; and to compile risk information for the operating agreement. Valley Gold did not engage Genske Mulder to investigate Mr. Vieria, to advise it about the Milk Producer's Fund, to investigate the viability and reputation of the New Jersey Distributor, Mr. Profaci, or to advise it about the sales price of cheese. Genske Mulder was not responsible for obtaining financing for Valley Gold. Summary judgment is GRANTED as to the allegations that Genske Mulder should have discovered Mr. Vieira's wrongdoings (TAC ¶ 158), should have advised Plaintiffs as to the Milk Fund (TAC ¶ 163), should have advised Plaintiffs as to the viability and reputation of the New Jersey distributor (TAC ¶ 166), and should have disclosed to Plaintiffs that Valley Gold was selling its cheese at a discount (TAC ¶ 172).

### 2.   Fourth Cause of Action: Securities Fraud, Securities Exchange Act of 1934

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

15 U.S.C. § 78j. Rule 10b-5, promulgated under Section 10(b)

makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b-5.

The elements of a claim under Section 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission; (2) scienter (i.e, knowledge of falsity or a wrongful state of mind); (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation (i.e., a causal connection between the material misrepresentation and the loss). *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-342, 125 S.Ct. 1627 (2005).

60

### a)  Material Misrepresentation or Omission

#### (1)  Primary Violator

Genske Mulder contends that it was not a primary violator for purposes of Rule 10b-5. A primary violation occurs where a defendant (i) signs a public filing containing a misstatement or (b) substantially participates or is intricately involved in the preparation of fraudulent statements even though that participation might not lead to the actor's actual making of the statements. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 & n.5 (9th Cir. 2000).

Here, it is undisputed that Genske Mulder prepared and signed the financial forecasts. There is a genuine issue of material fact whether Genske Mulder is a primary violator.

#### (2)  Omissions from Financial Forecasts

Plaintiffs assert that Genske Mulder's financial figures were based on known, false information, and that if Genske Mulder had drafted the financial forecasts based on all information known to them, the forecasts would have shown that Valley Gold could never be profitable.

Genske Mulder asserts that it did not include the penny per pound royalty in the financial forecasts because it was only effective upon Mr. Vieira's termination. Genske Mulder points to the Valley Gold minutes from the April 21, 2003 minutes, which provide: "Upon employee's termination for any reason, employee

gets a $0.01/pound royalty on all Company cheese sales for a period of ten years." Doc. 358-13, 5. Genske Mulder states that it did not include Mr. Vieira's and the other employee's bonuses in the financial forecasts because the bonuses were only paid on profits, and the financial forecasts. Genske Mulder contends that Plaintiffs have not offered any evidence that the 20 cent surcharge was disclosed to Genske Mulder before May 15, 2003, if ever. Genske Mulder asserts that it did not have a duty to update the financial forecasts after Valley Gold did not perform as forecasted. Genske Mulder does not address the allegations that the revenue projections in the Offering Memorandum were vastly different from the figures in the financial projections, and that the financial projections included incorrect cheese and milk prices.

There is a genuine issue of material fact on what data the financial forecasts were based. Genske Mulder contends that the financial forecast dated May 15, 2003 assumed that Valley Gold would receive 5 loads of milk per day from CVD. Plaintiffs contend that Genske Mulder's financial forecasts were based upon the Gustine plant processing 16.5 loads of milk per day in July 2003, and 21 loads of milk per day by October 2003, and 27 loads of milk per day starting in January 2004. Plaintiffs assert that the Gustine plant's maximum capacity was only 15 to 20 loads of

milk per day, and Mr. Vieira never planned to run the plant at full capacity to avoid overtime expense.

Plaintiffs contend that Genske Mulder's financial projections and the Offering Memorandum stated that the Gustine plant would need $700,000 in upgrades, including $500,000 for ricotta manufacturing equipment. Plaintiffs further contend that this ignores Mr. Vieira's calculations that the plant needed $2.5 million to $3 million in equipment repairs not including any ricotta equipment. Genske Mulder does not address this argument.

There are issues of material fact regarding whether Genske Mulder omitted material information from its financial forecasts that made the forecast false and misleading.

### b)   Scienter

Section 10(b) requires an element of scienter; it does not impose liability for negligence alone. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375 (1976). Scienter "refers to a mental state embracing intent to deceive, manipulate or defraud." *Id.* Recklessness is sufficient to support liability under Section 10(b). *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1283 (9th Cir. 1982). "Cases where intent is a primary issue generally are inappropriate for summary judgment unless all reasonable inferences that could be drawn from the evidence defeat the plaintiff's claims." *Id.* (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980)).

Genske Mulder contends that there is no evidence that Genske Mulder acted with intent to deceive, manipulate, or defraud, or with recklessness. There is a genuine issue of material fact whether Genske Mulder's alleged misrepresentations were such an extreme departure from the standards of ordinary care that they would constitute recklessness. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063 (9th Cir. 2000) ("Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.") (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (en banc) (internal quotation marks and citations omitted)).

### c)   Reliance

Genske Mulder moves for summary judgment on the basis that the individual Plaintiffs never read, and thus did not rely, on the financial forecasts.

Plaintiffs assert that even though they did not review the financial forecasts, they indirectly relied on Genske Mulder's representations. The TAC alleges that Genske Mulder:

> made representations to the management committee of Valley
> Gold, knowing and expecting that the substance of those
> representations would be communicated to Plaintiffs. For
> example, prior to April 22, 2003, GENSKE-MULDER prepared

1
2
3
4
5

> false and fraudulent financial projections similar to those
> that are attached hereto as Exhibit C, and GENSKE-MULDER
> presented them to, among others, John Nunes to demonstrate
> that the proposed cheese plant operations would meet cash
> flow needs and be viable. John Nunes relayed that
> information to various of the investors, including Mariana
> Lopes.

6
7

Doc. 330, ¶ 179. In the securities law context, a plaintiff may

rely on statements made indirectly to him. *See Zante v. Insurcorp*

8
9

*et al.*, 2010 WL 5477768, *7 (D. Nev. 2010); *see also Bell v.*

*Cameron Meadows Land Co.*, 669 F.2d 1278, 1283-84 (9th Cir.1982)

10
11

(reversing a district court's grant of summary judgment on a

federal securities fraud claim where triable issues of fact

12
13

remained as to indirect reliance).

14
15

Here, Joe Nunes told Mariana Lopes that "everything looks

fine." Plaintiffs contend that Mariana Lopes gave the financial

16
17

forecasts to her accountant, who read them on her behalf. Ms.

Miguel's deposition states that she received the financial

18
19

forecasts from other clients, Mr. and Mrs. Homan, not the Lopes.

Genske Mulder asserts that these financial forecasts have not

20
21

been produced and there is no evidence that Genske Mulder

authored the forecasts. Plaintiffs also point to Michael Lopes'

22
23

declaration, in which he asserts that Genske Mulder led a meeting

of Valley Gold investors and explained the financial forecasts to

24
25

them. Doc. 165, ¶ 13. Although Michael Lopes does not specify

26
27

when this meeting occurred, it creates a triable issue of fact of

not only indirect reliance, but direct reliance as well.

28

Under federal law, "[a] finding of nonreliance implies that plaintiffs would have acted no differently had they known the truth." *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1283 (9th Cir. 1982). Plaintiffs have asserted that they would not have invested in Valley Gold if they had known about the alleged misrepresentations upon which the Financial Forecasts were based and that Valley Gold could not be profitable.

There are genuine issues of material fact whether Plaintiffs relied on Genske Mulder's representations.

### d)   Loss Causation

Genske Mulder contends that Plaintiffs have not presented any evidence that they suffered any losses resulting from any act or omission of Genske Mulder. Genske Mulder contends that Valley Gold failed because: (1) it was flooded with milk by CVD; (2) Valley Gold did not get the forecasted financing because Plaintiffs would not give personal guarantees; and (3) the Valley Gold investors demanded repayment of their outstanding milk receivables in 2005.

Plaintiffs assert that if the Offering Memorandum had been accurate, i.e., if potential investors had known that Genske Mulder had not vetted the potential venture, Valley Gold would not have proceeded to purchase the Land O'Lakes plant but would have waited for another opportunity that would have had a chance to make a profit or break even. Plaintiffs' theory is tenuous.

For summary judgment, all inferences are drawn in favor of the non-moving party. This presents a genuine issue of material fact.

There are factual issues that preclude summary judgment on the Fourth Cause of Action. Genske Mulder's motion for summary judgment as to the Fourth Cause of Action is DENIED.

### 3.   Sixth Cause of Action: Negligence

"The elements of a cause of action for negligence are (1) a legal duty to use reasonable care, (2) the breach of that duty, and (3) proximate [or legal] cause between the breach and (4) the plaintiff's injury." *Mendoza v. City of Los Angeles*, 66 Cal.App.4th 1333, 1339, 78 Cal.Rptr.2d 525 (1998). "Proof of professional negligence requires testimony of experts as to the standard of care in the relevant community." *U.S. Fidelity & Guar. Co. v. Lee Investments LLC*, ---F.3d---, 2011 WL 1458793, *9 (9th Cir. 2011) (quoting *Huang v. Garner*, 157 Cal.App.3d 404, 413 (1984), *disapproved on other grounds by Aas v. Superior Court*, 24 Cal.4[th] 627 (2000)).

### a)   Breach of Accounting Standards in Preparing Financial Forecasts

The TAC alleges that Genske Mulder breached the accounting standards of care in creating the financial forecasts:

> As the author of the financial projections that GENSKE-MULDER knew would be distributed to potential investors or financing sources for Valley Gold, including Plaintiffs, GENSKE-MULDER had a duty of due care to Plaintiffs to ensure that the financial projections met the industry standards for compilations and generally accepted accounting

1    principals.

2    Doc. 330, ¶ 152. In its offer of proof, which the court

3    disregards as evidence, Plaintiffs assert that the applicable

4    standard of care for an accountant preparing compiled financial

5    statements is set forth in Section 19 of the Statement on

6    Standards for Accounting and Review Services ("SSARS 19").

7    Plaintiffs contend that under SSARS 19, Genske Mulder had the

8

9    following duties of care:

10        (1) the obligation to have knowledge of the accounting
          principles and practices of the industry in which the entity
11        operates (articles 1.34, 2.2, 2.3, 2.6 and 2.7); (2) the
          obligation to ensure that the compiled financial statements
12        are free from obvious material errors, including inadequate
          disclosure (article 2.12); (3) the obligation to ensure that
13        the compiled financial statements conform to information
          already known by the accountant and, if the statements
14        include material misstatements that management refuses to
          correct, to withdraw from the engagement (article 2.13) and
15        (4) the obligation to report to management and endeavor to
          correct misstatements that subsequently come to light
16        (article 2.47.)
17

18   Doc. 362, 3.

19        Even if the SSARS is judicially noticeable, Genske Mulder

20   points to the following sections of SSARS 19:

21        A compilation is a service, the objective of which is to
22        assist management in presenting financial information in the
          form of financial statements *without undertaking to obtain*
23        *or provide any assurance that there are no material*
          *modifications that should be made to the financial*
24        *statements in order for the statements to be in conformity*
          *with the applicable financial reporting framework*. Although
25        a compilation is not an assurance engagement, it is an
          attest engagement.
26

27   SSARS 19 § 1.5 (Doc. 358-23, Ex. W, 8) (emphasis added)

28

                                    68

1
2
3
4
5
6
7
8

A compilation differs significantly from a review or an
audit of financial statements. *A compilation does not
contemplate performance inquiry, analytical procedures, or
other procedures performed in a review. Additionally, a
compilation does not contemplate obtaining an understanding
of the entity's internal control; assessing fraud risk;
testing accounting records by obtaining sufficient
appropriate audit evidence through inspection, observation,
confirmation, or the examination of source documents, (for
example, cancelled checks or bank images); or other
procedures ordinarily performed in an audit. Therefore, a
compilation does not provide a basis for obtaining or
providing any assurance regarding the financial statements*.

9

SSARS 19 § 1.6 (Doc. 358-23, Ex. W, 8-9) (emphasis added).

10
11
12

When performing a compilation engagement, *the accountant has
no responsibility to obtain any evidence about the accuracy
or completeness of the financial statements*. As a result, a
compilation does not provide a basis for obtaining any level
of assurance on the financial statements being compiled.

13
14

SSARS 19 § 1.43 (Doc. 358-23, Ex. W, 18) (emphasis added).

15
16
17
18

The accountant should possess an understanding of the
industry in which the client operates, including the
accounting principles and practices generally used in the
industry, sufficient to enable the accountant to compile
financial statements that are appropriate in form for an
entity operating in that industry.

19

SSARS 19 § 2.6 (Doc. 358-23, 24).

20
21
22
23
24
25
26

The requirement that the accountant possess a level of
knowledge of the industry in which the client operates does
*not prevent the accountancy from accepting a compilation
engagement for an entity in an industry with which the
accountant has no previous experience*. It does, however,
place upon the accountant a responsibility to obtain the
required level of knowledge. The accountant may do so, for
example, by consulting AICPA guides, industry publications,
financial statements of other entities in the industry,
textbooks and periodicals, appropriate continuing
professional education, or individuals knowledgeable about
the industry.

27

SSARS 19 § 2.7 (Doc. 358-23, Ex. W, 24) (emphasis added).

28

69

> *The accountant is not required to make inquiries or perform other procedures to verify, corroborate, or review information supplied by the entity.* However, the accountant may have made inquiries or performed other procedures. The results of such inquiries or procedures, knowledge gained from prior engagements, or the financial statements on their faces may cause the accountant to become aware that information supplied by the entity is incorrect, incomplete, or otherwise unsatisfactory or that fraud or an illegal act may have incurred. The accountant should request that management consider the effect of these matters on the financial statements and communicate the results of such consideration to the accountant. Additionally, the accountant should consider the effect of management's conclusions regarding these matters on the accountant's compilation report. In circumstances when the accountant believes that the financial statements may be materially misstated, the accountant should obtain additional or revised information. If the entity refuses to provide additional or revised information, the accountant should withdraw from the engagement.

SSARS 19 § 2.13 (Doc. 358-23, Ex. W, 25-26) (emphasis added).

Mr. Hoekstra states in his deposition that all the assumptions underlying the financial forecasts came from Management Committee members. Doc. 342-4, 140. Genske Mulder asserts that its letter to Valley Gold management dated May 15, 2003 limits the scope of Genske Mulder's engagement and makes Genske Mulder not responsible for the financial forecasts, in accordance with SSARS 19. There are issues of material fact as to the scope of Genske Mulder's engagement and whether Genske Mulder omitted material information from its financial forecasts. It cannot be determined on summary judgment whether Genske Mulder breached the standard of care for accountants.

1

                    b)    Duty

2        "The existence of a legal duty to use reasonable care in a

3   particular factual situation is a question of law for the court

4   to decide." *Vasquez v. Residential Inv., Inc.*, 118 Cal.App.4th

5   269, 278, 12 Cal.Rptr.3d 846 (2004).

6        Privity of contract is generally required to establish a

7   professional negligence claim in California. *Giacometti v. Aulla,*

8   187 Cal.App.4[th] 1133, 1137, 114 Cal.Rptr.3d 724 (2010). Here, it

9   is undisputed that Valley Gold contracted Genske Mulder to

10  compile financial forecasts, the business plan, and a list of

11  risk factors; Genske Mulder did not contract with the individual

12  Plaintiffs to perform these services. Genske Mulder prepared

13  Raymond Lopes' tax returns and served as accountant for Joseph

14  Lopes, Michael Lopes, and Westside Holsteins, Joseph and Michael

15  Lopes' dairy, but did not advise them regarding the Valley Gold

16  investment. Genske Mulder never represented Manuel Lopes and

17  Mariana Lopes.

18       In determining whether to impose a legal duty in the absence

19  of privity of contract, courts examine the factors set forth in

20  *Biakanja v. Irving*, 49 Cal.2d 647, 320 P.2d 16 (1958):

21       The determination whether in a specific case the defendant
         will be held liable to a third person not in privity is a
22       matter of policy and involves the balancing of various
         factors, among which are the extent to which the transaction
23       was intended to affect the plaintiff, the foreseeability of
         harm to him, the degree of certainty that the plaintiff
24       suffered injury, the closeness of the connection between the
         defendant's conduct and the injury suffered, the moral blame

attached to the defendant's conduct, and the policy of preventing future harm....

*Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 398, 834 P.2d 745 (quoting *Biakanja*, 49 Cal.2d at 650-651). In *Bily*, the court applied the *Biakanja* factors and declined to "treat the mere presence of a foreseeable risk of injury to third persons as sufficient, standing alone" to impose liability for negligence. *Bily*, 3 Cal.4th at 399. The court's rejection was premised on three concerns: (1) liability would be "far out of proportion to its fault"; (2) the availability of "private ordering" among parties through contract; and (3) the costs to auditors of increased liability and decreased availability of auditing services outweigh the potential benefit of greater accuracy in reporting. *Id.* at 398. *Bily*'s analysis and concerns are applicable here. Genske Mulder's motions for summary judgment on the Sixth Cause of Action are GRANTED.

### 4.   Seventh Cause of Action: Intentional Misrepresentation

"'The necessary elements of fraud are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage.'" *Alliance Mortg. Co. v. Rothwell,* 10 Cal.4th 1226, 1239, 44 Cal.Rptr.2d 352 (1995) (quoting *Molko v. Holy Spirit Ass'n*, 46 Cal.3d 1092, 1108, 252 Cal.Rptr. 122 (1988)).

### a)   Duty

For intentional misrepresentation, a duty is owed to the "persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced." *Bily*, 3 Cal.4th at 415 (quoting Rest.2d Torts, § 531). A result is intended if:

> the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct. Thus one who believes that another is substantially certain to act in a particular manner as a result of a misrepresentation intends that result, although he does not act for the purpose of causing it and does not desire to do so.

Rest.2d Torts § 531, cmt. c. An actor has reason to expect a result if "he has information from which a reasonable man would conclude that the result will follow or would govern his conduct upon the assumption that it will do so." *Id.* at cmt. d.

Genske Mulder contends that Plaintiffs were not the intended users of the financial forecasts. Genske Mulder asserts that the financial forecasts were purposefully not included in the Offering Memorandum, which states: "NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OTHER THAN THAT CONTAINED IN THIS MEMORANDUM. . .." Doc. 307-2, 5. Pointing to Mr. Hoekstra's testimony, Genske Mulder contends that the intended use of the

forecasts was to seek and obtain a bank line of credit. Doc. 342-4, 14. It is undisputed that Genske Mulder's financial forecasts were initially included, but then removed from, the Offering Memorandum and not distributed to any of the individual Plaintiffs before they made their investment decision. Michael Lopes, however, testified that Genske Mulder led a meeting during which the financial forecasts were explained to potential investors. This evidence creates a material issue whether Genske Mulder intended Plaintiffs to rely on the financial forecasts.

There is also an issue of material fact whether Genske Mulder had reason to expect Plaintiffs to act or refrain from acting based on the financial forecasts. Genske Mulder worked as accountants for several of the Plaintiffs, their dairies and CVD, and had a long relationship with the dairy industry. Genske Mulder accountants attended CVD Meetings and the Management Committee were supplied the financial forecasts before April 22, 2003. If inferences are drawn in Plaintiffs' favor, given Genske Mulder's history with Plaintiffs, the Management Committee, and CVD, Genske Mulder should have had reason to expect Plaintiffs would rely on their financial forecasts – as presented by Genske Mulder at a meeting during which they explained the financial forecasts, through the Management Committee, and after the financial forecasts were distributed with the closing packets.

There are issues of material fact whether Genske Mulder owed

a duty to the individual Plaintiffs for purposes of the
intentional misrepresentation claim.

### b)   Scienter

Under California law, "[t]he requisite state of mind, or
scienter, for actual fraud or intentional misrepresentation is
disbelief in the truth of the statement, i.e., *knowledge of
falsity*." *Anderson v. Deloitte & Touche*, 56 Cal.App.4th 1468,
1476, 66 Cal.Rptr.2d 512 (1997) (quoting *Molko v. Holy Spirit
Assn.*, 46 Cal.3d 1092, 1108, 252 Cal.Rptr. 122 (1988)). Genske
Mulder's scienter is in dispute.

### c)   Reliance

California law permits claims for indirect
misrepresentations. "The maker of a fraudulent misrepresentation
is subject to liability ... to another who acts in justifiable
reliance upon it if the misrepresentation, although not made
directly to the other, is made to a third person and the maker
intends or has reason to expect that its terms will be repeated
or its substance communicated to the other, and that it will
influence his conduct in the transaction or type of transactions
involved." *Whiteley v. Philip Morris, Inc.*, 177 Cal.App.4th 635,
681, 11 Cal.Rptr.3d 807 (2004) (quoting Restatement Second of
Torts, § 533). As discussed above, there is an issue of material
fact whether Plaintiffs indirectly relied on Genske Mulder's
financial forecasts.

75

Issues of material fact preclude summary judgment. Genske Mulder's motions for summary judgment on the Seventh Cause of Action are DENIED.

### 5.   Eighth Cause of Action: Negligent Misrepresentation

The elements of negligent misrepresentation are "(1) a misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) ignorance of the truth and justifiable reliance thereon by the party to whom the misrepresentation was directed, and (5) damages." *Fox v. Pollack*, 181 Cal.App.3d 954, 962, 226 Cal.Rptr. 532 (1986).

### a)   Duty

For negligent misrepresentation, a duty is owed to the "person or class of persons to whom or for whom the representation is made. Even though the defendant should have anticipated that the misinformation might reach others, he is not liable to them." *Bily*, 3 Cal.4th at 408 (adopting the approach in Rest.2d Torts, § 552). Liability is "confined to cases in which the supplier 'manifests an intent to supply the information for the *sort of use* in which the plaintiff's loss occurs." *Id.* at 409. The Restatement of Torts § 552, Comment J explains:

> [T]he liability of the maker of a negligent misrepresentation is limited to the transaction that he

1
2

intends, or knows that the recipient intends, to influence, or to a substantially similar transaction.

3
4
5
6
7
8
9
10
11
12

Thus independent public accountants who negligently make an audit of books of a corporation, which they are told is to be used only for the purpose of obtaining a particular line of banking credit, are not subject to liability to a wholesale merchant whom the corporation induces to supply it with goods on credit by showing him the financial statements and the accountant's opinion. On the other hand, it is not necessary that the transaction in which the opinion is relied on shall be identical in all of its minute details with the one intended. It is enough that it is substantially the same transaction or one substantially similar. Thus, in the situation above stated, if the corporation, finding that at the moment it does not need the credit to obtain which the audit was procured, uses it a month later to obtain the same credit from the same bank, the accountants will remain subject to liability to the bank for the loss resulting from its extension of credit, unless the financial condition of the corporation has materially changed in the interim or so much time has elapsed that the bank cannot justifiably rely upon the audit.

13
14

REST 2d TORTS § 552, cmt. j. "Intent to influence is a threshold

15

issue." *Bily*, 3 Cal.4[th] at 771.

16
17
18
19
20
21
22
23
24
25
26

Genske Mulder contends that Plaintiffs were not the intended users of the financial forecasts, which were intended to seek and obtain a bank line of credit. It is undisputed that the financial forecasts were not included in the Offering Memorandum. Michael Lopes, however, testified that Genske Mulder led a meeting during which the financial forecasts were explained to potential investors. Drawing all inferences in Plaintiffs' favor, this creates an issue of material fact whether Genske Mulder intended the financial forecasts to influence potential investors in Valley Gold, including Plaintiffs.

27
28

77

Genuine issues of material fact preclude summary judgment. Genske Mulder's motions for summary judgment on the Eighth Cause of Action are DENIED.

F.   GENSKE MULDER'S MOTION FOR SUMMARY JUDGMENT AGAINST VALLEY GOLD (DERIVATIVE CLAIM)

Genske Mulder moves for summary judgment on Plaintiffs' derivative claim for negligence asserted on behalf of Valley Gold (Sixth Cause of Action).

1.   Procedural Issue

Plaintiffs contend that Genske Mulder's motion for summary judgment against Valley Gold is procedurally defective. As discussed above, a derivative action may be defeated if a defendant establishes that the corporation cannot prove its cause of action. *See Frederick*, 100 Cal.App.4th at 697.

2.   Statute of Limitations

Genske Mulder contends that Valley Gold's derivative claim was filed after the expiration of the statute of limitations.

Accounting malpractice claims are governed by a two-year statute of limitations. Cal. Code Civ. P. § 339(1). Courts have construed the statute of limitations as "requiring commencement of the suit no later than two years after the client discovered (or reasonably should have discovered) the accountant's negligence, and has suffered actual injury resulting from that negligence." *Sahadi v. Scheaffer*, 155 Cal.App.4th 704, 705, 66

78

Cal.Rptr.3d 517 (2007).

The original Complaint was filed September 11, 2006. Doc. 1. It is undisputed that Valley Gold's Management Committee knew that Mr. Vieira was the subject of criminal investigations before April 2003, that it knew Valley Gold could not pay for milk in September 2003, and that Mr. Vieira pled guilty to a felony in January 2004. Genske Mulder contends that no later than January 2004, the Valley Gold Management Committee knew Mr. Vieira had been investigated for criminal activity; that it was not able to pay its bills; and that it was selling its cheese at a discount. Genske Mulder's evidence, however, is more supportive of finding discovery of the allegations asserted against Downey Brand, not that Genske Mulder negligently prepared the financial forecasts.

Without pointing to any particular facts or offering any evidence to the contrary, Plaintiffs contend that Valley Gold did not learn of Genske Mulder's alleged negligence until after September 2005. Examining the evidence and drawing all inferences in Valley Gold's favor, it cannot be determined as a matter of law whether Valley Gold's derivative claim against Genske Mulder is time barred.

### 3.   Duty

Genske Mulder does not deny that it has a duty to Valley Gold. Genske Mulder correctly contends that its duty is limited to the scope of its engagement.

79

Summary judgment is GRANTED as to Valley Gold's derivative claims based on the allegations that Genske Mulder should have discovered Mr. Vieira's wrongdoings, should have advised Valley Gold as to the Milk Fund, should have advised Valley Gold as to the viability and reputation of the New Jersey distributor, and should have disclosed that Valley Gold was selling its cheese at a discount.

### 4.   Breach, Causation and Damages

There are material issues of fact as to whether Genske Mulder breached accounting standards and whether Genske Mulder caused Plaintiffs' damages.

Genske Mulder's motion for summary judgment as to Valley Gold's derivative claim is DENIED.

### 5.   Federal Rule of Civil Procedure 23.1(b)

Genske Mulder contends that the derivative claim asserted on behalf of Valley Gold is not verified, as required by Federal Rule of Civil Procedure 23.1(b).

Plaintiffs respond that objections to defects in pleading are properly raised by a Rule 12 motion shortly after a complaint is filed, not through a summary judgment motion, and by failing to raise this objection four years ago when the pleading was filed, Plaintiffs assert that Genske Mulder has waived the objection under Federal Rule of Civil Procedure 12(h). Citing *Johnson v. Courtier*, 2007 WL 3151802, *6, an unpublished district

court case, Plaintiffs assert that the failure to verify is a procedural defect which is easily cured by Plaintiffs' counsel's accompanying declaration; Plaintiffs attach a verification.

Federal Rule of Civil Procedure 23.1(b) requires that the complaint in a derivative action be verified, and that it "allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders ..., and the reasons for his failure to obtain the action or for not making the effort." Fed. R. Civ. Proc. 23.1(b). The rule's original purpose was to prevent strike suits. *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371, 86 S.Ct. 845 (1966). "Combined, Rule 11 and Rule 23.1 serve to assure the court 'that some person, party, attorney, advisor, or otherwise has responsibly investigated the allegations at the behest of the named plaintiff, who then stands behind the merits of the complaint.'" *In re MIPS Tech., Inc. Derivative Litig.*, 542 F.Supp.2d 968, 974 (N.D. Cal. 2008) (quoting *Rogosin v. Steadman,* 65 F.R.D. 365, 367 (S.D.N.Y. 1974).

Rule 23.1(b)'s verification requirement has rarely been the subject of litigation. 7C CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE, § 1827 (3d ed. 1995). "When a court finds that a complaint in a derivative suit lacks a valid verification, dismissal is appropriate under Rule 41(b), unless subsequent events demonstrate that the objectives of verification

have been satisfied." *Id.*; *In re MIPS Tech.,* 542 F.Supp.2d at 974 (dismissing unverified derivative complaint with leave to amend); *Glenbrook Cap. Ltd. Partnership v. Kuo*, 525 F.Supp.2d 1130, 1146 (N.D. Cal. 2007) (dismissing unverified derivative claim without prejudice with leave to amend).

Here, the TAC was not verified in accordance with Rule 23.1(b). Because subsequent events have demonstrated that the objectives of verification have been satisfied, the TAC will not be dismissed and Plaintiffs' late verification will be accepted.

## V.    CONCLUSION

For the reasons stated:

1.    Plaintiff's request for clarification is DENIED.

2.    Plaintiff's offer of proof is REJECTED.

3.    Downey Brand's motions for summary judgment as to Manuel and Mariana Lopes, Raymond Lopes, and Joseph and Michael Lopes are GRANTED as to claims regarding Valley Gold's business plan and the Sixth Cause of Action; and DENIED as to the Fourth, Seventh, and Eighth Causes of Action.

4.    Downey Brand's motion for summary judgment as to the derivative claim of Valley Gold is GRANTED.

5.    Genske Mulder's motions for summary judgments as to Manuel and Mariana Lopes, Raymond Lopes, and Joseph and Michael Lopes are GRANTED as to the Sixth Cause of Action, any misrepresentation claims regarding the

Offering Memorandum and business plan, and allegations that Genske Mulder should have discovered Mr. Vieira's wrongdoings, should have advised Plaintiffs as to the Milk Fund, should have advised Plaintiffs as to the viability and reputation of the New Jersey distributor, and should have disclosed to Plaintiffs that Valley Gold was selling its cheese at a discount; and DENIED as to the Fourth, Seventh, and Eighth Cause of Actions.

6.    Genske Mulder's motion for summary judgment is DENIED as to the derivative claim of Valley Gold.

7.    Downey Brand and Genske Mulder shall submit a proposed form of order as to their motions for summary judgment consistent with this memorandum decision within five (5) days following electronic service of this memorandum decision.

SO ORDERED.

DATED: May 16, 2011.

/s/ Oliver W. Wanger
Oliver W. Wanger
United States District Judge